IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ROBBINS, RUSSELL, ENGLERT ORSECK & UNTEREINER LLP, | : : : | UNDER SEAL |
|  | : | |
| Plaintiff, | : | Civil Action No. 1:07-cv-00554-JR |
|  | : | |
| v. | : | |
|  | : | |
| GARY KORNMAN, | : | |
|  | : | |
| Defendant. | : | |

RECEIVED

JUN - 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

Gary A. Orseck (Bar No. 433788)
Alan D. Strasser (Bar No. 967885)
Noah A. Messing (Bar No. 483185)
Matthew R. Segal (Bar No. 483486)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK & UNTEREINER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

Dated: June 8, 2007

This case is about a client who hires lawyers and then refuses to pay them for fees well earned. Adhering to the dictates of professional responsibility (see Rule 1.6 of the D.C. Rules of Professional Responsibility), our Complaint against Gary Kornman was as bare-bones – and shorn of details – as pleading rules allow. Now, precisely because we elected not to spread on the public record a full accounting of Kornman's conduct, the defendant has moved to dismiss the Complaint for want of sufficient detail.

At least we are not alone. Other counsel hired by Kornman in his criminal case, Dan Webb from the firm of Winston & Strawn, states that he was treated just as shabbily. His firm has likewise taken legal action against Kornman, in a case now pending in federal court in Dallas. See Civ. Action No. 3-07CV0968-N (N.D. Tex. May 31, 2007) (attached as Exhibit A) (stating that Kornman has bilked four law firms out of legal services). And like us, Winston & Strawn avers that it expended substantial time and resources on Kornman's behalf – only to be stiffed on its bills in the months before Kornman eventually pleaded guilty.[1]

As we show below, Kornman's motion to dismiss is meritless in all respects. With respect to the Contract claim, the Complaint alleges more than sufficient facts showing that Kornman, both directly and through his Dallas counsel, repeatedly expanded the work he asked Robbins Russell to do. Indeed, although Kornman refers to $300,000 in fees he paid to Robbins Russell from October 2004 through February 2006, he neglects to mention that most of those payments were for work well beyond the scope of the initial engagement.

With respect to the *quantum meruit* claim, the Complaint is again entirely sufficient. There is no requirement that Robbins Russell must plead – or, for that matter, even prove – that Kornman

---

[1] The Court may take judicial notice that Winston & Strawn is suing Kornman for refusing to pay for the legal work that he requested and received in his criminal case. *Chambers v. Gesell,* 120 F.R.D. 1, 1 (D.D.C. 1988) (taking judicial notice of other civil actions).

received an "actual benefit" from the services RREOU performed. And elemental pleading rules entitle a plaintiff to plead, in the alternative, both contractual and *quantum meruit* claims.

Finally, the Complaint sufficiently pleads the Account Stated claim as well. Merely because Kornman wanted Robbins Russell to perform additional services before he would pay his accrued unpaid bills – *some of which resulted in work product he later used in public filings, under other lawyers' names* – is not a legal basis for dismissing this cause of action.

## FACTUAL BACKGROUND

In August 2004, the Securities and Exchange Commission accused Kornman of "repeated insider trading." See 8/18/2004 SEC Complaint ¶ 1 (attached at Exhibit B). The SEC sought to enjoin Kornman from selling securities, to fine him, and to disgorge his allegedly unlawful profits. *Id.* at ¶ 5. Approximately six weeks later, Kornman engaged Robbins Russell to represent him in the SEC's civil action. Complaint ¶ 8. Kornman specifically asked Robbins Russell to "research issues relating to the SEC's rulemaking authority and prepare a possible motion to dismiss" the SEC's complaint. 10/5/2004 Engagement Letter ¶ 1 (attached as Exhibit C); see also Complaint ¶ 8. The letter also reflected, more generally, that Kornman was "engaging [Robbins Russell] to represent [Kornman] in connection with the above-referenced litigation." Exhibit C at 1. The "above-referenced litigation" was the SEC's case against Kornman.

Before long, both Kornman and his local counsel, Jeff Tillotson, instructed Robbins Russell to perform additional work that went beyond the specific tasks mentioned in the engagement letter. Complaint ¶ 11. Kornman then expanded the scope of Robbins Russell's responsibilities after the United States Attorney's Office for the Northern District of Texas indicted Kornman on charges of insider trading and making false statements to the SEC. See Indictment in *United States v. Kornman*,

No. 3:05-CR-0298P (N.D. Tex.) (attached as Exhibit D). Kornman and Tillotson *both* asked Robbins Russell to represent Kornman in his criminal case, and the firm duly entered its appearance in that case. Complaint ¶ 11 ("Pursuant to requests by Kornman and . . . Tillotson, acting at Kornman's direction, Robbins Russell expanded the scope of the services it provided" to Kornman); *Kornman*, No. 3:05-CR-0298P (N.D. Tex.) (Dkt. 20-22) (available on PACER). On April 9, 2007, Kornman pleaded guilty to making a false statement to the SEC. *Id.*, Dkt. 163-65.

Kornman paid all of his bills through February 2, 2006. Complaint ¶ 11. Beginning with the March 3, 2006 invoice, however, Kornman simply stopped paying. *Id.* at ¶ 15. Although Robbins Russell continued to bill Kornman for the additional work he requested, he failed to pay these invoices. *Id.* Significantly, however, Kornman never denied that he owed the money. *Id.* at ¶ 16. To the contrary, he "acknowledged [his] obligation to pay in full the outstanding invoices." *Id.* at ¶ 17. But while Robbins Russell repeatedly asked Kornman to pay his debts – and although both Kornman and Tillotson acknowledged Kornman's obligation to pay – Kornman never did so. *Id.*

Robbins Russell continued to perform legal work (at Kornman's and Tillotson's request) until approximately October 2006. *Id.* at ¶ 17. On October 24, 2006, Kornman spoke with Lawrence Robbins (who is a partner at Robbins Russell) about the unpaid invoices. *Id.* at ¶ 17. Kornman once again "acknowledged that he owed Robbins Russell the amounts listed in the outstanding invoices." *Id.* Kornman asked Robbins Russell to perform even more legal work; he threatened that he would not pay the prior invoices unless Robbins Russell performed additional legal work. *Id.* Kornman's debts, however, were seven months overdue, so Robbins Russell rejected Kornman's demand that the firm perform still more work before he would pay any of his previous bills. *Id.* at ¶ 18.

-3-

On October 31, 2006, and again on November 8, 2006, Lawrence Robbins sent written letters to Kornman formally requesting payment. *Id.* at ¶ 18. Kornman continued to withhold payment. *Id.* at ¶ 17. He presently owes $149,021.29 to Robbins Russell (exclusive of interest, costs, and attorney's fees for provoking this litigation). *Id.* at ¶ 18.

### ARGUMENT

**I.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT KORNMAN EXPANDED THE SCOPE OF HIS ORIGINAL ENGAGEMENT WITH ROBBINS RUSSELL, AND THUS THE CONTRACT CLAIM IS NOT SUBJECT TO DISMISSAL**

In a letter dated October 2004, Kornman engaged Robbins Russell to represent him in the SEC litigation. Exhibit C at 1. The contract enumerated particular projects that Kornman had already specified, but did not preclude Robbins Russell from performing additional tasks. *Id.* ("You are engaging this Firm to represent you in connection with the above-referenced [SEC] litigation"). Some of Kornman's unpaid bills relate to the SEC litigation. That work is covered by the engagement letter. Kornman must pay those bills.

Thereafter, Kornman and his agents repeatedly expanded the scope of Robbins Russell's work to include additional aspects of the SEC case and the related criminal case (which had not yet been indicted at the time Kornman hired Robbins Russell). As alleged in the Complaint, "*[p]ursuant to requests by Kornman and his Texas counsel, Jeff Tillotson, acting at Kornman's direction*, Robbins Russell expanded the scope of the services it provided" to Kornman. Complaint ¶ 11 (emphasis added).

Kornman asked Robbins Russell to perform additional work. Robbins Russell agreed. Robbins Russell charged Kornman for the work at the same rates as set forth in the engagement letter. Not only did Kornman fail to object – he paid several bills that covered the expanded scope

-4-

of work. These facts show that the parties agreed to expand the scope of the initial engagement letter.

D.C. law uniformly allows parties to modify their agreements in precisely this manner: Parties may mutually assent to expand the scope of a contract, and that agreement may be (i) made orally or (ii) inferred from the parties' conduct. "Under contract law, it is well-settled that a written contract may be orally modified or rescinded by a subsequent oral agreement . . . ." *Clark v. Clark*, 535 A.2d 872, 876 (D.C. 1987); see also *Hildreth Consulting Engineers, P.C. v. Larry E. Knight, Inc.*, 801 A.2d 967, 974 (D.C. 2002) ("Contracting parties may modify a written agreement by subsequent oral communications"); *Gagnon v. Wright*, 200 A.2d 196, 198 (D.C. 1964) ("Written agreements may be modified by subsequent oral agreement"); *Wesley v. Shaftel*, 170 A.2d 923, 924 (D.C. 1961) ("It is by no means a novel doctrine that parties to a contract may modify, rescind or discharge it by subsequent oral agreement"); accord *Nickel v. Scott*, 59 A.2d 206, 207 (D.C. 1948). Additionally, courts have held that "parties could modify the written agreement *by subsequent conduct, including acquiescence* . . . ." *Nolan v. Nolan*, 568 A.2d 479, 485 (D.C. 1990) (emphasis added); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App. 1997) ("the [trial] court easily could have found mutual assent based upon the acts and conduct of the parties."). Thus, parties may modify written agreements by either (i) an oral agreement or (ii) their conduct.

As the Complaint plainly alleges, Kornman modified the engagement letter in *both* of these ways. He asked for additional work, and Robbins Russell agreed. The Complaint alleges (accurately) that Kornman or his agent Tillotson authorized all of the work that Robbins Russell performed. Complaint ¶ 11. That reflects an oral agreement to expand the contract. Additionally, Kornman's conduct shows that he expanded the agreement because he accepted additional legal

work (*i.e.*, by requesting it, paying for some of it, recognizing his obligation to pay for it, and not objecting to any of it). Not only do the allegations suffice to withstand a motion to dismiss, but Kornman's conduct would quite easily allow a *jury* to conclude that the parties had expanded the scope of their initial engagement letter.

Kornman professes surprise that Robbins Russell is now suing to recover for work beyond the two specific projects enumerated in the October 2004 engagement letter. Yet Kornman paid invoices *for more than a year* that had *nothing* to do with the two projects enumerated in the engagement letter (*i.e.*, the SEC's rulemaking authority and a possible motion to dismiss). For example, on February 13, 2006, Kornman paid – in full – an invoice dated February 2, 2006 in the amount of $26,831.89 for services performed in January, 2006 in the SEC case beyond the scope of the October 2004 engagement letter *and* for services performed in the criminal case.[2] If Kornman had thought that Robbins Russell was performing work he had not requested, he had more than a year to object to the invoices. Instead, he paid them. Again, not only do the allegations suffice on a motion to dismiss, but Kornman's conduct would almost surely persuade a jury that he authorized the work for which Robbins Russell billed him.

Thus, Kornman's oral agreements with Robbins Russell and his conduct flatly refute Kornman's audacious claim that "Kornman has no contractual obligation to the firm based on any

---

[2] Robbins Russell's Complaint refers to and relies on the many invoices that it submitted to Kornman. Complaint ¶ 12. A party opposing a motion to dismiss may rely on documents cited in its complaint. See *Oparaugo v. Watts*, 884 A.2d 63, 76 n.10 (D.C. 2005) ("[T]he documents involved were referenced in the complaint and are central to appellant's claim. Therefore, the trial court could consider them in connection with the motion to dismiss . . . ."). Out of an abundance of caution, we have not actually attached any invoices, including the January 2006 invoice on which we have based the representations in text above. Should the Court deem it necessary, we are fully prepared to submit all of our invoices to the Court

work other than the carefully-defined scope found in the plain language of the contract."[3] Kornman Mot. 7. His oral agreements and conduct foreclose that argument.

The engagement letter, of course, gave Kornman the right to terminate Robbins Russell at any time. Exh. 2 at ¶ 5. Had Robbins Russell performed unauthorized or valueless work, Kornman presumably would have fired his lawyers. Rather than terminate the retention agreement, however, Kornman demanded more and more of Robbins Russell's services. Thus, even in October 2006 (after failing for seven months to pay for the work he had requested), Kornman asked Robbins Russell to perform still more work. That request is inconsistent with a conclusion that Robbins Russell was performing unauthorized work month after month. And even if a jury *could* ultimately find that Kornman did not request any additional work, the Complaint states a breach of contract claim with enough specificity to survive the pleading stage. See *Erickson v. Pardus*, No. 06-7317, 2007 WL 1582936, at *3 (U.S. June 4, 2007) (Rule 8 "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.") (citations and internal quotation marks omitted).

## II.    THE *QUANTUM MERUIT* CLAIM IS SUFFICIENTLY PLEADED

Kornman advances two arguments to dismiss Robbins Russell's *quantum meruit* claim. First, he alleges that the existence of a contract (*i.e.*, the engagement letter) precludes Robbins Russell from seeking a *quantum meruit* recovery as an alternative theory of damages. Second,

---

[3] That assertion is of a piece with Kornman's inexplicable claim that Robbins Russell allowed "a substantial passage of time before addressing billing issues . . . ." Kornman Mem. at 1. Presumably, Kornman's counsel did not speak with his client or with Tillotson before submitting that sentence to the Court.

Kornman contends that Robbins Russell must plead that the unpaid-for work provided an "actual benefit" to Kornman. Neither argument has any legal basis.

### A.    Robbins Russell Is Entitled To Plead Breach Of Contract And *Quantum Meruit* In The Alternative

When we reach the merits stage of the case, we expect that the jury (or this Court, on summary judgment) will likely conclude that Kornman is contractually obligated to pay Robbins Russell for the work that it performed. And a recovery on a contractual basis may well preclude *quantum meruit* recovery as double counting. At the pleading stage, however, it is black letter law that a plaintiff is permitted to allege *both* theories (even if, in the end, it recovers only on one of them). *North Am. Graphite Corp. v. Allan*, 184 F.2d 387, 389 (D.C. Cir. 1950) ("[N]o election is required between contract and quasi-contract. The two remedies may be joined and pursued in the same action."); *Illustro Sys. Int'l, LLC v. IBM*, 2007 WL 1321825, *14 (N.D. Tex. May 4, 2007) (slip copy) (allowing plaintiff to plead contract and unjust enrichment in the alternative); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) ("assertion of a breach of contract claim does not preclude [plaintiff] from pleading an unjust enrichment claim in the alternative"); *Houston v. Southern Elec. Services, Inc.*, 2007 WL 1228549, *3 n.3 (Tex. App. Apr. 26, 2007) ("[T]he City also complains that it is inconsistent to plead both breach of contract and *quantum meruit*. However, SES's claim for *quantum meruit* is clearly an alternative pleading."); *Auguston v. Spry*, 282 A.D.2d 489, 491 (N.Y. App. 2001) ("causes of action alleging breach of contract and unjust enrichment may be pleaded alternatively."); *Schwartz v. Swartz*, 723 A.2d 841, 842 (D.C. 1998) (observing that plaintiff won jury trial in which he filed an "action for quantum meruit, breach of contract, and unjust enrichment").

It may be added that Kornman seeks to have it both ways. On the one hand, he contends that he had a valid contract with Robbins Russell that was too narrow to cover the many months of legal work he accepted without challenge. On the other hand, he contends that the very existence of this contract absolves him from having to pay *quantum meruit* damages. In truth, *both* of those propositions are false: The written agreement is sufficient (because it was expanded to cover all of the billed work); and *quantum meruit* is available as an alternative remedy.

## B.    Robbins Russell Properly Pleaded That Its Services Were Valuable

Kornman also seeks to dismiss our *quantum meruit* claim because we ostensibly failed to allege that our legal services provided an "actual benefit" to Mr. Kornman. Kornman Mem. at 10. That contention is flawed at every turn.

*First*, Kornman misstates the applicable legal standard. Robbins Russell needs to allege only that its services were "valuable," not that its services provided Kornman with some measurable, tangible benefit. Under Kornman's theory of the law, lawyers would never get paid when they lose – but that is true only when a lawyer expressly agrees to be paid on a *contingent* basis (which is ethically forbidden in a criminal case). Indeed, a rule that clients need not pay in *quantum meruit* unless they secure a tangible benefit makes especially bad sense in cases like this one – *in which the client used the legal work he didn't pay for and then decided to plead guilty*. Because Kornman pleaded guilty to lying to the SEC before his pretrial motions were resolved, there is no way of knowing whether the work Robbins Russell performed at his direction would, in time, have yielded him a tangible benefit. Fortunately, the law imposes no such obligation, either at the merits stage or (especially) at the pleadings stage. Robbins Russell fully discharged its pleading burden by alleging that it "performed valuable legal services on Kornman's behalf." Complaint at ¶ 25.

Indeed, Robbins Russell went on to describe the nature of this valuable work, noting that it included "the preparation of a variety of motions and the performance of an array of legal research, in both the SEC litigation and criminal litigation." *Id.* at ¶ 11.

That level of detail suffices to defeat a motion to dismiss. See *Fred Ezra Co. v. Pedas*, 682 A.2d 173, 177 (D.C. 1996) ("Paragraph fifteen of the complaint satisfies the third element in alleging, '[appellees] [have] received *valuable* consideration from the efforts of [appellant] in introducing the purchaser of the Property to [appellees] and in providing the purchaser with knowledge of the Property and information concerning the Property as well as arranging for the purchaser to view the Property and to be introduced to and meet with representatives of [appellees].'") (emphasis added). The Complaint is properly pleaded under *Fred Ezra*. And more generally, courts are simply not as demanding as Kornman insists, especially given policy concerns about forcing law firms to describe how much more severe a client's sentence or civil fine would be if not for the firm's services. Robbins Russell has sufficiently alleged that its services were valuable.[4]

*Second*, even *if* the Complaint needed to plead facts to show that Kornman benefitted from Robbins Russell's work, the Complaint would meet even that standard. Among other things, the Complaint states that Kornman "sought additional legal services from Robbins Russell as recently as October 24, 2006." Complaint at ¶ 26; see also *id.* at ¶ 17. A jury could (and should) infer that Kornman benefitted from Robbins Russell's services because he wanted more of the firm's work.

---

[4] Kornman inexplicably relies on *Johnson v. Long Beach Mortgage Loan Trust 2001-4*, 451 F. Supp. 2d 16, 27 (D.D.C. 2006), to suggest "[a] claim cannot survive Rule 12(b)(6) based on a conclusory allegation that the firm provided 'valuable' services." Kornman Mem. at 10 n.36. But *Johnson* does not even mention *quantum meruit* standards.

Additionally, Kornman paid for *some* work that was beyond the express scope of his engagement letter. *Id.* at ¶¶ 14-15. That fact would allow a jury to infer that the work benefitted him; otherwise, Kornman would, presumably, have objected to those bills. And finally, *after* he had been billed, Kornman recognized his obligation to pay for the work that Robbins Russell performed. *Id.* at ¶ 17. Again, a jury could easily infer that the work benefitted him, or else he would have disputed his obligation to pay for it. In sum, the Complaint alleges more than enough facts to withstand not only a motion to dismiss, but for a jury to conclude that Kornman benefitted from the work that Robbins Russell performed but for which Kornman did not pay.

Moreover, Robbins Russell will, in time, produce substantial evidence that Kornman relied extensively on Robbins Russell's work product. Kornman filed papers that plainly were modeled on and drew in detail from drafts that Robbins Russell had prepared. The very existence of these filings suggests that Kornman benefitted from the work that Robbins Russell performed without pay.[5]

*Finally,* and in any event, Kornman's "no benefit" argument presents a disputed issue of fact and, as such, cannot be resolved on a motion to dismiss. Robbins Russell is certainly entitled to discovery to assess whether, and to what extent, its work has been valuable to Kornman. Thus, Kornman's reliance on *Novecon Ltd. v. Bulgarian-American Enterprise Fund*, 967 F. Supp. 1382 (D.D.C. 1997), is misplaced. *Novecon* was resolved on summary judgment, not a motion to dismiss; thus, plaintiffs had an opportunity to conduct discovery into how its services allegedly helped the

---

[5] If the Court believes that a more detailed pleading is needed, we would be happy to provide it with copies of our work product and of documents that other attorneys later filed on Kornman's behalf so that the Court may compare these filings side-by-side.

defendant. See *id.* at 1389 ("it is clear *from the record* that such work . . . resulted in nothing of value to [defendant]") (emphasis added).

At heart, Kornman is simply trying to avoid paying for work that he requested and that helped him in cases in which the government accused him of violating the nation's securities laws and making false statements. Whether under contract law or a *quantum meruit* theory, Kornman must pay Robbins Russell for the work that, at Kornman's request, it performed for him.

## III.    ROBBINS RUSSELL HAS SUFFICIENTLY ALLEGED THAT ITS INVOICES TO KORNMAN ARE AN ACCOUNT STATED

Kornman challenges Robbins Russell's "account stated" theory because, he contends, "more services [were] owed to him." Kornman Mem. at 10. The Complaint, however, does not support this factual claim, and the Court may not consider extra-record allegations on a motion to dismiss. The Complaint does *not* state that Kornman believed that he was *owed* more services. Rather, he just *wanted* more services. Complaint ¶ 17 ("Kornman . . . insisted that Robbins Russell perform additional legal work before Kornman would agree to pay the amounts owed."). But Kornman also fully recognized the validity of the invoices. *Id.* at ¶ 16 ("Neither Kornman nor anyone on Kornman's behalf has denied that Robbins Russell's invoices are outstanding and valid."); *id.* at ¶ 17 ("Kornman [has] acknowledged Kornman's obligations to pay in full the outstanding invoices.").

Kornman's motion to dismiss the Account Stated claim must be denied because the Complaint pleads that Kornman agreed to pay the invoices. An "account stated" exists between a lawyer and a client when they agree on the amount that the client will pay for the legal services. *Dale Hilton, Inc. v. Rotwein*, 130 A.2d 312, 312-13 (D.C. 1926). Here, Robbins Russell sent Kornman invoices, Complaint ¶ 12, and Kornman "acknowledged [his] obligation to pay in full the

outstanding invoices." *Id.* at ¶ 17.  Kornman's conduct therefore falls within the *Dale Hilton* case; he agreed to the amount in those invoices so there is an account stated.  *Id.* at ¶ 17.  And even if he *tried* to rescind this admission of liability when he "insisted that Robbins Russell perform additional legal work," *Dale Hilton* expressly held that a client cannot unilaterally negate an account stated. *Dale Hilton*, 130 A.2d at 313 (finding "evidence fully supported the finding of an account stated even when client's president "later changed his position" and tried to renege).

It does not undermine Robbins Russell's account stated claim that Kornman tried to squeeze more work out of Robbins Russell.  If Kornman wants to allege that Robbins Russell failed to perform some condition precedent to receiving payment, he may raise that argument as an affirmative defense, and the parties can conduct discovery into his argument.  But on the face of the Complaint, there is no basis to conclude that Kornman was due any further services.

## CONCLUSION

For the foregoing reasons, Robbins Russell respectfully asks that the Court deny Kornman's Motion To Dismiss.

Dated: June 8, 2007

Respectfully submitted,

Gary A. Orseck (Bar No. 433788)
Alan D. Strasser (Bar No. 967885)
Noah A. Messing (Bar No. 483185)
Matthew R. Segal (Bar No. 483486)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK & UNTEREINER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

**Attorneys for Plaintiff Robbins, Russell, Englert,
Orseck & Untereiner LLP**

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June, 2007, I caused copies of the foregoing to be served BY HAND DELIVERY in an envelope marked "DOCUMENTS UNDER SEAL," on:

Orlando E. Vidal, Esq.
SULLIVAN & WORCESTER LLP
1666 K Street, N.W., Suite 700
Washington, D.C. 20006
(Counsel for Defendant Gary Kornman)

Noah A. Messing

-15-



ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY 3 1 2007

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| GARY M. KORNMAN, | § | |
| | § | |
| Plaintiff/Counterclaim Defendant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| WINSTON & STRAWN LLP, | § | **3-07CV0968-N** |
| | § | |
| Defendant/Counterclaim Plaintiff. | § | |

## WINSTON & STRAWN LLP'S ORIGINAL ANSWER AND COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Winston & Strawn LLP ("Winston") files this Original Answer and Counterclaims in response to the Original Petition ("the Petition") filed by Plaintiff Gary M. Kornman ("Kornman").

### ORIGINAL ANSWER

1.     The allegations in paragraph 1 of the Petition require no response as they concern (1) Plaintiff's alleged state of mind concerning his intentions as to discovery and (2) state court discovery procedures which are no longer applicable in this case subsequent to the removal of the case to federal court. To the extent any response is required, Winston denies the allegations in paragraph 1 of the Petition.

2.     Winston admits the allegations of paragraph 2 of the Petition.

3.     Winston admits that it is a law firm organized as a limited liability partnership under the laws of Illinois. Winston admits that it is located at 35 W. Wacker Drive, Chicago, Illinois, 60601. Winston denies the remaining allegations of paragraph 3 of the Petition.

4.     Winston denies the allegations of paragraph 4 of the Petition.

5.     Winston denies the allegations of paragraph 5 of the Petition.

6.      Winston admits that, in 2006, Kornman retained Winston to represent him in two litigation matters, specifically, *United States v. Kornman*, No. 305-CR-0298P (N.D. Tex.) (the "Criminal Action") and *SEC v. Kornman*, No. 3:04CV1803L (N.D. Tex.) ("the SEC Action") (collectively, the "Litigation Matters"). Winston admits that Dan K. Webb ("Webb") is a partner of Winston and that Winston agreed to provide legal services in connection with the Litigation Matters. Winston denies the remaining allegations of paragraph 6 of the Petition.

7.      Winston admits that, on several occasions in the Criminal Action, Kornman requested continuances of the trial date in that case, and that some of those requests for continuances were granted. Winston admits that attorneys and timekeepers of Winston other than Webb worked on the Litigation Matters. Winston denies the remaining allegations of paragraph 7 of the Petition.

8.      Winston denies the allegations of paragraph 8 of the Petition.

9.      Winston incorporates by reference all of its answers to paragraphs 1 to 8 of the Petition.

10.     Winston admits that Winston and Kornman entered into a contract and agreement for the provision of legal services and payment for those services. Winston denies the remaining allegations of paragraph 10 of the Petition.

11.     Winston denies the allegations of paragraph 11 of the Petition.

12.     Winston incorporates by reference all of its answers to paragraphs 1 to 11 of the Petition.

13.     Winston denies the allegations in paragraph 13 of the Petition.

### Affirmative Defenses

14.     Kornman's claims are barred by estoppel.

15. Kornman's claims are barred by waiver.

16. Kornman's claims are barred by unilateral mistake.

17. Kornman's claims are barred by ratification.

18. Kornman's claims are barred by failure to mitigate damages.

## COUNTERCLAIMS

### Preliminary Statement

1. These counterclaims arise out of Kornman's breach of contract, fraud, and intentional theft of legal services from Winston.

2. During the period from approximately December 2006 through March 2007, Kornman specifically engaged and directed Winston to perform various legal work in connection with a then-pending federal criminal case in which Kornman was a defendant, *United States v. Kornman*, No. 305-CR-0298P (N.D. Tex.) (the "Criminal Action"), and then failed to pay for those legal services.

3. Kornman's conduct breached his written and oral agreements with Winston, which called for Kornman to pay Winston's fees and expenses for legal work Winston performed on the Criminal Action. Moreover, Kornman's conduct amounted to fraud and intentional theft of legal services in that Kornman knowingly and falsely misled Winston and its attorneys into believing that he would pay for the legal work that he knew Winston was performing and had directed Winston to perform for him, when in reality he had no intention of paying for that work and, ultimately, did not pay for that work.

4. As a result of Kornman's breach of contract, fraud, and theft of services, Winston has not been paid $920,188.60 that Kornman owes Winston for legal work performed in connection with the Criminal Action.

## Jurisdiction

5.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because the

parties are completely diverse and the amount in controversy, exclusive of interests and costs, is

at least $920,188.60 and, therefore, exceeds $75,000.

6.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the

events giving rise to the counterclaims arose in this District.

## Parties

7.      Winston is an international law firm with its principal place of business in

Chicago, Illinois and domestic offices in Chicago, New York, Los Angeles, Washington, D.C.

and international offices in Geneva, London, Moscow, and Paris. None of the partners of

Winston is a resident of Texas.

8.      Kornman is a resident of Texas residing at 3640 Haynie Avenue, Dallas, Texas,

75205.

## Factual Background

9.      In February 2006, Kornman and Winston entered a written legal services

agreement (the "Service Agreement") pursuant to which Kornman and Winston agreed that

Winston would represent Kornman in the Criminal Action.

10.     In the Criminal Action, Kornman was charged with committing four federal

crimes: two counts of securities fraud, in violation of Title 15, United States Code, Sections

78j(b) and 78ff; one count of making false statements to attorneys from the Securities and

Exchange Commission ("SEC") in violation of Title 18, United States Code, Section 1001; and

one count of obstruction of justice, in violation of Title 18, United States Code, Section 1519.

11.    The Service Agreement provided that Webb and other Winston attorneys would perform work for Kornman. The Service Agreement specifically stated that "other [Winston] attorneys and legal assistants" would, "as necessary," perform work for Kornman and provided the range of hourly billing rates for Winston partners, associates and legal assistants.

12.    The Service Agreement provided that Kornman was responsible for all costs and expenses incurred by Winston in performing its legal services.

13.    The Service Agreement also provided that Winston would issue monthly bills on the matter and that Kornman was obligated to pay the monthly bills within 30 days of receiving the bills.

14.    In early 2006, when considering whether to engage Winston, Kornman gave a personality test to not only Webb, but also to Winston partners Lawrence R. Desideri ("Desideri") and Kevin J. Narko ("Narko"). Kornman did this because, from the outset of the engagement, he knew that lawyers other than Webb would be working on the Litigation Matters.

15.    Winston began working for Kornman in February 2006. From the inception of the engagement, attorneys other than Webb performed work on the engagement. Throughout 2006, Kornman was aware that attorneys other than Webb were working for him and consented to and directed that they be involved in performing work on the engagement.

16.    Winston began billing Kornman in March 2006. During the period from March 2006 through October 2006, Winston issued to Kornman eight monthly bills for work performed in February 2006 through September 2006. The very first bill, issued March 27, 2006, billed solely for work performed by Desideri. The other bills issued during this time frame billed for work performed not only by Webb, but also by six other attorneys (Desideri, Narko and four associates) and two paralegals. Kornman paid each of these bills in full. As reflected by these

bills and Kornman's payment of them in full, Kornman knew, intended and directed that various Winston attorneys and timekeepers would be performing work in connection with the Litigation Matters and knew and understood that this was in accordance with both the Service Agreement and his express desires and directives.

17.    Beginning in late 2006 and continuing into March 2007, Kornman caused and directed Winston to continue to perform legal work for him in connection with the Criminal Action, but he intentionally failed to pay for the legal services rendered by Winston.

18.    Kornman led Winston to believe that he would pay for its services when he had no intention of doing so.

19.    Winston was not the only law firm victimized by Kornman in connection with the Criminal Action.

20.    Prior to December 2006, Kornman had separately engaged the law firm of Robbins, Russell, Englert, Orseck & Untereiner LLP ("Robbins Russell") to perform work in connection with the Criminal Action and caused Robbins Russell to perform approximately $149,021.29 in legal services for which he then refused to pay.

21.    Also prior to December 2006, Kornman had separately engaged the law firm of Monico, Pavich & Spevack ("Monico Pavich") to perform legal work in connection with the Criminal Action and had caused Monico Pavich to perform in excess of $20,000.00 in legal services for which he then refused to pay.

22.    Also prior to December 2006, Kornman had separately engaged the law firm of Foley & Lardner LLP ("Foley") to perform legal work in connection with the Criminal Action and had caused Foley to perform approximately $45,000.00 in legal services for which he then refused to pay.

27.     On February 5, 2007, Michels met with Kornman to discuss case strategy, trial preparation, and related matters. Michels was joined at this meeting by Winston partner Neil M. Murphy ("Murphy"), Tillotson, and others. During the meeting, which lasted most of the working day, Kornman expressly directed Michels and Murphy to begin various trial preparation tasks and case analysis and to assemble a team of attorneys to work on trial preparation and related matters. Kornman also administered a personality test to both Michels and Murphy.

28.     At Kornman's express direction, in about early February, Michels put together a team of Winston attorneys to work on trial preparation and related matters, and the team began working on trial preparation and a variety of related tasks, including motions and case analysis. Kornman expressly advised Michels to direct a team of Winston attorneys beyond simply himself and Murphy to work on trial preparation, motions, case analysis, and related matters.

29.     On February 12, 2007, Michels sent a letter to Kornman detailing many of the types of tasks that would be completed as part of the trial preparation and other work that Winston would be performing on the Criminal Action and provided Kornman with the names of Winston attorneys who would be working extensively on the matter. The letter noted that, as a result of the intensive trial preparation and other work that was required, the February and March bills would be in the range of $500,000-$600,000. Kornman approved of this budget. At no time did Kornman ever question or challenge the budget, or question or challenge the list of tasks that Michels indicated, both orally and in the February 12 letter, that Winston would be performing. Rather, Kornman expressly indicated that he desired that Winston, including Michels and the team of lawyers outlined in the February 12 letter, work on trial preparation and related matters as outlined in the February 12 letter.

8

30.    Relying on Kornman's specific instructions to work in earnest toward going to trial and his assurances that he would pay his growing legal bills, Michels and his team forged ahead with their work as outlined in the February 12 letter and in other discussions with Kornman. Among the trial preparation and related tasks that Winston performed for Kornman in February and March 2007 were: substantial research and briefing in connection with a motion to dismiss the obstruction of justice count; research for and preparation of various pretrial motions; research for and preparation of various motions *in limine*; research for and preparation of jury instructions; research for and analysis of various discovery issues; preparation of a jury questionnaire; preparation of various witness files; preparation of various key document files; preparation of various factual and analytical memos relating to trial preparation, strategy and defense of Kornman on the various charges against him; and coordinating with Tillotson and other attorneys Kornman had retained regarding case strategy and related matters. Kornman was aware of and specifically directed and approved of Winston performing work in each of these areas.

31.    Through various communications, Michels and the other Winston team members kept Kornman apprised of the progress on and the status of the trial preparation activities. During this time, Kornman never questioned the makeup of the team or the work being done. To the contrary, through various communications, Kornman complimented the team and its work and continued to direct Michels and his team to perform the work that the team was performing.

32.    By early March, Kornman had not paid Winston for its work in November 2006, December 2006, January 2007, or February 2007.

33.    In early March, in light of the amount of work being performed at Kornman's direction and the associated fees and expenses that work was generating, Webb requested that

Kornman provide Winston with a payment for the work Winston had performed for Kornman from November 2006 through February 2007 as well as a retainer for work that Winston would continue to perform going forward through trial in the Criminal Action. Kornman asked to discuss this matter with Webb, and a meeting was arranged for March 14, 2007.

34.    On March 14, 2007, after Webb's other trial had concluded, Webb and Kornman met to discuss the trial preparation activities and budget. At this meeting, Kornman advised Webb that he had retained additional counsel in the Criminal Action and was considering removing Winston from the case. Kornman again complimented the work that Winston had performed and expressed no complaints concerning the quality or nature of Winston's work. Tillotson also complimented Winston's work and made statements to the effect that Winston's trial preparation and related work had been helpful and necessary. Kornman agreed. Kornman stated that the reason for the change in counsel was to reduce costs.

35.    At the March 14, 2007 meeting, Webb advised Kornman that Kornman had two options: *first*, Kornman could proceed to trial with the other counsel that he had retained in the Criminal Action, including Tillotson, and simply pay Winston for the work Winston had performed as of that date (including approximately $580,000 that Kornman owed Winston for work performed in January and February); or, *second*, Kornman could provide Winston with a $2.5 million retainer payment and Winston would then continue to work on the case through trial. Webb advised Kornman that, if he chose to pay Winston the $2.5 million retainer, and Winston's work through the conclusion of the Criminal Action resulted in billings less than $2.5 million, Winston would refund to Kornman any amount of the retainer that was remaining.

36.    At the March 14, 2007 meeting, after Webb outlined for Kornman the two options, Kornman indicated he understood the two options and that would think about them and



let Webb know what he wanted to do. Also at the meeting, Kornman specifically directed Winston to continue to perform additional work to be used in fashioning Kornman's defense at trial. Winston agreed to complete this work as Kornman directed.

37.    On March 16, 2007, Tillotson advised Webb that Kornman had made a final decision to retain new attorneys to be chief trial counsel in the Criminal Action. Tillotson also advised that Kornman wanted Winston to continue to perform the additional work to be used in fashioning Kornman's defense at trial. Winston agreed to complete this work as Kornman had directed, and worked through March 19, 2007 doing so.

38.    By March 20, 2007, Kornman still had refused to pay for any of the work Winston had performed in December, January, February, or March. Accordingly, Winston ceased all work for Kornman and issued him a final bill. Winston subsequently withdrew as counsel for Kornman in the Criminal Action, and other attorneys substituted in as counsel for Kornman and co-counsel with Tillotson.

39.    After Winston ceased its work, Kornman continued to use and receive the benefit of Winston's work product in the Criminal Action. Kornman used a motion to dismiss and related briefing prepared by Winston, various pretrial motions researched and prepared by Winston, various motions *in limine* researched and prepared by Winston, jury instructions researched and prepared by Winston, a jury questionnaire researched and prepared by Winston, and other Winston work product relating to trial preparation, trial strategy and case analysis.

40.    Winston issued a final bill to Kornman on March 21, 2007, along with a letter demanding payment on the bill. On that date, Kornman owed $920,188.60. Kornman continues to owe this amount.

41.    Throughout his relationship with Winston, Kornman steadfastly refused to discuss with Winston the possibility of a plea bargain with the Department of Justice. Kornman advised Winston that he would never consider pleading guilty to any of the charges, and instructed Winston to direct all its efforts toward attaining an acquittal of him on all charges at trial.

42.    However, on April 9, 2007—just three weeks after ending his relationship with Winston—Kornman pled guilty to one felony count of making false statements to the SEC.

43.    On March 21 and May 8, 2007, Winston sent letters to Kornman demanding the full amount due to Winston. Kornman has not responded to these letters, other than by suing Winston in this case.

### Counterclaim 1—Breach of Contract

44.    The Service Agreement entered into between Kornman and Winston constitutes a valid, enforceable contract. All work performed by Winston for Kornman was performed under this contract and pursuant to other discussions and communications between Winston and Kornman relating to this contract.

45.    As a party to the Service Agreement, Winston is the proper party to assert a claim for breach of contract.

46.    By providing the specific legal services requested by Kornman in a timely and competent manner, Winston fully performed its obligations under the Service Agreement.

47.    By refusing to pay Winston for its services, Kornman has breached the Service Agreement.

48.    Winston sustained damages as a result of Kornman's breach of contract.

### Counterclaim 2—Theft of Service

49.    By accepting Winston's legal services without paying for them, Kornman is liable for theft of service under the Texas Theft Liability Act ("TTLA"). Tex. Civ. Prac. & Rem. Code §§134.001-134.005.

50.    The basis of Winston's TTLA claim is that Kornman unlawfully appropriated Winston's professional services as defined in sections 31.01 and 31.04 of the Texas Penal Code, incorporated into the TTLA through section 134.002(2). Specifically, with the intent to avoid payment for Winston's services, which Kornman knew were provided only for compensation, Kornman: (1) intentionally and knowingly secured Winston's services through deception by stating that he would pay for services that he never intended to pay for; and (2) intentionally and knowingly secured Winston's services by agreeing to provide compensation for the services and, after the services were rendered, failed to pay for Winston's services after receiving notice (in the form of both legal bills and the demand letters) demanding payment.

51.    Because Kornman failed to make payment under the Service Agreement within 10 days after receiving Winston's March 21 and May 8 letters demanding payment in full, it is presumed under Texas Penal Code section 31.04(b)(2) that he intended to avoid payment.

52.    Winston sustained damages as a result of Kornman's violation of the TTLA.

### Counterclaim 3—Fraud

53.    On multiple occasions, Kornman—both directly and through his agents—directed Winston to assign a full team to the work on the Criminal Action and to continue to work diligently on the Criminal Action, and represented that he would pay Winston in full for the services it was providing to him.

54.    Kornman directed Winston to prepare the case for trial and continually represented to Winston that he was not considering and would not consider a plea bargain.

55.    These representations were both material and false.

56.    Kornman made these representations knowingly and with knowledge that they were false when made.

57.    Kornman made the representations with the intent that Winston rely on them.

58.    Winston relied on these representations and performed its work for Kornman based on these representations.

59.    Winston sustained damages as a result of Kornman's fraud.

60.    Kornman's actions are part of a pattern of fraudulent conduct in which he has also defrauded at least three additional law firms by inducing those firms to perform work relating to the Litigation Matters that Kornman later arbitrarily refused to pay for, and still has not paid for. These firms include Russell Robbins, Monico Pavich, and Foley.

### Counterclaim 4—Quantum Meruit

61.    Winston provided valuable legal services to Kornman.

62.    These services were provided specifically for Kornman.

63.    Kornman accepted these services and used them for his defense in the Criminal Action.

64.    From the inception of his relationship with Winston, Kornman had notice that Winston expected compensation for its services.

### <u>ATTORNEYS' FEES</u>

65.    To recover the sums due it, Winston has engaged the undersigned attorneys and has agreed to pay them a reasonable fee.

66.    Winston is entitled to recover from Kornman the legal fees it incurs in this action.

## RELIEF

Winston respectfully asks that this Court:

A.    Dismiss Kornman's petition with prejudice.

B.    Award to Winston all damages available at law, including actual, statutory, and exemplary damages, and prejudgment and postjudgment interest.

C.    Award costs and attorneys' fees to Winston.

D.    Award Winston such equitable relief and other relief that the Court deems just and proper.

Dated: _____May 31_____, 2007

                    Respectfully submitted,

                    Rod Phelan
                    State Bar No. 15899800
                    Chris Davis
                    State Bar No. 24050483
                    BAKER BOTTS, L.L.P.
                    900 Trammell Crow Center
                    2001 Ross Avenue
                    Dallas, Texas, 75201
                    214 953 6500 (phone)
                    214 953 6503 (fax)
                    rod.phelan@bakerbotts.com
                    chris.davis@bakerbotts.com
                    ATTORNEYS FOR WINSTON & STRAWN LLP

## CERTIFICATE OF SERVICE

I certify that a true copy of this document has been served on all known counsel of record by hand delivery on the 31st day of May, 2007.

ROD PHELAN



ORIGINAL

> U.S. DISTRICT COURT
> NORTHERN DISTRICT OF TEXAS
>
> **FILED**
>
> AUG 1 8 2004
>
> CLERK, U.S. DISTRICT COURT
> By _____
>         **Deputy**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
**DALLAS DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, §<br>§<br>§<br>     Plaintiff, §<br>§<br>v.  §<br>§<br>GARY M. KORNMAN,  §<br>     Defendant. §<br>§ | Civil Action No.<br>**3 04 CV 1803- L** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY

1.    This case involves repeated insider trading by Dallas attorney and securities professional Gary M. Kornman.  During the relevant period, Kornman operated The Heritage Organization LLC ("Heritage"), a firm that previously offered tax shelters and estate planning to wealthy individuals.  During 2001, Kornman learned material nonpublic information concerning the acquisitions of two public companies during confidential personal tax-planning discussions with senior executives of the companies.  In each instance, the senior executive who supplied the material nonpublic information was a prospective Heritage tax client, and in each instance, Kornman traded on the basis of the information.

2.    In February 2001, Kornman learned from MiniMed, Inc. founder and then-chief executive officer (the "MiniMed executive") that there was a "70% chance" that MiniMed would be acquired by June 2001 by a Fortune 100 company. As Kornman knew, public announcement of such a transaction would almost certainly cause the share price of the NASDAQ-listed

medical-equipment company to rise. Two days after learning the information, Kornman purchased 6600 shares of MiniMed on behalf of a hedge fund he controlled. In May 2001, MiniMed publicly announced its acquisition by Medtronic Inc., and Kornman's hedge fund sold its MiniMed shares for a profit of approximately $67,000.

3.    Kornman obtained similar material nonpublic information during a November 2001 tax-strategy meeting with founder, board member, major shareholder and former chief executive officer of Hollywood Casino Corp. (the "Hollywood executive"). Kornman learned from the Hollywood executive that Hollywood was "definitely" going to be sold in the near future, probably in the late summer of 2002, at between $10 and $11 per share. Kornman knew that news of such a transaction would surely cause Hollywood's share price to rise, as it had with MiniMed. Immediately after the meeting, Kornman began acquiring Hollywood shares in the account of another hedge fund he controlled, at prices below $11 per share. By the time Hollywood announced it was being acquired by another publicly held casino firm in August 2002, Kornman's hedge fund had acquired 29,900 shares at an average cost of $9.39 per share. At Kornman's direction, the hedge fund sold all of these shares for a profit of approximately $75,000 shortly after the acquisition was announced.

4.    Kornman breached a duty of trust and confidence to the executives of the two companies. Given the nature of the tax and estate-planning services being offered by Heritage and Kornman, and the type of personal information being provided by the potential clients, both executives reasonably expected that the information would be kept confidential. Indeed, a Kornman associate specifically advised the MiniMed executive that information shared during the interview process would be kept confidential. Likewise, correspondence provided to the Hollywood executive was routinely marked "PERSONAL & CONFIDENTIAL." Furthermore,



the standard Heritage employment agreement defined confidential information to include information from prospective clients.

5.     By reason of these activities, Kornman has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.   The Commission, in the interest of protecting the public from any further violations of the federal securities laws, brings this action against Kornman seeking permanent injunctive relief, appropriate civil money penalties, and disgorgement of ill-gotten gains plus prejudgment interest.

## JURISDICTION

6.     The Commission brings this action under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin Kornman from future violations of the federal securities laws and to seek disgorgement, prejudgment interest, and a civil penalty.

7.     This Court has jurisdiction over this action under Sections 21(d), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1 and 78aa].

8.     Kornman, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce, as well as the facilities of a national securities exchange in connection with the acts, practices and courses of business described in this Complaint. Kornman was unjustly enriched as a result of these activities.

9.     Venue is proper because transactions, acts, practices and courses of business described below occurred within the Northern District of Texas, including that all the securities transactions were placed through Kornman's Dallas-based companies.

## DEFENDANT

10.    Gary M. Kornman, age 60, is an Alabama-licensed attorney who resides in Dallas, Texas. Since at least 1994, Kornman has provided tax and estate-planning advice to wealthy individuals through a private entity he controls, The Heritage Organization LLC. Kornman is an officer of Heritage.

11.    Kornman owns Heritage Securities Corporation, a securities broker-dealer registered with the SEC, and he individually holds Series 7 and Series 63 securities licenses.

12.    Kornman asserted his Fifth Amendment privilege against self-incrimination during the SEC investigation and refused to testify.

## RELATED ENTITIES

13.    The Heritage Organization LLC is a Delaware limited liability company formed by Kornman in 1994. From 1994 until 2004, Heritage, through as many as 120 Dallas-based employees or associates, offered estate planning and capital gains tax advice to wealthy individuals. On May 17, 2004, Heritage filed for Chapter 11 bankruptcy protection.

14.    During the relevant period, Heritage Capital Partners I LP and Heritage Capital Opportunities Fund I LP were hedge funds managed by a Kornman-controlled management company, which charged the funds a fee based on the assets under management. Kornman personally directed the hedge fund investments for the benefit of Kornman, several entities he controlled, and a few third-party investors. Kornman's illegal stock trading occurred in the hedge funds' brokerage accounts. Kornman discontinued operating the funds and liquidated them in 2003.



## STATEMENT OF FACTS

### Background

15.    Heritage offered its tax and estate-planning services primarily to individuals with at least $10,000,000 in net worth. Chief among the several services offered by the firm were tax-shelter investments involving the use of partnerships to shelter capital-gains income.

16.    In phone calls and in written correspondence, the firm touted the experienced lawyers and accountants on its staff. The firm's research department also created a profile for each prospective client that included detailed financial information, family relationships, work history, associations, political contributions and summaries of telephone conversations and face-to-face meetings.

17.    Heritage went to great lengths to ensure that the information obtained from its clients and prospective clients was accurate. For example, the firm required its employees to surreptitiously record telephone conversations and face-to-face meetings with clients and prospective clients.

18.    Heritage policy also required protection of confidential client information. At the conclusion of each meeting with clients and prospective clients, Heritage personnel were required to prepare a memorandum summarizing the meeting. Each memorandum emphasized the sensitive nature of the information and bore the following legend:

> This document and the information contained in it are Confidential Information owned by The Heritage Organization, L.L.C. The removal, copying or disclosure of this document and the information contained in it by anyone, other than an authorized employee of The Heritage Organization, L.L.C. only in the normal performance of their duties as an employee of The Heritage Organization, L.L.C. without the express written approval of the Chief Executive of The Heritage Organization, L.L.C. is strictly prohibited by law and by contract and will be enforced according to any contract and prosecuted to the limits of the law.

COMPLAINT                                                                                   Page 5
*SEC v. Gary M. Kornman*

Employees who failed to prepare such memoranda were subject to fines.

19.     Additionally, Heritage required its employees to sign a fifty-page employment agreement that strictly prohibited the disclosure or use of confidential information, which was broadly defined to include information from prospective clients.

### Kornman's Illegal MiniMed Trades

20.     Between October 2000 and June 2001, Heritage personnel had a series of phone conversations and meetings with the founder and then-CEO of MiniMed. The MiniMed executive was considering retaining Heritage as a personal tax adviser in anticipation of selling his controlling interest in MiniMed.

21.     During this period, a Heritage employee told the MiniMed executive that all information discussed with Heritage would be kept confidential. In addition, the MiniMed executive was provided a copy of the Heritage agreement that contained a "Confidentiality" provision requiring Heritage "to keep confidential ... all documents received from the [client]," except in four specifically enumerated circumstances, such as being compelled under the process of law.

22.     Further, due to the types of tax and estate-planning services and related legal and financial services offered by Heritage, the types of professionals it purportedly employed, and the personal, confidential, and sensitive nature of the information that needed to be shared in order to obtain the services offered by Heritage, the MiniMed executive expected Heritage to maintain the confidentiality of the information he provided.

23.     By letter dated February 2, 2001, after more than a year of confidential, nonpublic discussions, Medtronic proposed a one-for-one stock exchange to acquire MiniMed and another company.

24.    On February 7, 2001, Kornman and another Heritage associate traveled to California to meet with the MiniMed executive. As recorded in a memorandum prepared by the Heritage associate immediately after the meeting, the MiniMed executive informed Kornman that MiniMed "had a suitor who could potentially purchase Minimed and gave it a 70% chance of going through." Moreover, the MiniMed executive identified the suitor as a "Fortune 100 company" and stated that the acquisition would probably take place "around June 2001." Recognizing the highly confidential nature of the information received from the MiniMed executive, the memorandum contained the confidentiality provision described in paragraph 18 of this Complaint.

25.    On February 9, 2001, two days after meeting with the MiniMed executive, Kornman orally directed his trading assistant to purchase 6600 shares of MiniMed for the account of a Kornman hedge fund – Heritage Capital Partners I LP – at the market price of $37.86 per share.

26.    Kornman executed these trades on the basis of the material nonpublic information regarding the upcoming acquisition of MiniMed.

27.    Discussions continued between Medtronic and MiniMed. On May 30, 2001, the companies publicly announced that Medtronic had agreed to purchase all of the outstanding shares of MiniMed at $48 per share.

28.    On August 31, 2001, Kornman's hedge fund received cash for merged shares of MiniMed. Based on the $48 per share paid by Medtronic to acquire MiniMed, Kornman's hedge fund profited by approximately $67,000 on the MiniMed trades.

29.    The February 7, 2001 meeting at which Kornman obtained material nonpublic information was the third face-to-face meeting between the MiniMed executive and Heritage

representatives. On two earlier occasions – October 25 and November 30, 2000 – the MiniMed executive had disclosed confidences to Heritage regarding his personal financial condition and the potential acquisition of MiniMed. Kornman did not purchase MiniMed shares, however, until he received more definitive information about the acquisition at the February 7, 2001 meeting.

### Kornman's Illegal Hollywood Trades

30.    Kornman learned in a meeting with another potential Heritage client – the Hollywood executive – of the sale of Hollywood. The Hollywood executive was a Hollywood board member, founder, former CEO and major shareholder.

31.    On November 12, 2001, Hollywood's board of directors internally expressed its intent to sell Hollywood to another gaming firm, which, if completed, would result in substantial capital gains for the Hollywood executive.

32.    On November 19, 2001, the Hollywood executive met with Kornman and another Heritage employee at Hollywood's offices to discuss retention of Heritage as a personal tax adviser. As reflected in the memorandum of the November 19th meeting prepared by a Heritage employee, the Hollywood executive told Kornman that Hollywood was "definitely" going to be sold in the "near future," probably in the "late summer of 2002."

33.    The Hollywood executive also disclosed, as noted in the memorandum, that the purchase price "should be over $10 and possibly over $11 per share." On the eve of the meeting Hollywood's share price closed at $9.25.

34.    Recognizing the highly confidential nature of the information received from the Hollywood executive, the memorandum of the November 19th meeting contained the confidentiality provision described in paragraph 18 of this Complaint.

35.     Before the November 19th meeting, the Hollywood executive had held telephone discussions with Heritage personnel and had received correspondence from Heritage marked "PERSONAL & CONFIDENTIAL." Due to the types of tax and estate-planning services and related legal and financial services offered by Heritage, the types of professionals it purportedly employed, and the personal, confidential, and sensitive nature of the information that needed to be shared in order to obtain the services offered by Heritage, the Hollywood executive expected Heritage to maintain the confidentiality of the information he provided.

36.     As of the November 19th meeting with Kornman, the Hollywood executive had already held merger discussions with the CEO of Penn National Gaming, Inc. ("PNG"), a NASDAQ-listed gaming company. Although no agreements between the two companies had been signed at the time, the Hollywood executive believed PNG was an excellent prospect for acquiring Hollywood because Hollywood was a good fit for PNG's expansion strategy.

37.     The Hollywood executive based the probable $10 to $11 purchase price on Hollywood's earnings before interest, taxes, depreciation, and amortization. He based the "late summer 2002" timing of the acquisition on the time he expected it would take to complete an expansion project at one of Hollywood's several casinos.

38.     The Hollywood executive was aware that Hollywood's board intended to sell the company when the expansion was complete. In fact, on August 7, 2002, less than two months after the expansion was completed, a merger was announced in which PNG would acquire Hollywood for $12.75 per share.

39.     Once again taking advantage of a prospective client, not to mention the unsuspecting sellers of Hollywood shares, Kornman bought ahead of the expected good news.



40.    Specifically, within a week of the November 19th meeting with the Hollywood executive, Kornman directed his trading assistant to begin acquiring Hollywood shares in the account of another Kornman hedge fund, Heritage Capital Opportunities Fund I LP. Kornman instructed the assistant to purchase the shares at prices below $11 per share (the highest acquisition price mentioned by the Hollywood executive).

41.    Between November 26, 2001 and June 27, 2002, the hedge fund acquired 29,900 shares at prices between $7.65 and $10.70 per share, with the average price being $9.39. Kornman did not direct the purchase of any Hollywood shares from February 24 through May 24, 2002, when the stock traded between $13.70 and $16.92 per share.

42.    On August 7, 2002, a merger was announced in which PNG would acquire Hollywood for $12.75 per share. Six days later, on August 13, 2002, the hedge fund sold all of its Hollywood shares at Kornman's direction for a profit of approximately $75,000.

43.    Kornman had a pattern of dealings with the Hollywood executive that predated the November 19, 2001 meeting at which Kornman obtained material nonpublic information. In fact, letters from Heritage to the Hollywood executive dated February 28, March 2 and March 14, 2001 bore the legend "PERSONAL & CONFIDENTIAL." In addition, Heritage had face-to-face meetings with the Hollywood executive on March 23 and April 11, 2001 at which the Hollywood executive disclosed confidences about his personal financial condition and the potential acquisition of Hollywood. But Kornman did not purchase Hollywood shares until obtaining more definitive information about the merger on November 18, 2001.

## CLAIMS

### Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Thereunder

44.     Plaintiff Commission repeats and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim.

45.     Kornman, by engaging in the conduct described above, directly and indirectly, in connection with the purchase and sale of securities, and by use of the means and instrumentalities of interstate commerce, the mails, and a national securities exchange has:

        (a)     employed devices, schemes and artifices to defraud;

        (b)     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

        (c)     engaged in acts, practices or courses of business that have operated or will operate as a fraud and deceit upon other persons.

46.     Kornman purchased and sold securities of issuers Minimed and Hollywood, in breach of a duty of trust or confidence that he owed directly, indirectly, or derivatively, to the sources of the material nonpublic information – the MiniMed and Hollywood executives.  Kornman breached duties of trust and confidence established by agreement, by history, pattern, or practice of sharing confidences, and by the sensitive nature of the professional services discussed.

47.     Kornman intentionally, knowingly or with severe recklessness made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

48.     By reason of the foregoing acts and practices, Kornman violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## REQUEST FOR RELIEF

The Commission respectfully requests that this Court enter a judgment:

(i)     permanently enjoining Kornman from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

(ii)    ordering Kornman to pay civil penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1], for his violations of the federal securities laws;

(iii)   ordering Kornman to disgorge all ill-gotten gains from his unlawful conduct, with prejudgment interest; and

(iv)    granting any additional relief the Court deems appropriate.

Dated this __18th__ day of August, 2004.

Respectfully submitted,

Toby M. Galloway
Texas Bar No. 00790733
United States Securities and
Exchange Commission
Fort Worth Office
Burnett Plaza, Suite 1900
801 Cherry Street
Fort Worth, Texas 76102-6882
Telephone:     (817) 978-6447
Facsimile:     (817) 978-4927

Of Counsel:
Spencer C. Barasch
Stephen Webster
Timothy S. McCole
John Reding

# ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP

1801 K STREET, N.W., SUITE 411
WASHINGTON, D.C. 20006
PHONE (202) 775-4500
FAX (202) 775-4510
www.robbinsrussell.com

Lawrence S. Robbins

(202) 775-4501
lrobbins@robbinsrussell.com

October 5, 2004

*Via email:* lfk_lfk@yahoo.com

Mr. Gary Kornman
3640 Haynie Avenue
Dallas, TX 75205

Re:     Engagement in *SEC* v. *Gary M. Kornman*,
         Civ. Action No. 3:04CV1803-L (N.D. Texas)

Dear Gary:

The purpose of this letter is to set forth the basis upon which this firm will provide legal services to you with respect to the above-named litigation.

1.    <u>Legal Services Provided</u>:  You are engaging this Firm to represent you in connection with the above-referenced litigation; specifically, you have asked us to research issues relating to the SEC's rulemaking authority and prepare a possible motion to dismiss with respect to that subject matter. I will work principally with my partners Gregory Poe and Gary Orseck and my associate Alice Yao on this project. If at any time you have questions, concerns, or criticisms, please feel free to call. My direct dial number is (202) 775-4501 and my e-mail address is **lrobbins@robbinsrussell.com.**

2.    <u>Fees</u>: My fee will be $550 per hour, Gary's and Greg's will be $450 per hour, and Alice's will be $300 per hour. We may also, but only to the extent necessary, draw on other attorneys, most of whom are billed at rates lower than $325 per hour, but in no event would another lawyer's fee exceed my hourly rate. Our fees are generally based on the Firm's schedule of hourly rates. Our schedule of hourly rates for attorneys and other members of the professional staff is based on years of experience, specialization in training and practice, and level of

ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP

Mr. Gary Kornman
October 5, 2004
Page 2

professional attainment. You have also agreed to pay a retainer of $20,000, one-half of which will be applied to fees as they accrue, and one-half held as a reserve against the final bill.

3.  Costs: It is sometimes necessary for us to incur other charges for items such as travel, lodging, meals, telecommunication expenses (telephone, telecopier and telex) and messengers. Similarly, some matters require ancillary services such as photocopying, word processing, computerized legal research and staff overtime.

In order to allocate these charges fairly and keep billable rates as low as possible for those matters which do not involve such expenditures, these items are separately itemized on our statements. Some charges represent out-of-pocket costs, some include an allocation of overhead costs associated with the items, and others include a combination of both factors. It is the Firm's policy to maintain the costs of these items at reasonable levels.

4.  Billings: Our statements generally will be prepared and mailed during the month following the month in which services are rendered and costs advanced. We expect payment within twenty days after any statement is received.

5.  Termination: You will have the right to terminate our representation at any time. You agree that we will have the same right, subject to an obligation to give you reasonable notice to arrange alternative representation. You also agree that we will be relieved from the responsibility of performing any further work should you fail to pay any statement for fees and/or other charges unless other special arrangements have been mutually agreed upon.

6.  Acceptance of Engagement: Your acceptance of this engagement letter constitutes your understanding of, and consent to, the particular terms, conditions and disclosures described above.

*     *     *     *     *

ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP

Mr. Gary Kornman
October 5, 2004
Page 3


Please review the foregoing and, if it meets your approval, sign a copy of the letter and return it to us, together with a check in the amount of $20,000. If you have questions, please feel free to call me.

Very truly yours,

ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP

By: _____
Lawrence S. Robbins


APPROVED AND AGREED:

Gary Kornman

By: _____
Gary Kornman



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

NOV 16 2005

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. ___305 - CR - 0298P |
| | § | |
| GARY M. KORNMAN | § | |

## INDICTMENT

The Grand Jury Charges:

### Introduction

A.  Background

1.  At all times material to this indictment:

a.  Defendant, **Gary M. Kornman,** was an officer of The Heritage

Organization, L.L.C. and was a licensed attorney who held Series 6 and Series 63

securities licenses. **Kornman** controlled Heritage Securities Corporation (Heritage

Securities), a securities broker-dealer registered with the United States Securities and

Exchange Commission (SEC).

b.  The Heritage Organization, L.L.C. (Heritage) was a Delaware

limited liability company based in Dallas, Texas that was created in or about December

1994. Heritage was operated by **Kornman** and sold tax shelters and estate planning

services to wealthy individuals. **Kornman** was responsible for the management and

operations of Heritage.

Indictment – Page 1

    c.     **Kornman** managed and controlled Heritage Capital Partners I, L.P. (Heritage Partners Fund), a limited partnership formed under the laws of the State of Delaware in or about October 1998. Heritage Partners Fund operated a hedge fund that bought and sold stock in public companies at **Kornman's** direction and for the benefit of the defendant and other investors in the hedge fund.

    d.     **Kornman** managed and controlled Heritage Capital Opportunities Fund I, L.P. (Heritage Opportunities Fund), a limited partnership formed under the laws of the State of Delaware in or about September 1999. Heritage Opportunities Fund operated a hedge fund that bought and sold stock in public companies at **Kornman's** direction and for the benefit of the defendant and other investors in the hedge fund.

    e.     MiniMed, Inc. (MiniMed) was a company that was incorporated under the laws of the State of Delaware and had its principal operations in Northridge, California. Until its acquisition by Medtronic, Inc. (Medtronic) on or about August 31, 2001, MiniMed was a public company whose stock was: (1) registered on a national securities exchange under 15 U.S.C. § 78l; and (2) publicly traded on the National Association of Securities Dealers Automatic Quotation National Market System (NASDAQ), an electronic securities market and national securities exchange administered by the National Association of Securities Dealers (NASD). MiniMed had shareholders located throughout the United States, including within the Dallas Division of the Northern District of Texas. On or about May 30, 2001, Medtronic publicly

Indictment – Page 2

announced its agreement to acquire all of the outstanding shares of MiniMed at a price of

$48.00 per share.

        f.      Hollywood Casino Corporation (Hollywood Casino) was a company

that was incorporated under the laws of the State of Delaware and had its principal

operations in Dallas, Texas. Until its acquisition by Penn National Gaming, Inc. (Penn

National) on or about March 3, 2003, Hollywood Casino was a public company whose

stock was: (1) registered on a national securities exchange under 15 U.S.C. § 78l; and (2)

publicly traded on the American Securities Exchange (AMEX), a national securities

exchange. Hollywood Casino had shareholders located throughout the United States,

including within the Dallas Division of the Northern District of Texas. On or about

August 7, 2002, Penn National publicly announced its agreement to acquire all of the

outstanding shares of Hollywood Casino at a price of $12.75 per share.

B.    <u>The Scheme to Defraud</u>

        2.      Beginning on or about October 12, 2000, and continuing thereafter until on

or about August 8, 2002, in the Dallas Division of the Northern District of Texas, and

elsewhere, defendant, **Gary M. Kornman**, knowingly and willfully, directly and

indirectly, by use of the means and the instrumentalities of interstate commerce, the mails,

and the facilities of national securities exchanges, did use and employ manipulative and

deceptive devices and contrivances in connection with the purchase and sale of securities

registered on national securities exchanges, namely, MiniMed and Hollywood Casino, by:

Indictment – Page 3

(a) employing devices, schemes, and artifices to defraud; and (b) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers and sellers of MiniMed and Hollywood Casino securities, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.

3.     It was part of the aforesaid scheme and artifice to defraud that **Kornman** bought stock in MiniMed and Hollywood Casino while in possession of material, nonpublic information obtained during meetings **Kornman** and other Heritage representatives attended with senior representatives of MiniMed and Hollywood Casino. While soliciting prospective clients for Heritage, **Kornman** obtained material, nonpublic information from large shareholders and principals of MiniMed and Hollywood Casino regarding possible acquisitions of MiniMed and Hollywood Casino. In furtherance of his scheme and artifice to defraud, and in violation of a duty of trust and confidence he owed to the sources of the information, **Kornman** then misappropriated and misapplied to his own use the material, nonpublic information, which he knew would cause the stock prices of MiniMed and Hollywood Casino, respectively, to rise, by purchasing stock in MiniMed and Hollywood Casino before disclosure of the information to the public. After the public disclosure of the material, nonpublic information previously obtained by **Kornman,** the stock price of both MiniMed and Hollywood Casino, in fact, increased, resulting in substantial illegal profits to the defendant.

Indictment – Page 4

## Kornman's Illegal MiniMed Trades

4.    It was further part of the aforesaid scheme and artifice to defraud that occurring sometime between on or about October 12, 2000, and October 25, 2000, the exact date being unknown to the Grand Jury, at Dallas, Texas, **Kornman** caused a person known to the Grand Jury, who was a Heritage representative, to send a letter marked "PERSONAL & CONFIDENTIAL" to a MiniMed senior executive (the MiniMed executive) located in Northridge, California, confirming that a meeting had been scheduled for October 25, 2000, between a Heritage "Principal" and the MiniMed executive. At the time, the MiniMed executive was MiniMed's Chief Executive Officer, Chairman of the Board, co-founder, and a large stockholder in the company.

5.    It was further part of the aforesaid scheme and artifice to defraud that on or about November 30, 2000, at Dallas, Texas, **Kornman** caused a person known to the Grand Jury, who was a Heritage representative, to send a second letter marked "PERSONAL & CONFIDENTIAL" to the MiniMed executive located in Northridge, California.

6.    It was further part of the aforesaid scheme and artifice to defraud that occurring sometime between on or about October 12, 2000, and on or about February 7, 2001, the exact dates being unknown to the Grand Jury, **Kornman** and other persons known to the Grand Jury, who were all Heritage representatives, spoke with the MiniMed executive in Northridge, California regarding Heritage's attempts to sell its tax

Indictment – Page 5

elimination services to the MiniMed executive. As **Kornman** well knew, the MiniMed

executive shared numerous confidences with **Kornman** and the other Heritage

representatives during the course of such discussions, including, but not limited to,

detailed information regarding the MiniMed executive's financial condition; his

ownership interests in numerous companies, including MiniMed; his business plans and

financing arrangements for numerous companies, including MiniMed; his anticipated

income and taxes resulting from his business operations and interests; information

regarding taxes the MiniMed executive paid in the preceding year and his future tax

strategy; and other detailed personal and family information.

    7.    It was further part of the aforesaid scheme and artifice to defraud that on or

about February 7, 2001, at Northridge, California, during a meeting among **Kornman**, a

Heritage representative known to the Grand Jury, and the MiniMed executive, **Kornman**

obtained material, nonpublic information from the MiniMed executive concerning an

upcoming acquisition of MiniMed by another company, which included, but was not

limited to, the following:

    a.    that there was a 70% chance that MiniMed would be acquired by a

Fortune 100 company;

    b.    that the expected acquisition of MiniMed would probably take place

around June 2001; and

c.    that the MiniMed executive, whose MiniMed stock was then valued at approximately $900 million, expected to receive approximately $1 billion in stock in the new company if the acquisition of MiniMed occurred, resulting in, as **Kornman** then well knew, a significant increase in the value of MiniMed's stock price to its shareholders.

8.    It was further part of the aforesaid scheme and artifice to defraud that occurring sometime between on or about February 7, 2001, and on or about February 9, 2001, the exact date being unknown to the Grand Jury, **Kornman,** in violation of a duty of trust and confidence owed to the MiniMed executive, caused a person known to the Grand Jury, who was the broker for the Heritage Partners Fund managed and controlled by **Kornman,** to purchase 6,600 shares of MiniMed stock, at a cost of $37.8641 per share, on behalf of the hedge fund. The MiniMed stock purchase ordered by **Kornman** occurred before Medtronic's public announcement, on or about May 30, 2001, of its acquisition of MiniMed's outstanding shares and resulted in a total transaction cost to the Heritage Partners Fund of $250,050.06. Before this purchase, the Heritage Partners Fund had never bought or sold MiniMed stock.

9.    It was further part of the aforesaid scheme and artifice that on August 31, 2001, as a result of Medtronic's acquisition of MiniMed on or about that same date, the Heritage Partners Fund received cash for the shares of MiniMed, valued at $48.00 per

share, that the fund had purchased at **Kornman's** direction. **Kornman's** illegal trades resulted in a profit to the Heritage Partners Fund of $66,749.94.

### Kornman's Illegal Hollywood Casino Trades

10.    It was further part of the aforesaid scheme and artifice to defraud that on or about February 28, 2001, at Dallas, Texas, **Kornman** caused a person known to the Grand Jury, who was a Heritage representative, to mail a letter marked "PERSONAL & CONFIDENTIAL" to a senior executive of Hollywood Casino, in Dallas, Texas (the Hollywood Casino executive) regarding Heritage's attempts to sell its tax elimination strategies to the Hollywood Casino executive. At the time, the Hollywood Casino executive was the company's co-founder, Chairman of the Board, and its Chief Executive Officer.

11.    It was further part of the aforesaid scheme and artifice to defraud that on or about March 2, 2001, at Dallas, Texas, **Kornman** caused a person known to the Grand Jury, who was a Heritage representative, to send a letter marked "PERSONAL & CONFIDENTIAL" to the Hollywood Casino executive in Dallas, Texas, confirming that a March 23, 2001, meeting was scheduled between a Heritage "Principal" and the Hollywood Casino executive.

12.    It was further part of the aforesaid scheme and artifice that on or about March 14, 2001, at Dallas, Texas, **Kornman** caused a person known to the Grand Jury, who was a Heritage representative, to send a letter marked "PERSONAL &

CONFIDENTIAL" to the Hollywood Casino executive in Dallas, Texas confirming, the March 23, 2001, meeting scheduled between a Heritage "Principal" and the Hollywood Casino executive.

13.    It was further part of the aforesaid scheme and artifice to defraud that between on or about March 23, 2001, and on or about November 19, 2001, the exact dates being unknown to the Grand Jury, **Kornman** and other persons known to the Grand Jury, who were all Heritage representatives, met with the Hollywood Casino executive regarding Heritage's attempts to sell its tax elimination services to the Hollywood Casino executive. As **Kornman** well knew, the Hollywood Casino executive shared numerous confidences with **Kornman** and the other Heritage representatives during the course of such meetings, including, but not limited to, details regarding the Hollywood Casino executive's ownership interest in Hollywood Casino and his expected forthcoming capital gains arising from the acquisition of Hollywood Casino by another company.

14.    It was further part of the aforesaid scheme and artifice to defraud that on or about November 19, 2001, at Dallas, Texas, during a meeting among **Kornman**, a Heritage representative known to the Grand Jury, and the Hollywood Casino executive, **Kornman** obtained material, nonpublic information from the Hollywood Casino executive concerning an upcoming acquisition of Hollywood Casino by another company, which included, but was not limited to, the following:

Indictment – Page 9

a. that Hollywood Casino would definitely be sold in the very near future, probably during the late summer or early fall of 2002;

b. that Hollywood Casino had identified prospective buyers for the company; and

c. that the purchase price for Hollywood Casino, whose stock was trading at the time at approximately $9.25 per share, should be over $10.00 per share and could be as high as $11.00 per share.

15. It was further part of the aforesaid scheme and artifice to defraud that on or about November 19, 2001, immediately after meeting with the Hollywood Casino executive and receiving valuable material, nonpublic information regarding Hollywood Casino, **Kornman** called a person known to the Grand Jury who was the broker for the Heritage Opportunities Fund, a hedge fund managed and controlled by **Kornman.** At that time, **Kornman** ordered the broker to begin acquiring shares of Hollywood Casino and, further, instructed the broker to purchase the shares at prices below $11.00 per share, the highest acquisition price disclosed to **Kornman** by the Hollywood Casino executive.

16. It was further part of the aforesaid scheme and artifice to defraud that on or about the following dates, at Dallas, Texas, **Kornman,** in violation of a duty of trust and confidence owed to the Hollywood Casino executive, caused the broker for the Heritage Opportunities Fund, through the hedge fund controlled by **Kornman,** to purchase 29,900 shares of Hollywood Casino as follows:

Indictment – Page 10

| DATE | SHARES BOUGHT | SHARE PRICE |
|---|---|---|
| Nov. 26, 2001 | 400 | $8.99 |
| Nov. 30, 2001 | 600 | $8.99 |
| Dec. 3, 2001 | 5,500 | $8.85 |
| Jan. 29, 2002 | 5,000 | $10.00 |
| Feb. 6, 2002 | 300 | $10.70 |
| Feb. 19, 2002 | 8,800 | $10.67 |
| June 3, 2002 | 900 | $10.65 |
| June 14, 2002 | 3,100 | $7.89 |
| June 18, 2002 | 3,000 | $7.71 |
| June 19, 2002 | 1,000 | $7.65 |
| June 24, 2002 | 1,300 | $8.01 |

The Hollywood Casino stock purchases caused by **Kornman** occurred before Penn

National's public announcement, on or about August 7, 2002, of its acquisition of all of

Hollywood Casino's outstanding shares.  Before **Kornman** caused the foregoing

purchases, the Heritage Opportunities Fund had never bought or sold stock in Hollywood

Casino.

17.    It was further part of the aforesaid scheme and artifice to defraud that on or

about August 8, 2002, and occurring one day after Penn National's announcement of its

acquisition of Hollywood Casino, **Kornman** caused the broker for the Heritage

Opportunities Fund to sell all of its shares of Hollywood Casino, resulting in a profit to

the hedge fund of $76,400.00.

Count One
Securities Fraud
(Violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5)

1.    The Grand Jury hereby adopts, realleges, and incorporates by reference herein all allegations set forth in the Introduction of this indictment.

2.    Between on or about October 12, 2000, and on or about August 31, 2001, in the Dallas Division of the Northern District of Texas, and elsewhere, defendant, **Gary M. Kornman**, knowingly and willfully, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security, in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did:  (a) employ devices, schemes, and artifices to defraud; and (b) engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the purchasers and sellers of MiniMed securities in connection with the purchase and sale of a security.

In violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.

Count Two
Securities Fraud
(Violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5)

1.    The Grand Jury hereby adopts, realleges, and incorporates by reference herein all allegations set forth in the Introduction of this indictment.

2.    Between on or about February 28, 2001, and on or about August 8, 2002, in the Dallas Division of the Northern District of Texas, and elsewhere, defendant, **Gary M. Kornman**, knowingly and willfully, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security, in contravention of Rule 10b-5 (17 C.F.R. § 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did:  (a) employ devices, schemes, and artifices to defraud; and (b) engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon the purchasers and sellers of Hollywood Casino securities in connection with the purchase and sale of a security.

In violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.

Indictment – Page 13

## Count Three
### False Statements to the SEC
### (Violation of 18 U.S.C. § 1001)

1.     The Grand Jury hereby adopts, realleges, and incorporates by reference herein all allegations set forth in the Introduction of this indictment.

2.     On or about October 29, 2003, in the Dallas Division of the Northern District of Texas, defendant, **Gary M. Kornman,** in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the SEC, did knowingly and willfully falsify, conceal, and cover up material facts by trick, scheme, and device and make materially false, fictitious, and fraudulent statements and representations, in that the defendant did conceal from agents of the SEC, who were investigating **Kornman's** purchases and sales of MiniMed stock, the material fact that the defendant purchased stock in MiniMed while in possession of material, nonpublic information, which was in violation of a duty of trust and confidence he owed to the source of the information, and, further, that **Kornman** did make the following false, fictitious, and fraudulent statements to the SEC:  (a) that **Kornman** did not know who managed the hedge fund that purchased and sold the MiniMed stock; (b) that the alleged former manager of the hedge fund was no longer employed by Heritage; © that **Kornman** did not know who possessed trading authority over the brokerage account for the hedge fund that purchased and sold the MiniMed stock; and (d) that **Kornman** did not purchase MiniMed stock based on material, nonpublic information.

3.    **Kornman's** statements to the SEC were false, fictitious, and fraudulent. In fact, **Kornman,** as he then well knew, personally managed and had sole trading authority over the Heritage Partners Fund, the hedge fund that purchased and sold the MiniMed stock at the defendant's direction. Further, **Kornman** learned from the MiniMed executive material, nonpublic information concerning MiniMed that **Kornman** subsequently used to trade upon, namely, that there was a strong probability that MiniMed would be acquired by another company in or about June of 2001 and that, following such acquisition, the MiniMed executive expected the value of his MiniMed stock holdings to increase substantially.

In violation of 18 U.S.C. § 1001.

A TRUE BILL

REDACTED

FOREPERSON

RICHARD B. ROPER
UNITED STATES ATTORNEY

JEFFREY A. ANSLEY
Assistant United States Attorney
Texas Bar No. 00790235
1100 Commerce Street, Suite 300
Dallas, Texas 75242
Telephone:    214.659.8600
Facsimile:    214.767.4100

Indictment – Page 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

GARY M. KORNMAN

INDICTMENT

15 U.S.C. §§ 78j(b) and 78ff
and 17 C.F.R. § 240.10b-5
Securities Fraud

18 U.S.C. § 1001
False Statements to the SEC

3 Counts

A true bill rendered

FORT WORTH

Filed in open court this __16__ day of __Nov.__, A.D. 2005.

_____ Clerk

Gary M. Kornman - Issue an Arrest Warrant

_Charle / Lei_

MAGISTRATE

UNITED STATES ~~DISTRICT~~ JUDGE

No Criminal Complaint Pending

*Criminal Case Cover Sheet*                                              Revised 3/5/98

| UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF TEXAS | Related Case Information |
|---|---|

**Related Case Information**

Superseding Indictment: ☐ Yes ☒ No    New Defendant: ☒ Yes ☐ No

Pending CR Case in NDTX: ☐ Yes ☒ No    If Yes, number:

Search Warrant Case Number _____

R 20 from District of _____

Magistrate Case Number:  **3 0 5 - C R - 0 2 9 8 P**

1.  **Defendant Information**

Juvenile: ☐ Yes ☒ No

If Yes, Matter to be sealed:

☐ Yes  ☒ No

Defendant Name _____ GARY M. KORNMAN (1) _____

Alias Name _____

Address _____

_____

RECEIVED

NOV 16 2005

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

County in which offense was committed: _____

2.  **U.S. Attorney Information**

Jeffrey J. Ansley                    Bar # _00790235_____

3.  **Interpreter**

☐ Yes  ☒ No    If Yes, list language and/or dialect: _____

4.  **Location Status**

Arrest Date - Issue Arrest Warrant

☐ Already in Federal Custody
☐ Already in State Custody
☐ On Pretrial Release

5.  **U.S.C. Citations**

Total # of Counts as to This Defendant: 3    ☐ Petty    ☐ Misdemeanor    ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 | Securities Fraud | 1,2 |
| 18 U.S.C. § 1001 | False Statements to the SEC | 3 |

Date _11/14/05_        Signature of AUSA: _____