IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ROBBINS, RUSSELL, ENGLERT     :
ORSECK & UNTEREINER LLP,     :
    :     **Civil Action No.**
    **Plaintiff,**     :     **1:07-cv-00554-JR/JMF**
    :
    **v.**     :
    :
**GARY KORNMAN,**     :
    :
    **Defendant.**     :

---

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT III (ACCOUNT STATED) OF COMPLAINT AND COUNTERCLAIMS**

---

Gary A. Orseck (Bar No. 433788)
Alan D. Strasser (Bar No. 967885)
Matthew R. Segal (Bar No. 483486)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411
Washington, DC  20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

Dated: October 16, 2007

Plaintiff Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell") submits this reply memorandum in support of its Motion for Summary Judgment on Count III (Account Stated) of the Complaint and Counterclaims. As we show below, Mr. Kornman's brief in opposition ("Opp.") is wholly insufficient to fend off summary judgment.[1]

## INTRODUCTION

Kornman's effort to forestall summary judgment has three main features. First, he has amended his answer to add a never-before-asserted affirmative defense of "mistake." Second, in support of that defense, he has asserted in a declaration that he failed to realize that the long series of monthly bills he received from Robbins Russell obligated him to make payment, because he believed that Robbins Russell was performing work on a fixed-fee basis, and that his obligation to pay had not yet arisen. And third, Kornman seeks to have the Court believe – apparently in an effort to impugn Robbins Russell's credibility – that we have withheld material information from the Court concerning a fixed-fee billing arrangement between the parties. None of these claims deserves any credence.

We billed Kornman in the disputed period month after month, just as we had billed him since October 2004, for myriad types of work. Each bill contained, by attorney, descriptions of work performed on an hourly basis, the date on which services were rendered, and time spent on the work. As explained in Section I below, that course of dealing between the parties, and Kornman's failure ever to pay or dispute any of the bills, gave rise to an account stated. The sole project that involved a fixed-fee arrangement, out of all of the various civil and criminal work that we performed for

---

[1] In his submission, Kornman also argued in support of his own cross-motion for summary judgment on all counts, and in support of his motion under Rule 56(f). We will respond to those motions separately, within the time allowed under the Rules. For present purposes, we note with respect to the Rule 56(f) motion that Robbins Russell produced more than 16,000 pages of documents, and Kornman subsequently deposed both Lawrence Robbins and Gregory Poe.

Kornman, was a motion to dismiss the indictment in Kornman's criminal case, along with a reply brief and any oral argument that might be granted. We never came close to the cap, which is hardly surprising, because we drafted only the motion and did not draft a reply or participate in oral argument. Kornman refused to pay us long before the motion actually was filed (in a different form, signed by three other law firms, that relied on our arguments).

We did not dwell on the fixed-fee agreement in our motion papers because it does not implicate disputed issues of material fact on our account stated claim. The bills that Kornman received, month after month, concerned a wide range of civil and criminal work. Once Kornman decided to stop paying, he stopped paying for *all* of our work. He did not pay for work we did in his civil case or for work we did in the criminal case – be it work on his motion to dismiss the indictment or anything else. As shown in Section II below, Kornman's new defense of "mistake," the uncorroborated and late-arriving claims in his declaration, and his spurious claim that Robbins Russell has attempted to withhold material information from the Court (as if that could actually be accomplished in such a contested case) should all be rejected, and summary judgment should be granted on Count III.

## ARGUMENT

### I.    Kornman's Failure To Pay Or Dispute Robbins Russell's Invoices While Continuing To Request Additional Legal Services Establishes An Account Stated

An invoice issued to a debtor becomes an account stated when the debtor either expressly or impliedly agrees to pay the debt. Opening Br. at 8-11. As is common in collection actions by lawyers against former clients, the implied agreement in this case arises by virtue of Robbins Russell's invoices being "rendered and retained without objection for a reasonable time after full opportunity

to object." *Continental Cas. Co.* v. *Dr. Pepper Bottling Co. of Texas, Inc.*, 416 F. Supp. 2d 497, 505 (N.D. Tex. 2006).[2] Whether (as we contend) Kornman's failure to dispute our monthly bills for eight months was unreasonable is a question of law for the Court. *Reed Research, Inc.* v. *Schumer Co.*, 243 F.2d 602, 604 (D.C. Cir. 1957). As explained in our opening brief (at 11-15), Kornman's silence was unreasonable as a matter of law because there was (1) "a long course of dealing between the parties"; (2) Robbins Russell "render[ed] a number of statements of account"; and (3) Kornman "fail[ed] to challenge the statements." *Brand* v. *Westall*, 1995 WL 235579, *5 (D.D.C. 1995).

Kornman offers two different (and contradictory) reasons why Robbins Russell's many unpaid invoices never achieved the status of an account stated. First, he argues, his "mere" failure to dispute the bills does not constitute an implicit acknowledgment of the debt. Second, he claims that he *did* timely dispute the bills. Neither argument is correct.

A.    **An Account Stated Arose From The Parties' Debtor-Creditor Relationship, Ongoing Requests For And Provision Of Legal Services, Numerous Payment Demands, And Kornman's Failure To Dispute Or Pay The Invoices**

According to Kornman (Opp. at 14-16), although an account stated may be based on an implied agreement that payment is due, mere "short-term silence" by the debtor in the face of invoices received does not constitute an implied agreement. In this case, Kornman says, all we have is "disputed evidence" regarding Kornman's "temporary silence in response to a few improper invoices." Opp. 15. The "short passage of time here," Kornman says, "is far from sufficient to bind [him] to the Robbins Firm's erroneous invoices." *Id.*

Every bit of that is wrong. There were not just a "few" invoices that Kornman ignored; there

---

[2] Kornman claims that we "ha[ve] assumed that the law of the District of Columbia applies to this matter." Opp. at 12 n.4. That is incorrect. See Opening Br. at 9 n.6. Kornman's argument falls short under both Texas and District of Columbia law.

were eight months' worth of invoices – each of them accompanied by cover letters from Lawrence Robbins requesting payment and inviting Kornman to state any questions or concerns. Some of them contained further handwritten notes urging Kornman to make payments. See June 2006 invoice, Robbins Exh. C at 64 ( "I would appreciate it if you could get rid of some of the older invoices"); October 2006 invoice, *id*. at 79 ( "I would really like to get these bills cleared up very soon").[3] Robbins Russell also sent text messages (Robbins Exh. H), re-delivery of Robbins Russell's invoices and work product (Robbins Exhs. F & J), and two demand letters (Robbins Exhs. K and L), all reminding Kornman to pay his bills. All the while, Kornman (through his agent and primary lawyer, Jeff Tillotson) affirmatively requested all manner of new legal services from Robbins Russell in the criminal case against him as well as the SEC action. See Robbins Exhs. E-1 to E-8. This was not, as Kornman asserts, a "temporary" state of affairs. Kornman waited until October 2006, when there were eight months of unpaid invoices, before he even *responded* to Robbins Russell's payment demands. Only then, after Mr. Robbins finally told Kornman that the jig was up, did Kornman assert that our work was "subpar" (Robbins Decl. ¶ 18) – an argument, we note, that Kornman has now abandoned in this litigation after having originally asserted it. See Kornman Opp. to Motion to Compel at 4.

Nor is there support for Kornman's argument (Opp. at 16-20) that, because Robbins Russell provided "personal services," there can be no account stated here. To begin with, by far the most common of the reported cases finding an account stated are collection actions by attorneys against former clients who did not pay their bills. See Opening Br. 9-10 (collecting cases). Although courts

---

[3] Exhibits cited as "Robbins Exh. _" refer to the attachments to the Declaration of Lawrence S. Robbins ("Robbins Decl."), filed on September 24, 2007. Exhibits cited as "Orseck Exh. _" refer to the attachments to the Declaration of Gary A. Orseck ("Orseck Decl."), filed herewith.

certainly have held that "mere retention" of a legal bill, by itself, does not normally suffice to establish an account stated, that is not the state of the record here.

Robbins Russell's provision of legal services to Kornman was not a one-shot deal. For well over a year before Kornman stopped paying, he and Robbins Russell developed a debtor-creditor relationship in which he (and Tillotson, on his behalf) requested legal services with respect to both civil and criminal matters on an *ad hoc* basis, and Robbins Russell provided and billed for those services. During the period in which Kornman stopped paying, that debtor-creditor relationship continued unabated. Unlike in many account stated cases that have gone against the debt collector, where the receipt and retention of bills occurs *after* the legal services have been rendered, Kornman was receiving bills, payment demands, and legal services *simultaneously and over a long period of time*. Under those circumstances, Kornman's silence *does* establish an account stated. See *Robins, Kaplan, Miller & Ciresi* v. *Sonoret Chem. Co.*, 1991 WL 325289, *3 (D. Minn. 1991) (summary judgment for firm on account stated where client "instructed Robins to perform further legal services" when invoices were long overdue and client "first complained" about the bills long after).[4]

Accordingly, the cases Kornman relies on do not help him. None of them involves an ongoing representation and, equally important, the clients in those cases disputed the bill *at or before the time it was rendered*. In *Chinn* v. *Lewin*, 16 F.2d 512, 514 (D.C. Cir. 1926) (Opp. at 16-17), for example, there was a "sharp controversy as to the proper amount" of the bill from the outset. Over the client's explicit objection, the lawyer sent his bill anyway, and then made "three written demands

---

[4] If the law were otherwise, then law firms faced with dilatory clients would be forced either to continue working – and face the unmitigated risk that the client will later refuse to pay the stale bills – or to demand payment immediately – and risk prematurely undermining the attorney-client relationship.

for payment, all within less than three months." *Id.* On those facts, "the mere silence of the debtor" in response to payment demands did not create an account stated because "the amount, *before delivery of the bill*, had been the subject of discussion between the parties, and was sharply contested by the defendant." *Id.* at 515 (emphasis added).

As the D.C. Circuit has since explained, while "silence alone" does not establish an account stated, "an agreement may be implied from the circumstances and [a client's] failure to object is a factor that" may be considered in evaluating those circumstances. *Bechtel & Cole* v. *Graceland Broad.*, 1994 U.S. App. LEXIS 4468, *9 (D.C. Cir. 1994) (unpublished decision; emphasis added). Here, as explained above and in our opening papers, Kornman acquiesced in Robbins Russell's bills, not only by failing to dispute them, but by demanding more services over time as his bills sat unpaid.[5]

Finally, Kornman urges the Court to deny the motion on the ground that, because Robbins Russell was Kornman's "fiduciary," Robbins Russell has the "burden of proof" to demonstrate that the amount of "account stated" was reasonable. Opp. at 20. In other words, Kornman seeks to convert our account stated claim into one for *quantum meruit*. But Kornman cites no case law for that proposition, which contradicts foundational principles of account stated law. See *Cohen Tauber Spievak & Wagner, LLP* v. *Alnwick*, 825 N.Y.S.2d 439, 439-40 (N.Y. App. Div. 2006) ("[I]t is 'not

---

[5] Kornman's reliance on California cases is equally misplaced. He argues that, under California law, lawyers cannot employ the account stated as a means of avoiding fiduciary duties to their clients. As Kornman notes (Opp. at 18), California courts have held that lawyers are not permitted, on the strength of the account stated doctrine, to "unilaterally determine" their own fees or "withdraw funds held in trust" for a client "without the knowledge or consent of the client." Robbins Russell has done nothing of the sort. We simply demanded payment on invoices we sent to Kornman, without response, over the course of eight months.

necessary to establish the reasonableness of the fee since the client's act of holding the statement without objection will be construed as acquiescence as to its correctness.").

### B. Kornman's Self-Serving Certification And Belated Insistence For More Work Do Not Defeat The Account Stated

Even while arguing that his *silence* in the face of our bills was insufficient to give rise to an account stated, Kornman also claims that summary judgment is improper here because he "timely disputed the sufficiency of Robbins Russell's work." Opp. at 3. See Kornman Cert. ¶ 20 ("While the Robbins Firm was invoicing me, I did complain about the fact that they had not yet sent to me finished, ready-to-file work product"). That late-arriving say-so is false, and not surprisingly, Kornman cites nothing in the record to support it. In any event, "self-serving, bald allegations of oral protests" like this one are "insufficient to raise a triable issue of fact as to the existence of an account stated." *Darby & Darby, P.C.* v. *VSI Int'l, Inc.*, 739 N.E.2d 744, 748 (N.Y. 2000); see also *Lankler Siffert & Wohl, LLP* v. *Rossi*, 287 F. Supp. 2d 398, 408 (S.D.N.Y. 2003) ("The alleged objections made by Rossi and Phillips are conclusory and unsubstantiated, and do not provide any detail as to the nature of the objections. Such objections are insufficient to defeat summary judgment in light of the account stated established by Plaintiffs."); *Morrison Cohen Singer & Weinstein* v. *Ackerman*, 720 N.Y.S.2d 486, 487 (N.Y. App. Div. 2001) (rejecting client's "self-serving, conclusory and unsubstantiated allegations" that she orally objected to law firm's bills).[6]

---

[6] See also *First Commodity Traders, Inc.* v. *Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) ("FCT offered two affidavits as grounds for opening the accounts stated. Both of those affidavits merely support FCT's allegations by offering conclusory statements unsupported by specific facts. Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact. FCT has not raised a genuine issue of fact in support of reopening the accounts stated.") (citations omitted).

Those cases are particularly salient here because Kornman's "self-serving, bald allegations" would be deficient even if they could be taken at face value on a summary judgment motion for an account stated. Although Kornman claims to have "complain[ed]" while receiving Robbins Russell's invoices, Kornman Cert. ¶ 20, he does not say that he complained to anyone *at Robbins Russell*. "An objection to an account rendered . . . must be more than a mental operation on the part of the recipient of the account, and must be made to the party rendering the account . . . ." 1 AM. JUR. 2d *Accounts and Accounting* § 38. Moreover, Kornman does not dispute Lawrence Robbins' declaration that Kornman acknowledged his obligation to pay Robbins Russell before insisting on more work on October 24, 2006. See Robbins Decl. ¶ 18; Kornman Cert. ¶ 25. Nor does Kornman contend that he then told Mr. Robbins what he now claims to believe: that nothing is owed on any of Robbins Russell's invoices. Even if he had done so, it would have been too late; the October 24 call occurred more than eight months after Kornman's last payment.

The whole point of the account stated doctrine is to preclude what Kornman is attempting here. A debtor cannot ignore invoices for months on end, while at the same time requesting *more* work, and then level unsupported claims that he "disputed" the invoices all along. To defeat an account stated claim, the defendant must point to a specific "communication to the creditor disputing the amount listed on the bills." *Continental Cas. Co.*, 416 F. Supp. 2d at 505. That never happened here, and no reasonable trier of fact could conclude that it did.

## II.    Kornman Cannot Invoke The Affirmative Defense Of "Mistake" As A Grounds For Defeating Summary Judgment

Just days after we filed the present summary judgment motion, Kornman filed an Amended Answer and Counterclaims. That pleading differed from the original answer in only one respect –

it added an Eighth Affirmative Defense, which asserts that "Any claim of an account stated is barred based upon a mistake of fact and/or law regarding the terms and obligations between the parties." The new mistake-of-fact defense is Kornman's *only* hope for challenging the account stated that resulted from his acquiescence in Robbins Russell's bills. See *First Commodity Traders, Inc.* v. *Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) (An account stated is conclusive "absent a showing of fraud, omission or mistake.").[7]

In his brief, Kornman says that a "mistake" defeats the account stated, and absolves him from having to pay any of the outstanding amounts. He claims that, at the time he stopped paying our bills, the parties had agreed to a "fixed-fee or capped-fee basis" (Opp. at 6) for all work on the criminal case, and that "he expected finished work product before any amounts were due for work on motions in the criminal matter." Opp. 16. Accordingly, Kornman now says, "he viewed the references to hourly time entries in the Robbins Firm's bills as either clerical errors or efforts to justify the agreed-upon amount of fixed fees." *Id.*

For two reasons, Kornman's newfound "mistake" defense cannot defeat summary judgment. First, the defense is unavailable as a matter of law where, as here, the supposed mistake was "known at the time of the settlement by the party seeking to impeach [the account stated]." 1A C.J.S. *Account Stated* § 45 (2005). A party cannot stand silent when the supposed mistake becomes apparent to him, only to invoke it later during litigation to avoid payment obligations. Second, and in any event, the record utterly contradicts Kornman's belated claim that he actually held the mistaken views he now describes.

---

[7] 1A C.J.S. *Account Stated* § 46 ("Generally speaking, an account stated may not be impeached for mistakes of law." (citing *Norum* v. *Ohio Oil Co.*, 272 P. 534 (Mont. 1928))).

### A.     Kornman's Mistake Defense Fails Because A Mistake-Of-Fact Defense Is Available Only When A "Mistake" In The Account Is Discovered After It Became An Account Stated

Either side may attempt to impeach an account stated if it turns out that the account was infected by some previously unknown mistake. "The burden of establishing [that defense] is on the party asserting [it], and unless that party carries the burden, the presumptive correctness of the account stated becomes conclusive." *Home Health Servs. of Sarasota, Inc.* v. *McQuay-Garrett, Sullivan & Co.*, 462 So.2d 605, 606 (Fla. Ct. App. 1985); *Palmer* v. *Kamin*, 238 S.W.2d 216, 217 (Tex. Civ. App. 1951) ("[T]he effect of [an account stated] is to cast on the adverse party the burden of disproving its correctness."). That burden can be carried only by "clear and convincing" evidence of mistake. *Levin* v. *Garfinkle*, 492 F. Supp. 781, 810 (E.D. Pa. 1980); *Erickson* v. *Gen. United Life Ins. Co.*, 256 N.W.2d 255, 259 (Minn. 1977); cf. *Perbal* v. *Dazor Mfg. Corp.*, 436 S.W.2d 677, 686 (Mo. 1968) (requiring "clear proof of fraud or mistake").

A party can establish the mistake defense *only* by proving (by clear and convincing evidence) that he discovered the mistake *after* the account stated was "settled." Thus, for example, in *Los Angeles Bond & Secs. Co.* v. *Superior Court in and for Los Angeles County*, 37 P.2d 159 (Cal. Ct. App. 1934), the discovery of fictitious charges after the account had been stated "[fell] within the principle that where, *after a settlement and adjustment of an account of the dealings between parties, a mistake or misrepresentation as to an item is discovered*, . . . the error may be corrected and the rights of the parties readjusted in that respect." *Id.* at 161 (emphasis added).[8]

---

[8]     Even then, the party that proves the mistake *still* faces liability on the account, since impeaching an account stated usually "affects it only as to the corrections made in it, resulting in an adjustment of the balance due." 1A C.J.S. *Account Stated* § 53 (2005) (footnotes omitted).

Conversely, "[t]he failure to promptly contest an account or act to correct an error precludes the reopening of an account stated based upon mistake." *York Hunter Servs., Inc.* v. *Brooklyn Historical Soc'y*, 2007 WL 79642, *3 (N.Y. Sup. Ct. Jan. 8, 2007); see also *City of Lawrenceville* v. *Ricoh Elecs., Inc.*, 2006 WL 839074, *4 (11th Cir. 2006) ("'[A] party will not be allowed to impeach an account stated, on the ground of fraud or mistake, if he assented to it with full knowledge of the facts and circumstances attending it, or if, with ample means of knowledge at hand, he failed to ascertain the facts.'" (quoting *J.R. Watkins Co. v. Brewer*, 36 S.E.2d 442, 449 (Ga. Ct. App. 1945))), *aff'g* 370 F. Supp. 2d 1328, 1331 (N.D. Ga. 2005) ("Even if there is a unilateral mistake, a party may not seek reformation of an account or contract if reasonable diligence could have prevented the mistake.").[9]

Kornman's mistake theory plainly fails this threshold test. Even if one assumed that the parties originally had different understandings about Kornman's obligation to pay the bills that Robbins Russell had sent to him each month, no reasonable trier of fact could conclude that the supposed confusion continued to exist as time passed. Kornman received bills for *eight months* from Robbins Russell, accompanied by signed cover letters requesting payment and inviting Kornman to call if he had any questions about any part of the bills. See Robbins Exh. C. And, as the outstanding balance grew, Lawrence Robbins sent notes requesting that Kornman "get rid of some of the older invoices." See *id.* at 64, 79. If Kornman was laboring under some different and "mistaken" view – and therefore had reason to dispute the validity of the bills – it was incumbent upon him to speak up. Indeed, had Kornman told Robbins Russell that he thought he had no obligation to pay, we most

---

[9]   1A C.J.S. *Account Stated* § 45 (2005) ("[A]n account stated may not be impeached . . . by showing facts known at the time of the settlement by the party seeking to impeach it.").

certainly would have turned off the spigot. Instead, Kornman continued to request *more* work from Robbins Russell *months* after receiving the first bill that would have brought this "mistake" to his attention. See, *e.g.*, Exhs. E-2 (Kornman's May 2006 acknowledgment of his receipt of Robbins Russell's draft Rule 16 letter), and E-6 (June 2006 e-mail from Tillotson requesting Robbins Russell's draft of a motion to suppress). "An account will not be impeached at the instance of a party who has waited an unreasonable time . . . to the detriment of the other party relying on the account as stated." 1A C.J.S. *Account Stated* § 47 (2005).

Kornman tries to reckon with this problem by suggesting (without actually saying) that perhaps he never even saw the invoices. He says that while he is "aware" that we sent him "a few invoices" after work on the criminal matter began, he "do[es] not recall which one(s) [he] may have seen." Kornman Cert. ¶ 17. "Sometimes," Kornman claims, "my bills of those sort were handled by an assistant and simply forwarded to Attorney Tillotson who facilitated, at times, certain billing by other counsel through his firm." *Id.* To the extent Kornman means to argue that he did not actually learn of the purported "mistake" until after the account stated arose, on the premise that he never saw the invoices making clear Robbins Russell expected to be paid, the Court should reject that argument. All of our invoices were mailed directly to Kornman at his home. Robbins Decl. ¶ 5. And, as Kornman elsewhere acknowledges (Kornman Cert. ¶ 5), he "paid for all services . . . on a timely basis" – until he stopped. Whether Kornman, an assistant, or Jeff Tillotson actually took care of paying them, there is no doubt that all of them were received and understood. In light of that record, Kornman cannot now avoid summary judgment by claiming that he never saw the invoices detailing work for which he failed to pay.

**B.    The Record Is Devoid Of Evidence That Kornman Actually Believed He Did Not Have To Pay Robbins Russell's Bills**

Even if Kornman could prove that the asserted "mistake" regarding his payment obligation came to light only after the account was settled (he cannot), there is *no* evidence – short of Kornman's fantastical Certification submitted in opposition to this motion – that he ever had the understanding he now claims, much less that it reflects the agreement between the parties. Contrary to his assertion (Opp. at 2) that the parties "expressly" agreed that all work in the criminal case was on a "fixed fee" basis, and that no payment for any of it was due because it was not "completed" – *all* of the evidence in the record confirms that this is Kornman's recent invention.

It is important, at the outset, to be clear as to what the record shows regarding the "fixed fee" agreement. In January 2006, at Jeff Tillotson's request, Robbins Russell agreed "to do the opening brief, the reply brief, and any oral argument" on a "motion to dismiss the indictment" in the criminal case for a fee of $100,000. Pollack Cert. Exh. D. The exchange of emails between Robbins and Tillotson constitutes the universe of evidence on this topic, and the emails make the terms of the agreement abundantly clear. First, the agreement expressly covered the motion to dismiss, and *only* the motion to dismiss. When the parties meant to depart from the normal hourly billing arrangement, they knew how to do so; had they intended to agree to a fixed fee for the many other tasks assigned to Robbins Russell, the record would reflect it. Second, *nothing* in the emails between Robbins and Tillotson – indeed, nothing anywhere in the record, except for Kornman's Certification in response to this motion – remotely supports Kornman's claim that Robbins Russell was not entitled to any

payment until (as Kornman now claims, Opp. at 6) Kornman filed "an opening brief and reply papers," and Robbins "participate[d] in oral argument on that motion."[10]

Accordingly, even if Kornman were limiting his "mistake" defense to his failure to pay for the motion to dismiss, it would be baseless; still more absurd is his assertion that he believed he had no obligation to pay for *any* of our work. There is no evidence that any of the many criminal law projects we did (other than the motion to dismiss) was governed by any kind of fixed fee agreement. These projects included giving advice concerning the consequences of taking the Fifth Amendment in the civil case (Robbins Exhs. B-5, E-1); preparation of an outline for a pre-indictment presentation to the U.S. Attorney's Office (Robbins Exh. B-6); work on a Rule 16 letter (Orseck Exhs. A and B); preparation of a motion to suppress evidence (Orseck Exh. C); and preparation of a so-called *Stringer* motion (Orseck Exh. D).

Nevertheless, Kornman asserts (Kornman Cert. ¶ 12) – for the first time – that the motion to suppress and *Stringer* motion were governed by their own "fixed fee" arrangements. And he claims (again, for the first time) that all of the other projects simply fell outside any applicable "billing terms." Kornman Cert. ¶ 14. Such "'bald conclusory allegations of fraud, mistake, and other equitable considerations are insufficient to defeat a motion for summary judgment' on an account stated." *Cohen Tauber Spievak & Wagner, LLP*, 825 N.Y.S.2d at 439.

In a further attempt to manufacture a "mistake," Kornman also says for the first time (Kornman Cert. ¶¶ 21-24), that a $50,000 payment he made in February 2006 for work done in both the civil and criminal cases (see Robbins Exh. C at 46-50 (invoice dated February 2, 2006)) was in

---

[10]  Given Kornman's history to that point of receiving draft motions from Robbins Russell and sitting on them for months without filing them, Robbins Russell *never* would have agreed to an arrangement that made payment for a motion contingent on *Kornman's* decision to file it.

fact just a "deposit" that he thought would be held in "escrow" until the work was "complete." Kornman suggests that the "memo" line on his check, which referred to the payment as a "Deposit Against Legal Fees for Government Litigation," was an instruction to hold the payment in escrow. See Opp. at 10 (citing Pollack Cert. Exh. G). Had he "noticed and thought about" Robbins Russell's deposit of that check into its operating account, Kornman says, he "believe[s] he would have raised a formal objection" about it. Kornman Cert. ¶ 22.

That is errant nonsense. To begin with, Kornman used the term "deposit" synonymously with "payment," not with "escrow." Indeed, his single largest payment to Robbins Russell – a $160,000 check dated December 6, 2004 for services rendered – was styled as a "Deposit Against Fees." Orseck Exh. H. What is more, the *very next month's invoice* advised Kornman that some of the $50,000 had been applied to Robbins Russell's February 2006 invoice, see Robbins Exh. C at 55, and asked him to "please note that the remaining balance" had been applied to the March 2006 invoice, see *id.* at 51, 55. In short, no reasonable trier of fact could accept Kornman's claim that he was "mistaken" about his $50,000 payment, or about his obligation to pay for our work on the criminal case.[11]

Finally, even if there *had* been a "completed work product" pre-condition to any payment from Kornman, Kornman's assertion that Robbins Russell "never produced the requisite *finished*

---

[11] Kornman also attempts to bolster his newfangled theory that his failure to pay for our work in the *criminal case* resulted from his mistaken belief about the terms of the "fixed-fee" agreement by claiming (Kornman Cert. ¶ 2) that he "paid for all services on the civil case." That is demonstrably false. Robbins Russell's June 2006 invoice, for example – which included a handwritten payment demand (Robbins Exh. C at 64) – covered an opposition brief that Robbins Russell drafted (and sent to Tillotson) in the civil case. *Id.* at 65-67; see also Robbins Exhs. E-3, E-4.

work product for filing in connection with the criminal matter" (Opp. at 3, emphasis in original) is

baseless. For example:

- On March 13, 2006, Robbins Russell sent to Tillotson a completed draft of a Rule 16 letter. Orseck Exh. A. The next day, Robbins Russell sent Kornman an updated draft incorporating edits from one of Kornman's other lawyers. *Id.* Exh. B.

- On April 6, 2006, Lawrence Robbins sent Tillotson a completed draft of the motion to dismiss the indictment and invited him to share it with Kornman. Orseck Exh. E. Robbins wrote Tillotson three days later to find out "where we are on the [motion to dismiss]." *Id.* Exh. F. Subsequently, on April 12, 2006, Robbins Russell sent an updated version of the draft to Tillotson. *Id.* Exh. G.

- On June 13, 2006, after working on the so-called *Stringer* motion that Robbins Russell had urged Kornman not to have the firm draft, Tillotson told Robbins Russell to "put that motion on the slow boat." Robbins Exh. E-5.

- On June 22, 2006, in response to Tillotson's request for a "not final" draft (Robbins Exh. E-6), Robbins Russell provided a draft suppression motion (Robbins Exh. E-7; Orseck Exh. C).

Despite sending all of these materials to Jeff Tillotson for the client's review, and despite

regular follow-ups urging the client to respond with any comments so the documents could be filed,

there was never any response (other than Kornman's May 2006 instruction to "send all future

documents in Word format," see Robbins Exh. E-2). Indeed, on June 13, 2006, Greg Poe spoke with

Tillotson about the status of the work product that Robbins Russell had prepared. As memorialized

by Mr. Poe's contemporaneous e-mail message (Robbins Exh. E-5), Tillotson advised that Robbins

Russell should provide a draft suppression motion (which it did on June 22, see Orseck Exh. C); that

Robbins Russell should continue looking at the "legal standards" concerning another possible

motion; that "the motion to dismiss has been reviewed by the client," who planned to file it in mid-

July; that "Kornman took [our Rule 16 letter] and turned it into junk"; and that "the holdup in

sending things out has been due to the client's position on things and the AUSA's involvement in a long trial that just ended."

Robbins Russell never received any further response, let alone any objection that the work was "incomplete" or "subpar." To the contrary, after refusing to pay Robbins Russell, Kornman (through his other lawyers) used Robbins Russell's work product. A motion to suppress signed by three other law firms, but copying verbatim portions of Robbins Russell's draft, was filed on February 9, 2007. See *United States v. Kornman*, No. 3:05-CR-0298P (N.D. Tex.), Dkt. 79. That same day, Kornman also filed a motion to dismiss signed by other lawyers, but which presented arguments developed by Robbins Russell. *Id.* Dkt. 75. Accordingly, even if Kornman could prove that he mistakenly believed that the parties had agreed to a "completed work product" condition to payment of legal fees, there is no support for Kornman's newly developed suggestion that it excused him from paying.[12]

Summary judgment is warranted here because no reasonable trier of fact could side with Kornman.

---

[12]    As we have noted previously, Kornman's newfound "mistake" defense is obviously undermined by his failure to pay the bills of numerous other law firms in the same underlying matters. In its collection action against Kornman in Texas, Winston & Strawn alleges that Kornman failed to pay that firm more than $1 million in fees, and that Kornman similarly failed to pay at least three other law firms as well. On information and belief, Kornman has failed to pay even *more* law firms in these same matters. Yet so far, although Kornman long ago agreed to produce demand letters and complaints from his other lawyers about unpaid bills (see Oct. 16, 2007 Memorandum Order, Dkt. 38), he has produced nothing. Kornman should not be permitted to rely on a "mistake" defense while simultaneously refusing to produce the materials that bear on that defense.

-17-

**CONCLUSION**

For the foregoing reasons, and those stated in our opening submission, the Court should enter summary judgment in favor of Robbins Russell on its account stated claim.

Dated: October 16, 2007

<div style="margin-left:40%">

Respectfully submitted,


_____/s/ Gary A. Orseck_____
Gary A. Orseck (Bar No. 433788)
Alan D. Strasser (Bar No. 967885)
Matthew R. Segal (Bar No. 483486)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411
Washington, DC  20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

**Attorneys for Plaintiff Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP**

</div>

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBBINS, RUSSELL, ENGLERT ORSECK & UNTEREINER LLP, | : : : | |
| Plaintiff, | : : | Civil Action No. 1:07-cv-00554-JR/JMF |
| v. | : : | |
| GARY KORNMAN, | : : | |
| Defendant. | : | |

## DECLARATION OF GARY A. ORSECK

I, Gary A. Orseck, under penalty of perjury, state as follows:

1.    I am counsel of record for Plaintiff Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell") in the above-captioned matter.

2.    Attached as Exhibit A is an accurate copy of a March 13, 2006, e-mail message transmitting to Jeff Tillotson Robbins Russell's draft Rule 16 letter.

3.    Attached as Exhibit B is an accurate copy of a March 14, 2006, e-mail message transmitting to Gary Kornman and Jeff Tillotson a revised draft of Robbins Russell's Rule 16 letter.

4.    Attached as Exhibit C is an accurate copy of a June 22, 2006, e-mail message transmitting to Tillotson Robbins Russell's draft of a motion to suppress evidence.

5.    Attached as Exhibit D is an accurate copy of an October 26, 2006, e-mail message transmitting to Tillotson Robbins Russell's draft of a so-called *Stringer* motion.

6.    Attached as Exhibit E is an accurate copy (without the attachment) of an April 6, 2006, e-mail message transmitting to Tillotson Robbins Russell's draft motion to dismiss the criminal indictment against Kornman.

7.    Attached as Exhibit F is an accurate copy of an April 9, 2006, e-mail message to Tillotson concerning Robbins Russell's draft motion to dismiss.

8.    Attached as Exhibit G is an accurate copy of an April 12, 2006, e-mail message transmitting to Tillotson a revised draft of Robbins Russell's motion to dismiss.

9.    Attached as Exhibit H are accurate copies of the check and deposit ticket evidencing Kornman's December 2004 payment of $160,000.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _Oct. 16, 2007_____

_____
Gary A. Orseck

**Unknown**

| | |
|---|---|
| **From:** | Yao, Alice |
| **Sent:** | Monday, March 13, 2006 5:53 PM |
| **To:** | 'Barry J. Pollack (bpollack@colliershannon.com)'; 'Jeff Tillotson (jmt@lynnllp.com)' |
| **Cc:** | Robbins, Larry; Poe, Greg |
| **Subject:** | Rule 16 Letter |
| **Attachments:** | Rule 16 Letter v5.pdf; Rule 16 Letter v5.wpd; Redline of Rule 16 Letter (v5 and v3).pdf; Redline of Rule 16 Letter (v5 and v3).wpd |

All,

Please find attached the most recent version of the Rule 16 letter, which incorporates some of Barry's points, as well as a few edits that we made here.  Also attached is a redline comparison to the last version that Larry circulated.

Alice

Alice W. Yao
Robbins, Russell, Englert, Orseck & Untereiner LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
Telephone:  (202) 775-4492
Fax: (202) 775-4510
www.robbinsrussell.com
ayao@robbinsrussell.com

This communication is for the use of the intended recipient only. It contains information that may be privileged, confidential, and/or attorney work product. If you are not the intended recipient, any use, disclosure, or copying of this communication is prohibited. If you received this communication in error, please notify the sender and permanently delete this communication.

**Exhibit A**
**Page 1**

RREOUS007497

Lawrence S. Robbins

<div align="right">(202) 775-4501<br>lrobbins@robbinsrussell.com</div>

March 13, 2006

Jeffrey J. Ansley
U.S. Attorney's Office – Dallas
Department of Justice
1100 Commerce
3rd Floor
Dallas, Texas 75242

     *Re:*    *United States* v. *Kornman*, 3:05-cr-00298 (N.D. Tex.)

Dear Mr. Ansley:

On behalf of Gary M. Kornman, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny, including *United States* v. *Agurs*, 427 U.S. 97 (1976), and *Giglio* v. *United States*, 405 U.S. 150 (1972), and the Fifth and Sixth Amendments to the United States Constitution, we write to request that you furnish the discovery materials and information described below.[1]

---

[1] We remind the government that its obligations under *Brady* are very broad. See *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Strickler* v. *Greene*, 527 U.S. 263, 280 (1999) (duty to disclose encompasses impeachment evidence as well as exculpatory evidence (citing *United States* v. *Bagley*, 473 U.S. 667, 676 (1985))); *United States* v. *Bowie*, 198 F.3d 905, 907 (D.C. Cir. 1999) ("Evidence affecting the credibility of government witnesses is a category of exculpatory information potentially within *Brady*'s disclosure obligation." (Citing *Giglio* v. *United States*, 405 U.S. 150, 154 (1972))); *In re Sealed Case (Brady Obligations)*, 185 F.3d 887 (D.C. Cir. 1999); see also *United States* v. *McVeigh*, 954 F. Supp. 1441, 1449 (D. Colo. 1997) (under *Brady* v. *Maryland*, 373 U.S. 83 (1963), prosecutors must "disclose to the defense the information known to or available to them which may develop doubt about the truth of the government's narrative"). Let me further note that the government's disclosure

<div align="center" style="color:darkred"><b>Exhibit A<br>Page 2</b></div>

Jeffrey J. Ansley
March 13, 2006
Page 2

Because the investigation in this matter has been jointly conducted by the United States Attorney and the Securities and Exchange Commission ("SEC"), we believe that for purposes of the government's discovery obligations, all documents, information and other materials in the possession, custody, and control of the SEC are likewise in the possession, custody, and control of the government.  If you do not intend to produce discovery on that same premise, please inform us as soon as possible.

In addition to those documents that the government has already produced, we request that the government produce the following documents, materials and information that are material to the preparation of the defense, material to the elements of the crimes charged in the indictment, or will play a significant role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, and assisting impeachment and rebuttal by the defendant. ("Documents" should be understood to include both electronic data and paper, "materials and information" should be understood to include, but not be limited to, recordings.)  More specifically, without limiting the scope of the general requests set forth below the asterisks, please produce the following:

1.    All documents, materials and information obtained from the residences of Gary Kornman and Michael Kornman, or any Kornman entity, by the government, law enforcement authorities, or the SEC.

2.    All documents, materials and information obtained by the government, law enforcement authorities, or the SEC from MiniMed, Inc. ("MiniMed"), Medtronic, Inc. ("Medtronic"), Hollywood Casino Corporation ("Hollywood"), Penn National Gaming, Inc. ("Penn National Gaming"), or any other third party, relating to the allegations underlying the indictment. This request includes, but is not limited to, any written or oral statements or presentations made by any MiniMed, Medtronic, Hollywood, Penn National Gaming, or any other third party, attorney to the government, law enforcement authorities, or the SEC.

3.    All documents, materials and information concerning Heritage procedures and controls, or lack thereof, between 2000 and the present, concerning the conduct alleged in the indictment.

------

obligations under Rule 16(a)(1)(E) are very broad as well. See *United States* v. *Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (stating that even inculpatory evidence may be material within the meaning of Rule 16(a)(1)(E) (then Rule 16(a)(1)(C))).

Jeffrey J. Ansley
March 13, 2006
Page 3

4.  All documents, materials and information sufficient to identify which Heritage employees worked with the defendant and the period when those employees worked for the defendant between 2000 and the present.  In addition, please produce:

    a.  All complaints, information, and indictments of each employee who worked for the defendant.

    b.  All testimony transcripts for any Heritage employee interviewed "on the record" by the SEC during the investigation.

    c.  Any notes of any interview of any Heritage employee conducted by the SEC during the investigation.

5.  All documents, materials and information sufficient to identify any witnesses who testified to the grand jury with regard to the defendant's case after the return of the indictment in this matter.

6.  All Heritage policies (if any) concerning relationships with prospective clients and clients during the period of 2000 to the present (including but not limited to recording policies, confidentiality policies, fiduciary duty policies, minutes or transcripts of meetings at which any policies relating to prospective clients or clients were discussed, and memoranda and e-mails concerning the same).

7.  All documents, materials and information relating to Heritage policies (if any) concerning relationships with prospective clients and clients that were created or received by the defendant or any other Heritage representative, or the contents of which were communicated to the defendant or any other Heritage representative.

8.  All documents, materials and information relating or reflecting the substance of Heritage policies regarding document retention.

9.  All documents, materials or information reflecting discussions at any meeting at which the defendant was present (either physically, by telephone, or by videoconference) that relate to the allegations set forth in the indictment.

10.  All documents, materials or information, including but not limited to brokerage account statements, reflecting the trading histories of Heritage Partners Fund or Heritage Opportunities Fund.

Jeffrey J. Ansley
March 13, 2006
Page 4

11.    All documents, materials or information referring to or relating to the purchase or sale of shares of MiniMed or Hollywood.

12.    All documents, materials or information that reflect or constitute communications between Gary Kornman, Michael Kornman, or any Kornman entity or agent thereof, and MiniMed or Hollywood.

13.    All documents, materials or information discussing or relating to the use, receipt or retention of material, nonpublic information concerning MiniMed or Hollywood.

14.    All documents, materials or information reflecting the course of negotiations between MiniMed and Medtronic, and the eventual acquisition of MiniMed by Medtronic.

15.    All documents, materials or information reflecting the course of negotiations between Hollywood and Penn National Gaming, and the eventual acquisition of Hollywood by Penn National Gaming.

16.    All documents, materials or information reflecting or relating to MiniMed's rules, procedures, guidelines, requirements, or policies regarding the handling or dissemination of nonpublic information, including but not limited to the acquisition of MiniMed by Medtronic.

17.    All documents, materials or information reflecting or relating to Hollywood Casino's rules, procedures, guidelines, requirements, or policies regarding the handling or dissemination of nonpublic information, including but not limited to the acquisition of Hollywood Casino by Penn National Gaming.

18.    All documents, materials or information reflecting interviews of potential witnesses for the government's case-in-chief, including, but not limited to, an interview of Anthony Bird on July 13, 2004, by Christian Parker.

19.    All documents, materials or information relating to the allegation in paragraphs 1.e and 8 of the indictment that on or about May 30, 2001, Medtronic publicly announced its agreement to purchase all outstanding Minimed shares at $48.00 per share.

20.    All documents, materials or information relating to the allegation in paragraphs 1.f and 16 of the indictment that on or about August 7, 2002, Penn National

**Exhibit A**
**Page 5**

Jeffrey J. Ansley
March 13, 2006
Page 5

Gaming publicly announced its agreement to purchase all of Hollywood's outstanding shares at $12.75 per share.

21.   All documents, materials or information relating to the allegations in paragraph 2 of the indictment that the defendant operated a fraud and deceit upon the purchasers and sellers of MiniMed and Hollywood securities.

22.   All documents, materials or information relating to the allegation in paragraphs 3, 7 and 14 of the indictment that the defendant obtained material, nonpublic information regarding possible acquisitions of MiniMed and Hollywood.

23.   All documents, materials or information relating to the allegation in paragraph 3 and 16 of the indictment that the defendant had a duty of trust and confidence to the principals of MiniMed and Hollywood.

24.   All documents, materials or information relating to the allegation in paragraph 3 of the indictment that the defendant misappropriated and misapplied material, nonpublic information that he obtained from the principals of MiniMed and Hollywood.

25.   All documents, materials or information relating to the allegations in paragraphs 3 and 7 of the indictment, reflecting the extent to which the information allegedly disclosed to the defendant was publicly available at the time of the purchases of MiniMed shares.

26.   All documents, materials or information relating to the allegations in paragraphs 3 and 14 of the indictment, reflecting the extent to which the information allegedly disclosed to the defendant was publicly available at the time of the purchases of Hollywood Casino shares.

27.   All documents, materials or information relating to the allegation in paragraph 3 of the indictment that the defendant knew that the material, nonpublic information would cause the stock prices of MiniMed and Hollywood to rise.

28.   All documents, materials or information relating to the allegation in paragraph 3 of the indictment that the defendant purchased stock in MiniMed and Hollywood before the disclosure of the information to the public.

29.   All documents, materials or information relating to the allegation in paragraph 3 of the indictment that after the public disclosure of the material, nonpublic

**Exhibit A**
**Page 6**

Jeffrey J. Ansley
March 13, 2006
Page 6

information previously obtained by the defendant, the stock prices of MiniMed and Hollywood increased.

30.     All documents, materials or information relating to the allegations in paragraphs 4, 5, 10, 11, and 12, of the indictment that the defendant caused Heritage representatives to send letters marked "PERSONAL & CONFIDENTIAL" to the MiniMed and Hollywood executives.

31.     All documents, materials or information relating to the allegation in paragraph 6 of the indictment that the MiniMed executive shared numerous confidences during meetings with the defendant and other Heritage representatives.

32.     All documents, materials or information relating to the allegation in paragraph 8 of the indictment that the defendant caused the broker for Heritage Partners Fund to purchase shares of MiniMed stock on behalf of the hedge fund sometime between on or about February 7, 2001, and on or about February 9, 2001.

33.     All documents, materials or information relating to the allegation in paragraph 9 of the indictment that Heritage Partners Fund received cash for its shares of MiniMed.

34.     All documents relating to the allegation in paragraph 13 of the indictment that the Hollywood executive shared numerous confidences during meetings with the defendant and other Heritage representatives.

35.     All documents, materials or information relating to the allegation in paragraphs 15 and 16 of the indictment that the defendant caused the broker for the Heritage Opportunities Fund to purchase shares of Hollywood on behalf of the hedge fund between on or about November 19, 2001 and June 24, 2002.

36.     All documents relating to the allegation in paragraph 17 of the indictment that the defendant caused the broker for Heritage Opportunities Fund to sell all of the hedge fund's shares of Hollywood on or about August 8, 2002.

37.     All documents relating to the allegation in paragraphs 2 and 3 of Count 3 of the indictment that on or about October 29, 2003, the defendant made false statements to the SEC, including but not limited to any tape recordings or transcripts that relate to the allegedly false statements.

*               *    *

**Exhibit A
Page 7**

RREOUS007503

Jeffrey J. Ansley
March 13, 2006
Page 7


Defendant's Statements – Rule 16(a)(1)(A)-(B)

    1.     All written or recorded statements made by the defendant within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the government.

    2.     All documents, whether in hard copy or electronic form, including writings, books, papers, memoranda, reports, drawings, graphs, charts, photographs, phone records, communications, electronic mail, data, or any data compilations from which the information can be obtained, translated, if necessary, into reasonably usable form, or any portion thereof (hereinafter "documents") that contain the substance of any oral statement made by the defendant to the government, law enforcement, or regulatory authorities, regardless of the government's intentions with respect to the statement's use at trial. FED. R. CRIM. P. 16(a)(1)(A). This request includes documents prepared by law enforcement agents or regulators to the extent that a statement of the defendant is related or described within. Where a statement is contained in more than one document, please provide each such writing.

    3.     All recorded testimony of the defendant or of any other person authorized to legally bind the defendant or to make admissions on the defendant's behalf, if any, which relates to the offense(s) charged.

    4.     With respect to the government's due diligence obligation, please provide the name and whereabouts of any government agent or employee who has had contact with the defendant, but who has not been interviewed to determine whether the defendant made statements in his or her presence.

    5.     All communications between the government, law enforcement or regulatory authorities and the defendant, or any attorney representing the defendant concerning any of the allegations underlying the indictment.

Defendant's Prior Criminal Record – Rule 16(a)(1)(D)

    6.     Defendant's prior criminal record (including pending cases), if any, the existence of which is known, or by the exercise of due diligence may become known, to the government. This request includes, but is not limited to all matters known or reasonably discoverable by the government which may affect defendant's criminal history score under the United States Sentencing Guidelines, and, more specifically, includes, but is not limited to a request for a "copy of [defendant's]

**Exhibit A**
**Page 8**

RREOUS007504

Jeffrey J. Ansley
March 13, 2006
Page 8

prior criminal record." See FED. R. CRIM. P. 16(a)(1)(D); *United States* v. *Trejo-Zambrano*, 582 F.2d 460, 465 (9th Cir. 1978) ("prosecutor ordinarily discharges his duty under Rule 16(a)(1)(B) [the predecessor to the current provision] by supplying the accused with a copy of his F.B.I. rap sheet"); *United States* v. *Feola*, 651 F. Supp. 1068, 1147-48 (S.D.N.Y. 1987) (requiring production of copy of conviction record), *aff'd*, 875 F.2d 857 (2d Cir. 1989). Please indicate whether the government has exercised the due diligence required by Rule 16 in addition to any reliance that the government may have placed upon efforts made by Pretrial Services.

Documents and Tangible Objects – Rule 16(a)(1)(E)

7.    All documents, materials and information that were obtained from or belong to the defendant and a description of all tangible objects, buildings or places material to the preparation of the defense, intended to be used at trial, or obtained from or pertaining to any defendant.

8.    All documents, materials and information that the government intends to use at trial as evidence in its case in chief. We request that any items in this category be specifically identified from among the materials that must be produced pursuant to the defendant's Rule 16 requests, both to enable counsel to prepare effectively for trial and to afford the defendant an opportunity to move to suppress any evidence the government intends to use in its case in chief. FED. R. CRIM. P. 12(b)(3) and 12(d).

9.    All charts, summaries or calculations reflecting the contents of writings or other documents that are either (a) material to the preparation of the defense, or (b) intended for use by the government as evidence in chief at trial.

10.   A detailed description of any documents, objects or physical evidence relating to the allegations underlying the indictment that have been destroyed or lost, or are not in the custody or control of the government. If the government contemplates destroying or releasing any such items in the future, we request notice and an opportunity to object prior to any such action.

11.   A detailed description of any documents, objects or physical evidence relating to the allegations underlying the indictment that you believe are not in the possession, custody or control of the government.

Reports of Examinations and Tests – Rule 16(a)(1)(F)

**Exhibit A
Page 9**

Jeffrey J. Ansley
March 13, 2006
Page 9

12.　All results and reports of physical and mental examinations relevant to this matter, and scientific tests of experiments relevant to this matter, which are in the government's possession, custody or control, and the existence of which is known to the government or may become known through the exercise of due diligence. We request notice of any government decision to refrain from producing such materials, so that a judicial decision as to production may, if warranted, be sought.

Summaries of Expert Testimony – Rule 16(a)(1)(G)

13.　A written summary of any expert testimony which the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence in its case-in-chief at trial. All summaries must describe the witnesses' opinions, the asserted bases and reasons for the opinions, and the witnesses' qualifications. FED. R. CRIM. P. 16(a)(1)(G).

Rule 12(b)(4)(B) Notice

14.　Notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16.

"Other Crimes, Wrongs Or Acts" Evidence – FED. R. EVID. 404(b)

15.　Notice of the nature of any "other crimes, wrongs, or acts" evidence ("other offense evidence") that the government intends to use at trial in its case-in-chief or in rebuttal, together with any documents or tangible objects that the government intends to introduce in evidence in connection with such other offense evidence; any documents material to the preparation of the defense in opposition to such other offense evidence; and any written or oral statement made by the defendant relating to such other offense evidence. For purposes of this paragraph, the term "statements" shall be construed to the broadest extent permitted by the FED. R. CRIM. P. 26.2.

*Brady/Giglio* Material

16.　To the extent not requested above, all exculpatory or impeaching material in the government's possession, custody or control, or otherwise known to the government, including, but not limited to, the items listed below. We request prompt production of all exculpatory and impeaching material because such material is necessary to (i) enable the defense to determine what motions in

**Exhibit A
Page 10**

Jeffrey J. Ansley
March 13, 2006
Page 10

limine are necessary; (ii) allow counsel to prepare for trial; and (iii) allow counsel to prepare for meaningful cross-examination of any witness who may testify on behalf of the government.

a.    All documents relating to when the type of conduct alleged in the indictment occurred.

b.    A list of the names and addresses of all witnesses that the government intends to call at trial.

c.    Any and all threats, express or implied, direct or indirect, directed against any potential government witness, including, but not limited to, threats concerning criminal prosecutions or investigations pending or which could be brought against any such witness; any probationary, parole, deferred prosecution or custodial status or any such witness; and any civil, tax court, court of claims, administrative, regulatory or other pending or potential legal disputes or transactions involving any such witness and a State or the Federal Government, or over which the State or Federal Government has real, apparent or perceived influence.

    i.    The above request specifically seeks oral or written statements made by an Assistant United States Attorney, other law enforcement official, SEC official, to any individual or to that individual's lawyer in connection with the government's interview of such individual, testimony given by the individual, or a proffer given by the individual's attorney, concerning: (i) whether the government tended to doubt the individual's credibility or the statements he or she made during the interview, during testimony, or at any other time; or (ii) the government's view that the individual might be subject to criminal or regulatory charges for any reason.

    ii.    The date and description of all any and all considerations or promises of consideration given by an Assistant United States Attorney, any law enforcement official or any employee of the SEC, to or on behalf of any potential government witness, or any such consideration or promises expected or hoped for by any such witness at any future time. Such "considerations" include anything that arguably could be of value or use to a witness or anyone related to the witness by blood or marriage, including, but not

RREOUS007507

Jeffrey J. Ansley
March 13, 2006
Page 11

limited to, formal or informal, direct or indirect, leniency, favorable treatment or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative, regulatory, or other matter involving a State or the Federal Government, or any other authority or party; relief from forfeiture; payments of money; provisions of food, clothing, transportation, legal services or other benefits; statements to anyone informing the recipient of the witness's cooperation; recommendations concerning federal aid or benefits; recommendations concerning licensing, certification or registration; promises to take affirmative action to help the status of the witness in a profession, business or employment or promises not to jeopardize such status; aid or efforts in securing or maintaining the business or employment of a witness; and anything else that arguably could reveal an interest, motive or bias in the witness in favor of the government or against any defendant.

iii.    A list and description of any and all requests, demands or complaints made to the government by a potential government witness that could demonstrate any hope or expectation on the part of the witness for favorable governmental action on his or her behalf (regardless of whether or not the government has agreed to provide any favorable action).

iv.    Any material not otherwise listed that might potentially reflect or evidence either the motivation of a potential government witness to cooperate with the government or any bias or hostility against any defendant.

d.    Any and all records and information revealing prior criminal convictions or guilty verdicts or juvenile adjudications (including pending cases), including but not limited to relevant "rap sheets," of each potential government witness.

e.    Any and all records and information revealing prior or subsequent misconduct, criminal acts or bad acts, and disciplinary action (including pending cases) of each potential government witness, including, without limitation, allegations of criminal conduct, or allegations of conduct in violation of any federal, state, or self-regulatory organization law, regulation or rule, involving the bank, securities or other industry, or in

RREOUS007508

Jeffrey J. Ansley
March 13, 2006
Page 12

violation of any rule, policy, practice, or procedure of Heritage, of which the government knows or through reasonable diligence should have reason to know.

f.      All information concerning the witness's immigration status.

g.      All information arguably showing or tending to show that the witness has manufactured, falsified, or planted evidence, whether in physical or testimonial form, in connection with any criminal arrest or charge.

h.      All instances of the witness having failed to follow government regulations in connection with the investigation, arrest, and post-arrest treatment of suspects.

i.      All other evidence arguably supporting the proposition that a witness has a motive to lie against the defendant.

j.      Any and all statements by the government, its agents and representatives to any potential government witness (or counsel for such witness) whom the government intends to call as a witness during trial pertaining in any way to any government matter involving the witness or anyone related by blood or marriage to the witness.

k.      Any statements (written or oral) or documents, including but not limited to, grand jury testimony and federal, state and local tax returns made or executed by any potential government witness which the government knows, or through reasonable diligence should have reason to know is false.

l.      A copy of all medical and psychiatric reports, or any other document or information known to the government or which can reasonably be known to the government concerning any potential government witness that may arguably affect the witness's credibility or ability to perceive, relate or recall events.  This request includes, but is not limited to, information demonstrating that any person who is a potential government witness in this case is or was suffering from any physical or mental disability or emotional disturbance, or using, dependent upon or addicted to drugs or alcohol at any time, from the time period charged in the indictment to the present.

RREOUS007509

Jeffrey J. Ansley
March 13, 2006
Page 13

m.    Any written or oral statement, whether or not reduced to writing, made by any potential government witness which in any way contradicts, is inconsistent with or different from other oral or written statements he or she has made.

n.    The name and address of any person(s) known to the government to whom the witness has made statements relating to the subjects of the indictment, which statements were inconsistent with statements made by the witness to law enforcement officers.

o.    Any and all records and information that could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the government's evidence.

p.    The same records and information requested in items (a) through (o) with respect to each non-witness declarant whose statements are offered in evidence.

q.    The same records and information requested in items (a) through (o) with respect to each informant in this case.

r.    The names and addresses of, and the same records and information requested in items (a) through (o) with respect to, all persons whom the government, its agents or representatives believe to have relevant knowledge and information with reference to the charges contained in the indictment but whom the government does not propose to call as witnesses at trial.

s.    Copies of any and all documents and records of any law enforcement agency, or self-regulatory organization, reflecting any investigation of or disciplinary action taken against any law enforcement or regulatory official who participated in this investigation or who is expected to testify in this proceeding.

t.    Copies of any and all records of any law enforcement or regulatory agency reflecting any commendations, awards or recognition of any kind, or requests for any commendations, awards or recognition of any kind made to or by, or on behalf of, any law enforcement, SEC, or other official involved in this case with respect to this case.

**Exhibit A**
**Page 14**

RREOUS007510

Jeffrey J. Ansley
March 13, 2006
Page 14

u.  In addition to the above, please provide all documents, tests or experiments, objects, statements of witnesses, and other evidence and information, including, but not limited to, the items set forth below that (i) tend to exculpate the defendant, (ii) may be favorable or useful to the defense as to either guilt or punishment, or (iii) tend to affect the weight or credibility of evidence to be presented against the defendant. This request applies to evidence that is within the possession, custody or control of the government, known by the government or could by the exercise of due diligence become known to the government. *Brady* v. *Maryland*, 373 U.S. 83 (1963).

   i.  We specifically request any statements made by any witness that tend to exculpate the defendant.

   ii.  We specifically request all testimony by any witness that tends to exculpate the defendant.

   iii.  Any exculpatory information presented to the grand jury.

   iv.  If the government is aware of facts that would constitute *Brady* material but assumes that the defendant or counsel knows or should know such facts, please verify that counsel is aware of these facts.

17.  The results of any and all efforts on the part of the government or its agents or representatives to secure an identification of the defendant. This request seeks information relating to the conduct of any show-up (any viewing of only one individual) or photographic identification procedure. If such occurred, we request copies of all photographs examined by any individual; copies of any other relevant photograph; the date, time and place of such identification procedure; the name(s) and address(es) of all individuals requested to attempt an identification; the results – positive, negative or otherwise – of such identification procedure; any document embodying in whole or in part the circumstances and results of such identification procedure; all physical descriptions given to law enforcement personnel prior to the identification procedure (including copies of any composite drawings); and whether any individual advised law enforcement personnel in advance of the procedure that he or she would be unable to make an identification.

18.  As a predicate to motions pursuant to FED. R. CRIM. P. 12, notice as to:

**Exhibit A**
**Page 15**

RREOUS007511

Jeffrey J. Ansley
March 13, 2006
Page 15

    a.    Whether any evidence in the government's possession, custody or control was obtained by a search and seizure, and a description of such evidence.

    b.    Please provide details regarding any searches conducted in the course of this investigation whether or not items seized in the search will be introduced by the government as evidence at trial, including but not limited to the premises searched, the date of the search, the names of the officers who conducted the search, descriptions of any items seized, the name of any individual purporting to give consent to any such search and the purported relationship between that person and the premises searched.

    c.    Whether any evidence in the government's possession, custody or control was obtained through electronic or mechanical surveillance or tape recording, and a description of such evidence.

    d.    Whether any evidence in the government's possession, custody or control was obtained through the use of a beeper or other tracking device, and description of such evidence.

    e.    Whether any evidence in the government's possession, custody or control was obtained through a mail cover, and a description of such evidence.

    f.    Whether any persons were present during the grand jury proceedings other than the grand jurors, witnesses, court reporters and Assistant United States Attorneys.

    g.    Whether any grand jury materials, including grand jury transcripts or any documents or information produced to the grand jury or pursuant to subpoena issued by the grand jury, were disclosed or released to any person other than the grand jurors, witnesses, court reporters and Assistant United States Attorneys, including any disclosure made to any SEC official or employee.  If such disclosure was so made, please provide a copy of any court orders authorizing such disclosure and the identity of all persons authorized to receive disclosure.

19.    Whether, should the defendant testify in his own behalf, the government will attempt to rely upon specific instances of conduct or a prior conviction for the purpose of impeachment, and a description of any such instance or prior conviction.

RREOUS007512

Jeffrey J. Ansley
March 13, 2006
Page 16

20.    All results or reports of physical or mental examinations, scientific tests or experiments (or copies thereof) that were conducted in connection with any investigation of the charges contained in the indictment, including but not limited to:

    a.    All handwriting exemplars and samples, and reports of handwriting analyses.

    b.    All fingerprint and palm print exemplars, fingerprint samples, comparisons and opinions of fingerprint experts, and all documents that relate to those opinions.

    c.    All attempts at voice identification by whatever means, upon which the government will rely, which are material to the defense of this case.

    d.    All psychological or other tests performed upon any potential government witness and all documents that refer or relate to such tests.

    e.    All polygraph examinations, psychological stress evaluations or any other procedures, devised to determine whether a subject is telling the truth or to refresh a witness's memory and all documents that refer or relate to such examinations.

21.    Pursuant to FED. R. EVID. 104, and the defendant's rights to effective representation by counsel and a fair trial, disclosure of the following evidence, to the extent the government intends to offer such evidence in its case in chief:

    a.    Any statement as to which the defendant manifests his adoption or belief in its truth, FED. R. EVID. 801(d)(2)(B).

    b.    Any statement made by another that was purportedly authorized by the defendant, or is deemed to be an admission of any defendant, FED. R. EVID. 801(d)(2)(A) and 801(d)(2)(C).

    c.    Any statement by any agent or servant of the defendant concerning a matter within the scope of his agency or employment made during the existence of such a relationship, FED. R. EVID. 801(d)(2)(D).

    d.    Please state whether the government intends to claim that the defendant acted as part of a conspiracy (even if uncharged), and if so, who the

RREOUS007513

Jeffrey J. Ansley
March 13, 2006
Page 17

> defendant's alleged co-conspirators were.  Please also disclose any statement made by any alleged co-conspirator of the defendant during the course and in furtherance of the alleged conspiracy, FED. R. EVID. 801(d)(2)(E).
>
> e. Please state whether the government intends to offer any hearsay evidence pursuant to FED. R. EVID. 807.  If so, provide the information required by the Rule.

22. Pursuant to FED. R. EVID. 1006, notice as to whether the government will seek to offer any chart, summary or calculation in evidence.  If so, the defense requests that such be made available sufficiently in advance of trial for inspection and copying.

23. Please produce and/or identify any and all documents that are responsive to the defendant's requests for particulars dated **[fill in date]**.

<u>Other Sentencing-Related Issues</u>

24. To ensure that the defendant's rights to due process and effective assistance of counsel under the United States Constitution are protected, please advise me promptly of all facts and circumstances (including but not limited to documents) known to, or reasonably discoverable by, the government that relate to sentencing issues in connection with this matter (*e.g.*, any alleged relevant conduct of which the government is aware or by the exercise of due diligence may become aware). Defendant submits that, in the event he wishes to consider entering a guilty plea in this case, he cannot knowingly, intelligently, or voluntarily do so without disclosure of such sentencing-related information.  In other words, defendant submits that a plea in such circumstances would not be fully informed as to potential sentencing consequences, and could not be knowing, voluntary, and intelligent.  See *United States* v. *McKoy*, 215 F.3d 102, 108 (D.C. Cir. 2000) (quoting *United States* v. *Horne*, 987 F.2d 833, 840 (D.C. Cir. 1993) (Buckley, J., concurring)); accord *Horne*, 987 F.2d at 839-41 (Buckley, J., concurring) ("A bargain . . . is a pragmatic exchange based on an understanding of mutual advantage.  A defendant's understanding of the maximum penalties he will face if he enters a guilty plea may be of critical importance . . . to the defendant's decision to accept the Government's offer rather than assume the risks of trial"); U.S.S.G. § 6B1.2 (Policy Statement), Commentary ("The Commission encourages the prosecuting attorney prior to the entry of a plea of guilty . . . to disclose to the defendant . . . the offender characteristics, then known to the

Jeffrey J. Ansley
March 13, 2006
Page 18

> prosecuting attorney, that are relevant to the application of the sentencing guidelines").

Each of the above requests calls for all responsive items which are within the possession, custody, or control of the government, or which are either known to exist or could by the exercise of due diligence become known to the government. Each request is also of a continuing nature, and we request prompt notice in the event that responsive information comes to the government's attention at any point in the future. If the government declines to provide any information requested, please advise us of the government's objection so that we can consider bringing any dispute to the attention of the Court.

Finally, I request that you advise the investigating law enforcement officers and any other government agents involved in this matter to refrain from any contact with defendant, except with prior notification to, and in the presence of, defendant's attorney. In addition, we request that all government agents be directed to preserve all of their rough notes and other objects that may be material to this case.

Very truly yours,

Lawrence S. Robbins

Exhibit A
Page 19

## Unknown

| | |
|---|---|
| **From:** | Yao, Alice |
| **Sent:** | Tuesday, March 14, 2006 3:25 PM |
| **To:** | 'Pollack, Barry'; 'gmkornmanlegalprivileged@yahoo.com'; 'jmt@lynnllp.com' |
| **Cc:** | Robbins, Larry; Poe, Greg |
| **Subject:** | RE: Rule 16 Letter |
| **Attachments:** | Rule 16 Letter v6.wpd; Rule 16 Letter v6.pdf; Redline of Rule 16 Letter (v6 and v5).pdf; Redline of Rule 16 Letter (v6 and v5).wpd; Rule 16 Letter v6.pdf; Rule 16 Letter v6.wpd; Redline of Rule 16 Letter (v6 and v5).pdf; Redline of Rule 16 Letter (v6 and v5).wpd |

All,

Please find attached the most recent version of the Rule 16 letter, which incorporates Barry's suggestion (with some minor edits), as well as a redline comparison to the version that I circulated yesterday.

Alice

> -----Original Message-----
> **From:** Pollack, Barry [mailto:BPollack@colliershannon.com]
> **Sent:** Tuesday, March 14, 2006 11:32 AM
> **To:** gmkornmanlegalprivileged@yahoo.com; Yao, Alice; jmt@lynnllp.com
> **Cc:** Robbins, Larry; Poe, Greg
> **Subject:** RE: Rule 16 Letter
>
> One other concept we may want to address in the Brady letter is materiality. The following is a paragraph I have included in recent letters:
>
> > Further, the Government must identify and provide any potentially exculpatory materials. It cannot evade its responsibility to produce *Brady* materials by asserting that in the Government's view the materials would not likely impact the result of the proceeding. United States v. Safavian, 233 F.R.D. 12, 16 (D.D.C. 2005)("The only question before (and even during) trial is whether the evidence at issue may be `favorable to the accused'; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.").
>
> > -----Original Message-----
> > **From:** Yao, Alice [mailto:ayao@robbinsrussell.com]
> > **Sent:** Monday, March 13, 2006 4:53 PM
> > **To:** Pollack, Barry; jmt@lynnllp.com
> > **Cc:** Robbins, Larry; Poe, Greg
> > **Subject:** Rule 16 Letter
> >
> > All,
> >
> > Please find attached the most recent version of the Rule 16 letter, which incorporates some of Barry's points, as well as a few edits that we made here. Also attached is a redline comparison to the last version that Larry circulated.
> >
> > Alice

**Exhibit B**
**Page 1**

RREOUS007663

Alice W. Yao
Robbins, Russell, Englert, Orseck & Untereiner LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
Telephone:  (202) 775-4492
Fax: (202) 775-4510
www.robbinsrussell.com
ayao@robbinsrussell.com

This communication is for the use of the intended recipient only. It contains information that may be privileged, confidential, and/or attorney work product. If you are not the intended recipient, any use, disclosure, or copying of this communication is prohibited. If you received this communication in error, please notify the sender and permanently delete this communication.

This electronic message transmission contains information

from the law firm of Collier Shannon Scott, PLLC and is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination or distribution of this communication to other than the intended recipient is strictly prohibited. If you have received this communication in error, please notify us immediately by collect telephone at (202)342-8808 or electronic mail (WebGroup@colliershannon.com). Thank you. For more information about Collier Shannon Scott, PLLC, please visit us at http://www.colliershannon.com/

**Exhibit B**
**Page 2**

RREOUS007664

Lawrence S. Robbins                                                          (202) 775-4501
                                                            lrobbins@robbinsrussell.com


March 14, 2006


Jeffrey J. Ansley
U.S. Attorney's Office – Dallas
Department of Justice
1100 Commerce
3rd Floor
Dallas, Texas 75242

        Re:      *United States* v. *Kornman*, 3:05-cr-00298 (N.D. Tex.)

Dear Mr. Ansley:

        On behalf of Gary M. Kornman, pursuant to Rule 16 of the Federal Rules of Criminal
Procedure, *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny, including *United States* v.
*Agurs*, 427 U.S. 97 (1976), and *Giglio* v. *United States*, 405 U.S. 150 (1972), and the Fifth and
Sixth Amendments to the United States Constitution, we write to request that you furnish the
discovery materials and information described below.[1]

---

        [1] We remind the government that its obligations under *Brady* are very broad. See *Kyles* v.
*Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable
evidence known to the others acting on the government's behalf in the case, including the police");
*Strickler* v. *Greene*, 527 U.S. 263, 280 (1999) (duty to disclose encompasses impeachment evidence
as well as exculpatory evidence (citing *United States* v. *Bagley*, 473 U.S. 667, 676 (1985))); *United
States* v. *Bowie*, 198 F.3d 905, 907 (D.C. Cir. 1999) ("Evidence affecting the credibility of
government witnesses is a category of exculpatory information potentially within *Brady*'s disclosure
obligation." (Citing *Giglio* v. *United States*, 405 U.S. 150, 154 (1972))); *In re Sealed Case (Brady
Obligations)*, 185 F.3d 887 (D.C. Cir. 1999); see also *United States* v. *McVeigh*, 954 F. Supp. 1441,
1449 (D. Colo. 1997) (under *Brady* v. *Maryland*, 373 U.S. 83 (1963), prosecutors must "disclose
to the defense the information known to or available to them which may develop doubt about the
truth of the government's narrative"). Among these obligations is the government's duty to identify

RREOUS007686

Jeffrey J. Ansley
March 14, 2006
Page 2


Because the investigation in this matter has been jointly conducted by the United States Attorney and the Securities and Exchange Commission ("SEC"), we believe that for purposes of the government's discovery obligations, all documents, information and other materials in the possession, custody, and control of the SEC are likewise in the possession, custody, and control of the government.  If you do not intend to produce discovery on that same premise, please inform us as soon as possible.

In addition to those documents that the government has already produced, we request that the government produce the following documents, materials and information that are material to the preparation of the defense, material to the elements of the crimes charged in the indictment, or will play a significant role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, and assisting impeachment and rebuttal by the defendant. ("Documents" should be understood to include both electronic data and paper, "materials and information" should be understood to include, but not be limited to, recordings.)  More specifically, without limiting the scope of the general requests set forth below the asterisks, please produce the following:

1.    All documents, materials and information obtained from the residences of Gary Kornman and Michael Kornman, or any Kornman entity, by the government, law enforcement authorities, or the SEC.

2.    All documents, materials and information obtained by the government, law enforcement authorities, or the SEC from MiniMed, Inc. ("MiniMed"), Medtronic, Inc. ("Medtronic"), Hollywood Casino Corporation ("Hollywood"), Penn National Gaming, Inc. ("Penn National Gaming"), or any other third party, relating to the allegations underlying the indictment. This request includes, but is not limited to, any written or oral statements or presentations made by any MiniMed, Medtronic, Hollywood, Penn National Gaming, or any other third party, attorney to the government, law enforcement authorities, or the SEC.

---

and provide any *potentially* exculpatory materials. The government cannot evade its responsibility to produce *Brady* materials by asserting that in the government's view the materials would not likely impact the result of the proceeding. *United States* v. *Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) ("The only question before (and even during) trial is whether the evidence at issue may be 'favorable to the accused'; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." (Citations omitted.)).  Let me further note that the government's disclosure obligations under Rule 16(a)(1)(E) are very broad as well. See *United States* v. *Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (stating that even inculpatory evidence may be material within the meaning of Rule 16(a)(1)(E) (then Rule 16(a)(1)(C)).

**Exhibit B**
**Page 4**

Jeffrey J. Ansley
March 14, 2006
Page 3

3.    All documents, materials and information concerning Heritage procedures and controls, or lack thereof, between 2000 and the present, concerning the conduct alleged in the indictment.

4.    All documents, materials and information sufficient to identify which Heritage employees worked with the defendant and the period when those employees worked for the defendant between 2000 and the present.  In addition, please produce:

a.    All complaints, information, and indictments of each employee who worked for the defendant.

b.    All testimony transcripts for any Heritage employee interviewed "on the record" by the SEC during the investigation.

c.    Any notes of any interview of any Heritage employee conducted by the SEC during the investigation.

5.    All documents, materials and information sufficient to identify any witnesses who testified to the grand jury with regard to the defendant's case after the return of the indictment in this matter.

6.    All Heritage policies (if any) concerning relationships with prospective clients and clients during the period of 2000 to the present (including but not limited to recording policies, confidentiality policies, fiduciary duty policies, minutes or transcripts of meetings at which any policies relating to prospective clients or clients were discussed, and memoranda and e-mails concerning the same).

7.    All documents, materials and information relating to Heritage policies (if any) concerning relationships with prospective clients and clients that were created or received by the defendant or any other Heritage representative, or the contents of which were communicated to the defendant or any other Heritage representative.

8.    All documents, materials and information relating or reflecting the substance of Heritage policies regarding document retention.

9.    All documents, materials or information reflecting discussions at any meeting at which the defendant was present (either physically, by telephone, or by videoconference) that relate to the allegations set forth in the indictment.

**Exhibit B**
**Page 5**

Jeffrey J. Ansley
March 14, 2006
Page 4

10.    All documents, materials or information, including but not limited to brokerage account statements, reflecting the trading histories of Heritage Partners Fund or Heritage Opportunities Fund.

11.    All documents, materials or information referring to or relating to the purchase or sale of shares of MiniMed or Hollywood.

12.    All documents, materials or information that reflect or constitute communications between Gary Kornman, Michael Kornman, or any Kornman entity or agent thereof, and MiniMed or Hollywood.

13.    All documents, materials or information discussing or relating to the use, receipt or retention of material, nonpublic information concerning MiniMed or Hollywood.

14.    All documents, materials or information reflecting the course of negotiations between MiniMed and Medtronic, and the eventual acquisition of MiniMed by Medtronic.

15.    All documents, materials or information reflecting the course of negotiations between Hollywood and Penn National Gaming, and the eventual acquisition of Hollywood by Penn National Gaming.

16.    All documents, materials or information reflecting or relating to MiniMed's rules, procedures, guidelines, requirements, or policies regarding the handling or dissemination of nonpublic information, including but not limited to the acquisition of MiniMed by Medtronic.

17.    All documents, materials or information reflecting or relating to Hollywood Casino's rules, procedures, guidelines, requirements, or policies regarding the handling or dissemination of nonpublic information, including but not limited to the acquisition of Hollywood Casino by Penn National Gaming.

18.    All documents, materials or information reflecting interviews of potential witnesses for the government's case-in-chief, including, but not limited to, an interview of Anthony Bird on July 13, 2004, by Christian Parker.

19.    All documents, materials or information relating to the allegation in paragraphs 1.e and 8 of the indictment that on or about May 30, 2001, Medtronic publicly

**Exhibit B**
**Page 6**

Jeffrey J. Ansley
March 14, 2006
Page 5

announced its agreement to purchase all outstanding Minimed shares at $48.00 per share.

20.    All documents, materials or information relating to the allegation in paragraphs 1.f and 16 of the indictment that on or about August 7, 2002, Penn National Gaming publicly announced its agreement to purchase all of Hollywood's outstanding shares at $12.75 per share.

21.    All documents, materials or information relating to the allegations in paragraph 2 of the indictment that the defendant operated a fraud and deceit upon the purchasers and sellers of MiniMed and Hollywood securities.

22.    All documents, materials or information relating to the allegation in paragraphs 3, 7 and 14 of the indictment that the defendant obtained material, nonpublic information regarding possible acquisitions of MiniMed and Hollywood.

23.    All documents, materials or information relating to the allegation in paragraph 3 and 16 of the indictment that the defendant had a duty of trust and confidence to the principals of MiniMed and Hollywood.

24.    All documents, materials or information relating to the allegation in paragraph 3 of the indictment that the defendant misappropriated and misapplied material, nonpublic information that he obtained from the principals of MiniMed and Hollywood.

25.    All documents, materials or information relating to the allegations in paragraphs 3 and 7 of the indictment, reflecting the extent to which the information allegedly disclosed to the defendant was publicly available at the time of the purchases of MiniMed shares.

26.    All documents, materials or information relating to the allegations in paragraphs 3 and 14 of the indictment, reflecting the extent to which the information allegedly disclosed to the defendant was publicly available at the time of the purchases of Hollywood Casino shares.

27.    All documents, materials or information relating to the allegation in paragraph 3 of the indictment that the defendant knew that the material, nonpublic information would cause the stock prices of MiniMed and Hollywood to rise.

**Exhibit B**
**Page 7**

Jeffrey J. Ansley
March 14, 2006
Page 6

28.     All documents, materials or information relating to the allegation in paragraph 3 of the indictment that the defendant purchased stock in MiniMed and Hollywood before the disclosure of the information to the public.

29.     All documents, materials or information relating to the allegation in paragraph 3 of the indictment that after the public disclosure of the material, nonpublic information previously obtained by the defendant, the stock prices of MiniMed and Hollywood increased.

30.     All documents, materials or information relating to the allegations in paragraphs 4, 5, 10, 11, and 12, of the indictment that the defendant caused Heritage representatives to send letters marked "PERSONAL & CONFIDENTIAL" to the MiniMed and Hollywood executives.

31.     All documents, materials or information relating to the allegation in paragraph 6 of the indictment that the MiniMed executive shared numerous confidences during meetings with the defendant and other Heritage representatives.

32.     All documents, materials or information relating to the allegation in paragraph 8 of the indictment that the defendant caused the broker for Heritage Partners Fund to purchase shares of MiniMed stock on behalf of the hedge fund sometime between on or about February 7, 2001, and on or about February 9, 2001.

33.     All documents, materials or information relating to the allegation in paragraph 9 of the indictment that Heritage Partners Fund received cash for its shares of MiniMed.

34.     All documents relating to the allegation in paragraph 13 of the indictment that the Hollywood executive shared numerous confidences during meetings with the defendant and other Heritage representatives.

35.     All documents, materials or information relating to the allegations in paragraphs 15 and 16 of the indictment that the defendant caused the broker for the Heritage Opportunities Fund to purchase shares of Hollywood on behalf of the hedge fund between on or about November 19, 2001 and June 24, 2002.

36.     All documents relating to the allegation in paragraph 17 of the indictment that the defendant caused the broker for Heritage Opportunities Fund to sell all of the hedge fund's shares of Hollywood on or about August 8, 2002.

RREOUS007691

Jeffrey J. Ansley
March 14, 2006
Page 7

37.    All documents relating to the allegation in paragraphs 2 and 3 of Count 3 of the indictment that on or about October 29, 2003, the defendant made false statements to the SEC, including but not limited to any tape recordings or transcripts that relate to the allegedly false statements.

\*                \*    \*

Defendant's Statements – Rule 16(a)(1)(A)-(B)

1.    All written or recorded statements made by the defendant within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the government.

2.    All documents, whether in hard copy or electronic form, including writings, books, papers, memoranda, reports, drawings, graphs, charts, photographs, phone records, communications, electronic mail, data, or any data compilations from which the information can be obtained, translated, if necessary, into reasonably usable form, or any portion thereof (hereinafter "documents") that contain the substance of any oral statement made by the defendant to the government, law enforcement, or regulatory authorities, regardless of the government's intentions with respect to the statement's use at trial.  FED. R. CRIM. P. 16(a)(1)(A).  This request includes documents prepared by law enforcement agents or regulators to the extent that a statement of the defendant is related or described within.  Where a statement is contained in more than one document, please provide each such writing.

3.    All recorded testimony of the defendant or of any other person authorized to legally bind the defendant or to make admissions on the defendant's behalf, if any, which relates to the offense(s) charged.

4.    With respect to the government's due diligence obligation, please provide the name and whereabouts of any government agent or employee who has had contact with the defendant, but who has not been interviewed to determine whether the defendant made statements in his or her presence.

5.    All communications between the government, law enforcement or regulatory authorities and the defendant, or any attorney representing the defendant concerning any of the allegations underlying the indictment.

Defendant's Prior Criminal Record – Rule 16(a)(1)(D)

**Exhibit B**
**Page 9**

RREOUS007692

Jeffrey J. Ansley
March 14, 2006
Page 8

6.    Defendant's prior criminal record (including pending cases), if any, the existence of which is known, or by the exercise of due diligence may become known, to the government.  This request includes, but is not limited to all matters known or reasonably discoverable by the government which may affect defendant's criminal history score under the United States Sentencing Guidelines, and, more specifically, includes, but is not limited to a request for a "copy of [defendant's] prior criminal record."  See FED. R. CRIM. P. 16(a)(1)(D); *United States* v. *Trejo-Zambrano*, 582 F.2d 460, 465 (9th Cir. 1978) ("prosecutor ordinarily discharges his duty under Rule 16(a)(1)(B) [the predecessor to the current provision] by supplying the accused with a copy of his F.B.I. rap sheet"); *United States* v. *Feola*, 651 F. Supp. 1068, 1147-48 (S.D.N.Y. 1987) (requiring production of copy of conviction record), *aff'd*, 875 F.2d 857 (2d Cir. 1989).  Please indicate whether the government has exercised the due diligence required by Rule 16 in addition to any reliance that the government may have placed upon efforts made by Pretrial Services.

Documents and Tangible Objects – Rule 16(a)(1)(E)

7.    All documents, materials and information that were obtained from or belong to the defendant and a description of all tangible objects, buildings or places material to the preparation of the defense, intended to be used at trial, or obtained from or pertaining to any defendant.

8.    All documents, materials and information that the government intends to use at trial as evidence in its case in chief.  We request that any items in this category be specifically identified from among the materials that must be produced pursuant to the defendant's Rule 16 requests, both to enable counsel to prepare effectively for trial and to afford the defendant an opportunity to move to suppress any evidence the government intends to use in its case in chief.  FED. R. CRIM. P. 12(b)(3) and 12(d).

9.    All charts, summaries or calculations reflecting the contents of writings or other documents that are either (a) material to the preparation of the defense, or (b) intended for use by the government as evidence in chief at trial.

10.    A detailed description of any documents, objects or physical evidence relating to the allegations underlying the indictment that have been destroyed or lost, or are not in the custody or control of the government.  If the government contemplates destroying or releasing any such items in the future, we request notice and an opportunity to object prior to any such action.

**Exhibit B**
**Page 10**

RREOUS007693

Jeffrey J. Ansley
March 14, 2006
Page 9

11.     A detailed description of any documents, objects or physical evidence relating to the allegations underlying the indictment that you believe are not in the possession, custody or control of the government.

Reports of Examinations and Tests – Rule 16(a)(1)(F)

12.     All results and reports of physical and mental examinations relevant to this matter, and scientific tests of experiments relevant to this matter, which are in the government's possession, custody or control, and the existence of which is known to the government or may become known through the exercise of due diligence. We request notice of any government decision to refrain from producing such materials, so that a judicial decision as to production may, if warranted, be sought.

Summaries of Expert Testimony – Rule 16(a)(1)(G)

13.     A written summary of any expert testimony which the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence in its case-in-chief at trial. All summaries must describe the witnesses' opinions, the asserted bases and reasons for the opinions, and the witnesses' qualifications. FED. R. CRIM. P. 16(a)(1)(G).

Rule 12(b)(4)(B) Notice

14.     Notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16.

"Other Crimes, Wrongs Or Acts" Evidence – FED. R. EVID. 404(b)

15.     Notice of the nature of any "other crimes, wrongs, or acts" evidence ("other offense evidence") that the government intends to use at trial in its case-in-chief or in rebuttal, together with any documents or tangible objects that the government intends to introduce in evidence in connection with such other offense evidence; any documents material to the preparation of the defense in opposition to such other offense evidence; and any written or oral statement made by the defendant relating to such other offense evidence. For purposes of this paragraph, the term "statements" shall be construed to the broadest extent permitted by the FED. R. CRIM. P. 26.2.

*Brady*/*Giglio* Material

RREOUS007694

Jeffrey J. Ansley
March 14, 2006
Page 10

16.    To the extent not requested above, all exculpatory or impeaching material in the government's possession, custody or control, or otherwise known to the government, including, but not limited to, the items listed below. We request prompt production of all exculpatory and impeaching material because such material is necessary to (i) enable the defense to determine what motions in limine are necessary; (ii) allow counsel to prepare for trial; and (iii) allow counsel to prepare for meaningful cross-examination of any witness who may testify on behalf of the government.

a.    All documents relating to when the type of conduct alleged in the indictment occurred.

b.    A list of the names and addresses of all witnesses that the government intends to call at trial.

c.    Any and all threats, express or implied, direct or indirect, directed against any potential government witness, including, but not limited to, threats concerning criminal prosecutions or investigations pending or which could be brought against any such witness; any probationary, parole, deferred prosecution or custodial status or any such witness; and any civil, tax court, court of claims, administrative, regulatory or other pending or potential legal disputes or transactions involving any such witness and a State or the Federal Government, or over which the State or Federal Government has real, apparent or perceived influence.

i.    The above request specifically seeks oral or written statements made by an Assistant United States Attorney, other law enforcement official, SEC official, to any individual or to that individual's lawyer in connection with the government's interview of such individual, testimony given by the individual, or a proffer given by the individual's attorney, concerning: (i) whether the government tended to doubt the individual's credibility or the statements he or she made during the interview, during testimony, or at any other time; or (ii) the government's view that the individual might be subject to criminal or regulatory charges for any reason.

ii.    The date and description of all any and all considerations or promises of consideration given by an Assistant United States Attorney, any law enforcement official or any employee of the

**Exhibit B**
**Page 12**

RREOUS007695

Jeffrey J. Ansley
March 14, 2006
Page 11

SEC, to or on behalf of any potential government witness, or any such consideration or promises expected or hoped for by any such witness at any future time. Such "considerations" include anything that arguably could be of value or use to a witness or anyone related to the witness by blood or marriage, including, but not limited to, formal or informal, direct or indirect, leniency, favorable treatment or recommendations or other assistance with respect to any pending or potential criminal, parole, probation, pardon, clemency, civil, administrative, regulatory, or other matter involving a State or the Federal Government, or any other authority or party; relief from forfeiture; payments of money; provisions of food, clothing, transportation, legal services or other benefits; statements to anyone informing the recipient of the witness's cooperation; recommendations concerning federal aid or benefits; recommendations concerning licensing, certification or registration; promises to take affirmative action to help the status of the witness in a profession, business or employment or promises not to jeopardize such status; aid or efforts in securing or maintaining the business or employment of a witness; and anything else that arguably could reveal an interest, motive or bias in the witness in favor of the government or against any defendant.

iii.     A list and description of any and all requests, demands or complaints made to the government by a potential government witness that could demonstrate any hope or expectation on the part of the witness for favorable governmental action on his or her behalf (regardless of whether or not the government has agreed to provide any favorable action).

iv.     Any material not otherwise listed that might potentially reflect or evidence either the motivation of a potential government witness to cooperate with the government or any bias or hostility against any defendant.

d.     Any and all records and information revealing prior criminal convictions or guilty verdicts or juvenile adjudications (including pending cases), including but not limited to relevant "rap sheets," of each potential government witness.

RREOUS007696

Jeffrey J. Ansley
March 14, 2006
Page 12

e.     Any and all records and information revealing prior or subsequent misconduct, criminal acts or bad acts, and disciplinary action (including pending cases) of each potential government witness, including, without limitation, allegations of criminal conduct, or allegations of conduct in violation of any federal, state, or self-regulatory organization law, regulation or rule, involving the bank, securities or other industry, or in violation of any rule, policy, practice, or procedure of Heritage, of which the government knows or through reasonable diligence should have reason to know.

f.     All information concerning the witness's immigration status.

g.     All information arguably showing or tending to show that the witness has manufactured, falsified, or planted evidence, whether in physical or testimonial form, in connection with any criminal arrest or charge.

h.     All instances of the witness having failed to follow government regulations in connection with the investigation, arrest, and post-arrest treatment of suspects.

i.     All other evidence arguably supporting the proposition that a witness has a motive to lie against the defendant.

j.     Any and all statements by the government, its agents and representatives to any potential government witness (or counsel for such witness) whom the government intends to call as a witness during trial pertaining in any way to any government matter involving the witness or anyone related by blood or marriage to the witness.

k.     Any statements (written or oral) or documents, including but not limited to, grand jury testimony and federal, state and local tax returns made or executed by any potential government witness which the government knows, or through reasonable diligence should have reason to know is false.

l.     A copy of all medical and psychiatric reports, or any other document or information known to the government or which can reasonably be known to the government concerning any potential government witness that may arguably affect the witness's credibility or ability to perceive, relate or recall events.  This request includes, but is not limited to, information

RREOUS007697

Jeffrey J. Ansley
March 14, 2006
Page 13

      demonstrating that any person who is a potential government witness in this case is or was suffering from any physical or mental disability or emotional disturbance, or using, dependent upon or addicted to drugs or alcohol at any time, from the time period charged in the indictment to the present.

m.     Any written or oral statement, whether or not reduced to writing, made by any potential government witness which in any way contradicts, is inconsistent with or different from other oral or written statements he or she has made.

n.     The name and address of any person(s) known to the government to whom the witness has made statements relating to the subjects of the indictment, which statements were inconsistent with statements made by the witness to law enforcement officers.

o.     Any and all records and information that could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the government's evidence.

p.     The same records and information requested in items (a) through (o) with respect to each non-witness declarant whose statements are offered in evidence.

q.     The same records and information requested in items (a) through (o) with respect to each informant in this case.

r.     The names and addresses of, and the same records and information requested in items (a) through (o) with respect to, all persons whom the government, its agents or representatives believe to have relevant knowledge and information with reference to the charges contained in the indictment but whom the government does not propose to call as witnesses at trial.

s.     Copies of any and all documents and records of any law enforcement agency, or self-regulatory organization, reflecting any investigation of or disciplinary action taken against any law enforcement or regulatory official who participated in this investigation or who is expected to testify in this proceeding.

**Exhibit B**
**Page 15**

RREOUS007698

Jeffrey J. Ansley
March 14, 2006
Page 14

t.     Copies of any and all records of any law enforcement or regulatory agency reflecting any commendations, awards or recognition of any kind, or requests for any commendations, awards or recognition of any kind made to or by, or on behalf of, any law enforcement, SEC, or other official involved in this case with respect to this case.

u.     In addition to the above, please provide all documents, tests or experiments, objects, statements of witnesses, and other evidence and information, including, but not limited to, the items set forth below that (i) tend to exculpate the defendant, (ii) may be favorable or useful to the defense as to either guilt or punishment, or (iii) tend to affect the weight or credibility of evidence to be presented against the defendant. This request applies to evidence that is within the possession, custody or control of the government, known by the government or could by the exercise of due diligence become known to the government. *Brady* v. *Maryland*, 373 U.S. 83 (1963).

        i.     We specifically request any statements made by any witness that tend to exculpate the defendant.

        ii.    We specifically request all testimony by any witness that tends to exculpate the defendant.

        iii.   Any exculpatory information presented to the grand jury.

        iv.    If the government is aware of facts that would constitute *Brady* material but assumes that the defendant or counsel knows or should know such facts, please verify that counsel is aware of these facts.

17.    The results of any and all efforts on the part of the government or its agents or representatives to secure an identification of the defendant. This request seeks information relating to the conduct of any show-up (any viewing of only one individual) or photographic identification procedure. If such occurred, we request copies of all photographs examined by any individual; copies of any other relevant photograph; the date, time and place of such identification procedure; the name(s) and address(es) of all individuals requested to attempt an identification; the results – positive, negative or otherwise – of such identification procedure; any document embodying in whole or in part the circumstances and results of such identification procedure; all physical descriptions given to law enforcement

**Exhibit B**
**Page 16**

Jeffrey J. Ansley
March 14, 2006
Page 15

personnel prior to the identification procedure (including copies of any composite drawings); and whether any individual advised law enforcement personnel in advance of the procedure that he or she would be unable to make an identification.

18.    As a predicate to motions pursuant to FED. R. CRIM. P. 12, notice as to:

a.    Whether any evidence in the government's possession, custody or control was obtained by a search and seizure, and a description of such evidence.

b.    Please provide details regarding any searches conducted in the course of this investigation whether or not items seized in the search will be introduced by the government as evidence at trial, including but not limited to the premises searched, the date of the search, the names of the officers who conducted the search, descriptions of any items seized, the name of any individual purporting to give consent to any such search and the purported relationship between that person and the premises searched.

c.    Whether any evidence in the government's possession, custody or control was obtained through electronic or mechanical surveillance or tape recording, and a description of such evidence.

d.    Whether any evidence in the government's possession, custody or control was obtained through the use of a beeper or other tracking device, and description of such evidence.

e.    Whether any evidence in the government's possession, custody or control was obtained through a mail cover, and a description of such evidence.

f.    Whether any persons were present during the grand jury proceedings other than the grand jurors, witnesses, court reporters and Assistant United States Attorneys.

g.    Whether any grand jury materials, including grand jury transcripts or any documents or information produced to the grand jury or pursuant to subpoena issued by the grand jury, were disclosed or released to any person other than the grand jurors, witnesses, court reporters and Assistant United States Attorneys, including any disclosure made to any SEC official or employee.  If such disclosure was so made, please provide a

RREOUS007700

Jeffrey J. Ansley
March 14, 2006
Page 16

        copy of any court orders authorizing such disclosure and the identity of all persons authorized to receive disclosure.

19.    Whether, should the defendant testify in his own behalf, the government will attempt to rely upon specific instances of conduct or a prior conviction for the purpose of impeachment, and a description of any such instance or prior conviction.

20.    All results or reports of physical or mental examinations, scientific tests or experiments (or copies thereof) that were conducted in connection with any investigation of the charges contained in the indictment, including but not limited to:

    a.    All handwriting exemplars and samples, and reports of handwriting analyses.

    b.    All fingerprint and palm print exemplars, fingerprint samples, comparisons and opinions of fingerprint experts, and all documents that relate to those opinions.

    c.    All attempts at voice identification by whatever means, upon which the government will rely, which are material to the defense of this case.

    d.    All psychological or other tests performed upon any potential government witness and all documents that refer or relate to such tests.

    e.    All polygraph examinations, psychological stress evaluations or any other procedures, devised to determine whether a subject is telling the truth or to refresh a witness's memory and all documents that refer or relate to such examinations.

21.    Pursuant to FED. R. EVID. 104, and the defendant's rights to effective representation by counsel and a fair trial, disclosure of the following evidence, to the extent the government intends to offer such evidence in its case in chief:

    a.    Any statement as to which the defendant manifests his adoption or belief in its truth, FED. R. EVID. 801(d)(2)(B).

**Exhibit B**
**Page 18**

RREOUS007701

Jeffrey J. Ansley
March 14, 2006
Page 17

    b.    Any statement made by another that was purportedly authorized by the defendant, or is deemed to be an admission of any defendant, FED. R. EVID. 801(d)(2)(A) and 801(d)(2)(C).

    c.    Any statement by any agent or servant of the defendant concerning a matter within the scope of his agency or employment made during the existence of such a relationship, FED. R. EVID. 801(d)(2)(D).

    d.    Please state whether the government intends to claim that the defendant acted as part of a conspiracy (even if uncharged), and if so, who the defendant's alleged co-conspirators were.  Please also disclose any statement made by any alleged co-conspirator of the defendant during the course and in furtherance of the alleged conspiracy, FED. R. EVID. 801(d)(2)(E).

    e.    Please state whether the government intends to offer any hearsay evidence pursuant to FED. R. EVID. 807.  If so, provide the information required by the Rule.

22.    Pursuant to FED. R. EVID. 1006, notice as to whether the government will seek to offer any chart, summary or calculation in evidence.  If so, the defense requests that such be made available sufficiently in advance of trial for inspection and copying.

23.    Please produce and/or identify any and all documents that are responsive to the defendant's requests for particulars dated **[fill in date]**.

Other Sentencing-Related Issues

24.    To ensure that the defendant's rights to due process and effective assistance of counsel under the United States Constitution are protected, please advise me promptly of all facts and circumstances (including but not limited to documents) known to, or reasonably discoverable by, the government that relate to sentencing issues in connection with this matter (*e.g.*, any alleged relevant conduct of which the government is aware or by the exercise of due diligence may become aware). Defendant submits that, in the event he wishes to consider entering a guilty plea in this case, he cannot knowingly, intelligently, or voluntarily do so without disclosure of such sentencing-related information.  In other words, defendant submits that a plea in such circumstances would not be fully informed as to potential sentencing consequences, and could not be knowing, voluntary, and

Jeffrey J. Ansley
March 14, 2006
Page 18

intelligent.  See *United States* v. *McKoy*, 215 F.3d 102, 108 (D.C. Cir. 2000) (quoting *United States* v. *Horne*, 987 F.2d 833, 840 (D.C. Cir. 1993) (Buckley, J., concurring)); accord *Horne*, 987 F.2d at 839-41 (Buckley, J., concurring) ("A bargain . . . is a pragmatic exchange based on an understanding of mutual advantage.  A defendant's understanding of the maximum penalties he will face if he enters a guilty plea may be of critical importance . . . to the defendant's decision to accept the Government's offer rather than assume the risks of trial"); U.S.S.G. § 6B1.2 (Policy Statement), Commentary ("The Commission encourages the prosecuting attorney prior to the entry of a plea of guilty . . . to disclose to the defendant . . . the offender characteristics, then known to the prosecuting attorney, that are relevant to the application of the sentencing guidelines").

Each of the above requests calls for all responsive items which are within the possession, custody, or control of the government, or which are either known to exist or could by the exercise of due diligence become known to the government.  Each request is also of a continuing nature, and we request prompt notice in the event that responsive information comes to the government's attention at any point in the future.  If the government declines to provide any information requested, please advise us of the government's objection so that we can consider bringing any dispute to the attention of the Court.

Finally, I request that you advise the investigating law enforcement officers and any other government agents involved in this matter to refrain from any contact with defendant, except with prior notification to, and in the presence of, defendant's attorney.  In addition, we request that all government agents be directed to preserve all of their rough notes and other objects that may be material to this case.

Very truly yours,

Lawrence S. Robbins

RREOUS007703

From: Poe, Greg
Sent: Thursday, June 22, 2006 10:12 PM
To: 'Jeff Tillotson'
Cc: Robbins, Larry; Untereiner, Alan; Yao, Alice
Subject: Draft Suppression Motion

Attachments: Motion to Suppress v3.doc; Motion to Suppress v3.pdf;
Motion to Suppress v3.wpd

Jeff --

Attached is a draft of the suppression motion.  As you'll see, it's for your
eyes at this point.  Larry hasn't had a chance to review this yet.  I've
restructured Alice's draft in a way that I think makes logical sense, but after
some decisions are made about the relative strength of the arguments, we should
revisit the issue of structure.  As you'll see from my notes in the text, I'm
skeptical about the fiduciary duty argument.  The staleness argument, in my view,
probably will go nowhere, but I'm not saying at this point that we shouldn't
make it.  The Fifth Amendment invocation argument is going to need more work.
The Franks argument needs to be honed.  Other notes (on the
overbreadth/particularity points and especially on the computer search issue)
are in the text.  The document is now too long but cutting text will be very
easy once we firm up the approach some more.

The attached pdf copy doesn't include italics, for some reason.  The Word
version has bad formatting due to the conversion.  The draft was created using
WordPerfect so you should open up that document if possible.  By the time Gary
looks at a draft, we can have a good copy of a Word document.

Let's talk about this when you have a chance.  I'm not sure what Larry's
schedule is but I expect he'll want to get into this at his first reasonable
opportunity.

Greg


Gregory L. Poe
Robbins, Russell, Englert, Orseck & Untereiner LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
Telephone:  (202) 775-4490
Fax: (202) 775-4510
www.robbinsrussell.com <http://www.robbinsrussell.com/> gpoe@robbinsrussell.com
<mailto:gpoe@robbinsrussell.com>


NOTICE:

This communication is intended solely for the use of the addressee.  It may
contain information that is privileged, confidential, exempt from disclosure
under applicable law, and/or attorney work product.  If the reader of this
communication is not the intended recipient or the employee or agent responsible
for delivering it to the intended recipient, you are hereby notified that any
dissemination or copying of this communication is strictly prohibited. If you
have received this communication in error, please notify us immediately by reply
e-mail and by telephone (at 202.775.4500) and immediately delete this
communication (including any attachments).

**Exhibit C**
**Page 1**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| Plaintiff, | § § | |
| | § | Criminal Action No. |
| v. | § § | 3:05-CR-0298P |
| GARY M. KORNMAN, | § § | |
| Defendant. | § § | |

---

## DEFENDANT GARY M. KORNMAN'S
## MOTION TO SUPPRESS EVIDENCE

---

Jeffrey M. Tillotson
State Bar No. 20039200
LYNN, TILLOTSON & PINKER, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, TX 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839

Lawrence S. Robbins
Gregory L. Poe
Alice W. Yao
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

ATTORNEYS FOR DEFENDANT GARY M. KORNMAN

Exhibit C
Page 2

RREOUS014259

**TABLE OF CONTENTS**

Exhibit C
Page 3

RREOUS014260

**TABLE OF AUTHORITIES**

-ii-

Exhibit C
Page 4

RREOUS014261

COMES NOW Defendant Gary M. Kornman and files this, his Motion To Suppress Evidence and, in support thereof, would show as follows:

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this case, the government has charged Gary Kornman with insider trading in violation of 15 U.S.C. § 78j(b), 15 U.S.C. § 78ff, and 17 C.F.R. § 240.10b-5.[1]  The government's prosecution arises from two routine (but unsuccessful) sales calls that Kornman made on executives of Hollywood Casino Corp. ("Hollywood") and MiniMed, Inc. ("MiniMed") in which he pitched his firm's asset planning services.  As part of their investigation, government agents conducted a search on Kornman's Dallas home on August 3, 2004.

The search of Kornman's home violated the Fourth Amendment in multiple respects and its fruits should be suppressed.  To begin with, the warrant (Ex A) was not issued on probable cause because the supporting affidavit (Ex. B) was lacking for three reasons.  First, no criminal case has *ever* held that a merely *prospective* sales relationship gives rise to the fiduciary duty necessary to ground the securities law violations alleged in the affidavit.  Second, the affidavit relied on stale allegations.  Third, the affidavit improperly referred to Kornman's assertion of his Fifth Amendment privilege against self-incrimination in the related SEC proceeding.  Even if probable cause *did* exist on the face of the affidavit, however, the Court should conduct a hearing under *Franks v. Delaware*, after which the evidence should be suppressed, because the affidavit contained knowingly false statements (or at least statements made in reckless disregard of the truth).

Even if the warrant were otherwise valid, the evidence should be suppressed because the warrant was facially overbroad and lacked the requisite particularity.  The warrant effectively

---

[1] Count 3 of the indictment charges Kornman with making false statements in violation of 18 U.S.C. § 1001.  That count is not at issue in this motion.

**Exhibit C**
**Page 5**

RREOUS014262

authorized the seizure of virtually *all* of Kornman's business records, both paper and electronic – including, as the search inventory (Ex. C) shows, all 20 of Kornman's home computers, 204 computer hard drives and media storage devices, 17 personal digital assistants, and numerous microcassettes, tapes, floppy disks, CDs, and DVDs.  Finally, even if the warrant and affidavit otherwise passed muster, the computer evidence should be suppressed because the warrant lacked a search protocol.

## ARGUMENT

### I. THE GOVERNMENT'S AFFIDAVIT FAILED TO ESTABLISH PROBABLE CAUSE THAT EVIDENCE OF SECURITIES FRAUD WAS LOCATED ON THE PREMISES

"In a search warrant case, the magistrate must have probable cause to believe that certain items evidence criminal activity and that those items are presently located in a certain place." *United States* v. *Namer*, 680 F.2d 1088, 1095 (5th Cir. 1982).  The affidavit in support of the warrant authorizing the search of Kornman's home, however, suffered from three deficiencies that, singly as well as in combination, rendered it insufficient to establish probable cause that evidence of a securities fraud violation would be found there: (1) it failed to establish probable cause to believe that Kornman owed any fiduciary-like duty to the MiniMed or Hollywood executives from whom he allegedly derived inside information; (2) it was based on stale information; and (3) it improperly referred to Kornman's assertion of his Fifth Amendment privilege against self-incrimination in the related civil proceeding.

-2-

Exhibit C
Page 6

A.    **Because Kornman Lacked A Fiduciary-Like Duty To The MiniMed and Hollywood Executives, The Affidavit Was Insufficient To Establish Probable Cause That Kornman Committed Securities Fraud**

The affidavit in support of the search warrant fails even to allege a crime.  According to the affidavit, Kornman "misappropriated material, nonpublic information by breaching" a "duty of trust and confidence" to executives of MiniMed and Hollywood.  Ex. A ¶ 13.  As the affidavit states, the executives were "prospective clients" to whom Kornman was pitching his firm's asset-planning services.  Id. ¶ 12.  The affidavit (like the eventual indictment (see Indictment ¶ 3)) thus relies on the misappropriation theory of insider trading.  Under that theory, a person commits fraud under Rule 10b-5 "when he misappropriates confidential information, for securities trading purposes, in breach of a duty owed to the source of the information."  *United States* v. *O'Hagan*, 521 U.S. 642, 652, 666 (1997).  The government is required to show that the alleged misappropriator owed a "fiduciary-like duty" to the sources of the information.  *United States* v. *Chestman*, 947 F.2d 551, 569 (2d Cir. 1991).  "At the heart of the fiduciary relationship lies reliance and *de facto* control and dominance."  *Id.*  To find such a relationship, a court must determine that "'confidence is reposed on one side and there is resulting superiority and influence on the other side.'"  *Ibid.* (quoting *Mobil Oil Corp.* v. *Rubenfeld*, 339 N.Y.S.2d 623, 632 (Civ. Ct. 1972)).

The affidavit's allegations do not establish probable cause that Kornman owed a fiduciary-like duty to the executives.  As a salesman making a pitch for new business, Kornman had nothing close to a fiduciary-like relationship with his two prospective customers.  The affidavit alleges that Kornman had two "critical meetings" with each executive to discuss Heritage's asset planning services.  Ex. A ¶ 11.  As the affidavit makes plain, both of those meetings were solicitations for business with *prospective* clients.  Id. ¶ 12.  Neither of the executives hired Kornman or Heritage.

-3-

Exhibit C
Page 7

RREOUS014264

Kornman exercised absolutely no control (*de facto* or otherwise) or dominance over either executive; it was instead, if anything, the executives who retained all of the control over the relationships. Neither executive was "dependent" on Kornman, who was nothing more than a salesman plying his trade, or at least trying to do so.  **[Need to deal with paragraph 13 of the affidavit concerning confidentiality – allegation of confidentiality promise, at least as to Mann, makes this argument problematic.  Consider whether pressing this argument in a motion to suppress may weaken the motion to dismiss.  Note, however, that the alleged promise of confidentiality even to Mann in ¶ 13 does not refer specifically to Kornman.]**

No criminal case has *ever* held that a merely *prospective* sales relationship is fiduciary in nature.  To the contrary, the cases that have considered the issue have thoroughly rejected the application of the misappropriation theory to prospective business relationships.  See, *e.g.*, *United States* v. *Cassese*, 273 F. Supp. 2d 481 (S.D.N.Y. 2003) (business executive who learned during the course of a prospective business relationship that the company he was negotiating with was about to be acquired by a different company could not be charged with insider trading because executive and information source were "not inherent fiduciaries, but rather arms-length business partners"). See also *United States* v. *Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (in affirming the district court's judgment of acquittal under Section 14(e) and Rule 14e-3, court noted that defendant "did not breach any fiduciary duty, nor did he misappropriate any confidential information"); accord *S.E.C.* v. *Mayhew*, 916 F. Supp. 123, 130 (D. Conn. 1995) (holding that a consultant owed no fiduciary duty to a potential client with respect to material, nonpublic information that was disclosed during a lunch meeting because the consultant's "ambiguous and ambivalent role . . . lack[ed] the indicia of de facto control and dominance arising from the confidence imposed"), *aff'd*, 121 F.3d 44 (2d Cir. 1997).

-4-

Exhibit C
Page 8

RREOUS014265

Moreover, Judge Lindsay's ruling on Kornman's motion to dismiss the complaint in the parallel SEC case strongly counsels that probable cause was lacking, on the facts alleged in the affidavit, with respect to whether a fiduciary-like duty existed between Kornman and either executive. Although Judge Lindsay ultimately chose not to dismiss the SEC's complaint based on allegations of fiduciary breach duty almost identical to those alleged in the affidavit and criminal indictment, he stated that "this is an extremely close case." *S.E.C.* v. *Kornman*, 391 F. Supp. 2d 477, 486 (N.D. Tex. 2005).[2] Although "an extremely close case" may be sufficient to deny a motion to dismiss a *civil* complaint, the rule of lenity precludes imposing a fiduciary-like duty on a prospective business relationship in a *criminal* case. See *Chestman*, 947 F.2d at 569 (holding that while courts have some discretion to define a "confidential relation" in civil cases, "such an elastic and expedient definition of confidential relations, *i.e.*, relations of trust and confidence . . . has no place in the criminal law"). Because the affidavit fails to allege sufficiently that Kornman breached the duty necessary to find a Section 10(b) and Rule 10b-5 violation, the warrant lacked probable cause, and the evidence should be suppressed. **[Question is looked at from the magistrate's perspective in a probable cause context – how useful is Judge Lindsay's ruling for this purpose?]**

B.    **The Affidavit Relies On Stale Allegations**

Probable cause for the warrant was also lacking because the affidavit was rooted in information that was over three months old. The Fifth Circuit has emphasized that the existence of probable cause is determined *at the time that the warrant is issued*. *United States* v. *Freeman*, 685 F.2d 942, 951 (5th Cir. 1982) ("Probable cause must be found to exist at the time the warrant issues"

---

[2] The parallel SEC proceeding was dismissed without prejudice on May 31, 2006, by Judge Lindsay pending the completion of certain discovery by Kornman.

**Exhibit C**
**Page 9**

RREOUS014266

(quotation omitted)).  Because the government relied on information in this case that was stale, the resulting affidavit was "so lacking in indicia of probable cause as to render belief in its existence unreasonable."  *United States* v. *Puma*, 937 F.2d 151, 158 (5th Cir. 1991).

The warrant relied on information that the government received from Chris Seeber, who worked in Heritage's Information Technology department until late April 2004.  Aff. ¶ 22. According to Seeber, he worked "side-by-side with Gary Kornman as his backup administrator," *ibid.*, and transcripts of meetings with clients and prospective clients "recently were backed-up on the servers now believed to be at the residences of Gary Kornman and Michael Kornman." *Id.* ¶ 31. Seeber also told the government that "[t]hese transcripts are believed to include transcriptions of the meetings on February 7, 2001, and November 19, 2001, with Alfred Mann and Jack Pratt, respectively, during which Gary Kornman received material, nonpublic information that he used to trade in MiniMed and Hollywood Casino securities."  *Ibid.*

The warrant was not issued until August 2004 – more than three months later.  In fact, Mr. Seeber "was last at Gary Kornman's house sometime between April 15 and April 23, 2004." *Id.* ¶ 28.  Soon thereafter, on May 21, 2004, Heritage filed for bankruptcy.  *Id.* ¶ 9.  Although "a mechanical count of days is of little assistance," *United States* v. *Hyde*, 574 F.2d 856, 865 (5th Cir. 1978), Heritage's intervening bankruptcy required the officers to obtain more contemporaneous evidence to establish probable cause that the transcripts they sought were at Kornman's residence. **[Query why the bankruptcy would make it more likely Kornman would transfer the servers somewhere else or would delete stuff from them.]**  "Although probable cause may exist at one point to believe that evidence will be found in a given place, the passage of time may (without additional newer facts confirming the location of the evidence sought) render the original

-10-

**Exhibit C**
**Page 10**

RREOUS014267

information insufficient to establish probable cause at the later time." *Freeman*, 685 F.2d at 951.

In an effort to mask the staleness of its information, the affidavit speculates that Kornman's business was ongoing, relying on nothing but tissue-thin allegations. See *United States* v. *Craig*, 861 F.2d 818, 822-823 (5th Cir. 1988) ("[I]f 'the information of the affidavit clearly shows a long-standing, ongoing pattern of criminal activity, even if fairly long periods of time have lapsed between the information and the issuance of the warrant, the information need not be regarded as stale.'"). The affidavit relies on information from "reliable sources" that "Kornman and select employees have continued performing wealth management consulting, operating under a different Kornman entity," Aff. ¶ 34, and attempts to corroborate that information by stating that three vehicles, two of which were registered to a Kornman entity and one of which was registered to Kornman, were parked on the street directly in front of his residence on July 22, 2004. *Id.* ¶ 33. According to the affidavit, "[b]ased on the number of vehicles parked in front of Gary Kornman's residence, it appears that Gary Kornman is working out of his residence with the select number of employees that have remained with him from Heritage. As such, the computers described by Chris Seeber are still being used by Gary Kornman and his Heritage operation at the residences." *Ibid.*

Such rank speculation of an "ongoing business," which is primarily based on the fact that multiple cars were parked outside of Kornman's home, cannot save a warrant that otherwise relies solely on stale allegations. **[The invocation of "reliable sources" may create problems here. Need to address.]** The affidavit's assertion that Kornman was continuing to perform the same wealth management consulting services is speculative at best, and makes no mention of continuing *criminal* activity. See *Freeman*, 685 F.2d at 950. Rather, the warrant is based on allegations of two isolated incidents of insider trading. Aff. ¶ 8. **[Need to flesh this out.]** See also *Freeman*, 685 F.2d

-11-

**Exhibit C**
**Page 11**

at 950; accord *United States* v. *Wagner*, 989 F.2d 69, 75 (2d Cir. 1993) ("Because the Search Warrant Affidavit does not establish the likelihood that there was an ongoing drug-selling operation in O'Leary's home, we cannot conclude that the district court erred in finding no probable cause at the time the warrant was issued and the search conducted."); *cf. United States* v. *Hyde*, 574 F.2d 856, 865 (5th Cir. 1978) ("The upshot of this rule in practical application has been to allow fairly long periods of time to elapse between information and search warrant in cases where the evidence clearly shows a longstanding, ongoing pattern of criminal activity."). "The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time." *Bastida* v. *Henderson*, 487 F.2d 860, 864 (5th Cir. 1973). A period of three months, during which time Heritage filed for bankruptcy, was more than sufficient time for probable cause to dissipate, and a belief otherwise would be nothing short of unreasonable. *Puma*, 937 F.2d at 158.

    **C.**    **The Affidavit's Statement That Kornman Asserted His Fifth Amendment Rights Against Self-Incrimination In The Parallel Civil Proceeding Violates *Griffin* v. *California* And Taints The Probable Cause Determination**

In an effort to shore up its allegations, the affidavit states that, "[i]n response to a subpoena directing Gary Kornman to provide sworn testimony before the SEC, Gary Kornman asserted his Fifth Amendment rights against self-incrimination." Aff. ¶ 9. By slipping in a reference to Kornman's assertion of his Fifth Amendment privilege against self-incrimination in the parallel SEC proceeding, the government doubtless hoped that the magistrate judge reviewing the affidavit for probable cause would make an adverse inference against Kornman. Especially given the defects in the affidavit concerning the existence of a fiduciary-like duty, and the stale information at the heart of the affidavit, the government's resort to an allegation tied to an unfair inference undercuts the

-12-

**Exhibit C**
**Page 12**

RREOUS014269

notion that a probable cause finding was appropriate in this case.

The Supreme Court held in *Griffin* v. *California*, 380 U.S. 609 (1965), that a prosecutor may not comment on the defendant's failure to testify, and that a judge is forbidden from instructing a jury that it may draw inferences from such silence, without running afoul of the defendant's Fifth Amendment privilege against self-incrimination. *Id.* at 614. The Court later held that *any* penalty against a defendant for asserting his Fifth Amendment privilege against self-incrimination runs afoul of his constitutional rights. In *Spevack* v. *Klein*, 385 U.S. 511 (1967), the Court held that the refusal of an attorney to produce financial records and to testify at a judicial inquiry into his alleged professional misconduct pursuant to his privilege against self-incrimination was not grounds for disbarment because "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege [against self-incrimination]." *Id.* at 516. As the Court held, "'penalty' is not restricted to fine or imprisonment. It means, as we said in Griffin v. State of California, the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Id.* at 515 (citation omitted).

Kornman's assertion of his Fifth Amendment privilege against self-incrimination was just as, if not more, costly here. While an adverse inference may be drawn in the civil context, see *Barrett* v. *Palmigiano*, 425 U.S. 308 (1976), such an inference is impermissible in a criminal case. By allowing Kornman's assertion of his privilege against self-incrimination to weigh in the magistrate's calculus, the government betrayed the weakness of its probable cause allegations, and infected the magistrate's probable cause finding in violation of *Griffin* and *Speveck*. **[This argument isn't really a probable cause argument as framed. Need to revamp this.]**

<center>-13-</center>

<center><span style="color:darkred">**Exhibit C**</span></center>
<center><span style="color:darkred">**Page 13**</span></center>

RREOUS014270

## II.    KORNMAN IS ENTITLED TO A HEARING UNDER *FRANKS* v. *DELAWARE* BECAUSE THE AFFIDAVIT CONTAINS STATEMENTS THAT WERE KNOWINGLY FALSE OR AT LEAST IN RECKLESS DISREGARD OF THE TRUTH

Even if the Court concludes that the warrant was supported by probable cause, Kornman is entitled to an evidentiary hearing under *Franks* v. *Delaware*, 438 U.S. 154 (1978), because the affidavit contains false statements.  An evidentiary hearing is required where a defendant makes a "substantial preliminary showing," by a preponderance of the evidence, that false statements were made "knowingly and intentionally, or with reckless disregard for the truth," and that the false material was necessary to a finding of probable cause.  *Id.* at 155-56.  See also *United States* v. *Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002).  If, after conducting a hearing, a court determines that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause," then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  *Franks*, 438 U.S. at 156.

### A.    The Affidavit Contains False Statements That Were Made Knowingly and Intentionally, Or With Reckless Disregard For The Truth, And That Were Critical To A Finding Of Probable Cause

#### 1.    Contrary to the affidavit, SEC testimony establishes that the February 7, 2001 meeting with Al Mann was not recorded.

The affidavit heavily relies on an allegation that Kornman withheld critical evidence from the SEC in response to subpoenas and other document requests.  See Aff. ¶¶ 10, 11.  Among the allegedly withheld evidence is a transcript of Kornman's February 7, 2001 meeting with Mann, the MiniMed executive.  *Id.* ¶ 11.  According to the affidavit:

[a]lthough some meeting transcripts were produced, Heritage and Gary Kornman failed to produce transcripts of the two most critical meetings (*i.e.*, Gary Kornman's February 7,

**Exhibit C**
**Page 14**

RREOUS014271

> 2001, meeting with Alfred Mann of MiniMed and his November 19, 2001 meeting with Jack Pratt of Hollywood Casino), each of which occurred shortly before he made stock purchases currently being investigated by the SEC and FBI. Mr. Reding believes these meetings were recorded and transcribed based upon, among other things, witness statements and SEC testimony, as well as Heritage's production of the transcripts from Gary Kornman's other meetings with Alfred Mann and Jack Pratt.

*Ibid.*; see also *id.* ¶ 10 ("Mr. Reding does not believe that Gary Kornman and Heritage supplied all documents responsive to the SEC's subpoenas and other document requests. This belief is based upon information Mr. Reding learned from reliable informants, including former employees, about Heritage's document retention practices, coupled with Heritage's apparent incomplete document production."). The affidavit also states that, "[a]ccording to the Affiant's sources and information disclosed to Mr. Reding, this February 7, 2001 meeting was likely recorded and later transcribed with Gary Kornman's knowledge." *Id.* ¶ 16.

The affidavit's allegations concerning the putative transcript are contradicted by the deposition of Timothy Seaberg, the Heritage employee who accompanied Kornman to the February 7, 2001 meeting with Mann. Mr. Reding, the SEC lawyer, took that deposition. Seaberg testified unambiguously that *the meeting was neither recorded nor transcribed*:

> Q.    Was this meeting [on February 7, 2001, with Mann] recorded?
> A.    No.
> Q.    Why wasn't this meeting recorded?
> A.    Because we made it a practice not to record meetings in non-record states.

May 11, 2004 Deposition of Timothy William Seaberg at 131. See also *id.* at 158 ("Q. Did Gary Kornman ever ask you to record a meeting in a non-record state? A. Not that I remember.").

The affiant attested that he was "thoroughly familiar with the information contained in the affidavit, either through personal investigation, review of the documents provided by the SEC, or through discussions with other persons assisting with this case." Aff. ¶ 6. By the affiant's own

-15-

**Exhibit C**
**Page 15**

RREOUS014272

assertion, therefore, he reviewed the SEC testimony that Mr. Reding purportedly relied on, including Seaberg's deposition transcript.  Such a false statement thus could have been made only knowingly and intentionally, or with a reckless disregard for the truth.

Even if the affiant (despite the affidavit's own language) did *not* review the Seaberg transcript, the affiant's recklessness is properly inferred from the falsehood's materiality.  The Fifth Circuit has held that where a misrepresentation is "clearly critical to a finding [of] probable cause the fact of recklessness maybe inferred from the proof of the omission itself." *Namer*, 680 F.2d at 1094.  See also *United States* v. *Alvarez*, 127 F.3d 372, 374-75 (5th Cir. 1997).  The allegation that Kornman withheld documents from the SEC, including the transcript to the February 7, 2001 meeting, must have been critical to the magistrate's determination of probable cause.  The affiant himself described the February 7, 2001 meeting with Mann as "critical," Aff. ¶ 11, alleging that during the meeting, Mann shared material, nonpublic information with Kornman, *id.* ¶¶ 13, 31, and more specifically, that "Mann told Seaberg and Gary Kornman there was a 70% chance that a Fortune 10 Company would purchase MiniMed, probably around June 2001." *Id.* ¶ 16.  The affiant went on to allege that Heritage Capital Partners LLP, a hedge fund controlled by Kornman, purchased "6,600 shares of MiniMed stock on February 14, 2001 (7 days after receiving inside information from Mann) at a price of $37.86 per share." *Id.* ¶ 17.  Those shares were sold due to a merger "on August 31, 2001, at a price of $48.00 per share[,]" and "MiniMed's acquisition was announced May 30, 2001, and the merger was completed on August 30, 2001." *Ibid.*  The transcript of this meeting, if it existed, would have been a key piece of evidence regarding exactly what, if anything, Mann told Kornman about a possible sale of MiniMed.  Thus, the *allegation* that the transcript existed and that Kornman withheld it from the SEC was clearly a central factor in the

-16-

Exhibit C
Page 16

RREOUS014273

magistrate's probable cause determination. *Namer*, 680 F.2d at 1095.

>   **2.    Contrary to the affidavit, Pratt did *not* state that Heritage representatives told him that the company would keep the information confidential.**

The affiant also swore that he had "reviewed sworn statements Pratt and Mann gave the SEC" which ostensibly state that Heritage representatives "told them that the company would keep the information confidential." Aff. ¶ 13.  That is a crucial allegation, since it is the linchpin for the government's argument that Kornman owed a fiduciary-like duty to Mr. Pratt, a *prospective* client. **[See note above concerning the fiduciary duty argument.]**  But Pratt's declaration – which is otherwise almost word-for-word the same as Mann's – omits that crucial assertion. Even a cursory glance at the two-and-a-half page declaration confirms the point. **[Need to cite and attach.]** The knowingly false – or at least recklessly made – nature of this statement is evident on the affidavit's face.  The affiant himself asserted that he had reviewed Pratt's declaration, see *id.* ¶ 6, but then goes on to describe the Pratt declaration as stating that Heritage representatives told him that "all information that [he] gave Heritage would be kept confidential." *Id.* ¶ 13.

Like the allegation concerning the supposed Mann transcript, the Pratt confidentiality assertion also was critical to the magistrate's probable cause determination. See *id.* ¶ 14 ("Because of the confidential nature of these disclosures, Gary Kornman owed a duty of trust and confidence to the sources of the information.").  As we explain above, probable cause to believe that Kornman was guilty of insider trading could not possibly exist if he did not owe a fiduciary or fiduciary-like duty to the executives.  See *supra* at **[cite]**.  Despite the affiant's statements that Pratt shared material, nonpublic information with Kornman and an associate, Aff. ¶ 13, 31 – and specifically, that "Hollywood Casino would definitely be sold in the very near future," and that "the stock would be

-17-

**Exhibit C**
**Page 17**

RREOUS014274

worth between $10 and $100 after Hollywood's sale" (compared to $9.50 at the time of the meeting), *id.* ¶ 18 – the law is clear that "a fiduciary relationship cannot be imposed unilaterally by entrusting a person with confidential information." *Chestman*, 947 F.2d at 567; see also *Walton* v. *Morgan Stanley Co.*, 623 F.2d 796, 799 (2d Cir. 1980) (disclosure alone of confidential information does not impose any fiduciary duties on the recipient) (cited approvingly in *Dirks* v. *S.E.C.*, 463 U.S. 646, 662 n.22 (1983)); *Cassese*, 273 F. Supp. 2d at 487 ("[t]he fact that information exchanged between two parties is confidential" does not, without more, "change their relationship from arms-length into a fiduciary relationship"). If the affiant's false assertion concerning the alleged promise of confidentiality to Pratt is set aside, the magistrate could not have concluded that probable cause existed for the warrant.

## III.    THE WARRANT WAS FACIALLY OVERBROAD AND LACKED THE REQUISITE PARTICULARITY IN VIOLATION OF THE FOURTH AMENDMENT

The Fourth Amendment states that all warrants must "particularly describ[e] . . . the persons or things to be seized," U.S. CONST. amend. IV, so as to "enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *United States* v. *Cook*, 657 F.2d 730, 733 (5th Cir. Unit A 1981). "[A]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron* v. *United States*, 275 U.S. 192, 196 (1927). A search pursuant to a warrant therefore must be limited to "particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *United States* v. *Leary*, 846 F.2d 592, 600 (10th Cir. 1988).

The warrant in this case failed these requirements. It broadly authorized the seizure of "[a]ny and all documents referring to the purchase or sale of MiniMed, Inc. and/or Hollywood Casino Corporation securities; communications between Gary Kornman, Michael Kornman, or any

-18-

**Exhibit C**
**Page 18**

RREOUS014275

Kornman entity and MiniMed, Inc. or Hollywood Casino Corporation; or *other documents discussing or relating to the use, receipt, or retention of material, nonpublic information concerning any publicly-traded securities or actions based on that information.*" Ex.A, Attachment B, ¶ 3 (emphasis added). As we next explain, that sweeping authorization (1) extended far beyond potential evidence of any allegedly criminal activity for which the government had *even attempted* to establish probable cause; (2) failed to list specific categories of documents (and instead targeted documents that are typical of those kept by a hedge fund and an asset-planning firm); and (3) failed to limit the warrant to any relevant time frame despite the fact that dates relevant to the crimes alleged were available in the supporting affidavit. Individually as well as collectively, these shortcomings rendered the warrant impermissibly broad *on its face*. *Leary*, 846 F.2d at 602; *Cook*, 657 F.2d at 734.

     *First*, the warrant authorized a "fishing expedition" by directing agents to seize all manner of "other documents" that were not relevant to the alleged crimes for which the government sought to establish probable cause in the affidavit. The affidavit refers only to *two* securities in which Kornman is alleged to have made "suspicious stock purchases and sales" (Aff. ¶ 8): MiniMed and Hollywood. The warrant, however, authorized government agents to seize documents relating to *any* publicly traded security.

     A warrant may authorize the seizure of only those items that are relevant to the alleged crimes for which the government has established probable cause. See *United States* v. *Ford*, 184 F.3d 566, 574, 576 (6th Cir. 1999) (warrant authorizing the seizure of items "evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and or expenditure of money" was overly broad because it was not expressly limited

**Exhibit C**
**Page 19**

RREOUS014276

to items relevant to the crimes for which there was demonstrated probable cause, illegal gambling and bingo); *Ctr. Art Galleries-Haw., Inc.* v. *United States*, 875 F.2d 747, 750 (9th Cir. 1989) (warrants overbroad because they were not limited to items pertaining to the sale of forged Dali artwork "despite the total absence of any evidence of criminal activity unrelated to Dali"). In this case, the warrant's sweeping authorization fails to meet the Fourth Amendment's particularity requirement because it is not restricted to "'particularly described evidence relating to a *specific crime* for which there is demonstrated probable cause.'" *Leary*, 846 F.2d at 600 (quotation omitted). Because "the quoted language authorized a broader search than was reasonable given the facts in the affidavit supporting the warrant," *Ford*, 184 F.3d at 576, the warrant is impermissibly overbroad on its face.

    *Second*, the warrant failed to provide any guidance as to what categories of "other documents" were to be seized (*e.g.*, emails, letters, account statements, debriefs, etc.). Due to the nature of Kornman's businesses, most, if not all, of his business and financial records fall within the scope of the warrant's broad description; Kornman's hedge funds traded publicly-traded securities **[check]** and his asset-planning firm catered exclusively to wealthy individuals, many of whom were directors and officers of publicly-traded companies.

    The Tenth Circuit held a similar warrant to be constitutionally overbroad in *Leary*, 846 F.2d at 594. There, the supporting affidavit alleged that the defendant's company was attempting to export a piece of equipment for which it was not properly licensed. *Id.* at 594. The warrant authorized the seizure of "[c]orrespondence, Telex messages, contracts, invoices, purchase orders, shipping documents, payment records, export documents, packing slips, technical data, recorded notations, and other records and communications relating to the purchase, sale and illegal

-20-

**Exhibit C**
**Page 20**

RREOUS014277

exportation of materials in violation of the" federal export laws.  *Ibid.*  The Tenth Circuit ruled that

the warrant was overbroad because "the documents to be seized had to fall within a long list of

business records typical of the documents kept by an export company" and "those documents had

to relate to 'the purchase, sale and illegal exportation of materials in violation of the' federal export

laws," effectively providing no limitations at all.  *Id.* at 600-01.  Just as in *Leary,* the government's

description of what documents fell within the scope of the warrant was constitutionally overbroad

because it authorized the seizure of virtually all of Kornman's business and financial records.

     *Third*, the warrant failed to "limit the scope of the seizure to a time frame within which the

suspected criminal activity took place," *United States* v. *Kow*, 58 F.3d 423, 427 (9th Cir. 1995), even

though the affidavit specified the dates on which Kornman allegedly met with the MiniMed and

Hollywood executives, Aff. ¶¶ 11, 16, 18, and the dates on which the Heritage hedge funds bought

and sold MiniMed and Hollywood stock.  *Id.* ¶ 17, 19.   See also *Naugle* v. *Witney*, 755 F. Supp.

1504, 1514 (D. Utah 1990) (no probable cause existed for the seizure of plaintiffs' telephone records

because "the reference to the telephone records is not limited to particular dates, times, places or

phone numbers relevant to the criminal investigation of the Naugles, although the record indicates

[the affiant] possessed such information").  As the Sixth Circuit held in *Ford*, 184 F.3d at 576,

"[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to the

police, will render a warrant overbroad."  So, too, here.

## IV.   AT A MINIMUM, THE COMPUTER EVIDENCE SHOULD BE SUPPRESSED BECAUSE THE WARRANT LACKED A SEARCH PROTOCOL

     The warrant authorized the search and seizure of:

    Any and all computer systems and related peripheral equipment and data storage media,
including but not limited to the following: electronic data processing and storage devices,
computers and their hard drives, central processing units; internal and external data storage

**Exhibit C**
**Page 21**

RREOUS014278

devices and media such as fixed disks, external hard disks, floppy disk drives, and diskettes; compact disks; tape drives and tapes, including backups; optical storage devices; optical readers and scanning devices; encryption passwords or other access-limiting devices or software; or other computer or electronic devices that could be used to store data relating to business communications and transactions.

Ex. A, Attachment B, ¶ 2. Without any limiting language, the warrant's authorization gave the government "a license to roam through everything in the computer[s] without limitation and without standards." *In the Matter of: 3817 W. West End, First Floor, Chicago, Illinois 60621*, 321 F. Supp. 2d 953, 962 (N.D. Ill. 2004). That included 20 computers, 204 hard drives and media storage devices, 17 personal digital assistants, and numerous microcassettes, tapes, floppy disks, CDs, and DVDs, and documents. See Ex. C. The warrant's broad authorization for the search and seizure of "any and all" of Kornman's home computers and computer equipment, without *any* protocol or strategy for searching the computers and storage devices and for ensuring that only files and documents relevant to the investigation would be targeted to be searched, violates the DOJ's own computer search protocol, and cannot possibly meet the minimum requirements of the Fourth Amendment. Accordingly, the court should suppress all of the evidence gathered from the computers and computer equipment. **[Do we know the extent to which the government may have searched the seized electronic databases already? Has a lawyer for Kornman written to the government at any point stating that agents must not to search the databases without a court order? If databases are merely being held, then this argument is not ripe as to those databases, is it?]**

The "unparalleled ability of computers to store and process information" have made them essential to both our daily professional and personal lives," creating a heightened risk that electronic documents relevant to a criminal investigation will be intermingled with wholly irrelevant

**Exhibit C**
**Page 22**

RREOUS014279

documents." *United States* v. *Hunter*, 13 F. Supp. 2d 574, 583 (D. Vt. 1998); see also *United States* v. *Barbuto*, No. 2:00CR197K, 2001 WL 670930, at *4 (D. Utah April 12, 2001) ("[S]earches on computers are unique because of their abundant storage capacity and the likelihood of discovering 'intermingled documents.'").  "[C]omputers are playing an ever greater role in daily life and are recording a growing proportion of it," acting as "postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more." Orin Kerr, *Searches and Seizures In A Digital World*, 119 HARV. L. REV. 532, 569 (2005). And nowhere is the risk of intermingling documents relevant to a criminal investigation with wholly irrelevant documents greater than in home computers, which "are exactly the sort of repositories of personal information that the Fourth Amendment protects most heavily." Raphael Winick, *Searches and Seizures of Computers and Computer Data*, 8 HARV. J.L. & TECH. 75, 103 (1994).  As the government itself has recognized in this case, "[c]omputer storage devices can store the equivalent of thousands of pages of information." Aff. ¶ 36C. The warrant's authorization for the wholesale search and seizure of all of Kornman's computers and computer equipment, and thus *all* of Kornman's computer files, is insufficiently particular and allows the government to conduct exactly "'the kind of investigatory dragnet that the fourth amendment was designed to prevent.'" *United States* v. *Tamura*, 694 F.2d 591, 595 (9th Cir. 1982) (quoting *United States* v. *Abrams*, 615 F.2d 541, 543 (1st Cir. 1980)); see also *United States* v. *Carey*, 172 F.3d 1268, 1275 n.7 (10th Cir. 1999) ("the storage capacity of computers requires a special approach"); *Kow*, 58 F.3d at 423 (invalidating search warrant which authorized the seizure of "virtually every . . . computer file" at the defendant's business); *In the Matter of Search of 3817 W. West End*, 321 F. Supp. 2d at 959  ("The capacity of the computer to store these large quantities of information increases the risk that many of the

-23-

Exhibit C
Page 23

RREOUS014280

intermingled documents will have nothing to do with the alleged criminal activity that creates the probable cause for a search and seizure."); *Hunter*, 13 F. Supp. 2d at 584 (warrant authorizing the search of defendant's law office, which was located in his home, was overbroad because the computers and related equipment "were listed . . . without limitation and without reference to the limitations in the other sections," and "all computer equipment and disks seized under that paragraph were taken in violation of the Fourth Amendment's particularity requirement.").

The manner in which data is stored on hard drives also gives rise to especially acute Fourth Amendment concerns. "A search for one type of digital evidence often reveals a tremendous amount of other evidence: a great deal comes into plain view." Kerr, 119 Harv. L. Rev. at 569. Because computer searches are less costly, less time-pressured, and require less manpower than traditional searches, "a single computer analyst can conduct a very invasive search through a computer at any time." *Ibid.* Law enforcement officials must therefore exercise sensitivity and good judgment in conducting searches of computer records; otherwise, seizures of computers and large hard disks could become "intrusive and impermissible 'all records' searches." Winick, 8 Harv. J.L. & Tech. at 86.

Recognizing these unique dangers posed by computer searches, some courts have required officers to be "clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant." *United States* v. *Walser*, 275 F.3d 981, 986 (10th Cir. 2001); see also *United States* v. *Riccardi*, 405 F.3d 852, 862-63 (10th Cir. 2005) (holding that a warrant to search a computer was invalid because it failed to describe the objects of the computer search with the same level of specificity as it used to describe the objects of the home search, and instead authorized the search and seizure of "any particular files" related to "any

-24-

**Exhibit C**
**Page 24**

RREOUS014281

particular federal crime"); *United States* v. *Carey*, 172 F.3d 1268, 1275-76 (10th Cir. 1999) (although police used key word searches, court invalidated search because of errors relating to the absence of a computer protocol).[3] Indeed, the Department of Justice *itself* recommends that warrants include a computer search protocol:

> The third step in drafting a successful computer search warrant is to explain both the search strategy and the practical considerations underlying the strategy in the affidavit. . . . *The affidavit should also explain what techniques the agents expect to use to search the computer for specific files that represent evidence of crime and may be intermingled with entirely innocuous documents.* . . . When agents expect that the files described in the warrant will be commingled with innocent files outside of the warrant's scope, it is a good practice, if technically possible, to explain in the affidavit how the agents plan to search the computer for the targeted files.

Department of Justice, SEARCHING AND SEIZING COMPUTERS AND OBTAINING ELECTRONIC EVIDENCE IN CRIMINAL INVESTIGATIONS 69, 73 (July 2002) (emphasis added) ("DOJ MANUAL"); see also *In the Matter of the Search of 3817 W. West End*, 321 F. Supp. 2d at 960 n.4. Thus, just as warrants to search a house or office must describe with sufficient particularity the types of items and records sought by the government, *Cook*, 657 F.2d at 733, so too should a warrant to search a computer's hard drive specify the relevant types of data or documents sought. DOJ MANUAL at 69; *Carey*, 172 F.3d at 1275-76. Once computers have been seized and removed to another site, there

---

[3] See also *United States* v. *Campos*, 221 F.3d 1143, 1147 (10th Cir. 2000) (relying on explanation of search strategy contained in affidavit to find that computer search warrant was not overbroad); *In the Matter of the Search of 3817 W. West End*, 321 F. Supp. 2d at 957-63 (Fourth Amendment's particularity requirement demands computer search protocol); *Hunter*, 13 F. Supp. 2d at 583-85 (upholding computer search because comprehensive instructions for search were presented to magistrate in warrant application); *Barbuto*, 2001 WL 670930, at *5 (invalidating search because investigators should have presented computer search methods or criteria to magistrate before warrants were issued); Winick, 8 HARV. J.L. & TECH. at 109. Cf. *United States* v. *Grimmet*, 439 F.3d 1263, 1270 (10th Cir. 2006) (affirming district court's denial of motion to suppress computer evidence because "[t]here is no evidence of exploratory rummaging through files, or inadvertent discoveries," nor did "wholesale searching occur[ ] here, despite the broad authority the warrant may have granted").

-25-

Exhibit C
Page 25

RREOUS014282

is "no 'exigent circumstance or practical reason to permit officers to rummage through all of the stored data regardless of its relevance or its relation to the information specified in the warrant.'" *Ibid.* (quoting Winick, 8 HARV. J.L. & TECH. at 105). At that point, "law enforcement officers can generally employ several methods to avoid searching files of the type not identified in the warrant: observing file types and titles listed in the directory, doing a key word search for relevant terms, or reading portions of each file stored in the memory." *Id.* at 1276.

Even if the warrant established probable cause to believe that Kornman's computers and computer equipment *may* contain information regarding allegedly "suspicious stock purchases and sales . . . in MiniMed, Inc. . . . and Hollywood Casino Corporation," Aff. ¶ 8, that hardly constitutes probable cause encompassing all of Kornman's computer files. See *In the Matter of Search of 3817 W. West End*, 321 F. Supp. 2d at 958 ("While the warrant application here established probable cause that the computer may contain information of tax fraud, it did not contain information that the computer contains nothing but information of tax fraud."). Indeed, the broad language of the warrant authorizing the seizure of Kornman's computers and computer equipment does not delineate any limits for the subsequent search and does not even limit its authorization to the computers and computer equipment described in its supporting affidavit. See Aff. ¶¶ 21-27, 31, 32. Instead, this section of the warrant is "a catch-all paragraph, which lacks sufficient limitation," *Hunter*, 13 F. Supp. 2d at 584, giving the officers unfettered discretion to seize and search all of Kornman's computers and computer equipment. Such a sweeping authorization allows the kind of "wide-ranging exploratory search[ ] that the Framers intended to prohibit." *Maryland* v. *Garrison*, 480 U.S. 79, 84 (1987).

Indeed, although the bulk of the affidavit supporting the warrant is devoted to the computer

-26-

**Exhibit C**
**Page 26**

RREOUS014283

search and seizure, see Aff. ¶¶ 20-45, nowhere does the affidavit describe *how* the computers would be searched and evidence would be extracted.  Despite a generic assurance that "unrelated data will not be used and will be separated, to the extent possible, from the evidentiary data and preserved," *id.* ¶ 37, neither the affidavit nor the warrant outlines how searching agents would attempt to distinguish innocuous documents from actual evidence of the alleged offenses, such as using keyword searches or date ranges.  See *In the Matter of Search of 3817 W. West End*, 321 F. Supp. 2d at 960 (finding warrant insufficiently particular where "it does not specify what objective standards the government proposes to use 'to specify what types of files were sought in the searching of the two computers so that personal files would not be searched'" (quotation omitted)).  Such absolute silence flouts the DOJ's *own recommended protocol*.  DOJ MANUAL at 69 (affidavit should identify "techniques the agents expect to use to search the computer for the specific files that represent evidence of crime and may be intermingled with entirely innocuous documents")..

Kornman's computers undoubtedly contained a plethora of materials wholly irrelevant to this case.  Not only did his home computers contain strictly personal information, but Kornman also had business interests wholly unrelated to this case, the records of which were also on his home computers and computer equipment **[check]**.  Aff. ¶ 9.  Moreover, given the specificity of the government's allegations regarding Kornman's dealings with the MiniMed and Hollywood executives, it hardly would have been onerous for the government to have included a search protocol in the warrant.  As the Fifth Circuit has noted, "technology exists by which relevant communications can be located without the necessity of reviewing the entire contents of all of the stored communications."  *Steve Jackson Games, Inc.* v. *U.S. Secret Service*, 36 F.3d 457, 463 (5th Cir. 1994; see also *In re Grand Jury Subpoena Duces Tecum Dated November 15, 1993*, 846 F. Supp.

**Exhibit C**
**Page 27**

RREOUS014284

11, 13 (S.D.N.Y. 1994) ("[A] subpoena demanding documents containing specified key words would identify relevant documents without requiring the production of irrelevant documents."). Instead, the warrant in this case authorized the government to rummage through Kornman's personal and business records as they were stored on 20 computers and countless hard drives, memory devices, personal digital assistants, disks, microcassettes, and tapes, in order to find anything relevant to "the use, receipt, or retention of material, nonpublic information concerning any publicly-traded securities or actions based on that information.[4]  Attachment B, ¶ 3.  Given the lack of any protocol (much less the exacting one required), the warrant in this case falls far short of the minimum requirements of the Fourth Amendment.  See *United States* v. *Falon*, 959 F.2d 1143, 1148 (1st Cir. 1992) (warning that without "extraordinary proof to demonstrate that an individual's life is consumed by fraud and that *all* records found in the home were subject to seizure," the items that may be seized "must be sufficiently linked to the alleged criminal activity so as to distinguish them from innocent, personal materials").  Accordingly, the computer evidence should be suppressed.

## CONCLUSION

For each of the foregoing reasons, defendant Kornman requests that the Court suppress the fruits of the government's search executed on his home on August 3, 2004. **[Flesh out to request the specific relief requested in this motion.]**

Dated: June ___, 2006

Respectfully submitted,

_____

---

[4] **[Did the government maintain a search log (assuming that searches were conducted? If not, we may want to argue that also runs afoul of the Fourth Amendment.]**

**Exhibit C**
**Page 28**

RREOUS014285

Jeffrey M. Tillotson
State Bar No. 20039200
LYNN, TILLOTSON & PINKER, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, TX 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839

Lawrence S. Robbins
Gregory L. Poe
Alice W. Yao
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

**Attorneys for Defendant Gary M. Kornman**

-29-

**Exhibit C
Page 29**

RREOUS014286

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record, as identified below, on this the __th day of June, 2006:

> ***Via Facsimile and Overnight Mail***
> Jeffrey J. Ansley
> Assistant United States Attorney
> 1100 Commerce Street, Suite 300
> Dallas, Texas 75242
> Telephone: (214) 659-8600
> Fax: (214) 767-4100

_____
Jeffrey M. Tillotson

Exhibit C
Page 30

RREOUS014287

## Unknown

| | |
|---|---|
| **From:** | Yao, Alice |
| **Sent:** | Thursday, October 26, 2006 6:09 PM |
| **To:** | 'Jeff Tillotson (jmt@lynnllp.com)' |
| **Cc:** | Robbins, Larry; Poe, Greg |
| **Subject:** | FW: |
| **Attachments:** | Draft Stringer Motion v3.wpd |

Jeff,

We also prepared a draft Stringer motion.  This is the most recent version.

Alice
-----Original Message-----
**From:** Untereiner, Alan
**Sent:** Tuesday, June 13, 2006 3:31 PM
**To:** Poe, Greg
**Cc:** Yao, Alice
**Subject:**

Greg and Alice – as promised.  Let me know what you think.

Alan Untereiner
Robbins, Russell, Englert, Orseck & Untereiner LLP
1801 K Street, N.W.
Suite 411
Washington, DC  20006

Ph.: 202-775-4505
Fax: 202-775-4510

auntereiner@robbinsrussell.com

**Exhibit D
Page 1**

RREOUS008496

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| **v.** | § | **CRIMINAL NO. 3:05-CR-0298-P**<br>**ECF FILING (JUDGE SOLIS)** |
| **GARY M. KORNMAN** | § | |

**DEFENDANT GARY M. KORNMAN'S MEMORANDUM IN SUPPORT
OF MOTION FOR LEAVE TO CONDUCT LIMITED DISCOVERY INTO
WHETHER COUNT THREE OF THE INDICTMENT SHOULD BE
DISMISSED BECAUSE OF INEQUITABLE GOVERNMENT CONDUCT
AND MISUSE OF PARALLEL CIVIL PROCEEDINGS**

Defendant Gary M. Kornman, by and through undersigned counsel, respectfully submits this motion seeking leave to conduct limited discovery that would support a motion for dismissal of Count III of the Indictment. Count III, which alleges false statements by Kornman to the Securities and Exchange Commission ("SEC"), is predicated entirely on a telephone conversation that occurred on October 29, 2003 between Kornman and two SEC lawyers (Timothy McCole and John Reding). As we explain below, during this conversation Mr. McCole, in order to draw out Mr. Kornman and elicit from him statements that could be used against him, took pains to assure Kornman emphatically that the SEC had not reached "any conclusions" about whether the securities laws had been broken and that the investigation was at only a very preliminary stage. On information and belief, Kornman believes that these representations were untrue, or at the very least misleading. Accordingly, he requests leave to conduct limited discovery into the veracity of McCole's representations as well as whether, at the time of the call, the government was already contemplating criminal charges – and, if so, whether there was any coordination between parallel criminal and civil investigations (including misuse of the civil investigation to obtain discovery for the criminal investigation). For the reasons

set forth below, this Court should allow Kornman to conduct limited discovery into these important matters bearing on whether Count III should be dismissed.

## FACTUAL BACKGROUND

1.  The grand jury returned an indictment against Gary Kornman on November 16, 2005. Counts I and II of the indictment allege securities fraud in connection with certain trading in the stock of two companies: MiniMed, Inc. and Hollywood Casino Corporation.  Count III alleges that Kornman made false statement to the SEC, in violation of 18 U.S.C. § 1001, during a phone conversation that occurred on October 29, 2003.  See Indictment at 14-15.  Specifically, Count III alleges the Kornman

> did make the following false, fictitious, and fraudulent statements to the SEC: (a) that Kornman did not know who managed the hedge fund that purchased and sold the MiniMed stock; (b) that the alleged former manager of the hedge fund was no longer employed by Heritage [Organization, L.L.C.]; [(c)] that Kornman did not know who possessed trading authority over the brokerage account for the hedge fund that purchased and sold the MiniMed stock; and (d) that Kornman did not purchase MiniMed stock based on material, nonpublic information.

*Id.* at 14 (¶ 2) (bold typeface omitted).  According to the indictment, these statements were false because Kornman "as he then well knew, personally managed and had sole trading authority over the Heritage Partners Fund, the hedge fund that purchased and sold the MiniMed stock at [Kornman's] direction."  *Id.* at 15 (¶ 3).  In addition, the indictment alleges that Kornman "learned from [a] MiniMed executive material, nonpublic information concerning" the company "that Kornman subsequently used to trade upon, namely, that there was a strong probability that MiniMed would be acquired by another company in or about June of 2001 and that, following such acquisition, the MiniMed executive expected the value of his MiniMed stock holdings to increase substantially."  *Ibid.*; see also id. at 5-7 (¶¶ 6-7) (describing Kornman's meeting with the MiniMed executive and

–2–

**Exhibit D**
**Page 3**

alleged receipt of material, nonpublic information).

2.   The October 29, 2003 call underlying Count III was initiated by two SEC lawyers –
Timothy McCole and John Reding – who called Kornman shortly after 9 a.m.  Tr. 2-3.  McCole had
tried to reach Kornman the day before, and Kornman had returned the call, only to have McCole say
he wanted to call back with a colleague on the line.  At the beginning of the ensuing call, Kornman
voiced concern about talking to the SEC lawyer about a potential matter that was under active
investigation:

> Okay.  If this is an investigation of something we've done, then I – we'll probably not do –
> speak to you, you know, to find out what the questions are.  I mean, I'll listen to your
> questions, but I may want to consult with counsel.

Tr. 4.  After McCole indicated that Kornman need not speak to him if he wished to consult first with
an attorney (*id.* at 5), the conversation continued.

Later in the conversation, Kornman indicated that he "felt relatively comfortable we haven't
done anything wrong" but also indicated that "at the same time I want to get legal counsel because
obviously you're thinking that we trade on inside information."  McCole responded:

> Well, no, *we don't think that*.  I mean, we're merely conducting a fact-finding investigation.
> *We haven't made any conclusions*.  We routinely do fact-finding investigations to determine
> whether the securities laws have been violated, but we, you know, haven't – quite frankly, we
> haven't gathered all the facts in this case and *we certainly haven't made any
> conclusions* . . . .

Tr. 21 (emphasis added).   Shortly thereafter, McCole reiterated this assurance: "[W]e haven't
concluded anything, and we haven't made up our minds one way or the other about any of this stuff."
Tr. 22.  When Kornman asked whether "there was a lot of trading" in MiniMed shares and whether
that was "what triggered" the SEC's investigation, McCole responded: "We don't want to sit here
and say that we have, you know, completed an investigation looking into all those things or whether

–3–

RREOUS008499

or not that – the volume of trading is even an issue. And I frankly don't know off the top of my head whether there was a whole lot of trading in the company stock." Tr. 24.

Over the course of the conversation between Kornman, McCole and Reding, the SEC attorneys elicited statements from Kornman that form the exclusive basis for the false statement charge in Count III of the Indictment. See, *e.g.*, Tr. 26-31 (Kornman discussed the information he obtained from his interview with the MiniMed executive regarding the possibility that the company would be sold in the future and whether that information qualified as material nonpublic information). Compare Indictment at 14 (¶ 2) (bold typeface omitted) (alleging that Kornman made "false, fictitious, and fraudulent statements to the SEC," including that he "did not purchase MiniMed stock based on material, nonpublic information").

3. On August 18, 2004, the SEC filed a civil action arising out of the same allegedly unlawful securities transactions that are charged in the indictment in this case. See *Securities and Exchange Comm'n v. Gary Kornman*, No. 3:04-CV-1803L (N. D. Tex.) (Lindsay, J.). Almost two years later, after some discovery had been conducted and with the case set for trial sometime during the four-week docket beginning on August 7, 2006, the SEC on May 5 abruptly moved for dismissal of the litigation without prejudice. On May 31, Judge Lindsay granted the SEC's motion to dismiss, but conditioned it on Kornman's ability to complete certain discovery to which the court had previously ruled he was entitled. In dismissing the case, Judge Lindsay took note of the SEC's "aggressive approach in handling this civil action" and specifically criticized the government for engaging in "gamesmanship" aimed at "thwart[ing]" the court's "prior lawful rulings." Mem. Op. 8 & n.2. "The court is not pleased with this apparent legal legerdemain," Judge Lindsay added, and he accordingly "reject[ed] the SEC's attempt to truncate Kornman's legitimate right to defend himself in this civil

–4–

action consistent with this court's prior rulings." *Id.* at 7-8.

## ARGUMENT

In a trilogy of cases involving the Internal Revenue Service (IRS), the Supreme Court long ago made clear that investigations conducted by government agencies may be challenged on the ground that investigators engaged in bad-faith conduct. In *Reisman v. Caplin*, 375 U.S. 440 (1964), the Court, in holding that the recipient of an IRS summons could not challenge it through an action for injunctive relief, explained that the recipient "may challenge" the summons "on any appropriate ground" in an action for enforcement brought by the IRS. *Id.* at 449. "This would include," the Court observed, situations where the agency seeks "material . . . for the improper purpose of obtaining evidence for use in a criminal prosecution." *Ibid.* In *United States v. Powell*, 379 U.S. 48 (1964), the Court ruled that the IRS need not show probable cause to obtain enforcement of a summons, but reiterated that the IRS's lesser showing nonetheless could be attacked by demonstrating that the agency had engaged in an abuse of process or had conducted its investigation "to harass the taxpayer or . .. for any other purpose reflecting on the good faith of the particular investigation." *Id.* at 58. Finally, in *United States v. LaSalle National Bank*, 437 U.S. 298 (1978), the Court took note of the "prophylactic" rule forbidding the use of an IRS summons once the agency had recommended criminal prosecution to the Department of Justice, and held that the IRS "*at all times* must use the summons authority *in good faith* pursuit of the congressionally authorized purposes of [26 U.S.C.] § 7602." *Id.* at 311-12, 318 (emphasis added). The Court also made clear that it was the "good faith" of *the IRS as an institution* (rather than of any individual agent) that was critical, and that the party challenging the summons bore a "heavy burden" of showing bad faith. *Id.* at 313-19.

**Exhibit D**
**Page 6**

RREOUS008501

The Fifth Circuit has applied these principles vigorously – including to investigations conducted by the SEC. In *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977), the defendant's accountant asked an IRS revenue agent who was conducting an audit whether a "special agent" was involved, and the revenue agent said no. (The involvement of a special agent would have signaled that the investigation was at least partially criminal in nature, and not exclusively civil.) In reliance on that representation, the accountant turned over certain documents to the IRS, which were later used in securing the defendant's convictions for tax evasion and other crimes. As it turned out, the IRS's audit was being conducted at the specific request of the Organized Crime and Racketeering Section of the Department of Justice. In holding that the defendant's motion to suppress the documentary evidence should have been granted and remanding for an evidentiary hearing, the Fifth Circuit "agree[d]" that the defendant had been "grossly deceived" by the government. *Id.* at 298. "[T]he agent's failure to apprise the appellant of the obvious criminal nature of this investigation," the court of appeals reasoned, "was a sneaky deliberate deception" as well as "a flagrant disregard for [the defendant's] rights" – and the agent's "silent misrepresentation was both intentionally misleading and material." *Ibid.* "We cannot condone this shocking conduct by the IRS," the Fifth Circuit explained, because "[o]ur revenue system is based upon the good faith of the taxpayers and the taxpayers should be able to expect the same from the government in its enforcement and collection activities." *Id.* at 300. The court reached that conclusion even while acknowledging that the IRS agent's response to the defendant's accountant had been "on the face of it true." *Id.* at 299; see also *SEC v. ESM Government Securities, Inc.*, 645 F.2d 310, 315 (5th Cir. 1981) (noting that special agent's response in *Tweel*, "[a]lthough factually correct, . . . was misleading").

The Fifth Circuit applied these principles to an SEC investigation in *ESM Government*

**Exhibit D**
**Page 7**

RREOUS008502

*Securities.* That case involved an SEC investigator who told a broker-dealer engaged exclusively in the sale of government securities (an entity that was not subject to the SEC's routine supervision) that the investigator was in the same building to audit another firm and would like to receive a tour of the broker-dealer's operations as well as a brief tutorial on how the government securities markets work, which the broker-dealer then provided. Sometime later, after the SEC had ordered an investigation of the broker-dealer, the investigator returned on several occasions with another SEC attorney and requested that the tour be repeated and the tutorial continued. Only after several days of this charade, and after the broker-dealer had provided the investigators with various documents, did the SEC lawyers disclose that the broker-dealer was the subject of an investigation. In reversing an order enforcing the SEC's subpoena, the Fifth Circuit explained:

> [A] private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the government's representations. We think it *clearly improper* for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.

645 F.2d at 316 (emphasis added). Noting that "each case" of alleged government deception or bad faith "must be examined on its facts," the court of appeals reversed for a determination of whether the broker-dealer could establish three points that were "crucial" to whether enforcement of the subpoena should be denied: (1) Did the SEC "intentionally or knowingly mislead" the broker-dealer "about the purposes of [the SEC's] review of [the broker-dealer's] files?"; (2) Was the broker-dealer "in fact misled?"; and (3) Was the subpoena "the result of the SEC's allegedly improper access to [the broker-dealer's] records?" In so doing, the Fifth Circuit also noted that, on remand, the district court should revisit its refusal to permit further discovery into the SEC investigator's "personnel file." *Id.*

–7–

**Exhibit D**
**Page 8**

RREOUS008503

at 318 n.10.

The lower courts have relied on these same principles forbidding deception and bad faith by the government in the conduct of investigations (including those conducted by the SEC) as grounds for ordering the dismissal of an indictment.  In *United States v. Stringer*, 408 F. Supp. 2d 1083 (D. Ore. 2006), the district court dismissed a 50-count indictment where the U.S. Attorney's Office (USAO) had made a deliberate decision to put on hold criminal proceedings against a likely target of prosecution in order to exploit the discovery it could obtain from the SEC's civil investigation and lawsuit.  Not only did the "criminal and civil investigators communicate[] regularly throughout the civil investigation" by "exchanging information discussing strategy," but the federal prosecutor "advised the SEC that he was interested in false testimony cases" and "explained how to create the best record possible for such cases." *Id.* at 1086; see also *ibid.*  (SEC officials, in turn, forwarded this information to testimony takers "so that we will know and understand what [the USAO] needs/wants to prosecute a false testimony case").  Moreover, SEC investigators took pains to conceal the interest of federal prosecutors (by making sure that the prosecutors' interest was not disclosed by court reporters providing copies of transcripts) and gave evasive answers in response to one of the defendant's lawyers.  See *id.* at 1086-87 (in response to question whether defendant was a target of any SEC investigation, SEC lawyer responded that the SEC "does not have targets in this investigation"; in response to question whether the SEC was working in conjunction with any USAO, SEC lawyer stated that it was the agency's policy not to respond to questions like that and noted that sharing information with other parts of the government was a "routine use" of information collected by the SEC as stated in SEC Form 1662).

After conducting eleven days of evidentiary hearings and hearing oral argument, the district

–8–

Exhibit D
Page 9

court ruled that the USAO's "strategy to conceal the criminal investigation from defendants was an abuse of the investigative process." *Stringer*, 408 F. Supp. 2d at 1084, 1088. "[T]hese were not parallel investigations," the court reasoned, because the "USAO identified potential criminal liability and a few targets in the beginning of the investigation, and elected to gather information through the SEC instead of conducting its own investigation." *Id.* at 1087.   Not only did the government fail to "advise defendants that it anticipated their criminal prosecution," but it also "intentionally shielded its intentions behind the guise of a civil" action and "resort[ed] to subterfuge to maintain the secrecy of its involvement." *Id.* at 1088.   In particular, the court explained, SEC investigators "made affirmative misrepresentations as to the nature or existence of parallel proceedings" and engaged in "deceit and trickery" by providing an "evasive and misleading" response to the questions of the defendant's attorney and by "instruct[ing] court reporters to refrain from mentioning the U.S. Attorney's involvement." *Id.* at 1089.   The government's misconduct, the district court reasoned, was "so grossly shocking and so outrageous" as to warrant dismissal of the indictment and, in the alternative, suppression of the defendants' statements and of other evidence obtained through the SEC's "egregious" misconduct. *Id.* at 1089-90.

In other cases as well, district courts have not hesitated to permit targets of SEC inquiries to conduct limited discovery into whether agency investigators acted in good faith during a civil investigation – or to dismiss an indictment based on a showing of government bad faith. See, *e.g.*, *Ayers v. SEC*, 482 F. Supp. 2d 747, 753-54 (D. Mont. 1980) (ordering evidentiary hearing into SEC's motives behind investigation); *United States v. Rand*, 308 F. Supp. 1231, 1233-38 (N.D. Ohio 1970) (ordering dismissal of indictment where government used evidentiary hearing in agency's civil proceeding to obtain evidence for criminal prosecution and where defendant relied on government's

–9–

**Exhibit D**
**Page 10**

RREOUS008505

assurance that he would be immune from prosecution for matters elicited in testimony at hearing).

In this case, Mr. Kornman seeks discovery in order to obtain far more limited relief: dismissal of a single count of the indictment, Count III, which as explained above charges Kornman with making false statements during an October 29, 2003 telephone call initiated by two SEC lawyers. During that call, SEC investigator Timothy McCole emphatically assured Mr. Kornman that the government "d[idn't think" that Kornman had traded on inside information and "ha[dn't] made any conclusions" about that subject. Tr. 21; see also *ibid.* ("[W]e're merely conducting a fact-finding investigation. *We haven't made any conclusions.* We routinely do fact-finding investigations to determine whether the securities laws have been violated, but we, you know, haven't – quite frankly, we haven't gathered all the facts in this case and *we certainly haven't made any conclusions* . . . .") (emphasis added); *id.* at 22, 24. McCole also told Kornman that he "frankly" didn't "know off the top of my head whether there was a whole lot of trading in the company stock." Tr. 24. These assurances had the desired effect of encouraging Mr. Kornman to continue the conversations notwithstanding misgivings he had expressed about whether he should be consulting with counsel first.

There can be little doubt that, under the stringent standards applied to government investigations in this Circuit, Mr. McCole's representations would qualify as bad-faith conduct warranting remedial action if they turned out to be either false or misleading. Similarly, if McCole misled Mr. Kornman about McCole's knowledge concerning the actual volume of trading in MiniMed stock, that too could qualify as bad faith conduct by the government. And, needless to say, if the USAO was collaborating with the SEC and had decided to bring a criminal prosecution of Kornman at the time of the October 29, 2003 call – or even if the USAO had reached a tentative conclusion

–10–

RREOUS008506

that insider trading occurred, and was using the SEC to circumvent the limits the government's right to discovery in a criminal action – this would render McCole's statements misleading if not false.

The veracity of McCole's representations during the October 29, 2003 call depends on facts that are within the government's knowledge and control but unknown to Mr. Kornman.   There is reason to believe, however, that in this case – as in *Stringer* and in other reported cases – the SEC's conduct has been less than punctilious.  In granting voluntary dismissal of the SEC's civil action arising out of the same trading activity, Judge Lindsay took note of the SEC's "aggressive approach in handling this civil action" and specifically criticized the government for engaging in "gamesmanship" that was aimed at "thwart[ing]" the court's "prior lawful rulings."  *Securities and Exchange Comm'n v. Gary Kornman*, No. 3:04-CV-1803L (N. D. Tex.), Mem. Op. 8 & n.2.  "The court is not pleased with this apparent legal legerdemain," Judge Lindsay added, and he accordingly "reject[ed] the SEC's attempt to truncate Kornman's legitimate right to defend himself in this civil action consistent with this court's prior rulings."  *Id.* at 7-8.

Unless Mr. Kornman is permitted to engage in limited discovery targeting this issue, there is no way for him to know for sure whether the government has engaged in bad faith in the conduct of its investigation (as occurred recently in *Stringer*).[1]  Accordingly, Kornman respectfully requests that he be permitted to engage in limited discovery to see whether there is a basis for his proposed motion to dismiss.  In the alternative, Kornman respectfully requests that this Court conduct an *in camera* inquiry into this matter in order to determine whether additional discovery is warranted.

---

[1] The government has filed a notice of appeal in *Stringer*.  Of course, to the extent that the government is or will be taking the position in that case that there is nothing wrong with the conduct of the SEC and the USAO in that case, or suggesting that such conduct is commonplace, that would be all the more reason to conclude that similar conduct occurred in this case.

–11–

RREOUS008507

## CONCLUSION

For the foregoing reasons, this Court should permit Mr. Kornman to conduct limited discovery into whether the government has conducted its investigation in bad faith. In the alternative, this Court should conduct an *in camera* inquiry into whether additional discovery should be permitted.

Respectfully submitted,

Jeffrey M. Tillotson
State Bar No. 20039200
LYNN, TILLOTSON & PINKER, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, TX 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839

Lawrence S. Robbins
Gregory L. Poe
Alice W. Yao
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

### ATTORNEYS FOR DEFENDANT GARY M. KORNMAN

RREOUS008508

**From:** Robbins, Larry
**Sent:** Thursday, April 06, 2006 4:22 PM
**To:** 'Jeff Tillotson'; Poe, Greg; Yao, Alice
**Subject:** Motion to Dismiss

**Attachments:** Motion to Dismiss Indictment v4.pdf; Motion to Dismiss Indictment v4.wpd

Jeff -- as promised, here is a draft of the motion to dismiss the indictment. Greg is still looking at it, so he may yet have some edits. I look forward to your and Gary's thoughts and edits. Larry

**Exhibit E**
**Page 1**

**Sarti, Dana I Wesley**

| | |
|---|---|
| **From:** | Robbins, Larry |
| **Sent:** | Sunday, April 09, 2006 10:58 PM |
| **To:** | 'jmt@lynnllp com' |
| **Cc:** | Poe, Greg; Yao, Alice |
| **Subject:** | Motion to dismiss |

Jeff -- I have not yet had a chance to make a few additional changes that greg suggested
-- but can you give me a sense of where we are on the mtd?  Larry
-------------------------
Sent from my BlackBerry Wireless Handheld

1

**Exhibit F
Page 1**

RREOUS015054

**From:** Yao, Alice
**Sent:** Wednesday, April 12, 2006 11:18 AM
**To:** 'Jeff Tillotson (jmt@lynnllp.com)'
**Cc:** Robbins, Larry; Poe, Greg
**Subject:** Motion to Dismiss

**Attachments:** Motion to Dismiss Indictment v5.pdf; Motion to Dismiss Indictment v5.wpd; Redline Comparison of Motion to Dismiss Indictment (v5 and v4).pdf; Redline Comparison of Motion to Dismiss Indictment (v5 and v4).wpd

Jeff,

Please find attached the most recent version of the motion to dismiss the indictment, which incorporates Greg's edits as well as a few other minor changes. Also attached is a redline comparison to version 4.

Alice

Alice W. Yao
Robbins, Russell, Englert, Orseck & Untereiner LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
Telephone: (202) 775-4492
Fax: (202) 775-4510
www.robbinsrussell.com
ayao@robbinsrussell.com

This communication is for the use of the intended recipient only. It contains information that may be privileged, confidential, and/or attorney work product. If you are not the intended recipient, any use, disclosure, or copying of this communication is prohibited. If you received this communication in error, please notify the sender and permanently delete this communication.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Criminal Action No. |
| v. | § | |
| | § | 3:05-CR-0298P |
| GARY M. KORNMAN, | § | |
| | § | |
| Defendant. | § | |

---

**DEFENDANT GARY M. KORNMAN'S
MOTION TO DISMISS INDICTMENT**

---

Jeffrey M. Tillotson
State Bar No. 20039200
LYNN, TILLOTSON & PINKER, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, TX 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839

Lawrence S. Robbins
Gregory L. Poe
Alice W. Yao
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

Daniel K. Webb
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700

Barry J. Pollack
COLLIER SHANNON SCOTT, PLLC
3050 K Street, NW, Suite 400
Washington, DC 20007
Telephone: (202) 342-8400
Fax: (202) 342-8451

ATTORNEYS FOR DEFENDANT GARY M. KORNMAN

**Exhibit G
Page 2**

RREOUS013410

## TABLE OF CONTENTS

-i-

Exhibit G
Page 3

**TABLE OF AUTHORITIES**

**Exhibit G**
**Page 4**

RREOUS013412

COMES NOW Defendant Gary M. Kornman and files this, his Motion To Dismiss Indictment and, in support thereof, would show as follows:

<div align="center">**INTRODUCTION AND SUMMARY OF ARGUMENT**</div>

Defendant Gary Kornman, a Dallas-based businessman, has been indicted on two counts of insider trading, in violation of 15 U.S.C. § 78j(b); 15 U.S.C. § 78ff; 17 C.F.R. § 240.10b-5, and one count of making false statements to the Securities and Exchange Commission ("SEC"), in violation of 18 U.S.C. § 1001. The insider trading counts arise from two routine (but unsuccessful) sales call that Kornman made on executives of Hollywood Casino Corp. and MiniMed, Inc., in which he pitched his firm's asset planning services. The Section 1001 count is based on four statements that Kornman allegedly made to two SEC lawyers during the course of a telephonic interview regarding his purchases of MiniMed stock.

As we show below, none of these counts states a crime. Counts 1 and 2, which purport to allege the "misappropriation theory" of insider trading, fail for two independent reasons – they fail to allege that Kornman had the requisite fiduciary-like duty to the two executives (as the misappropriation theory requires); and they fail to allege that Kornman acted with the requisite criminal intent. See generally *United States* v. *O'Hagan*, 521 U.S. 642, 652, 666 (1997). Indeed, in a parallel *civil* case brought against Mr. Kornman by the SEC, Judge Lindsay nearly dismissed the identical allegations *on the pleadings*, concluding that "this is an extremely close case." *S.E.C.* v. *Kornman*, 391 F. Supp. 2d 477, 486 (N.D. Tex. 2005). It follows that in a *criminal* case – where the Rule of Lenity applies – the allegations against Mr. Kornman cannot possibly give rise to the kind of fiduciary duty required to state an offense. To the contrary, as the indictment itself confirms, Mr. Kornman dealt with each executive at arm's length; he was never hired by either executive; he never reached an agreement of any kind with either executive; and he never promised either executive any

RREOUS013413

type of confidentiality.

Count 3, the false statement charge, fares no better. Although the indictment attributes four allegedly false statements to Mr. Kornman, each of these is a paraphrase – and a *misleading* paraphrase, at that – of what Mr. Kornman actually said in his telephonic interview with the SEC. The government's decision to indict based on mere paraphrases is especially troubling *because the prosecutors possess a tape recording and transcript of the SEC's actual interview with Mr. Kornman*. But there is no mystery about *why* the government indicted based on a paraphrase instead – Mr. Kornman's *actual* words are not false. The government should not be permitted to charge false words that were *not* spoken instead of the true words that *were* spoken.

For each of these reasons, all Counts of the indictment should be dismissed for failure to state a criminal offense.

## THE INDICTMENT

According to the indictment, Kornman met with an unnamed MiniMed executive, and with an unnamed Hollywood executive, in the course of soliciting them for business. Indictment ¶¶ 6, 7, 13, 14. While no business relationship ever resulted from these solicitations, the indictment alleges that each executive imparted material, nonpublic information regarding the possible acquisition of his respective company. *Id.* ¶¶ 3, 7, 14. The indictment alleges that Mr. Kornman, based on that information, purchased stock in each company in violation of a duty he supposedly owed to each executive, *id.* ¶¶ 3, 8, 15, 16, and thereafter sold the shares after each acquisition for a total profit of $143,149.94. *Id.* ¶¶ 9, 17.

## I.    MR. KORNMAN AND THE HERITAGE ORGANIZATION, L.L.C.

The indictment alleges that Mr. Kornman operated the Heritage Organization, L.L.C.

-2-

Exhibit G
Page 6

("Heritage"), which "sold tax shelters and estate planning services to wealthy individuals." Indictment ¶ 1.b.  Although the indictment also alleges that Mr. Kornman is "a licensed attorney who held Series 6 and Series 63 licenses," *id.* ¶ 1.a, the indictment does not allege that Kornman acted as a lawyer, advisor, or accountant for any actual Heritage client, much less any *prospective* client.

## II.    MR. KORNMAN MEETS WITH TWO PROSPECTIVE CUSTOMERS

### A.    Hollywood Casino Corporation

#### 1.    The Hollywood meeting was an arm's-length solicitation of business.

According to the indictment, Mr. Kornman and other Heritage representatives met with an unnamed Hollywood executive between on or about March 23, 2001, and on or about November 19, 2001, Indictment ¶ 13, 14, in "attempts to sell [Heritage's] tax elimination services to the Hollywood Casino executive."  *Id.* ¶ 13.  The indictment does not specify any business, personal, or social relationship that Mr. Kornman had with the executive before this time.  According to the indictment, the Hollywood executive told Mr. Kornman at the November 19, 2001 meeting that "Hollywood Casino would definitely be sold in the very near future, probably during the late summer or early fall of 2002."  *Id.* ¶ 14.a.

The Hollywood executive did not engage Heritage, and the indictment does not allege that any follow-up meetings or discussions occurred.  The indictment does allege that, within a week of the meeting, Mr. Kornman bought shares of Hollywood stock in a hedge fund which he managed, and that, over the next few months, he intermittently continued to purchase Hollywood stock.  *Id.* ¶ 16.

#### 2.    At the time of the Hollywood meeting, an acquisition of Hollywood was highly uncertain.

-3-

RREOUS013415

At the time of Mr. Kornman's solicitation meeting, Hollywood had not yet met with any interested suitor. In fact, it was not until December 5, 2001, that senior executives of Hollywood and Penn National Gaming ("PNG") met in person for the first time. Excerpts from November 15, 2002 Hollywood Casino Proxy Statement at 6.[1] Discussions between them took a turn for the worse when PNG notified Hollywood on February 3, 2002 that it was "withdrawing from discussions . . . and terminating its indication of interest." *Ibid.* Although Hollywood sought to find other potential bidders in February and March of 2002, PNG notified Hollywood's investment banker that it was *not* interested in participating. *Id.* at 7. It was not until May 23, 2002 – almost a full month after "final bid" letters went out to all interested parties – that PNG evidenced a renewed interest in Hollywood. *Ibid.*

Following the development of a new business plan by Hollywood, the process resumed in mid-June – more than six months after Kornman's solicitation meeting. *Ibid.* On July 19, 2002, Hollywood's board agreed to negotiate with PNG on an exclusive basis. *Id.* at 8. Over the next several weeks, bankers and lawyers for Hollywood and PNG negotiated the deal terms. Finally, on August 7, 2002 – more than eight months after Kornman's November 19, 2001 solicitation meeting with the Hollywood executive – the Hollywood board approved the transaction. *Ibid.*

B.     **MiniMed**

1.     **The MiniMed meeting was an arm's-length solicitation of business.**

---

[1] MiniMed and Hollywood proxy statements filed with the SEC are included in the appendix filed with this motion. For the Court's convenience, only the quoted excerpts are referenced. The full proxy statements are attached in Appendix **[tab numbers]**. This Court may take judicial notice of the proxy statements under FED. R. EVID. 201. See also *Lovelace* v. *Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) ("[A] district court deciding a motion to dismiss may take judicial notice of the contents of documents filed with the Securities and Exchange Commission.").

-4-

**Exhibit G**
**Page 8**

According to the indictment, Mr. Kornman and a Heritage representative met with the MiniMed executive on February 7, 2001 in Northridge, California. Indictment ¶ 7. Again, the meeting was a solicitation effort. *Id.* ¶ 6. During the course of the solicitation meeting, the MiniMed executive allegedly informed Mr. Kornman that "there was a 70% chance that MiniMed would be acquired by a Fortune 100 company." *Id.* ¶ 7.a. According to the indictment, the MiniMed executive claimed that "the expected acquisition of MiniMed would probably take place around June 2001," *id.* ¶ 7.b, and that he "expected to receive approximately $1 billion in stock in the new company if the acquisition of MiniMed occurred, resulting in . . . a significant increase in the value of MiniMed's stock price to its shareholders." *Id.* ¶ 7.c.

## 2. At the time of the MiniMed meeting, an acquisition of MiniMed was highly uncertain.

At the time of Mr. Kornman's solicitation meeting, Medtronic had just reinitiated discussions regarding the possibility of a stock-for-stock transaction after months of "start and stop" negotiations, which MiniMed described to its own board as "preliminary." Excerpts from July 18, 2001 MiniMed Proxy Statement at 22. The "price" offered by Medtronic's proposal was unclear and, as a result, MiniMed's board had made no decision to sell the company at that point. *Ibid.* MiniMed itself described the discussions "exploring the possibility of such a transaction" as "still preliminary in nature." *Ibid.* Negotiations continued, and by mid-March, the MiniMed board had not decided whether to remain independent or pursue "a strategic transaction with a third party." *Id.* at 23. Medtronic lowered its proposed offer in April 2001, which MiniMed rejected. *Id.* at 24. At that point, Medtronic gave MiniMed notice that it was withdrawing its efforts to merge with MiniMed. *Ibid.* Other possible suitors for MiniMed evaporated, and in late May, MiniMed

-5-

**Exhibit G**
**Page 9**

RREOUS013417

rekindled negotiations with Medtronic, with a deal eventually reached at the end of May 2001, more than three months after Mr. Kornman purchased MiniMed stock.  *Id.* at 26-28.

<div align="center">**THE PARALLEL SEC CASE BEFORE JUDGE LINDSAY**</div>

The SEC filed a complaint against Mr. Kornman on August 18, 2004.  Like the indictment in the present case, the SEC alleged that Mr. Kornman violated Section 10(b) of the Exchange Act and Rule 10b-5 by trading MiniMed and Hollywood stock based on material, nonpublic information. Mr. Kornman filed a motion to dismiss the SEC's complaint pursuant to FED. R. CIV. P. 12(b)(6) and 9(b), arguing in principal part that Kornman owed no fiduciary-like duties to the two executives. Judge Lindsay denied the motion to dismiss, but acknowledged that – even in that *civil* setting – this was "an extremely close case."  *Kornman*, 391 F. Supp. 2d at 486.

<div align="center">**ARGUMENT**</div>

I.      **COUNTS 1 AND 2 SHOULD BE DISMISSED BECAUSE THEY FAIL TO ALLEGE THE REQUISITE DUTY AND SCIENTER UNDER THE "MISAPPROPRIATION" THEORY OF INSIDER TRADING**

To survive a motion to dismiss, an insider trading charge based on the "misappropriation" theory must allege (at a minimum) that the defendant (1) traded on the basis of material, nonpublic information; (2) breached a recognized duty to the source of the information; and (3) acted with the requisite scienter.  *United States* v. *Chestman*, 947 F.2d 551, 566 (2d Cir. 1991); *O'Hagan*, 521 U.S. at 562, 566.  As we show below, the complaint in this case fails sufficiently to allege two separate elements under Section 10(b): duty and scienter.

A.      **The Indictment Fails To Allege A "Fiduciary-Like" Relationship Between Mr. Kornman And Either Executive, And Thus Fails To Plead The Requisite Duty**

1.      **To sustain the two misappropriation charges, the indictment must sufficiently allege that Mr. Kornman owed a fiduciary-like duty to each**

<div align="center">-6-</div>

<div align="center">**Exhibit G
Page 10**</div>

RREOUS013418

**of the two executives.**

As the Supreme Court has strongly emphasized, "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Chiarella* v. *United States*, 445 U.S. 222, 232 (1980). Liability for insider trading must be based on "a fiduciary or other similar relation of trust and confidence" owed to the source of the information. *Id.* at 228.

Broadly speaking, there are two basic theories of liability under Section 10(b) and Rule 10b-5: (a) the "classical" theory and (b) the misappropriation theory. *United States* v. *Cassese*, 273 F. Supp. 2d 481, 485 (S.D.N.Y. 2003). Under the "classical" theory, Section 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information. *Chiarella*, 445 U.S. at 228. The indictment makes no such allegations. Instead, the indictment charges that Mr. Kornman "misappropriated and misapplied to his own use material, nonpublic information." Indictment ¶ 3. Under the misappropriation theory, which was recognized by the Supreme Court in *United States* v. *O'Hagan*, 521 U.S. 642 (1997), a person commits fraud under Rule 10b-5 "when he misappropriates confidential information, for securities trading purposes, in breach of a *duty* owed to the *source* of the information." *Id.* at 652 (emphasis added), 666.

As the Second Circuit recently cautioned, "a fiduciary obligation is not to be lightly implied. . . To label someone a fiduciary is to impose on that person obligations additional, and often contrary, to the ordinary allocations of responsibility that govern commercial transactions." *United States* v. *Skelly*, No. 05-4261, 2006 WL 766746, at *2 (2d Cir. March 21, 2006). Imputing a fiduciary duty is especially hazardous in criminal cases, where a defendant is entitled to fair notice of any heightened responsibilities whose breach might result in conviction of a crime. Courts have

**Exhibit G**
**Page 11**

RREOUS013419

therefore confined the misappropriation theory to "hornbook fiduciary relations" such as employer-employee, lawyer-client, and the like. *O'Hagan* itself, for example, involved a lawyer who "misappropriated" information about a pending acquisition from his law firm. *O'Hagan*, 521 U.S. at 560. In upholding his conviction under the misappropriation theory, the Supreme Court couched its analysis in terms of a "fiduciary's responsibility" not to misappropriate from his "principal." *Ibid.* Similarly, when it decided the *Chestman* case, the Second Circuit noted that it had applied the misappropriation theory only in the context of employee relationships. *United States* v. *Chestman*, 947 F.2d at 567 ("To date, we have applied the theory only in the context of employment relations."). The *Chestman* court therefore declined to extend the misappropriation theory to the context of a husband and wife. *Id.* at 569.

Moreover, courts will find a fiduciary-like duty only when the traditional indicia of a fiduciary relationship are present. As the Second Circuit explained in *Chestman*, "[a]t the heart of the fiduciary relationship lies reliance and *de facto* control and dominance." *Id.* at 569. Essential to finding such a relationship, the Court concluded, is a determination that "confidence is reposed on one side and there is resulting superiority and influence on the other side." *Ibid.* (quoting *Mobil Oil Corp.* v. *Rubenfeld*, 339 N.Y.S.2d 623, 632 (Civ. Ct. 1972)). Without these characteristics (which the Court described as "discretionary authority" on the part of the fiduciary and "dependency" on the part of the principal), there is no relationship on which misappropriation liability can be premised. *Id.* at 569. Other courts in criminal cases have followed *Chestman's* reasoning and sought to enforce its requirements. See *United States* v. *Kim*, 184 F. Supp. 2d 1006, 1010 (N.D. Cal. 2002) (citing *Chestman* approvingly as the "key case for examining the precise contours of misappropriation liability – *i.e.*, what relationships can potentially give rise to liability?").

-8-

**Exhibit G**
**Page 12**

RREOUS013420

2.    **The indictment falls woefully short of alleging the requisite fiduciary-like duty between Mr. Kornman and the executives**.

As a salesman making a pitch for new business, Gary Kornman had nothing close to a fiduciary-like relationship with his two prospective customers.  He exercised absolutely no control (*de facto* or otherwise) or dominance over the targets of his solicitation efforts – essential characteristics of a fiduciary relationship – and the indictment does not allege otherwise.  If anything, it was the executives – the targets of Mr. Kornman's sales efforts – who retained all of the control over the relationships.  Nor is there the slightest suggestion in the indictment that either executive was "dependent" on Mr. Kornman.  Defendant, in short, was nothing more than a salesman plying his trade, or at least trying to do so.[2]

Even the government admits that both executives were merely *prospective* clients of Heritage.  Indictment ¶ 3.  That concession is crucial because, to our knowledge, no criminal case has ever held that a merely *prospective* sales relationship is fiduciary in nature.  To the contrary, the cases that have considered the issue have thoroughly rejected the application of the misappropriation theory to prospective business relationships.  In *Cassese*, for example, a business executive, having learned during the course of a prospective business relationship that the company he was negotiating with was about to be acquired by a different company, was charged with insider trading under the misappropriation theory when he traded in the target company's stock.  *Cassese*, 273 F. Supp. 2d at

---

[2] Perhaps in an effort to make Mr. Kornman's relationship with the prospective buyers appear to be more fiduciary-like, the indictment notes that Mr. Kornman is a "licensed attorney who held Series 6 and Series 63 securities licenses." Indictment ¶ 1.  That fact, however, leads nowhere.  The indictment does not allege either that the MiniMed or Hollywood executive was aware of Mr. Kornman's status as a licensed attorney or securities professional or that Mr. Kornman was acting as an attorney or securities professional in attempting to sell asset planning services to the two executives.

-9-

**Exhibit G**
**Page 13**

481. Relying on *Chestman*, the district court rejected the SEC's attempt to characterize the defendant's relationship with the target as fiduciary-like in nature. "[T]he key question," noted the court, "is whether the relationship is 'best characterized as an equal relationship between peers or as a relationship involving a degree of dominance." Explaining that the parties had none of the indicia of fiduciaries, the court concluded that the prospective business partners "were thus not inherent fiduciaries, but rather arms-length business partners." *Id.* at 486; *see also United States* v. *Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (in affirming the district court's judgment of acquittal under Section 14(e) and Rule 14e-3, court noted that Cassese "did not breach any fiduciary duty, nor did he misappropriate any confidential information"); *accord S.E.C.* v. *Mayhew*, 916 F. Supp. 123, 130 (D. Conn. 1995) (holding that a consultant owed no fiduciary duty to a potential client with respect to material, nonpublic information that was disclosed during a lunch meeting because the consultant's "ambiguous and ambivalent role . . . lack[ed] the indicia of de facto control and dominance resulting from the confidence imposed"), *aff'd*, 121 F.3d 44 (2d Cir. 1997).

Beyond all this, Gary Kornman never reached agreement on *anything* with *either* executive. Instead, the indictment simply alleges that the executives shared "numerous confidences" about their financial conditions and business interests with Mr. Kornman and other Heritage representatives. Indictment ¶¶ 6, 13. Courts have made it very clear, however, that "a fiduciary relationship cannot be imposed unilaterally by entrusting a person with confidential information." *Chestman*, 947 F.2d at 567; *see also Walton* v. *Morgan Stanley Co.*, 623 F.2d 796, 799 (2d Cir. 1980) (disclosure alone of confidential information does not impose any fiduciary duties on the recipient) (cited approvingly in *Dirks* v. *S.E.C.*, 463 U.S. 646, 662 n.22 (1983)); *Cassese*, 273 F. Supp. 2d at 487 ("[t]he fact that information exchanged between two parties is confidential" does not, without more, "change their

-10-

relationship from arms-length into a fiduciary relationship"). Instead, there must be an *explicit acceptance* of the duty of confidentiality to create such a relationship. *Chestman*, 947 F. 2d at 571 (disclosure of confidential information by wife insufficient to create functional equivalent of fiduciary relationship where husband did not explicitly accept duty of confidentiality). The indictment does not allege that either executive signed a written agreement with Heritage, nor does it allege that Mr. Kornman made an oral promise of confidentiality or in any way (much less explicitly) accepted any duty of confidentiality.[3]

In a sign of just how pressed the government is to allege facts giving rise to a fiduciary duty, the indictment speaks of letters that Kornman "caused" a Heritage representative to send to both executives bearing the legend "personal and confidential." Indictment ¶¶ 4, 5, 10, 11, 12. These allegations simply do not give rise to a fiduciary-like duty. *Cf. Idema* v. *Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1191 (C.D. Cal.) (such markings insufficient to create a confidential relationship for a breach of confidence claim), *aff'd*, 90 Fed. Appx. 496 (9th Cir. 2003). After all, people are bombarded, almost every day, with junk mail bearing the self-important label "Personal and Confidential." Not surprisingly, no court has ever held that boilerplate mailings give rise to a fiduciary-like relationship between the junk mailer and the recipient – especially for purposes of a criminal prosecution.

3.    **Judge Lindsay's ruling in the parallel *civil* case – as fortified by the Rule**

---

[3] Texas law follows the same rule. The mere receipt of confidential information does not transform any relationship, much less a prospective business arrangement, into a fiduciary relationship. *Thigpen* v. *Locke*, 363 S.W.2d 247, 253 (Tex. 1962). This is true even if there is trust between the parties. As the Texas Supreme Court explained in *Crim Truck & Tractor Co.* v. *Navistar International*, 823 S.W.2d 591, 594 (Tex. 1992), "mere subjective trust alone is not enough to transform arms' length dealing into a fiduciary relationship." (Citing *Thigpen*, 363 S.W.2d at 253.)

-11-

**Exhibit G
Page 15**

RREOUS013423

**of Lenity applicable in *criminal* cases – strongly counsels dismissal for want of a fiduciary duty**

In the parallel SEC proceeding against Mr. Kornman, Judge Lindsay nearly dismissed almost identical allegations of fiduciary duty, holding that "this is an extremely close case." *Kornman*, 391 F. Supp. 2d at 486. While "an extremely close case," *ibid.*, may be sufficient to deny a motion to dismiss a *civil* complaint, the Rule of Lenity does not allow a *criminal* indictment to stand on such allegations.

The Rule of Lenity is a well-established cornerstone of American criminal law. "The rule promotes fair notice of prohibited conduct and reduces the likelihood that unintentionally criminal conduct will be penalized." *United States* v. *Hartec Enterprises, Inc.*, 967 F.2d 130, 133 (5th Cir. 1992). In the context of Section 10(b) and Rule 10b-5, "[m]ore than a perfunctory nod at the rule of lenity . . . is required." *Chestman*, 947 F.2d at 570. Indeed, the Supreme Court has emphasized the important role that the rule of lenity plays in criminal securities law. See *Chiarella*, 445 U.S. at 235 n.20 ("[A] judicial holding that certain undefined activities 'generally are prohibited' by § 10(b) would raise questions whether either criminal or civil defendants would be given fair notice that they have engaged in illegal activity."). See also *Dirks*, 463 U.S. at 658 n.17 (rejecting the SEC's proposed parity-of-information rule because "this rule is inherently imprecise, and imprecision prevents parties from ordering their actions in accord with legal requirements"). As to the specific question of what constitutes a fiduciary duty or a "similar relationship of trust and confidence," the Second Circuit, in *Chestman*, applied the Rule of Lenity in defining the limits of what otherwise would be "the boundless nature of relations of trust and confidence." 947 F.2d at 569. The court held that, while courts have some discretion to define what constitutes a "confidential relation" in

-12-

**Exhibit G
Page 16**

civil cases, "such an elastic and expedient definition of confidential relations, *i.e.*, relations of trust and confidence . . . has no place in the criminal law." *Ibid.* Open-ended tests for fiduciary duties, the court held, "would offend not only the rule of lenity but due process as well." *Ibid.*

The Second Circuit's warnings resonate strongly in this case. If, in the SEC's *civil* proceeding, the fiduciary duty allegations presented (at best for the government) "an extremely close case," it follows that in a *criminal* case – where the Rule of Lenity applies – the allegations simply do not and cannot suffice.

> **4.    This Court should decline the government's implicit invitation to break new ground in this case.**

The government evidently hopes that this Court will reject prior case law by superimposing a fiduciary-like duty in the context of unconsummated sales calls. No court has ever done so, and for at least two reasons, this case would be an unusually poor choice in which to break new ground.

*First,* most, if not all, of the alleged "nonpublic" information purportedly disclosed to Mr. Kornman was in fact already in the public domain at the time of his trades. See *S.E.C.* v. *Monarch Fund*, 608 F.2d 938, 943 n.3 (2d Cir. 1979) ("If the information relied upon is in fact widely known among investors, the usual informational inequities simply do not exist."). Thus, this case is a particularly inappropriate one in which to assert unprecedented prosecutorial authority. As early as February 1999, for example, Medtronic was identified publicly as "MiniMed's leading rival and a company rumored to be interested in acquiring [MiniMed]." *In Brief*, L.A. DAILY NEWS, Feb. 26, 1999, at 1. Just days before Mr. Kornman's February 7, 2001 meeting, one analyst raised the prospect of an acquisition of MiniMed by Johnson & Johnson – a "Fortune 100 company" easily fitting the description allegedly conveyed by the MiniMed executive. David Kliff, *JNJ Earnings* –

-13-

RREOUS013425

*More Good News for IMA Shareholders*, DIABETIC INVESTOR, *at* http://www.diabeticinvestor.com (January 24, 2001) (requires subscription). And when the MiniMed acquisition was ultimately announced, an analyst noted that it had "long been rumored as [an] acquisition target." Dan Bernstein, *Analysts Don't See Merger Trend Among Medical Device Makers*, THESTREET.COM, *at* http://www.thestreet.com/stocks/biotech/1446017.html (May 30, 2001). Comparable information about Hollywood was likewise in the public domain.[4]

*Second*, the government will have no end of trouble proving materiality of the information supposedly imparted to Mr. Kornman – yet another element under Section 10(b). A quick reading of the attached proxies of Hollywood Casino and MiniMed will show the uncertainty of both of these transactions for many months before and after Mr. Kornman allegedly received the information from the executives. If a person trading on information takes a "substantial economic risk that his tempting target will prove to be a 'white elephant,'" then the information is not material. *Mayhew*, 121 F.3d at 52 (quoting *Monarch*, 608 F.2d at 942). To be sure, both companies ultimately were acquired; but at the time Mr. Kornman bought stock, those future events were highly uncertain. In the case of Hollywood, the ultimate acquirer (PNG) had not even seriously surfaced at the time of the Kornman meeting and, even after getting involved, PNG later withdrew from the bidding process altogether. PNG re-appeared – but some seven months *after* the Kornman meeting. Meanwhile, in the case of MiniMed, its board had not decided to sell the company even several months after the Kornman meeting. And, similar to the uncertain road that Hollywood took, MiniMed's ultimate

---

[4] In October 2000, for example, a portfolio manager at Penn Capital Management, which at the time owned more than 150,000 Hollywood shares, considered Hollywood "'an obvious acquisition target for some of the large-cap gaming companies.'" Cassell Bryan-Lowe, *Hollywood Casino Executives Bet On Company Shares*, WALL ST. J., Oct. 11, 2000, at 2.

-14-

**Exhibit G**
**Page 18**

RREOUS013426

acquirer (Medtronic) also withdrew its offer several months after the Kornman meeting.

Given these other frailties in the government's case, it would be particularly imprudent to use this prosecution to audition a novel (and retroactive) theory of fiduciary duty.

### B. The Indictment Should Be Dismissed Because, As A Matter Of Law, The Government Cannot Prove The Requisite Intent

Even if, notwithstanding the case law and the Rule of Lenity, the indictment somehow alleges the requisite fiduciary duty, the government cannot, as a matter of law, prove that Kornman traded with the requisite criminal intent. To establish a criminal violation of Rule 10b-5, the government must show that Mr. Kornman knowingly and willfully violated the provision. See *United States* v. *Peterson*, 101 F.3d 375, 379 (5th Cir. 1996); *O'Hagan*, 521 U.S. at 665. Thus, in a misappropriation case, the government must allege and prove that a defendant *knew* he was *wrongfully* trading on material, nonpublic information. *United States* v. *Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) ("Rule 10b-5 requires that the defendant subjectively believe that the information received was obtained in breach of a fiduciary duty."). See also *Cassese*, 428 F.3d at 98 (holding that, in order to establish a criminal violation of securities laws, the government must show that the defendant had "a realization . . . that he was doing a wrongful act under the securities laws in a situation where the knowingly wrongful act involved a significant risk of effecting the violation that occurred" (internal quotation marks omitted)); Fifth Circuit Criminal Pattern Jury Instruction 1.37 (2001) ("The word 'willfully,' as that term has been used time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law."); *Id.* 1.38 ("The word 'knowingly,' as that term has been used from time to time in these instructions, means that the act

-15-

RREOUS013427

was done voluntarily and intentionally, not because of mistake or accident.").

The government fails even to *allege* the requisite *mens rea*. The indictment fails to allege anything suggesting that Kornman's fiduciary duty to the MiniMed and Hollywood executives was so *clear* that he *knew* his trades were a breach of duty. And as Judge Lindsay has already held, virtually the *opposite* is true. Judge Lindsay found the question of fiduciary duty to be "extremely close" even for *civil* purposes. That finding forecloses any possibility of proving *criminal mens rea*.

Indeed, in all the years prior to Kornman's trades, no court had *ever* held that a fiduciary-like duty could arise from a *prospective* business relationship. See *supra* at ___. A salesman trying to sell his services to a prospective client would therefore have no reason to believe that, merely because a prospective client provided confidential information, he might be saddled with a fiduciary-like duty from which criminal liability might arise. See *Chestman*, 947 F.2d at 567; *Walton*, 623 F.2d at 799. See also Indictment ¶¶ 6, 13.

For this independent reason, Counts 1 and 2 are legally insufficient and should be dismissed.

## II.    COUNT 3 FAILS TO ALLEGE THAT MR. KORNMAN MADE FALSE STATEMENTS IN VIOLATION OF 18 U.S.C. § 1001

### A.    The Indictment Inexplicably, And Misleadingly, Paraphrases The Words That Mr. Kornman Used When He Spoke With The SEC – Even Though The Government Has A Verbatim Transcript Of The Actual Conversation

Count 3 of the indictment alleges that, on or about October 29, 2003, Mr. Kornman made four specific false statements to the SEC (labeled (a) through (d)), in violation to 18 U.S.C. § 1001. Remarkably, however, the indictment merely paraphrases Kornman's remarks – even though the government seized from Kornman's home a tape recording and transcript of the actual conversation. As we show below, it is easy to see why the government chose to indict based on a paraphrase, rather

-16-

RREOUS013428

than the words Kornman actually used: The real words are not false. This inexplicable maneuver by the government should not be countenanced, and Count 3 should be dismissed.

### 1.    Statements (a) and (b)

The first two statements attributed to Kornman in Count 3 are closely related. According to the indictment, Kornman told the SEC that he "did not know who *managed* the hedge fund that purchased and sold the MiniMed stock" (Statement (a); emphasis added), and that the "former *manager* of the hedge fund was no longer employed by Heritage" (Statement (b); emphasis added). The indictment alleges that those two statements are false because, as Kornman "then well knew," he himself "personally managed" the hedge fund. In short, the indictment asserts, Kornman was lying when he professed that he could not recall who "managed" the hedge fund, and when he stated that this "manager" had left Heritage. Kornman himself, the indictment avers, was the "manager" of the fund.

Given these allegations, one might suppose that Kornman actually used the words "managed" or "manager" in his October 29, 2003 conversation with the SEC. Here, however, is what Kornman actually said:

>MR. McCOLE:        Yeah. Other questions have to do with where your brokerage accounts are held.
>MR. KORNMAN:     Okay.
>MR. McCOLE:        You know, any brokerage accounts where you have your personal accounts, where you would have any account for any entities you might have trading authority on, we would – we would ask that you provide that information as well.
>MR. KORNMAN:     Okay. Okay. I don't even know – See, I didn't -- We had a small little hedge fund.
>MR. McCOLE:        Yes.
>MR. KORNMAN:     And I don't remember. *I didn't run it. I mean, somebody else took care of it*, so I'll check and see where the brokerage accounts are. I don't even know that.
>MR. McCOLE:        Okay. *Who ran the hedge fund?*

<div align="center">-17-</div>

RREOUS013429

MR. KORNMAN:    You're going to laugh.  *I don't remember the guy's name, but he's no longer with us.  He's been gone for quite sometime.*

Transcript of October 29, 2003 Call between Gary Kornman, Tim McCole, John Reding at SEC 6 (emphasis added).  (The full transcript is included at Appendix **[tab]**.)

As the italicized text makes clear, Kornman used the word "run," not "managed."  And he immediately made clear that, by "run," he meant "took care of."  Read with even the slightest attention to context, Kornman's statements made clear that some other person, whose name Kornman could not then recall, was responsible for "taking care of" the hedge fund – "running" it – on a day-to-day basis.  Kornman manifestly did *not* say that someone other than himself "managed" the hedge fund.  Nor did the SEC lawyers ask that question.

So why did the government use a paraphrase instead of Kornman's actual words?  Because the prosecutors know full well that *someone else other than Kornman* **did** *"run" the hedge fund from day-to-day, and that that person had left Heritage at the time of Kornman's statements (just as Kornman told the SEC)*.  A few months after interviewing Mr. Kornman, the same two SEC attorneys deposed the very person that Mr. Kornman was referring to during the October 29, 2003 call, Cory D. Childs.  As Mr. Childs testified, it was his responsibility to run the day-to-day business of Heritage Capital Partners Fund, the fund alleged to have purchased shares of MiniMed stock, and to execute daily trades, "sometimes research securities, mutual funds, do the daily accounting for the fund, open and close new bank accounts and trading accounts, that type of thing."  Cory D. Childs Deposition Transcript at 21 (Appendix **[tab]**).  Mr. Childs also testified that he left the Heritage organization in June 2003, four months before Mr. Kornman's call with the SEC.  *Id.* at 19.  Thus, Mr. Kornman's statements that someone else, who was no longer employed by Heritage, "ran" the hedge fund were entirely accurate – which doubtless explains the government's preference for a

RREOUS013430

paraphrase of Kornman's remarks.

It goes without saying that "[a]n indictment premised on a statement which on its face is not false cannot survive." *United States* v. *Moses*, 94 F.3d 182, 189 (5th Cir. 1996); accord *United States* v. *Vesaas*, 586 F.2d 101, 104 (8th Cir. 1978). Statements (a) and (b) in Count 3 plainly cannot support a charge under § 1001.

### 2.    Statement (c)

The government fares no better with respect to Statement (c). According to the indictment, Kornman told the SEC that he did not know "who possessed trading authority over the brokerage account for the hedge fund that purchased and sold the MiniMed stock." Statement (c), the indictment alleges, was false because Kornman himself had "sole trading authority over the Heritage Partners Fund."

Although the government's paraphrase is somewhat closer to the mark this time, important differences remain. Here is Kornman's actual exchange with the SEC:

> MR. McCOLE:        Okay. *Who was the person who had trading authority in the brokerage account for Heritage Capital Partners?*
> MR. KORNMAN:    I'm sorry. *I just don't know that.*

Transcript of October 29, 2003 call at SEC 8 (emphasis added). The SEC asked whether Kornman could identify "the person" who had "trading authority." The questioner did not define "trading authority," nor did he explain his reference to "the person" who supposedly had the "authority" to trade. But given the immediately preceding exchange – in which Kornman had (truthfully) stated that there was a former Heritage employee who "ran" the fund day to day, including by executing trades – the obvious inference is that this person also had "trading authority."

-19-

**Exhibit G**
**Page 23**

At best for the government, the exchange culminating in Statement (c) is insolubly ambiguous. On the one hand, the phrase "trading authority" could mean – as the government evidently believes – "authority to dictate what trades are placed in the fund." But the phrase could just as readily refer to the act of executing the trades themselves – a task that Kornman delegated to others. Here, as elsewhere in the law, a false statement prosecution cannot rest on questions or answers that are fundamentally ambiguous. See *Moses*, 94 F.3d at 189 ("A prosecution for a false statement under § 1001 . . . cannot be based on an ambiguous question where the response *may* be literally and factually correct"). Accord *United States* v. *Martellano*, 675 F.2d 940, 943 (7th Cir. 1982) ("The context of the question and answer is often of critical importance if it is claimed the question was ambiguous or was misunderstood as it is in this case."); *United States* v. *Lighte*, 782 F.2d 367, 375 (2d Cir. 1986) (holding that a "fundamentally ambiguous" term or phrase is "not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony."). As the Supreme Court has emphasized, "[p]recise questioning is imperative as a predicate" for an offense involving false statements, *Bronston* v. *United States*, 409 U.S. 352, 362 (1973).[5]

### 3.      Statement (d)

Finally, the indictment alleges that Kornman falsely denied purchasing MiniMed stock based on material, non-public information, given the fact that Kornman has supposedly "learned from the

---

[5] The law of false statements is not limited to cases decided under 18 U.S.C. § 1001. Cases involving making false statements in other contexts, *e.g.*, 18 U.S.C. § 1014 (false statements intended to influence a financial institution) and 18 U.S.C. § 1623 (false statements to a court or a grand jury), are "equally applicable" to cases involving 18 U.S.C. § 1001. See *United States* v. *Manapat*, 928 F.2d 1097, 1099 (11th Cir. 1991).

-20-

MiniMed executive material, nonpublic information concerning MiniMed that Kornman subsequently used to trade upon, namely, that there was a strong possibility that MiniMed would be acquired by another company in or about June of 2001 and that, following such acquisition, the MiniMed executive expected the value of his MiniMed stock holdings to increase substantially."

Here, by contrast, is Kornman's actual exchange with the SEC on this issue

> MR. KORNMAN:    No. I mean, I don't – See, the issue – Let me tell you another issue too. We may have met with him after – we may have purchased something, but based on a meeting, and then we may have had another meeting – In other words, part of our business was working with people to minimize their taxes. And so once – We may – I'm just going to have to look at all of this because I don't know any sequence here, but I got – But let me tell you this: *I'm absolutely sure that we didn't buy any stock based on Medtronics or anything else because it – I mean, I know Medtronics finally bought them out, but  – I mean, we just didn't do that.*
>
> And the one thing I'm going to check is the sequence of events here because we had several meetings with him and I don't know when they were. So just like you, I'm going to look and see the sequence of meetings. I mean, you can get anything you want. I mean, we're not going to hold anything out on you.

<div align="center">*   *   *   *   *</div>

> MR. KORNMAN:     I mean, whatever happened happened. I mean, you know, if this is – if this is – *if something we did is considered insider trading, then, you know, we don't have any choice but to dispute it because I know damn well we didn't do that.*

Transcript of October 29, 2003 call at SEC 30, 31 (emphases added).

As the actual text reveals, Kornman told the SEC that he did not purchase the MiniMed stock "based on Medtronics or anything else." He was not asked, nor did he address, whether he bought the stock because he was told that "there was a strong possibility that MiniMed would be acquired by another company in or about June of 2001." Likewise, Kornman not asked, nor did he address, whether he had made the MiniMed purchases because the executive had told him that he "expected the value of his MiniMed stock holdings to increase substantially." Here, as elsewhere, the

<div align="center">-21-</div>

government has simply invented statements that it knows full well Kornman never made, instead of focusing on the statements he actually did make.

As for the remaining portion of Statement (d) – in which Kornman stated that he would have no "choice but to dispute" any allegation of insider trading" because he "kn[e]w damn well we didn't do that" – that too cannot conceivably support a false statement charge.  It is hard to see how such a statement – which amounts to little more than announcing an intention to "dispute," *i.e.*, to litigate a matter – could possibly be regarded as actionable under Section 1001 at all.  Beyond that, the statement is not false, according to the indictment's *own allegations*.  As explained above, the government's allegations of insider trading fail because they do not adequately allege that Mr. Kornman owed a duty to either executive or that he acted with the requisite *mens rea*.  See *supra* at **[cite]**.  Because Mr. Kornman's alleged actions do not constitute a crime under Section 10(b) or Rule 10b-5, it follows that his denials of wrongdoing to the SEC cannot be alleged as false, and his statements that he did not commit insider trading "cannot serve as the basis for a prosecution under § 1001." *Moses*, 94 F.3d at 189.

Finally, even if the Court disagrees with our contention that the indictment fails to allege a crime in Counts 1 and 2, the government cannot establish that Kornman made the denial of wrongdoing in Statement (d) with the requisite criminal intent.  As Judge Lindsay noted in the related SEC proceeding, whether a fiduciary relationship or a "similar relationship of trust and confidence" existed between Mr. Kornman and the executives "is an extremely close case." *Kornman*, 391 F. Supp. 2d at 486.  This Court's precedents establish that "18 U.S.C. § 1001 is a specific intent offense," and the government is required to prove that Mr. Kornman acted both knowingly *and* willfully to deceive and mislead the SEC.  *United States* v. *Whittington*, 783 F.2d

-22-

RREOUS013434

1210, 1217 (5th Cir. 1986); accord *United States* v. *Lange*, 528 F.2d 1280, 1287 n.10 (5th Cir. 1976).  The government's false statements prosecution cannot be based on Mr. Kornman's denial of actions that are not even clear *civil* violations of Section 10(b) or Rule 10b-5.  Any misrepresentation that Mr. Kornman made to the SEC about his actions were not made – and as a matter of law, could not have been – "deliberately, knowingly, wilfully, or at least with the reckless disregard for truth and with a conscious purpose to avoid learning the truth." *Lange*, 528 F.2d at 1288.  Because Mr. Kornman did not act "both knowingly and willfully," a prosecution based on Mr. Kornman's denial that he committed insider trading cannot stand.

## CONCLUSION

For each of the foregoing reasons, defendant Gary M. Kornman requests that the Court dismiss each Count of the Indictment for failure to allege a criminal offense.

Dated: April ___, 2006

Respectfully submitted,

_____
Jeffrey M. Tillotson
State Bar No. 20039200
LYNN, TILLOTSON & PINKER, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, TX 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839

Daniel K. Webb
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601
Telephone: (312) 558-5600
Fax: (312) 558-5700

-23-

**Exhibit G**
**Page 27**

RREOUS013435

Lawrence S. Robbins
Gregory L. Poe
Alice W. Yao
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
1801 K Street, NW, Suite 411
Washington, DC 20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

Barry J. Pollack
COLLIER SHANNON SCOTT, PLLC
3050 K Street, NW, Suite 400
Washington, DC 20007
Telephone: (202) 342-8400
Fax: (202) 342-8451

**Attorneys for Defendant Gary M. Kornman**

-24-

RREOUS013436

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record, as identified below, on this the __th day of April, 2006:

### ***Via Facsimile and Overnight Mail***

Jeffrey J. Ansley
Assistant United States Attorney
1100 Commerce Street, Suite 300
Dallas, Texas 75242
Telephone: (214) 659-8600
Fax: (214) 767-4100

-25-

**Exhibit G**
**Page 29**

RREOUS013437

DEPOSIT TICKET

TO REORDER
CALL 1-877-FOR-CITM
AND REFERENCE
STYLE DT14D8

TOTAL
ITEMS 3

CHECKS AND OTHER ITEMS ARE
RECEIVED FOR DEPOSIT SUB-
JECT TO THE PROVISIONS OF
THE UNIFORM COMMERCIAL
CODE OR ANY APPLICABLE COL-
LECTION AGREEMENT DEPOSITS
MAY NOT BE AVAILABLE FOR
IMMEDIATE WITHDRAWL.

**Robbins, Russell, Englert,
Orseck, & Untereiner LLP**

UNITED BANK

$  243168.63

<span style="color:red">Material Redacted</span>

THE FACE OF THIS DOCUMENT IS PRINTED BLUE - THE BACK CONTAINS A SIMULATED WATERMARK

**GARY M . KORNMAN**
<span style="color:red">Material Redacted</span>

<span style="color:red">Material Redacted</span>

9157

12-06-04

Pay to the order of  Robbins Russell  $ 160,000 00

One hundred sixty thousand + 00/100 ——— dollars

<span style="color:red">Material Redacted</span>

for  Deposit Against Fees  Gary M. Kornman

<span style="color:red">Material Redacted</span>

<span style="color:#800000">**Exhibit H
Page 1**</span>

**RREOUS000097**