# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP, | ) ) ) ) | |
| Plaintiff/Counterclaim-Defendant, | ) ) | |
| v. | ) ) ) | Case No. 1:07-cv-00554-JR/JMF |
| GARY M. KORNMAN, | ) ) | |
| Defendant/Counterclaim-Plaintiff. | ) ) ) | |

## DEFENDANT GARY M. KORNMAN'S MOTION FOR LEAVE TO SUPPLEMENT SUMMARY JUDGMENT RECORD WITH NEWLY-DISCOVERED MATERIAL

Defendant/Counterclaim-Plaintiff Gary M. Kornman ("Mr. Kornman") respectfully submits this motion for leave to supplement the summary judgment record with newly-discovered material. In his Opposition to the Motion for Summary Judgment by Plaintiff Robbins, Russell, Englert, Orseck & Untereiner LLP ("Robbins Firm"), Mr. Kornman requested the opportunity to take further discovery, under Rule 56(f) of the Federal Rules of Civil Procedure because, among other things, Lawrence Robbins ("Attorney Robbins") had not yet been deposed. Attorney Robbins has now been deposed and attached to this motion are various pages from his deposition and related exhibits relevant to issues before the Court.

Mr. Kornman respectfully requests that this Court accept these exhibits as additional items in the summary judgment record. These materials further demonstrate that the Robbins Firm cannot recover on an account stated claim, as a matter of law, and at most can pursue a claim in *quantum meruit*, **if** it can produce evidence of a benefit that it provided to Mr. Kornman beyond that for which he has already compensated the Robbins Firm.

{B0689425; 1}

<u>**Evidence that the Parties Never Agreed to the Fees Charged by Attorney Robbins**</u>

The deposition of Attorney Robbins revealed several facts that undermine the attempt by the Robbins Firm to obtain summary judgment on its account stated claim because the parties did not agree to the fees that it charged:

Attached hereto as Exhibit A are pages 13 – 15, 17 and 104, from the deposition of Attorney Robbins in which he testified that his firm drafted the only engagement letter between the parties to cover a particular civil matter, with no commitments with regard to any subsequent criminal matter.

Attached hereto as Exhibit B is page 18 from the deposition of Attorney Robbins in which he testified that "flat fees could be done "in different ways" and that there was no writing at the firm indicating how such a fee was used. *See also* Exh. A at 17.

Attached hereto as Exhibit C are pages 19 – 22 from the deposition of Attorney Robbins that reflect his agreement to a "flat fee" billing arrangement with Mr. Kornman for an opening brief, reply brief, and participation in oral argument related to a motion to dismiss.

Attached hereto as Exhibit D are pages 22 – 30, 42-44, 49 - 50, 52, 82 - 89, 111, 124 – 25, 130, 159, 166-67, 184, 211 from the deposition of Attorney Robbins in which he acknowledged that (1) he did not discuss with Mr. Kornman or Jeffrey Tillotson whether work on certain items potentially related to the motion to dismiss fell outside of the "flat fee" agreement, (2) they did not discuss the timing for the motion to dismiss, and (3) they did not discuss "when the flat fee would be due."

Attached hereto as Exhibit E is page 35 from the deposition of Attorney Robbins in which he testified that the indictment against Mr. Kornman posed a "significant turn of events" after which Mr. Kornman looked "for a lead counsel in the criminal case."

Attached hereto as Exhibit F are pages 171 - 73 of the deposition of Attorney Robbins in which he testified that he did not discuss with Mr. Kornman or Attorney Tillotson how the $100,000 flat fee was allocated for any of the portions of contemplated work, such as the opening brief, reply brief, and oral argument.

## Billing Mistakes

Attached hereto within Exhibits C and D are pages 22 – 23 and 159 from the deposition of Attorney Robbins in which he testified that he provided no instructions to anyone at his firm to segregate time entries for work on a "flat fee" basis from work that the Robbins Firm believed was billable on an hourly rate basis.

Attached hereto as Exhibit G are pages 74 - 75, 136 - 41 from the deposition of Attorney Robbins regarding obligations involving client trust funds and in which he testified that the Robbins Firm never asked Mr. Kornman whether the Robbins Firm could apply his $50,000 fee deposit against hourly rate billing fees that Mr. Kornman provided, until completion of the work required to earn the agreed-upon flat fee.

## Ethical Implications of Attorney Robbins' Testimony

The testimony of Attorney Robbins reveals a lack of appreciation for ethical obligations owed by the Robbins Firm to Mr. Kornman.

Attached hereto as Exhibit H is a copy of Formal Opinion No. 238 of the DC Legal Ethics Committee reiterating the responsibility of a law firm to reduce the important terms of "flat fee" arrangements to writing, and imposing on such firms the obligation to perform "all reasonably foreseeable services necessary to provide competent representation" in a matter covered by a flat fee.

Attached hereto as Exhibit I is a copy of Formal Opinion 310 of the DC Legal Ethics Committee containing, among other things, (1) a statement that a lawyer should "explain all aspects of a proposed fee relationship in detail in advance of obtaining the client's agreement"; (2) a citation to caselaw finding it "improper" for a lawyer to seek attorney's fees and costs in a collection action against a client, even when an engagement agreement expressly provided for it (here, the Robbins Firm did not include an attorneys' fee or cost provision in any term of its representation of Mr. Kornman); and (3) even "a client's unexcused failure to meet a fee obligation does not allow a lawyer to seek to collect interest on the unpaid portion of the debt unless that is specifically provided for in the existing fee arrangement."

## CONCLUSION

Based on the foregoing, this Court should grant leave for Mr. Kornman to supplement the summary judgment record with the attached exhibits.

Dated:  October 17, 2007                    Respectfully submitted,

**/s/ Orlando E. Vidal**
Orlando E. Vidal (D.C. Bar No. 461815)
Barry S. Pollack, *Admitted Pro Hac Vice*
Sullivan & Worcester, LLP
1666 K Street, N.W., Suite 700
Washington, D.C.  20006
Telephone: (202) 775-1200
Fax: (202) 293-2275

**COUNSEL FOR GARY M. KORNMAN**

# EXHIBIT A

october 10 recovered

1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF COLUMBIA

 3                      -----

 4

 5   ROBBINS, RUSSELL,           CASE NO. 1:07-cv-00554-JR
     ENGLERT, ORSECK &
 6   UNTEREINER, LLP

 7            Plaintiff,

 8      vs.

 9   GARY M. KORNMAN,

10            Defendant.

11

12                      -----

     GARY M. KORNMAN,
13
              Plaintiff,
14
        vs.
15
     ROBBINS, RUSSELL, ENGLERT,
16   ORSECK & UNTEREINER, LLP,

17            Defendant.

18

     DATE:  October 10, 2007
19   DEPONENT:  Lawrence Robbins

20

21

22
              William E. Weber, RDR, CRR
23              Weber Reporting, LLC
               3579 Ashland Drive
24             Bethel Park, Pa 15102
             Weberreportng@comcast.net
25
```

Page 1

october 10 recovered

4      A.  I think I would put it slightly differently.  I

5  think we believed that that must be their theory because

6  the warrant of their theory, it would be surpassingly

7  hard to divine what the theory of duty might be if it

8  weren't that.  I'm not sure I could necessarily

9  subscribe to the question the way you put it.

10     Q.  Did you view the -- withdrawn.  Did you at any

11  time view the SEC's case against Mr. Kornman as a test

12  case?

13     A.  Again, I would put it slightly differently

14  although I think it is quite conceivable that we

15  characterized it that way in some of our moving papers.

16  I did think and do think that the SEC's theory and its

17  application of the misappropriation doctrine to someone

18  who stood in the role that Mr. Kornman stood with

19  respect to Misters. Pratt and Mann was and

20  extraordinarily broad application of the theory.  And

21  could well have been rejected by the courts in the

22  fullness of time.  Extraordinarily.  /( /(.

23     Q.  Do you recall at some time Robbins Russell

24  providing Mr. Kornman with an engagement letter?

25     A.  Yes.

13

1      Q.  Who drafted the engagement letter?

2      A.  I did.

3      Q.  Did you work off of a form that the firm has used

4  in the past?

october 10 recovered

5      A.   I don't recall one way or the other, but it is
6    certainly possible.
7      Q.   Is it generally your practice when you draft an
8    engagement letter to pull up on a computer a recent
9    engagement letter you have used to ensure that you use
10   similar terms?
11     A.   Well, no, I wouldn't subscribe to that
12   formulation, but I would subscribe to the first part of
13   your question, I do commonly look at precursors at least
14   as a first approximation.
15     Q.   Do you recall any specific changes you have made
16   to /( a version of the engagement letter that you pulled
17   off of your system in order to create one for
18   Mr. Kornman?
19     A.   Well, I don't -- I can only give you my best
20   belief.  I'm certain that I amended, if in fact I used a
21   precursor which I'm not prepared to swear I did because
22   I don't actually recall it one way or the other, but if
23   I did, I would have obviously changed the description of
24   the services to be provided.  I likely would have
25   changed the persons who would be working on it because

14

1    they vary from case to case.  And I also provided a
2    specific term regarding the application of an initial
3    retainer to be divided half and half between a fees and
4    expenses as they approve and $10,000 reserve against the

Page 13

october 10 recovered

5  last bill in the case.

6      Q.  Do you recall whether you chose language for the

7  engagement letter that referred to work done on the

8  pending civil case?

9      A.  My best recollection is that I did make reference

10  to a specific legal issue and a possible motion to

11  dismiss.

12      Q.  At that time did you have any intention on your

13  part to expose Robbins Russell to responsibility for any

14  criminal action that might follow?

15      A.  I confess I have no idea what that question

16  means.

17      Q.  I will rephrase it.

18      A.  Let me try to answer what I think you are getting

19  at you tell me if I'm being responsive.  An engagement

20  letter as I understand the ethics rules in the District

21  of Colombia that were applicable at the time requires a

22  written document to explain the basis for the fees in

23  the case.

24      We put those down in writing stating what we were

25  going to be charging on an hourly basis and for whom.


15


1      The scope of the services to be provided, it is

2  my exceedingly common experience will change often from

3  day-to-day and therefore what you put down in initial

4  engagement as the initial obligation is quite apt to be

5  modified as time goes on.  That was manifestly true with

october 10 recovered

6  will be governed by the federal rule, all objections

7  except as to form are preserved with trial same with

8  motions to strike are preserved until the time of trial.

9  Otherwise, move to strike the last answer as

10  non-responsive.  I assume you agree?

11          MR. ORSECK:  Okay.

12          MR. POLLACK:  We will work with the same

13  rules when you take depositions.

14          MR. ORSECK:  Okay.  I do want to note for

15  the record that Mr. Poe just entered the room during

16  Mr. Robbins last answer so to the extent there is a

17  suggestion that he has been here from the start, that's

18  not the case.  Either way, he has every right to be

19  here.  So maybe we should go off the record.

20  (Off Record Discussion.)

21          MR. POLLACK:  I will note my objection to

22  Mr. Poe's presence here.  I will take the issue up again

23  during another break, we started very late this morning

24  we made efforts to call the Magistrate Judge on other

25  things I'm not attributing to you.  I want to make some

17

1  headway right now.

2      A.  Okay.

3  BY MR. POLLACK:

4      Q.  At the time that you drafted the engagement

5  letter from Mr. Kornman, did you believe you were

6  committing your law firm to represent Mr. Kornman in a

Page 16

october 10 recovered

7    criminal matter if one followed?

8       A.  Phrased that way the answer would be no.

9       Q.  After Mr. Kornman was indicted, did your firm

10   ever draft another engagement letter?

11      A.  No.

12      Q.  What is a flat fee?

13      A.  Suppose it depends on the context, but if you are

14   referring to the flat fee in this case?

15      Q.  Generally speaking, do you have one single

16   understanding of what a flat fee is when it comes to

17   legal fees?

18      A.  Yes, my general understanding is that the fees

19   for that matter will come to a certain amount of money.

20   I have done those in different ways but my general

21   understanding is that what they have in common is that

22   when the fees are all added up, they will not exceed

23   that amount and they typically will be that amount.

24      Q.  Is there any written policy at Robbins Russell

25   regarding flat fees?

18

1      A.  Not that I'm aware of.

2      Q.  Other than a policy, is there anything in writing

3   at Robbins Russell that would describe how Robbins

4   Russell uses flat fees with clients?

5      A.  Not that I'm aware of.

6      Q.  Has the partnership at Robbins Russell had

# EXHIBIT B

october 10 recovered

7    discussions about what it means to use a flat fee?

8        A.  None that I'm aware of.

9        Q.  Do you recall ever having a discussion with

10   Mr. Kornman about what you understood it to mean to have

11   a flat fee?

12       A.  No.

13       Q.  On how many occasions in your practice have you

14   used a flat fee approximately?

15       A.  I can't give you that answer, more than once.

16       Q.  More than ten times?

17       A.  It's possible but I'm not certain.

18       Q.  Likely less than 50?

19       A.  I'm not actually able to give you a number.

20       Q.  Was it -- withdrawn.  Did there come a time when

21   you prepared a proposal for use of a flat fee for any

22   portion of work for Mr. Kornman?

23       A.  Yes.

24       Q.  Do you recall who raised the concept of a flat

25   fee?

19

1        A.  Jeff Tillotson.

2        Q.  Did he do it in writing, in a conversation or

3    both?

4        A.  He did it in an e-mail.

5        Q.  Did you ever have a discussion with him about the

6    flat fee meaning a, an oral discussion?

7        A.  I don't think so.

Page 18

# EXHIBIT C

october 10 recovered

8       Q.  Did you ever have an oral discussion with

9    Mr. Kornman about a flat fee?

10      A.  I don't believe so, no.

11      Q.  Did you have an understanding as to why

12   Mr. Tillotson raised the question of a flat fee?

13      A.  I understood only what he put in the e-mail in

14   which he raised the question.  The e-mail is dated in or

15   about January 2006.  And that e-mail exhausts the full

16   amount of my knowledge regarding that subject.

17      Q.  Except after Mr. Tillotson contacted you by

18   e-mail about that, you did have internal discussions

19   about using a flat fee for Mr. Kornman, correct?

20      A.  I actually do not recall internal discussions

21   about using a flat fee for Mr. Kornman, no.

22      Q.  Do you recall whether you had a discussion about

23   a budget for work for Mr. Kornman?

24      A.  I recall an exchange of e-mails with Mr. Poe

25   regarding the possibility of a budget.  I do not

20

1    actually recall discussions on that subject.

2       Q.  Do you recall proposing a $100,000 flat fee for

3    the preparation of an opening brief, reply brief and

4    participation in oral argument related to a motion to

5    dismiss the indictment?

6       A.  Yes.

7       Q.  How did you come up with the number $100,000?

october 10 recovered

8    A.  It seemed like an appropriate sum to me for what

9  I thought the work would ultimately entail were we to do

10  all of it.

11    Q.  Did you have any qualms about proposing a flat

12  fee?

13    A.  I'm sure your question is quoting from an e-mail

14  that I sent to Mr. Tillotson so you must surely know the

15  answer is yes.

16    Q.  What was your one qualm?

17    A.  My concern, Mr. Pollack, was that our experience

18  with your client, Mr. Kornman, in connection with the

19  motion to dismiss during the SEC proceedings had caused

20  me to realize that preparing documents and editing

21  documents and finalizing documents with Mr. Kornman was

22  an enormously difficult process that would go on forever

23  resulting in changes with only minutes to spare.

24  Redrafting upon redrafting, periods of radio silence.

25  The inability to find out what was happening with

21

1  drafts, the inability to make contact in the way that

2  lawyers conventionally do with their clients and having

3  lived through that cycle with your client, Mr. Kornman,

4  not once, but twice with both the opening brief in the

5  motion to dismiss at the SEC stage and at the reply

6  brief stage I have learned through experience that it is

7  a tall order to get things done for Gary Kornman.

8  Nevertheless, because Mr. Tillotson had asked, I

Page 20

october 10 recovered

9   provided what I thought was a budget notwithstanding the

10  qualms to which you allude.

11      Q.  So you tried to build in a cushion that

12  anticipated similar issues with Mr. Kornman?

13      A.  I tried do my best to anticipate what I thought

14  would be the challenges of finalizing the work that as

15  often as not fell into a black hole.

16      Q.  Did you understand that the flat fee would

17  entitle Robbins Russell to $100,000 even if hourly rates

18  didn't add up exactly to that number?

19      A.  Yes, I think I would agree with that.

20      Q.  And you understood at that time that if hourly

21  rates exceeded $100,000 that the $100,000 flat fee would

22  serve as a cap?

23      A.  Yes, I think I understood that as well.

24      Q.  Are you aware of any particular ethical

25  provisions that guide the use of flat fees?

22

1       A.  No, I'm actually not.

2       Q.  Did you understand that an agreement had reached

3   regarding the use of a flat fee for the motion to

4   dismiss?  Been reached.

5       A.  Yes, I thought we did agree in writing /( through

6   an exchange of e-mails that the fee structure for that

7   particular project would be governed by that writing,

8   correct.

# EXHIBIT D

october 10 recovered

9    Q.  Did you have any discussion with Mr. Tillotson

10   regarding what would happen if only a portion of the

11   work on the motion to dismiss were done?

12   A.  No.

13   Q.  Did you have a conversation with Mr. Kornman

14   regarding what would happen with regard to the flat fee

15   if only a portion of the work on the motion to dismiss

16   was done?

17   A.  No.

18   Q.  Did you give attorneys at Robbins Russell any

19   particular instructions about how to enter their time to

20   assist in the use of a flat fee?

21   A.  No.

22   Q.  Is it common at the firm that attorneys will

23   enter multiple tasks for one day and only place the

24   aggregate amount of time into the system?

25   A.  Yes.

23

1    Q.  Did you discuss with attorneys at all how to bill

2    Mr. Kornman's matter in a way that would allow an

3    accurate segregation of time spent on a motion to

4    dismiss and on other matters?

5    A.  No.

6    Q.  Did you give any instructions of that sort to

7    your administrative staff at the firm?

8    A.  No.

9    Q.  Are there any memos internally at Robbins Russell

october 10 recovered

10    regarding how a review of time regarding the Kornman

11    matter after reaching a flat fee agreement for the

12    motion to dismiss would be assessed for purposes of

13    understanding what time was put into the motion to

14    dismiss and what time be put into something else?

15        A.  I'm sorry, I lost that.

16        Q.  It was a long question.  Can you read that back.

17    (Question read back)

18

19        A.  With that premise, no, there are no such memos.

20        Q.  Were there any discussions internally at the time

21    people at Robbins Russell were working on the motion to

22    dismiss the indictment regarding how to preserve an

23    ability to determine what time each day had been

24    allocated to a motion to dismiss and what time had been

25    allocated to work on other than a motion to dismiss?

24

1        A.  Internal discussions?

2        Q.  Internal discussions.

3        A.  No.

4        Q.  Did you have any discussions with Mr. Tillotson

5    about /( what work would relate to the motion to dismiss

6    and what work wouldn't?

7                MR. ORSECK:  Objection to form.

8        A.  I haven't the slightest idea what the question

9    means.

Page 23

october 10 recovered

10    Q.  In connection with discussions about --

11  withdrawn.  In connection with the communications about

12  the flat fee, did you and Mr. Tillotson communicate with

13  each other in any way about what work the firm would do

14  that would constitute work on the motion to dismiss and

15  what work would constitute work outside of the motion to

16  dismiss?

17    A.  The answer is no, but I can provide some

18  additional information that may be useful, I can also

19  simply say no if you prefer.

20    Q.  We might get to that other information, I

21  appreciate the answer right now.

22    A.  Fine.

23    Q.  Do you recall in your communications with

24  Mr. Tillotson explaining that your firm was going to

25  look into other possible grounds for a motion to dismiss

25

1  other than issues like duty and materiality that had

2  been previously briefed in the civil case?

3    A.  I think it's, I think one of my e-mails may have

4  alluded to additional possible additional grounds for

5  the motion.

6    Q.  Safe to say at the time you were hoping you could

7  draft a motion to dismiss that would be successful?

8    A.  Yeah.

9    Q.  And you were planning to be as creative as you

10  could be in order to find grounds on which a dismissal

october 10 recovered

11  might be obtained?

12    A.  If by creative you mean inventive within the

13  balance of the law, the answer is yes.

14    Q.  Did there come a time when you had an idea

15  regarding use of the collateral estoppel doctrine to

16  obtain a dismissal in the criminal case?

17    A.  Yes.

18    Q.  And did that involve potential efforts to obtain

19  summary judgment in the civil case in a way that you

20  hoped could be used in a criminal case as a grounds for

21  dismissal?

22    A.  Correct.

23    Q.  Did you have any discussions with Mr. Tillotson

24  about whether this grounds for dismissal based on the

25  collateral estoppel doctrine fit within the flat fee for

26

1  the motion to dismiss?

2    A.  No.

3    Q.  Did you have any discussions with Mr. Tillotson

4  in which you informed him that work on the collateral

5  estoppel argument would be billed on an hourly rate?

6    A.  No.

7    Q.  Is it your understanding that the work your firm

8  did on the collateral estoppel issue fell within the

9  flat fee agreement for the motion to dismiss?

10    A.  Of course not.

october 10 recovered

11    Q.  Why not?

12    A.  Because it couldn't possibly be brought on a

13 motion to dismiss.  There was no summary judgment of the

14 motion to dismiss by its nature is addressed to the face

15 of the indictment.  You know, a collateral estoppel,

16 collateral estoppel argument was entirely distinct.  It

17 was a matter that Mr. Kornman requested work on.  And

18 indeed, made phone calls to our associate Alice Yao to

19 solicit her advice on that on an expedited basis in

20 e-mail traffic in January of 2006.  But it couldn't

21 possibly have been included in the motion to dismiss and

22 I don't think anybody thought it was.

23    Q.  What did you discuss with Mr. Kornman about the

24 timing of the motion to dismiss?

25    A.  I don't recall any discussions with Mr. Kornman

27

1  on that subject.

2    Q.  You just gave a lengthy answer two answers ago

3 about your view of why work on collateral estoppel is a

4 grounds for dismissal wouldn't be part of the flat fee.

5 When did you explain that to Mr. Kornman?

6    A.  Well, first of all I object to the

7 characterization of my answer being lengthy.  I thought

8 the answer was responsive.  Did you mean something by

9 it, sir?

10    Q.  I wasn't insinuating a problem if we look and

11 compare to other answers it was probably longer I wanted

october 10 recovered

12   to help refer back?

13       A.   I thought it was responsive.  If it wasn't I

14   apologize.  When did I tell him that the collateral

15   estoppel research that he asked for was not part of the

16   flat fee arrangement for the motion to dismiss?  I

17   cannot recall having any discussions about that subject

18   with Mr. Kornman.

19       Q.   Was the collateral estoppel idea Mr. Kornman's in

20   the first place?

21       A.   No, it was mine.

22       Q.   And when did you think of that idea?

23       A.   My best recollection is that it was sometime

24   after Judge Lindsay's ruling in the motion to dismiss in

25   the civil case but I, the best date I can give you is in

28

1    or about December 2005.

2        Q.   When you set up the flat fee for Mr. Kornman on

3    the motion to dismiss, did you communicate to either

4    Mr. Tillotson or Mr. Kornman that work in progress on

5    potential grounds for dismissal would not be part of the

6    flat fee agreement?

7             MR. ORSECK:  Object to form.

8        Q.   You can answer.

9        A.   No.

10       Q.   Do you recall any particular conversations you

11   had with Mr. Tillotson regarding the collateral estoppel

Page 27

october 10 recovered

12  argument, and I mean oral conversations, not e-mails?

13  A.  No.

14  Q.  Do you recall any conversations you had with

15  Mr. Kornman regarding the collateral estoppel argument?

16  A.  Yes.

17  Q.  And what do you recall about that conversation?

18  A.  I recall only that I referred to one in an e-mail

19  to Mr. Tillotson setting out Ms. Yao's research on the

20  question and in the cover e-mail, that is I want to say

21  dated in or about January 2006 or early February I told

22  Tillotson that I had explained the basic argument and

23  research to Kornman earlier that evening but what was

24  actually said in the conversation, I can't tell you.

25  Q.  Do you recall Mr. Kornman having concern about

29

1  filing a motion to dismiss the indictment that would

2  include an argument related to Count 3 which had

3  allegations for making a false statement because he was

4  concerned that the government might supersede the

5  indictment and cure inaccuracies in the indictment?

6  A.  I recall that there is an e-mail, I think it is

7  an e-mail.  I have a recollection of some communication

8  from someone that I believe reported to be Dan Webb's

9  concern that if the motion to dismiss included a

10  challenge to Count 3, it would alert the government to a

11  problem in its charging instrument and prompt them to

12  supersede and to cure the defects and that Dan thought

Page 28

october 10 recovered

13    it would be better to sort of lay in the weeds on that

14    issue and perhaps file a similar argument in the form of

15    a Rule 29 motion once jeopardy had attached.

16         Now, who communicated that to me whether it was

17    Tillotson or Kornman or you know, well, it would likely

18    be one of them, that's true.  I believe it was in the

19    context of explaining to me why it is the motion to

20    dismiss continued to languish down in Texas and not get

21    turned around much less filed.  /( /(.

22    Q.  Did there come a time when you learned that there

23    was a superseding indictment?

24    A.  Yes.

25    Q.  Did you learn /( before that indictment was

30

1    returned or after?

2    A.  I believe I learned when it showed up on the

3    electronic filing system.  On or about August 23rd,

4    2006.

5    Q.  To your recollection was there any concern prior

6    to that time that there was a superseding indictment

7    under consideration?

8    A.  None that was communicated to me.  /(.

9    Q.  Did you understand that there was work being done

10    on a bill of particulars?

11    A.  Yes.

12    Q.  Did there come a time where you understood that

Page 29

october 10 recovered

13    Mr. Kornman wanted to receive a response to a bill of

14    particulars before filing a motion to dismiss?

15        A.  Yes.

16        Q.  At that time did you have any discussions with

17    Mr. Kornman about how that would affect the flat fee

18    arrangement?  If at all?

19        A.  No.

20        Q.  Had you had any discussion with Mr. Kornman about

21    when the flat fee would be due?

22        A.  No.

23        Q.  Had you had any discussion with Mr. Tillotson

24    about when the flat fee would be due?

25        A.  No.

                                                    31

1        Q.  Do you know when your firm stopped working on the

2    motion to dismiss the indictment?

3        A.  This is the best I can tell you about it.  We

4    sent a draft to Tillotson for Kornman's review in or

5    about April 2006.  We followed up for at least a month

6    thereafter trying to inquire about the progress, what

7    was being done with the document.  All we I believe

8    learned during that period of time was what you just

9    alluded to there, that Kornman wasn't, was holding it up

10    I believe were Tillotson's words, I could be mistaken

11    because of his belief that he ought to get answers to a

12    bill of particulars and the bill of particulars which we

13    weren't writing hadn't been finalized.  We continued to

october 10 recovered

19    helpful on a motion to dismiss?

20             MR. ORSECK:  Can you read that back.

21    (Question read back)

22             MR. ORSECK:  Object to form, you can answer.

23    A.  You are asking whether I had such an

24    understanding back at the time.  I would have to say I

25    did not have such an understanding at the time, no.

42

1    Q.  Do you recall whether there was any discussion in

2    your presence about whether or how helpful the -- that

3    is going to be a bad question, withdrawn.  Do you recall

4    if you were ever present for a discussion in which

5    someone raised the notion that a bill of particulars

6    might be somewhat helpful for a motion to dismiss in

7    Mr. Kornman's case?

8    A.  I have a faint recollection of such a discussion,

9    yes.

10    Q.  Do you recall who was present for that

11    discussion?

12    A.  I can't be sure that anybody was present.  It

13    could have been over the phone.

14    Q.  Do you recall who participated in that

15    discussion?

16    A.  All I can recall and only faintly so is a

17    conversation between Kornman and myself on that general

18    subject.

Page 41

october 10 recovered

19    Q.  What did you say to him?

20    A.  Actually all I can really recall is what he said

21    to me which was that he, that he wanted the bill of

22    particulars done because he thought it was important

23    including for the motion to dismiss.  I can tell you

24    what I likely would have said but that's the best I can

25    do.

43

1    Q.  First tell me what, if anything, you remember

2    saying?

3    A.  I don't recall saying what else I said.

4    Q.  And as you sit here today, what do you think as

5    of today you would likely have said back then?

6        MR. ORSECK:  I will object to the form.  I

7    don't think you should guess if you think you can fairly

8    answer the question what you think you would have said,

9    then I suppose you can do that.

10    A.  The best I can do, Mr. Pollack, is to tell you

11    what I generally believe about bills of particulars.

12    Sitting here today and for that matter were I sitting

13    here three years ago I believe the same thing today I

14    believed three years ago, so if I said anything, I might

15    well have said that, I will be happy to tell you what it

16    is it is no better than I guess what I said in realtime.

17    Q.  If it is only a guess, there is no need for you

18    to say it.  Can you remember anything other, in response

19    to Mr. Kornman other than something you would consider a

Page 42

october 10 recovered

20    guess?

21        A.  Just have a vague sense that I would have told

22    him that bills of particular are rarely granted and

23    rarely helpful.

24        Q.  Do you recall actually telling Mr. Kornman that

25    there would be no benefit for a motion to dismiss gained

                                                            44

1     by use of a bill of particulars?

2         A.  Do I actually recall saying those things, no.

3         Q.  In substance?

4         A.  No, I do not actually recall saying those things.

5     That is what I believe.

6         Q.  Do you recall actually saying to Mr. Kornman in

7     substance that there was no connection between a bill of

8     particulars and a motion to dismiss?

9         A.  Do I recall saying that, no.  I don't recall

10    saying that.

11        Q.  Do you recall telling Mr. Kornman that any work

12    your firm did on a bill of particulars fell outside of

13    the flat fee agreement for a motion to dismiss?

14        A.  Do I recall telling him that?  No.

15        Q.  Did there come a time when your firm engaged in

16    indexing discovery?

17        A.  Sounds familiar.

18        Q.  What was that?

19        A.  My best recollection and if you were to show me

october 10 recovered

23      A.  No.

24      Q.  So did you ever tell Mr. Kornman that the

25  depositions of man and Pratt would not be used for

50

1   purposes of helping with the collateral estoppel grounds

2   of dismissal?

3       A.  Did I ever say that to him?  Of course not.

4       Q.  Did you ever specifically discuss with

5   Mr. Kornman that your work to obtain testimony of man

6   and Pratt had no relationship with any motion to dismiss

7   that would be filed in the criminal case, did you ever

8   have that discussion?

9       A.  Of course not.

10      Q.  Did you ever have a discussion with Mr. Kornman

11  about specific hourly rates -- withdrawn.  After

12  Mr. Kornman started talking to you about opposing the

13  SEC's motion to dismiss, their own civil case, did you

14  discuss fees again after that with Mr. Kornman?

15      A.  Of course not.

16      Q.  Did there come a time when Mr. Kornman discussed

17  a suppression motion with you?

18      A.  Yes.

19      Q.  Did Mr. Kornman discuss that first with you or

20  Mr. Tillotson?

21      A.  I can't be certain.  But my best belief is that

22  it was Kornman when he came to Washington for a lunch

Page 49

october 10 recovered

24    shared with your client and I defect from your reaction

25    he has not shared with you.



                                                                52


1     Q.  Were you on the pleadings in the Stringer case at

2     all?

3     A.  Certainly not.

4     Q.  And did you agree with Ms. Hoffman's filing of

5     that motion?

6              MR. ORSECK:  Wait, wait.  Wait.  I just want

7     to caution.

8     A.  There is know way I will give him

9     anything privileged.

10             MR. ORSECK:  I don't want you to share

11    anything privileged on the Stringer case.

12    A.  Do you want to rephrase that, did I agree with

13    Janet on what?

14    Q.  I will withdraw that question.  Did you have any

15    discussion with Mr. Kornman that you recall about the

16    fees for a Stringer motion?

17    A.  None.

18    Q.  Do you recall Mr. Kornman ever asking you even

19    approximately how much it would cost to prepare one?

20    A.  No, he didn't do that.

21    Q.  And do you recall him ever asking you how much it

22    would cost for a motion to dismiss or anything of that

23    substance?

october 10 recovered

7    A.  Well, if we go to trial or if we seek summary

8    judgment, we will absolutely seek attorney fees for the

9    cost of this litigation.

10    Q.  Anything else?  That you recall?

11    A.  Well, depends on how things unfold but there may

12    be additional costs and fees that we may seek for a

13    variety of reasons, but I think I should let the future

14    litigation speak for itself.

15    Q.  I will show you what is marked Exhibit 1.  And

16    I'm going to direct your attention to the e-mail that

17    appears in the bottom half of the page.  Would you agree

18    that that is the e-mail to which you referred in earlier

19    testimony regarding the flat fee proposal from you

20    related to Mr. Kornman's matter?

21    A.  Referring to the bottom half of the top page?

22    Q.  Right.

23    A.  Yes.

24    Q.  And if you turn to page 2 of Exhibit 1?

25    A.  Right.

82

1    Q.  Would you agree that the e-mail that appears on

2    the top is an e-mail that you sent to Mr. Tillotson a

3    few days earlier prior to submitting the flat rate

4    proposal?

5    A.  It certainly appears to be.

6    Q.  The e-mail just below that is the e-mail from

7    Mr. Tillotson to you requesting a flat rate proposal,

october 10 recovered

8    request?

9        A.  So it appears.

10       Q.  Other than these three e-mails, do you remember

11   any communications with Mr. Kornman or Mr. Tillotson

12   regarding the flat fee arrangement related to the motion

13   to dismiss the indictment?

14           MR. ORSECK:  Object to form, I count more

15   than three.  You mean these three pages, bar re?

16       Q.  Rephrase the question, other than those three

17   e-mails, do you recall any other communications between

18   Mr. Tillotson and you that referred to a flat fee?

19       A.  Yes.

20       Q.  Which one?

21       A.  The one on the bottom of page two of this

22   exhibit, the one on top of page two of the exhibit, the

23   one on the bottom of page one of the exhibit and the one

24   on the top of page one of the exhibit.

25       Q.  Okay.  One of the top of page one, you are

83

1    referring where it says this is a great proposal?

2        A.  Yes.  I assume it is responsive to the one I

3    sent.

4        Q.  And the one on the top of page three of Exhibit

5    1, what in there refers to the flat fee arrangement?

6        A.  Yes, so it appears.

7        Q.  Are you saying where it says got your and Gary's

Page 81

october 10 recovered

8    voice mail is referring to a voice mail in which the

9    flat fee proposal was accepted?

10       A.  I actually don't recall what was said in that

11   voice mail.  But it obviously, I infer from the context

12   that it makes reference to the subject matter of the

13   surrounding e-mails.

14       Q.  It was your understanding when you sent the

15   e-mail on January 14th, 2006 at the top of page 3 of

16   Exhibit 1 that when you referred to getting started you

17   mean getting started on a motion to dismiss the

18   indictment pursuant to the flat fee agreement, is that

19   correct?

20       A.  I think so, yes.

21       Q.  And other than the e-mails that appear in Exhibit

22   1, do you recall any other communications with

23   Mr. Tillotson or Mr. Kornman relating to the flat fee

24   arrangement?

25       A.  Leading to it, relating to it?  The answer to

84

1    that question is yes.

2        Q.  Let me qualify a little bit.  Do you recall any

3    other communications with Mr. Tillotson and Mr. Kornman

4    other than those that appear in Exhibit 1 that refer to

5    the terms of a flat fee agreement?

6        A.  No.

7        Q.  When you say there are others that relate to it,

8    are you referring to the work that started it?

Page 82

october 10 recovered

9    A.  More.

10    Q.  What else?

11    A.  Well, the specific statement from Tillotson to me

12  among others, I think, on or about the 18th of January

13  that had the word start I believe in capital letters

14  directing us to begin to work on the document.

15    Q.  Anything else you can recall?

16    A.  It is possible that I sent an e-mail inquiring as

17  to whether we could start, that this was responsive to.

18  But that e-mail, if it exists, I have not stored it in

19  my head.

20    Q.  And other than the work you ultimately do that

21  may relate in some way to the flat fee arrangement, do

22  you recall any other communications between you and

23  either Mr. Tillotson or Mr. Kornman other than those

24  that appear in Exhibit 1 and the January 18th reference

25  to start by Mr. Tillotson and any response from you, can

85

1  you recall any other references to the flat fee

2  arrangement?

3    A.  Related to the terms.  I thought was your

4  qualification.

5    Q.  Well, I qualified by saying other than work that

6  was ultimately done?

7    A.  With all those qualifications in mind, I cannot

8  recall anything else.

Page 83

october 10 recovered

9   (Exhibit 2 marked)

10      Q.  So was it your understanding shortly after

11   January 18th, 2006 your firm was working on the motion

12   to dismiss the indictment under a flat fee agreement?

13      A.  I would put it differently.  I would say that

14   after January 18th we were authorized to begin but

15   immediately thereafter Mr. Kornman met with us and

16   assigned to us a whole raft of additional motions,

17   research and advice that consumed a lot of our time in

18   the near term.  And so I cannot actually say which days

19   we worked on the motion to dismiss because in the, right

20   off the bat our list of assignments greatly multiplied.

21      Q.  You would agree that when Mr. Kornman made other

22   requests of you, you did not again discuss fees with

23   him?

24      A.  Certainly not.

25      Q.  Now, other than -- withdrawn.  Excluding work on

86

1   matters other than a motion to dismiss the indictment,

2   did you start working on the motion to dismiss --

3   withdrawn.  You heard start from Mr. Tillotson on or

4   about January 18th referring to the motion to dismiss

5   the indictment, correct?

6      A.  I don't mean to split hairs, but I read start.

7      Q.  Well put.  At some point after that your firm did

8   work on the motion to dismiss the indictment?

9      A.  Yes.

Page 84

october 10 recovered

10     Q.  Is it fair to say at some point in January of
11     2006 your firm was working on the motion to dismiss the
12     indictment and I understand you to say among other
13     things?
14     A.  I actually do not, I think I said, let me say it
15     again, I don't recall in what months in particular we
16     were working on the motion to dismiss as opposed to the
17     many other assignments that Mr. Kornman gave us in those
18     early days.  I can reason backward, however, from when
19     we completed the draft of the motion to dismiss.  If
20     that would be helpful to you.
21     Q.  I will show you what is marked Exhibit 2.
22     A.  Okay.
23     Q.  Do you recognize the e-mail that appears on the
24     bottom half of the first page as one from one of your
25     associates, Alice Yao to you?

87

1     A.  Yes.
2     Q.  That was on January 30th, 2006?
3     A.  That is what it says.
4     Q.  And is the e-mail that appears just above that an
5     e-mail from you to Jeff Tillotson, Greg Poe and Alice
6     Yao with commentary by you regarding what Mr. Yao raised
7     below?
8     A.  Correct.
9     Q.  And when you refer in the second line of your

Page 85

october 10 recovered

10    e-mail to the phrase to get the criminal case dismissed,

11    you are referring to the indictment that was pending

12    against Mr. Kornman?

13        A.    That is, yeah, I'm referring to the charges in

14    the case and I guess the, I guess it would be fair to

15    say that if this strategy had been pursued and

16    prevailed, it would have resulted in the dismissal of

17    one or more charges.

18            Now, understand, we need to be precise about

19    this.  The scant of summary judgment would not, I think,

20    have resulted in the dismissal of all counts in the

21    indictment because the most you could expect is that

22    overlapping elements on which the burden of proof was in

23    the right direction would be dismissed.  But, I don't

24    think it would, I don't see offhand it would have

25    resulted in a dismissal of Count 3.


88


1        Q.    My question was whether your reference in the

2    second line to get the criminal case dismissed on

3    collateral estoppel grounds that does refer to Gary

4    Kornman's case?

5        A.    Yes, absolutely.

6        Q.    And if you look at Exhibit 1 again, there's the

7    e-mail on the bottom half of the first page?

8        A.    Right.

9        Q.    And do you see your reference to the, at the end

10    of that first big paragraph it says there may be other

Page 86

october 10 recovered

11    arguments we have not yet considered?

12      A.  Uh-huh, yes.

13      Q.  Do you see that?

14      A.  Yes.

15      Q.  Were you conveying to Mr. Tillotson that your

16    firm was going to undertake consideration /( of other

17    arguments for a motion to dismiss charges in the

18    indictment?

19      A.  I think what I was conveying, all I can do is

20    read the e-mail, my assumption based on reading it is if

21    there were other challenges to the face of the

22    indictment that occurred to us in the course of

23    preparing the motion, we would certainly wish to raise

24    them if they were meritorious.

25      Q.  Where in that e-mail does it say anything

89

1    about-face of the indictment?

2      A.  Well, surely you know that's what a motion to

3    dismiss indictment is, that is all it can be.  It is a

4    motion addressed to the face of the indictment, it can't

5    be anything else.

6      Q.  Did you explain that to Mr. Tillotson when you

7    negotiated a flat, the flat fee of $100,000?  Anything

8    more than what is in these e-mails?

9      A.  Of course not.

10      Q.  And you would agree there are arguments you were

Page 87

october 10 recovered

11  raising about duty and materiality that would not apply

12  to all of the counts in the indictment, right?

13      A.  Of course.

14      Q.  And you would agree that collateral estoppel and

15  res judicata are grounds that can be raised in a motion

16  to dismiss, correct?

17      A.  Not until summary judgment has been entered, not

18  until there is something on which collateral estoppel

19  rests.

20      Q.  But you would agree that if you had the predicate

21  of a summary judgment in the civil case, the vehicle by

22  which to raise it in the criminal case or a vehicle by

23  which to raise it in a criminal case is by way of a

24  motion to dismiss, correct?

25      A.  That is one vehicle.  If the facts bore out your

90

1  predicate.

2  (Exhibit 3 marked)

3      A.  Okay.

4      Q.  Do you recognize the e-mail on the bottom half of

5  the first page of Exhibit Number 3?

6      A.  Yes, I do.

7      Q.  On or about June 22nd, 2006 when Mr. Poe sent

8  this e-mail to Mr. Tillotson attaching a draft

9  suppression motion, had you reviewed that draft?

10      A.  I don't actually recall whether I had or I

11  hadn't.  I do see Mr. Poe's statement that I hadn't had

october 10 recovered

22    couldn't be sure.

23        Q.  If we look at the top of Exhibit 6 you will see

24    refers to February 13th meeting Alice Yao had with you

25    and Greg Poe, correct?


                                                        111


1         A.  That is what it says.

2         Q.  It doesn't indicate Mr. Kornman was present for

3     that meeting, right?

4         A.  Doesn't say that.

5         Q.  And the next document produced sequentially to us

6     by your firm refers to Barry and Blair each doing bills

7     of particular motions, right?

8         A.  Uh-huh.

9         Q.  Yes?

10        A.  Yes.

11        Q.  If you look at the line right underneath that,

12    LSR, does that refer to you?

13        A.  Probably.

14        Q.  LSR to review will support to some extent a,

15    shorthand for motion to dismiss, did I read that

16    correctly?

17        A.  Yes, you did.

18        Q.  And do you recall that discussion that you had

19    with Greg Poe and Alice Yao that referred to the bill of

20    particular motions as supporting to some extent a motion

21    to dismiss?

october 10 recovered

124

1           MR. ORSECK:  Can you give me just a minute?

2           MR. POLLACK:  Sure.

3           MR. ORSECK:  I'm lost.

4      Q.  Maybe it is a different pen, I'm not a

5   handwriting?

6      A.  It does look like Alice's because at least, well,

7   looks like Alice's.

8      Q.  That's fine, I just didn't want you to say that

9   because there had been a string of those, I just wanted

10  to know.

11     A.  You can be sure I won't do that.

12     Q.  I'm counting on it.  Now you will see this is

13  dated, in is Exhibit 11, correct?  Exhibit 11 is dated

14  December 15, 2005, do you see that at the top?

15     A.  I do.

16     Q.  And it refers to call with G. Kornman, meeting

17  with L. Robbins, do you see where it says that?

18     A.  Yes.

19     Q.  In the middle of the page there is a line that

20  says if judge says close call on MTD, would you

21  understand that to mean motion to dismiss?

22     A.  Yes.

23     Q.  If judge says close call on motion to dismiss,

24  then scienter or willfulness Cassese.

25     A.  I do see that.

october 10 recovered

1    Q.  Do you recall having a discussion with

2  Mr. Kornman after he was indicted about trying to use

3  the judge's opinion from the civil SEC case for

4  collateral estoppel or res judicata purposes in the

5  criminal case?

6    A.  I can't be sure that I would have suggested that

7  it was res judicata.  Because we didn't prevail in the

8  motion to dismiss, so that doesn't sound like the

9  doctrine that emerged.  I think my argument was rather a

10  bit different, I would be happy to explain what it was

11  if you want to know.

12    Q.  Was it based in the doctrine of collateral

13  estoppel?

14    A.  That is not how I remember it.  I remember it

15  differently, and again I'm happy to tell you what I

16  remember.

17    Q.  I will get to that.  In these notes you will see

18  Ms. Yao wrote down, looks like the fifth line of text

19  says collateral estoppel on motion to dismiss in SEC

20  case?

21    A.  Right.

22    Q.  Do you recall the phrase collateral estoppel

23  coming up at all in connection with this discussion?

24    A.  I don't.  The word could have come up.  I mean

25  she wrote it down here.  That is not the way I recall

october 10 recovered

1    references are there.  I just don't know.

2        Q.  Withdrawn.  Do you remember discussing with Alice

3    Yao in late January '06 the issue of whether winning

4    summary judgment in the civil case has a collateral

5    estoppel effect in the criminal case?

6        A.  I'm certain that we did discuss that.

7        Q.  You also discussed that with Mr. Kornman about

8    that time?

9        A.  I believe so, yes.

10       Q.  You do did not have a discussion with Mr. Kornman

11   about whether that work you were doing was related to

12   your work on the motion to dismiss or some other work,

13   right?

14       A.  I don't know what the word "related" means in

15   that because as somebody as famously has said everything

16   is related to everything else.  But no, I did not tell

17   Mr. Kornman if what you are driving at, manifestly I

18   didn't tell him that our research that he asked for on

19   collateral estoppel was encompassed by the $100,000 flat

20   fee agreement for the preparation of two briefs and an

21   oral argument.

22       Q.  And you also didn't tell him that the work on the

23   collateral estoppel issue was not within the $100,000

24   flat fee?

25       A.  Of course not.

131

Page 128

october 10 recovered

14  a.m. you wrote to Mr. Kornman again saying it is

15  essential, Gary, it is essential I hear from you today

16  on the clerk's inquiry, correct?

17      A.  Yes.

18      Q.  So at that point you didn't actually specify a

19  time during that day, you said today, right?

20      A.  That is what it says here.

21      Q.  And the word essential, did that word originate

22  with the clerk or with you?

23      A.  Probably originated with me.

24      Q.  Have you had a chance to review before this

25  deposition all of your cover letters with invoices that

159

1  went to either Mr. Kornman or Mr. Tillotson or both?

2      A.  I think I have reviewed them, yes.

3      Q.  Did any of those cover letters indicate anything

4  about the flat fee arrangement how it was being handled?

5      A.  Not that I'm aware of.

6      Q.  Did any of the invoices refer to the flat fee

7  agreement?

8      A.  Not that I'm aware of.

9      Q.  Did any invoices segregate out time that to which

10  the flat fee agreement would apply?

11      A.  Not that I'm aware of.

12  (Exhibit 18 marked)

13      Q.  Do you recognize Exhibit 18?

14      A.  Yes.

Page 156

october 10 recovered

15    Q.  What is it?

16    A.  My declaration.

17    Q.  And on page nine is that your signature?

18    A.  It is.

19    Q.  Do you recall when preparing your declaration

20  whether you in any drafts referred to the flat fee

21  agreement?

22    A.  Not that I'm aware of.

23    Q.  Who helped you with this declaration?

24    A.  I guess there were other lawyers in the office

25  but I don't know that I'm going to talking about who

160

1  worked on particular things and who did what.  That

2  sounds like work product to me.

3    Q.  I'm trying to find out who the people were that

4  helped you prepare the declaration?

5    A.  Well, I want to, my best belief is that Matt

6  Segal who is an associate in the firm probably did some

7  work on this.  /(.

8    Q.  Can you explain why you didn't refer to the flat

9  fee arrangement in this declaration?

10    A.  Because I don't regard it as the slightest bit

11  pertinent to the legal claims that we are making in this

12  case.

13    Q.  Anything else you can say about that to explain

14  why you believe that?

Page 157

october 10 recovered

18    estoppel applies, it might be a basis to move to dismiss

19    on the ground that the government cannot prove criminal

20    intent beyond a reasonable doubt.  Do you see that?

21        A.  Correct.

22        Q.  Do you remember having discussions at about that

23    time that estoppel with Mr. Kornman or Mr. Tillotson

24    that estoppel was a grounds for a motion to dismiss?

25        A.  I remember what I can recall was explaining to

166

1    Gary and Jeff my view that the ruling from Judge Lindsay

2    in the civil case could be leveraged as a basis for

3    arguing that the government cannot as a matter of law

4    prove scienter.

5        Q.  So, your thoughts at that time was that even

6    without obtaining summary judgment in a civil case you

7    might be able to use an existing order to make an

8    estoppel argument as a grounds in the motion to dismiss

9    the indictment, correct?

10        A.  Whether ultimately it would be cabin under the

11    doctrine of estoppel, I'm not sure.  I think what we

12    would have argued is that there was some type of

13    estoppel, perhaps even judicial estoppel, I'm not sure

14    that's the right formulation either, but, yes, we

15    absolutely, the argument that I was urging the client to

16    consider was an argument that said that Judge Lindsay's

17    ruling could be leveraged in the criminal case as a

Page 163

october 10 recovered
18   ground for arguing that the government is foreclosed

19   from proving scienter.

20       Q.  At least at that time you were framing that

21   argument at least potentially as one grounded in

22   estoppel, right?

23       A.  I certainly used that phrase here.  But you want

24   to be careful not to confuse this because I think you

25   either are or would like to in the future with a quite

167

1    different argument that a grant of summary judgment

2    would give rise to collateral estoppel through the

3    ordinary operation of collateral estoppel principles

4    between parallel proceedings.

5        Q.  Do you agree that there were notes that you have

6    seen today that referred to collateral estoppel as the

7    potential doctrine on which to rely based on the ruling

8    of the motion to dismiss?

9        A.  I think you have shown me something.  Yes.

10       Q.  There were some discussions happening in or about

11   December 2005 or January 2006 with regard to using

12   collateral estoppel as a vehicle by which you leverage

13   Judge Lindsay's language about it being and extremely

14   close call?

15       A.  Yes.

16       Q.  And that would potentially apply as you were

17   thinking at the time without a need for obtaining

18   summary judgment first, right?
                    Page 164

october 10 recovered

184

1    Q.  Sit your recollection in June of 2006 the

2    dispositive motion deadline was not in September?

3    A.  I don't remember when it was.

4    Q.  Was there an advantage to be gained waiting

5    toward the deadline dispositive motion deadline in order

6    to determine whether the government was going to

7    supersede?

8    A.  /( was there an advantage.  Are you asking me

9    whether I considered that question at the time?  I don't

10   recall if I considered that question at the time.  You

11   are asking whether looking back on it, I could construct

12   an argument to that effect?  You know, I can see

13   somebody making that argument.

14   Q.  And the government did actually supersede in

15   August I believe?

16   A.  Yes, they did, they added another count.

17   Q.  What do you recall about your discussions with

18   Jeff Tillotson in September 2006 rolled around regarding

19   collection efforts by your firm?

20   A.  You know, my, I don't have a distinct

21   recollection but I do know in September we were already

22   concerned that -- let's say biceps I became concerned

23   that we may not get paid here.  And I assumed, but I

24   cannot actually recall, but I assumed that I talked to

25   Tillotson and/or e-mailed with him about that.

october 10 recovered

9      Q.  And what conversations did you have with

10   Mr. Tillotson, if any, about three attorneys in your

11   firm making an appearance in the case?

12      A.  I guess I think that we probably talked to him

13   about helping us file pro hack motions which were

14   required because, as I recollect.  /( we were intending

15   to sign the motion to dismiss as one of the lawyers in

16   the case.  I thought that probably required a formal

17   appearance.  And because at least for a period of time I

18   was supposed to be the signatory to Rule 16 letter which

19   we haven't talked about today but as you know it is

20   another piece of work we haven't been paid for.  And the

21   Rule 16 letter in all of its incarnations at least when

22   we were working on it bore my name as the signatory and

23   I thought, I imagine I thought, I can't be sure because

24   I don't recall this precisely, it would have been

25   logical for us to think that before we would send a

211

1    letter to the U.S. Attorney's Office we should note our

2    appearance.

3      Q.  Who requested that you serve as signatory for the

4    Rule 16 letter?

5      A.  I don't remember.  I don't remember.

6      Q.  Do you remember talking about it with Gary

7    Kornman at all?

8      A.  No.  But we circulated the letter.

Page 207

october 10 recovered

9    Q.  Do you know how much time your firm put into the

10   Rule 16 letter?

11   A.  I don't know how much.  It is reflected in time

12   sheets.

13   Q.  Were any of the questions in the Rule 16 letter

14   or request in the Rule 16 letter designed to get

15   information that might be usable for a motion to

16   dismiss?  If you recall?

17   A.  I don't recall one way or the other.

18   Q.  Would have been the effect of moving to dismiss

19   on a superseding indictment -- withdrawn.  What would be

20   the effect of moving, it is getting late.  I was up very

21   early.  Let's start the question over.  What was the,

22   what would have been the effect of the superseding

23   indictment on a motion to dismiss the earlier

24   indictment?  Do your understanding?

25   A.  Well, if you are asking about an historical

212

1    understanding that I had at some point in tile, the

2    answer is I don't recall having or holding such an

3    understanding, /( the you would like me to provide my

4    own expert opinion, or quasi expert opinion as of today

5    I'm happy to do my best.

6    Q.  Is it your understanding if a motion to dismiss

7    an indictment is pending a superseding indictment moots

8    it?

9    A.  I have already told you I had no understanding, I

# EXHIBIT E

october 10 recovered

15  opportunity to do our job.  But stuck in the midsection

16  as we were for periods of time was inadvisable for a

17  professional law firm.

18      Q.  Did you ever communicate with Mr. Tillotson that

19  you wanted to be copied on every document your firm's

20  name appeared on before it was filed?

21      A.  I don't actually recall having such a

22  conversation but I wouldn't suppose that was necessary.

23      Q.  But there came a time when you learned something

24  was filed, at least one item based on your answer was

25  filed that had your firm's name on it that you had not

35

1   seen before filing, right?

2       A.  Yes, absolutely.

3       Q.  And you responded to that by asking Mr. Tillotson

4   whether your firm should remove itself from the case or

5   did you initially ask for the courtesy of seeing papers

6   before they were filed with your firm's name on it?

7       A.  I don't recall.

8       Q.  Would you agree that an indictment is a pretty

9   significant turn of events when there is a civil case

10  pending?

11      A.  It is hard to argue with that.

12      Q.  Is that a yes?

13      A.  Yes, I think an indictment is significant in most

14  people's lives.

15      Q.  And did you understand Mr. Kornman had some new

Page 34

october 10 recovered

16    concerns after the indictment about how to select a lead

17    counsel to represent him in the criminal case?

18          MR. ORSECK:  Object to form.  To the extent

19    you know.

20    A.  I don't know what new concerns mean.

21    Q.  Fair enough.  Did there come a time when you

22    learned that Mr. Kornman was looking for a lead counsel

23    in the criminal case?

24    A.  Yes.

25    Q.  How did you learn that?

36

1    A.  He told me.

2    Q.  When did that happen?

3    A.  Well, at least some of those efforts took place

4    in early February and probably thereafter 2006.  I know

5    that because I facilitated one such meeting between

6    potential lead counsel and Mr. Kornman and in fact was

7    present when they met one another in New York.

8    Q.  Who was that?

9    A.  Tom Puccio.  /(.

10    Q.  Prior to setting up that meeting, was there a

11    time when you discussed with Mr. Kornman consideration

12    of you as lead counsel for the criminal case?

13    A.  Yes.

14    Q.  When did that occur?  Relative to the indictment?

15    A.  Well, I would be guessing but my best guess is it

Page 35

# EXHIBIT F

october 10 recovered

20  we don't have this kind of back and forth.  That is why

21  lawyers send out invoices month after month.  That is

22  why God invented the telephone and the e-mail.  So no, I

23  didn't tell him that and he didn't tell memo after month

24  after month after month that he had any of these

25  concerns that he is now developed in the wake of your

171

1  litigation.

2    Q.  When you say that that's why engagement letters

3  were invented, you mean engagement letters are an

4  opportunity for lawyers to explain their fees to

5  clients, correct?

6    A.  No.  I wouldn't put it that way.  Engagement

7  letters are there to provide the basis for the legal

8  fees.  To state the rates so that everybody understands

9  what they are going to be charged.  That means they are

10  not surprised when they get an invoice that lists

11  particular hourly rates.  It is a requirement of DC

12  ethics as I understand it, that is what we did.

13           MR. ORSECK:  Excuse me Barry.  We have been

14  going for hours now.  Let's take a two minute break.

15           MR. POLLACK:  Fine.

16  (Recess held)

17    Q.  Mr. Robbins you were just referred to a

18  requirement of DC ethics as you understood it regarding

19  engagement letters, what is it that you understand is

20  the obligation of an attorney with regard to engagement

Page 168

october 10 recovered

21  letters?

22          MR. ORSECK:  Under DC law?

23      Q.  Under DC ethics?

24      A.  My understanding at the time this letter was

25  prepared a, an engagement letter was required to state

172

1   the basis for the fees and my best belief about what

2   that means is that you have to put down in a writing

3   what it is you are going to be charging and how the fee

4   will be determined.  Let me be clear, Mr. Pollack, I'm

5   not a legal ethics expert.  But that is my understanding

6   of what the rules were at the time this letter was

7   prepared.

8       Q.  What about the time that you reached a flat fee

9   agreement related to the motion to dismiss, what were

10  the ethics rules regarding making that fee arrangement

11  clear to the client?

12      A.  Again, my belief is that we had to state the

13  basis for the fees in a writing.  And that is all I

14  know.

15      Q.  Now, we were also discussing what was and wasn't

16  included in your math when you came out to approximately

17  $50,000.

18      A.  Uh-huh.

19      Q.  And you were saying that wasn't remotely close to

20  the $100,000 flat fee?

october 10 recovered

21    A.  Yes.

22    Q.  You would agree for the $100,000 there was also

23 to be a reply brief and a participation and oral

24 argument, correct?

25    A.  Those were part of the agreement, that's correct.


173


1    Q.  And at the time you agreed to that flat fee

2 arrangement, you, your firm already prepared a motion to

3 dismiss in the SEC case, correct?

4    A.  Yes.

5    Q.  Some of the research and work on that would

6 translate to the criminal case, right?

7    A.  I think so.

8    Q.  With regard to a reply brief on motion to dismiss

9 in a criminal case you would be facing the U.S.

10 attorney's opposition for the first time, right?

11    A.  Yes.

12    Q.  Did you ever calculate internally here what

13 percentage of your work you anticipated on the reply?

14    A.  No.  But you know, no.  The answer is no.

15    Q.  Did you ever communicate with Mr. Tillotson or

16 Mr. Kornman how your firm allocated its budget to the

17 $100,000 in terms of opening brief reply, oral argument?

18    A.  No.

19    Q.  And from your perspective after providing a draft

20 of a motion to dismiss the Tillotson, you didn't hear

21 back from him or Mr. Kornman with comments?  Is that

# EXHIBIT G

october 10 recovered

4    firm has an ethical obligation to refrain from applying

5    client trust funds to bills that are in dispute?

6              MR. ORSECK:  Objection to form.

7        A.   Client trust funds, you mean like a retainer?

8        Q.   A retainer.

9        A.   I think our obligation is to apply funds as we

10   have contracted to and that's what we have done.

11       Q.   Do you have any understanding as to any ethical

12   obligation your firms has in the event that you have

13   money in a client trust fund or escrow account and your

14   firm contends there is a bill outstanding but the client

15   disputes the bill?

16             MR. ORSECK:  Objection to form.

17       A.   I don't know what the ethics rules provide, but

18   it certainly seems like prudent conduct on if part of a

19   law firm not to apply retainer funds at a time when the

20   client rightly or wrongly is asserting a reason not to

21   pay.

22       Q.   Would you also agree that it is prudent for a law

23   firm not to apply retainer funds in a manner different

24   than as agreed to with a client?

25             MR. ORSECK:  Objection, form.

75

1        A.   I certainly agree you shouldn't apply money in a

2    way that contradicts something you have agreed to,

3    that's right.  And we never have.

Page 73

october 10 recovered

4    Q.   I'm going to move to strike the last clause and

5    we never have as non-responsive though I suppose we

6    reserved the right to do that at trial.

7         Do you have an understanding as to whether lead

8    counsel in a criminal case has an obligation to discuss

9    with his or her client the concept of plea agreements?

10   A.   Well certainly in cases which I have served as

11   the lead counsel in criminal cases I have certainly

12   discussed all aspects of a case and its defense

13   including whether or not a plea negotiation should be

14   considered, yes.

15        MR. ORSECK:  Barry it sounds like you are

16   moving to a new topic, would this be a convenient time

17   to take a two minute break.

18        MR. VIDAL:  If I could go five minutes we

19   should go.

20        MR. POLLACK:  If we could go five minutes I

21   we can go to lunch.

22        MR. ORSECK:  Five minutes I need to take a

23   break.

24        MR. POLLACK:  Hold me to five.

25        MR. ORSECK:  All right.

76

1    Q.   In federal criminal cases would you also agree

2    that it's prudent for a criminal defense lawyer who is

3    serving as lead counsel to discuss the Sentencing

4    Guidelines?

Page 74

october 10 recovered
3   the court reporter, Exhibit 13?

4       Q.  Do you recognize Exhibit 13?

5       A.  Just give me one second.  Yes.

6       Q.  What is it?

7       A.  The top page looks like a check from Kornman to

8   our firm.  And the second page looks like an internal

9   bookkeeping document that I'm not, I think typically

10  familiar with.

11      Q.  When Mr. Kornman wrote this check for $50,000 on

12  or about February 10th, 2006, do you remember having any

13  specific discussions with him about this check?

14      A.  No.

15      Q.  Did you ask him what he meant by his entry

16  deposit against legal fees for government litigation?

17      A.  No.

18      Q.  And you agree within a few days your firm

19  deposited this check?

20      A.  I have no doubt.  I hope we did.

21      Q.  Do you know whether you deposited it into a

22  client trust fund or escrow account or the firm's

23  account?

24      A.  I don't know where we deposited it, I know what

25  we did with it.

137

1       Q.  Can you tell from the form on the second page

2   what is Bates stamped with the number 95 at the top it

3   says, batch number 7 user IDBLF dash IOLTA deposit

Page 134

october 10 recovered

4    created by BLF on February 14th, 2006, do you see where

5    it says that?

6        A.   Yes.

7        Q.   Who is BLF?

8        A.   I think it is Beth Faller, our office manager.

9    /(.

10        Q.   Do you know what an IOLTA account is?

11        A.   You know, I should.   But I really don't.

12        Q.   Do you know --

13        A.   But my impression is that it is an account that,

14    you know, plan funds are put in for some period of time

15    until they are applied to accrued expenses, but, and

16    fees, but I'm not positive that I know exactly how it

17    works.

18        Q.   And do you know who gave Ms. Faller instructions

19    about where to deposit the check or how to deposit the

20    check?

21        A.   I don't recall exactly, no, I'm not sure I

22    remember who gave her instructions, if anyone.

23        Q.   By that I don't mean what bank to go to,

24    specifically whether to put it in IOLTA account, firm's

25    account or some other account?

138

1        A.   I don't have a recollection of who, if anyone,

2    had such a conversation one way or the other.   I may

3    have, but I don't recall that.

Page 135

october 10 recovered

4     Q.  Is there a general practice with regard to who

5  gives her instructions?

6     A.  I would say that the general practice is that if

7  we get a check from a client for legal fees, she

8  typically notify the lawyer with principal

9  responsibility and she will probably ask what am I

10  supposed to do with this.  I think that is pretty

11  typical.

12     Q.  Now, is it your understanding that out of this

13  $50,000 check, $31,067.52 was used toward fees and

14  expenses that had already been put through your billing

15  system into a bill?

16     A.  Where are you reading from?

17     Q.  The bottom left column.

18     A.  Uh-huh.

19     Q.  The number at the very bottom left.

20     A.  Right.

21     Q.  Says total AR.

22     A.  Right.

23     Q.  To you, does that mean that $31,067.52 was

24  applied from that $50,000 to amounts that had been

25  approved out of your billing system for billing to

139

1  Mr. Kornman?

2     A.  Could be.  I'm not sure.

3     Q.  And then next to that it says PTD.

4     A.  Uh-huh.

                    Page 136

october 10 recovered

5    Q.   $18,932.48?

6    A.   Right.

7    Q.   You agree those two numbers there add up to

8    $50,000?

9    A.   I would agree with that.

10   Q.   And do you know what PTD stands for?

11   A.   I don't.

12   Q.   Isn't it true that the $18,932.48 entry that came

13   out of the $50,000 payment from Mr. Kornman was applied

14   toward what your firm considered a receivable that had

15   not yet even been billed?

16   A.   I think it was held for the next month's bills,

17   that sounds right.

18   Q.   You just added the words held as opposed to

19   applied in advance of the next month's bills.  Do you

20   know whether this was applied in advance to the next

21   month's bills?

22   A.   Actually I don't know one way or the other.

23   Q.   Is Beth Faller the best person to ask that?

24   A.   Your client is a good person, if you give us the

25   invoice we will take a look at it for the following

140

1    month and see what happened.

2    Q.   What I'm asking, who is best person is at your

3    firm to know what entries were made in your computer

4    system as to how to apply the $50,000?

Page 137

october 10 recovered

 5    A.  Well, I think if Beth were here she could

 6  probably do a better job than I about saying what PPD

 7  means.  But then again, if I had all the invoices, cover

 8  letters, I might be able to give you more information.

 9    Q.  Does Ms. Faller still work here?

10    A.  Yes.

11    Q.  What is her position currently?

12    A.  She is the office manager.

13    Q.  Did you, do you recall asking Mr. Kornman if any

14  portion of the $50,000 could be used for the next

15  month's invoice?

16    A.  No.

17    Q.  Do you recall asking Mr. Kornman if he agreed

18  that these amounts were due?

19    A.  No.

20    Q.  Incidentally, the bills from January and February

21  and March, you issued on an hourly rate basis for the

22  fees, correct?

23    A.  They reflect hourly rates, that is correct.

24    Q.  And they didn't break off the work on the motion

25  to dismiss from any other work, did it?

141

 1    A.  When you say break off, they did not segregate

 2  those in a separate portion of the bill, that is

 3  correct.

 4  (Exhibit 14 marked)

 5    Q.  Do you recognize Exhibit 14?

Page 138

# EXHIBIT H

DC BAR

*For Lawyers*

Home > For Lawyers > Ethics > Legal Ethics > Opinions

## Opinion 238

### Written Fee Agreements

When a written fee agreement is required, the agreement must adequately inform the client of the basis or rate of the fee. In addition, fixed fee agreements must cover all reasonably foreseeable services necessary to provide competent representation.

### Applicable Rules

- Rule 1.1 (Competent Representation)
- Rule 1.4(a) (Communication Between Attorney and Client)
- Rule 1.5(b) (Written Fee Agreement Requirement for New Clients)

### Inquiry

The inquiring attorney handles cases on what he describes as a "flat fee" basis for enumerated services. The retainer agreement at issue, which involves an immigration representation, states that the client is "entitled" to one "office visit, telephone conference, or other consultation with staff members." It further states that "additional office visits and/or telephone consultations not specifically mentioned" will be charged at specified hourly rates. A dispute has arisen between the inquirer and a client regarding the appropriate charges for additional consultations.

While the retainer agreement states that only one consultation is included in the "flat fee," the inquirer's letter to the Committee states that he will not make an additional charge if "we contact the client to perform those services [specified in the retainer agreement] or if the client contacts us when we would need that contact in an effort to perform the specific services for which we are retained." A third version of the operative rule appears in a letter from the inquirer to a second attorney who became involved in the fee dispute. This letter states that there is no charge when a client calls to get updated status information from a paralegal, nor is there a charge for a consultation when "milestones" in a case are reached.

### Discussion

Fixed fee agreements serve the important purpose of making legal services available to persons who might otherwise not be able to afford an attorney. However, such agreements cannot be used to circumvent basic principles governing the relationships between attorneys and clients. This inquiry presents two issues, both of first impression. The first addresses the requirement, new in the Rules of Professional Conduct, that fee agreements must be reduced to writing. The second is whether, when a fixed fee agreement is entered into, there are certain services which must be covered by the fixed fee and not subject to additional charges.

### 1. When a Written Fee Agreement Is Required, the Agreement Must Inform the Client of the Basis or Rate of the Fee

For clients "not regularly represented" by the lawyer, Rule 1.5 (b) requires the lawyer to communicate to them, in writing, the "basis or rate of the fee." The comments to Rule 1.5(b) explain

that the requirement has been introduced in order to establish "an understanding as to the fee," Comment [1] and to reduce "the possibility of misunderstanding." Comment [2]. The Rule recognizes that "[i]t is not necessary to recite all the factors that underlie the basis of the fee, but only those that are directly involved in its computation." Comment [1]. The comments specifically recognize that fixed fee schedules may meet the requirement of the Rule, so long as the schedule "adequately informs the client of the charges to be imposed." Comment [3].

The facts presented by this inquiry amply demonstrate the importance of this Rule. In this case, it is simply not possible to discern how charges are assessed for consultations beyond the one consultation enumerated in the fee agreement. Indeed, it appears that the assessment of such fees is purely at the attorney's discretion. This has led to a breakdown of the attorney-client relationship, the introduction of a second attorney into the dispute, and a letter of inquiry to this Committee. While there is a written retainer agreement, it is more than apparent that such writing does not adequately explain the "basis or rate" of the fee. It is the Committee's view that the fee agreement at issue does not comport with the requirements of Rule 1.5.

**2. Fixed Fee Agreements Must Cover, as Part of the Fixed Fee, Those Reasonably Foreseeable Services That Are Necessary to Provide Competent Representation**

The second question involves the extent to which services covered by a fixed fee may be limited. As with the agreement that is the subject of this inquiry, it is apparently common for fixed fee agreements to include certain services in the fixed fee and then to provide for further services at an additional hourly rate. It is the view of the Committee that the fixed fee must include those reasonably foreseeable services that are necessary to provide competent representation. See Rule 1.1 (a) ("A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.")

A fixed fee agreement is attractive precisely because it offers a predictable and affordable fee, typically for a routine legal matter. As Comment [3] to Rule 1.5 states, "[s]uch services as routine real estate transactions, uncontested divorces, or preparation of simple wills, for example, may be suitable for description in . . . a fixed fee schedule." If necessary services are billed at hourly rates in addition to the fixed fee, clients may not be able to afford such services or may choose to forego necessary legal services in order to achieve savings. Moreover, lawyers may not provide additional necessary services based on a concern that their clients may not be able to pay for them.

Comment [5] to Rule 1.5 explains that it is improper to enter into a fee agreement that might lead to the curtailment of necessary legal services. It states, in pertinent part:

> An agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest. For example, a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client. Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction. However, it is proper to define the extent of services in light of the client's ability to pay.

A fixed fee agreement that does not provide for foreseeably necessary services runs afoul of this principle.

The Committee does not intend to suggest by this opinion that a lawyer is required to consult with a client at the client's

whim or to provide services that are not reasonably necessary to the competent provision of the agreed-upon representation. See Rule 1.2(c) regarding permissible limitations on the scope of representation. However, the lawyer does have the responsibility, in drafting a fixed fee agreement, to anticipate those services that will be reasonably necessary to competently carry out the agreed-upon representation. Complications and unforeseeable events will occur in certain representations, and a lawyer is not precluded from making additional charges in such circumstances. The test is whether such events are reasonably foreseeable at the outset of the representation. If so, attendant legal services must be covered by the fixed fee.

We recognize that this opinion may result in increases in fixed fees charged for the provision of certain legal services. However, this result is preferable to the enticement of clients with an unreasonably low fee schedule and leaving them in mid-representation with unanticipated—and possibly unaffordable—legal fees.

Regarding the pending inquiry, the Committee is not a finder of facts and is not in a position to render an opinion as to whether limiting a client to a single consultation during the course of the particular representation is reasonable. We do note that the requirement in Rule 1.4(a) that "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information," suggests that such a limitation may not be reasonable. Indeed, the lawyer's obligation in this regard is underscored in Comment [2] to Rule 1.4 which states that, "[a] client is entitled to whatever information the client wishes about all aspects of the subject matters of the representation unless the client expressly consents not to have certain information passed on." Moreover, "the lawyer must initiate and maintain the consultative and decision-making process if the client does not do so and must ensure that the ongoing process is thorough and complete." *Id.*

Of course, a lawyer is not limited to a single model for the required consultation and may, in appropriate circumstances, rely on paralegal or other staff members to communicate with the client rather than devote more costly attorney time. This may be particularly true in connection with those routine legal matters that are likely to be the subject of fixed fee agreements. *See* comment [4] to Rule 1.4 ("[w]here many routine matters are involved, a system of limited or occasional reporting may be arranged with the client.")

In sum, a written fee agreement, when required, must adequately inform the client of the basis or rate of the fee to be charged. In addition, fixed fee agreements must include, as part of the fixed fee, those reasonably foreseeable services that are necessary to provide competent representation.

Inquiry No. 91-9-36
Adopted: June 15, 1993



Click to see how the D.C. Bar Membership Benefits Program can help you and your firm

# EXHIBIT I

Home > For Lawyers > Ethics > Legal Ethics > Opinions

## Opinion 310

**Propriety Of Lawyer Charging Interest When the Client Fails to Pay Fees**

Opinion No. 11 re-examined and broadened; when a client fails without justification to make payments to a lawyer that are called for by their fee agreement, and that agreement does not provide for payment of interest on such amounts, the lawyer may, assuming there is no overreaching on the lawyer's part, request the client to alter the fee arrangement prospectively to include charges for interest on any unpaid balance for future work and condition further representation of the client on agreement to that condition.

### Applicable Rules

- Rule 1.5 (Fees)
- Rule 1.8 (Conflicts of Interest: Prohibited Transaction)

Fee arrangements between lawyers and clients are of course a matter of constant interest to both. As lawyers and clients attempt to craft agreements that provide both for fair fee amounts and assurances of payment, fee arrangements increasingly include not simply the designation of a fee for service but also terms that give the lawyer rights vis-à-vis the client to assist the lawyer in inducing the client to pay—most particularly in the question of whether a lawyer may charge interest on an unpaid client balance, although other issues also arise. Generally speaking, there is wide agreement that a lawyer can charge a client interest on unpaid bills, although jurisdictions differ on whether such a charge can be imposed unilaterally by the lawyer if not agreed to by the client at the outset of the representation. In Opinion No. 11 (1975), we concluded that the former Code of Professional Responsibility allowed a lawyer to charge interest on an unpaid legal fee, but "only if clearly agreed to by the client, in advance of the representation or in advance of a new stage of the representation."
  Because of current interest in the issue and because we have not examined it pursuant to the current Rules of Professional Conduct, we reconsider the issue.

### Discussion

### 1. Adversity in Fee Arrangements

Finding the appropriate standpoint from which to assess fee arrangements can be difficult. There is some tendency to discuss the issue in terms of the adversity between the lawyer and the client, particularly when the lawyer includes provisions in a fee agreement intended to induce the client to pay. See, e.g., Lustig v. Horn, 732 N.E. 2d 613 (Ill. App. 2000)(provision in fee agreement allowing lawyer to seek attorneys' fees for any lawsuit against the client to recover fees rejected as "potentially violative of the Rules of Professional Conduct barring an attorney from representing a client if such

representation may be limited by the attorney's own interests"). Indeed, this Committee has considered a similar problem from that perspective in Opinion No. 211, one of a series of opinions dealing with the appropriateness of fee agreement provisions requiring arbitration of fee disputes.[1]

But at least some adversity likely exists between client and lawyer in the creation of virtually any fee arrangement. At the most basic level, the client's natural interest is to prefer the fee to be smaller and the lawyer's, larger. Moreover, in carrying out a representation, a lawyer is often faced with the need to resolve at least technically conflicting interests. If the fee basis is payment by the hour, for example, the lawyer (who has a financial incentive to do more work) may face the question of whether to perform work that appears to be at the margin of utility; if the fee is fixed (and in Opinion No. 238 we have recognized that fixed fees can serve to make legal services available to those who might not otherwise be able to afford them), there is a built-in incentive for the lawyer to forgo performing work that would take time and would be of uncertain benefit for the client. Therefore, it is not only not possible to erase all instances of adversity between client and lawyer in the fee process, but it must be recognized that the lawyer and client inescapably will have adverse interests to at least some degree throughout the relationship.

In Rule 1.8 (particularly Rule 1.8(a)), the D.C. Rules provide a framework for regulation of business relations between client and lawyer. However, to treat the relationship between client and lawyer in arriving at a fee arrangement as a legally adverse business relationship under Rule 1.8 would produce results that the Rules do not seem designed to bring about. Under Rule 1.8(a), a client could not be asked to negotiate a fee arrangement with a lawyer unless the client could consult a different lawyer. Rule 1.8(a)(2). Not only would such a result be highly unusual and disruptive, but, as the Association of the Bar of the City of New York has observed (ABCNY Formal Opinion 2000-3), it would also mean, logically, that a client could never retain a lawyer, i.e., to arrive at a fee arrangement with one lawyer the client would have to retain another lawyer, which the client could not do without retaining a third lawyer, and so on. For these reasons, analyzing particular aspects of a fee arrangement to determine whether or not they raise conflict of interest issues does not seem to be a fruitful approach.

Nor is it desirable to draw a bright-line distinction by saying that wherever a fee arrangement contemplates the possibility that the lawyer will institute adversary proceedings against the client to compel payment that a sufficient level of adversity had been reached to give a rise to a conflict. Our Opinion 218, for example, approves a fee arrangement between lawyer and client providing for mandatory arbitration of fee disputes under the rules of the Attorney/Client Arbitration Board. While such a proceeding can be hoped to be less antagonistic than litigation, it is nonetheless distinctly adversarial. Thus, we have approved fee arrangements that contemplate adversary proceedings between lawyers and clients. Indeed, fee arrangements are in general intended to create legally enforceable obligations to pay (*see* Restatement of the Law Governing Lawyers, §§ 17-18 (2000)), and thus necessarily contemplate at least the possibility of a legal action to enforce them. It is difficult to see how there could be effective lawyer-client relationships without this ability.

## 2. Considerations Involved in Attorney-Client Fee Agreements

It cannot be forgotten, however, that a fee arrangement between a lawyer and client is not like a standard business arrangement. Clients often seek legal services at times of difficulty, and the client must feel free to impose a high level of

trust in the lawyer and to have confidence in the relationship. In dealing with the client, the lawyer should not take advantage of either the lawyer's superior knowledge and experience or the lawyer's freedom from the concern and distress that disturb the client. Moreover, because it is unusual for a client to obtain independent legal advice when concluding a fee arrangement with a lawyer means that lawyers owe a particular duty to avoid overreaching in the fee-setting process.

At the same time, there are benefits to providing assurances of payment of fees or compensation for late payment. First, the binding contractual commitment between client and lawyer makes the provision of legal services possible in the first place. Second, it is the client's duty to pay fees to the lawyer that the lawyer appropriately earns under their fee arrangement. See Restatement of the Law Governing Lawyers, § 17(1) (2000). The payment of fees the lawyer has earned is not a voluntary act on the part of the client, and the lawyer is entitled to insist on being paid in accord with the terms of the fee arrangement and to pursue reasonable steps to enforce payment from a recalcitrant client. Not just individual lawyers, but the profession as a whole and the availability of legal services would suffer if that were not the case.

Third, the availability of fee arrangements with incentives for timely payment may well have a positive impact on the formation of lawyer-client relationships. Since a lawyer must somehow account for the additional cost—in time as well as money—of clients who do not pay or who delay payment in violation of the fee agreement, recovery of the additional costs of dealing with clients who do not pay or pay timely from those clients themselves allows the lawyer to avoid spreading those additional costs among all of the lawyer's clients, thus minimizing upward fee pressure on clients who do pay their fees. Such an assurance may even make a lawyer willing to take on representation of a particular client who presents an unusual risk of delayed payment or non-payment where the lawyer would be unwilling otherwise.

### 3. Provisions of Rule 1.5

The District of Columbia Rules of Professional Conduct deal with fees in a fashion that allows taking full account of these considerations in individual cases. Rule 1.5 requires a lawyer's fee to be "reasonable." While the rule provides a list of factors that may be considered in that determination (including the time and labor, difficulty and skill required, the likelihood that acceptance of the assignment will preclude the lawyer from accepting other work, customary fees for such work, the amount at issue and the result obtained, time limits, nature and length of the client relationship, experience and reputation of the lawyer, and fixed or contingent nature of the fee), that list is non-exclusive.[2] As the comments indicate, the Rule covers not just the amount of a fee but fee arrangements generally, including method of payment and the impact of the agreement on the provision of the lawyer's services. See Comment [4] (discussing advance payment of fees and the "special scrutiny" necessary when fees are paid in property rather than money) and Comment [5] (cautioning that "an agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest").[3]

The reasonableness requirement is an objective standard. Because the term "reasonable" is well understood to be a broad one, the lawyer must consider not just the non-exclusive list of factors provided in Rule 1.5(a)(1)–(8), but all issues that may bear upon the fairness and reasonableness of a fee arrangement. This balance is more wide-ranging than

is covered by Rule 1.8(c); Rule 1.8(e) restricts the conditions under which a lawyer may accept fees from someone other than a client; and Rule 1.8(i) governs liens to secure payment of fees. We do not express an opinion on whether a fee arrangement as part of which the lawyer arguably "acquire[d] an ownership, possessory, security, or other pecuniary interest adverse to a client" within the meaning of Rule 1.8(a) would trigger that Rule's applicability as well. *See Renouf v. Multicultural Broadcasting*, 1994 WL 499060 (D.D.C. 1994) at *2–3.

4. This conclusion is consistent with Scope Comment[5] of the Rules, a rule of construction that cautions against importing additional general considerations into the operation of Rule provisions that deal with specific issues, as Rule 1.5 does with fee arrangements. Scope Comment [5] provides:

> In interpreting these Rules, the specific shall control the general in the sense that any rule that specifically addresses conduct shall control the disposition of matters and the outcome of such matters shall not turn upon the application of a more general rule that arguably also applies to the conduct in question. In a number of instances, there are specific rules that address specific types of conduct. The rules of interpretation expressed here is meant to make it clear that the general rule does not supplant, amend, enlarge, or extend the specific rule. So, for instance, the general terms of Rules 1.3 are not intended to govern conflicts of interest, which are particularly discussed in Rules 1.7, 1.8 and 1.9. Thus, conduct that is proper under the specific conflicts rules is not improper under the more general rule of Rule 1.3. Except where the principle of priority state here is applicable, however, compliance with one rule does not generally excuse compliance with other rules. Accordingly, once a lawyer has analyzed the ethical considerations under a given rule, the lawyer must generally extend the analysis to ensure compliance with all other applicable rules.

5. Such a view is consistent with that taken by the New York City Bar Association (Formal Opinion No. 2000-2), Georgia Opinion 45 (1985), Massachusetts Opinion 83-1 (1983), Rhode Island Opinion 98-06 (1998), and North Carolina (98-3 (1998). In Massachusetts and Georgia, while interest can be imposed even though that is not provided for in the original fee arrangement, the client must first be given an opportunity to pay without interest.

6. Rule 1.5(b) requires a lawyer who has not regularly represented a client to provide the client, in writing, a statement of the basis or rate of the fee.

7. West Virginia (Opinion No. 93-02) refuses to allow a lawyer to charge interest on an unpaid balance where there was no provision for such a charge in the original fee agreement, finding that such a charge might "confuse" the client and "carry with it the threat that the attorney might withdraw." We think that the client

is unlikely to be confused where the occasion for the lawyer's request to change the fee arrangement is the client's failure to pay.

8.  Cf. Rule 1.16 (b)(3), which authorizes a lawyer to withdraw from a representation upon the failure of the client "substantially to fulfill an obligation to the lawyer [if the client] has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled. . . ."



The District of Columbia Bar | 1250 H Street NW, sixth floor | Washington DC 20005-5937 | 202-737-4700 | **Directions/Parking**
**©2007** District of Columbia Bar. All rights reserved. **Privacy Policy** | **Disclaimer** | **Author guidelines**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    :
ROBBINS, RUSSELL, ENGLERT,          :
ORSECK & UNTEREINER LLP,            :
                                    :
    Plaintiff/Counterclaim-Defendant  :    Case No. 1:07-cv-00554-JR/JMF
                                    :
        v.                        :
                                    :
GARY M. KORNMAN,                    :
                                    :
    Defendant/Counterclaim-Plaintiff. :
_____:


### <u>ORDER</u>

    The Court **GRANTS** Defendant/Counterclaim-Plaintiff Gary M. Kornman's _Motion For Leave To Supplement Summary Judgment Record With Newly-Discovered Material_.  The Court hereby makes as part of the record in this case and shall consider the exhibits attached to that motion as part of the pending motions for summary judgment.


                  **BY THE COURT:**



_____
                            **Judge**


Dated: _____