# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBBINS, RUSSELL, ENGLERT      :
ORSECK & UNTEREINER LLP,      :
     :      **Civil Action No.**
     **Plaintiff,**      :      **1:07-cv-00554-JR/JMF**
     :
     **v.**      :
     :
**GARY KORNMAN,**      :
     :
     **Defendant.**      :

---

## PLAINTIFF'S OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT

---

Gary A. Orseck (Bar No. 433788)
Alan D. Strasser (Bar No. 967885)
Matthew R. Segal (Bar No. 483486)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411
Washington, DC  20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

Dated: October 19, 2007

If Kornman's cross-motion for summary judgment has the ring of familiarity, that is because it makes for the third time the same ill-fated arguments that Kornman first trotted out in his motion to dismiss. Copying verbatim from that submission, and repeating the same rhetoric he deployed in a motion for reconsideration of this Court's denial of the motion to dismiss (at the Court's September 7, 2007, hearing), Kornman once again seeks dismissal of Robbins Russell's breach-of-contract and *quantum meruit* (breach of implied-in-fact contract) claims. And, for good measure, Kornman also seeks summary judgment on the account stated claim that, as our affirmative summary judgment motion shows, should be decided *in Robbins Russell's* favor.

Kornman's arguments are just as empty now as they were when he first made them. First, Kornman argues that the breach-of-contract claim is foreclosed because the engagement letter did not expressly prefigure that Kornman would modify the parties' initial agreement by requesting a raft of additional legal services in both his civil and criminal matters. That argument ignores the specific, limited purpose of an engagement letter, well-settled law that contractual arrangements can be modified and expanded by the parties, and *abundant* material in the record that undermines Kornman's theory.

Second, Kornman argues that our breach-of-contract claim precludes our pursuing the *quantum meruit* claim, ignoring unanimous case law to the contrary (which we have previously cited to him and the Court). Next, apparently confusing our claim for a breach of implied-in-fact contract with an unjust enrichment claim, Kornman seeks to impose on Robbins Russell an obligation to show that its work "benefited" Kornman. Op. Br. at 24 (citing cases, but providing no quotations or parenthetical explanations). In fact, Robbins Russell is not required to adduce evidence that our services benefited Kornman, but we have done so anyway, and in spades.

Kornman's regurgitation of his previous arguments apparently takes its cue from an overly literal reading of this Court's allowance that Kornman could "restate" his motion to dismiss as a motion for summary judgment. September 7, 2007 Hearing Transcript at 10. But Kornman has done nothing to turn his groundless dismissal papers into non-frivolous summary judgment papers. His brief in support of his cross motion ("Op. Br.") contains *no record citations* relating to the breach-of-contract or *quantum meruit* claims, and his Counterstatement of Undisputed Facts (Docket Entry 31) likewise asserts no purported facts relevant to those claims. See Op. Br. at 22-27. The manifest purpose of asking Robbins Russell to explain, yet again, the relevant law and facts, is simply to increase Robbins Russell's costs in litigating what should be a fairly straightforward (and indefensible) collection matter. Indeed, only days ago, Kornman acknowledged that even under his interpretation of the relevant law, our *quantum meruit* claim is viable.[1]

But Kornman is right about one thing: our account stated claim is ripe for adjudication now. Nothing Kornman has said either in opposing our motion or in supporting his own motion explains why he never disputed our invoices or even responded (until October 24, 2006) to our numerous demands for payment. Nor is there any evidence that Kornman believed then what he now claims: that he had no contractual relationship with Robbins Russell beyond the scope of the engagement letter; that Robbins Russell's work was not beneficial to him; and that all of Robbins Russell's legal services somehow fell under the umbrella of what Kornman has called (at page 6 of his opposition to our summary judgment motion) a "fixed-fee or capped-fee" agreement for a motion to dismiss the

---

[1] See Sept. 7 Hearing Tr. at 8 (Mr. Pollack: "Our position today was going to be this case should proceed as a *quantum meruit* case."); Defendant's Motion for Leave to Supplement Summary Judgment Record with Newly-Discovered Material at 1 (filed Oct. 17, 2007) (arguing that Robbins Russell "at most can pursue a claim in *quantum meruit*").

criminal indictment. Robbins Russell, not Kornman, is entitled to summary judgment on the account stated claim.[2]

## BACKGROUND[3]

### 1.    Kornman's Engagement of Robbins Russell

In August 2004, the Securities and Exchange Commission brought an action against defendant Gary Kornman, under Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, for "repeated insider trading." See Aug. 18, 2004 SEC Complaint ¶ 1 (attached at Exhibit B to our opposition to Kornman's motion to dismiss ("Dismissal Opp")). The SEC sought to enjoin Kornman from selling securities, to fine him, and to disgorge his allegedly unlawful profits. *Id.* at ¶ 5. Approximately six weeks later, Kornman engaged Robbins Russell to represent him in the SEC's civil action. Robbins Decl. ¶ 2.[4] Kornman specifically asked Robbins Russell to "research issues relating to the SEC's rulemaking authority and prepare a possible motion to dismiss" the SEC's complaint. *Id.* ¶ 3 & Exh. A (Engagement Letter). The letter also reflected, more generally, that Kornman was "engaging [Robbins Russell] to represent [Kornman] in connection with the above-referenced litigation," which was the SEC's case against Kornman. *Id.* ¶ 1.

---

[2] Robbins Russell hereby incorporates by reference its submissions in support of its account stated motion. We will not separately address in this submission Kornman's cross-motion on the account stated claim.

[3] Much of this Background is repetitive of the material provided in support of our own summary judgment motion. We regret burdening the Court with the additional paper, but wish to make clear that the record dispositively refutes Kornman's summary judgment motion.

[4] Exhibits cited as "Robbins Exh. _" refer to the attachments to the Declaration of Lawrence S. Robbins ("Robbins Decl."), filed on September 24, 2007. Exhibits cited as "Orseck Exh. _" refer to the attachments to the Declaration of Gary A. Orseck ("Orseck Decl."), filed on October 16, 2007.

Before long, both Kornman and Tillotson instructed Robbins Russell to perform additional work that went beyond the specific tasks mentioned in the engagement letter. Robbins Decl. ¶ 4; see generally Robbins Exhs. B-1 to B-7. In the civil case, for example, Robbins Russell was asked to (and did) prepare an opposition to a motion by the SEC to dismiss the case without prejudice. Robbins Exh. C at 65-67; see also Robbins Exhs. E-3, E-4.

Kornman further expanded the scope of Robbins Russell's responsibilities after the United States Attorney's Office for the Northern District of Texas indicted Kornman on charges of insider trading and making false statements to the SEC. See Indictment in *United States v. Kornman*, No. 3:05-CR-0298P (N.D. Tex.); Robbins Decl. ¶ 4 & Exhs. B-1 to B-7. Kornman and Tillotson both asked Robbins Russell to draft motions, give advice, and conduct research in connection with Kornman's criminal case. *Id.* Those projects included preparing a motion to dismiss the criminal indictment (Orseck Exhs. E, F, and G); giving advice concerning the consequences of taking the Fifth Amendment in the civil case (Robbins Exhs. B-5, E-1); preparation of an outline for a pre-indictment presentation to the U.S. Attorney's Office (Robbins Exh. B-6); work on a Rule 16 letter (Orseck Exhs. A and B); preparation of a motion to suppress evidence (Orseck Exh. C); and preparation of a so-called *Stringer* motion (Orseck Exh. D). After providing those services for several months, the firm entered its appearance in that case. *Kornman*, No. 3:05-CR-0298P (N.D. Tex.) (Dkt. 20-22) (available on PACER).

Kornman later pleaded guilty to making a false statement to the SEC, *id.*, Dkt. 163-65, but not before making use of Robbins Russell's work product. A motion to suppress signed by three other law firms, but copying verbatim portions of Robbins Russell's draft, was filed on February 9, 2007. See *United States v. Kornman*, No. 3:05-CR-0298P (N.D. Tex.), Dkt. 79. That same day,

-4-

Kornman also filed a motion to dismiss signed by other lawyers, but which presented arguments developed by Robbins Russell. *Id.* Dkt. 75.

### 2.    Kornman's Failure Either to Pay or Dispute Robbins Russell's Invoices

Pursuant to the practice described in Robbins Russell's engagement letter, Robbins Russell issued monthly invoices to Kornman for its work in the civil and criminal matters. Each invoice was mailed directly to Kornman's home, along with a cover letter from Lawrence Robbins. Each cover letter specified the time period covered by the invoice, listed the previous, unpaid balance (if any), and said that "If you have any questions, please do not hesitate to contact me." Robbins Decl. ¶ 7 & Exh. C. Robbins Russell always billed Kornman in quarter-hour increments at rates specified in the engagement letter and each invoice. *Id.* ¶ 6. As stated in the engagement letter, Robbins Russell "expect[ed] payment within twenty days after any statement is received." Robbins Exh. A ¶ 4.

From the outset, Jeff Tillotson assured Robbins Russell that he would "make sure Gary [Kornman] pays you promptly." Robbins Exh. B-1. And for more than a year, Kornman paid his bills according to the parties' agreement. He timely paid in full Robbins Russell's first twelve monthly invoices, dated November 1, 2004 through February 2, 2006. Robbins Exh. C (invoices and cover letters); Exh. D (Kornman ledger of invoices and payments). But following Robbins Russell's March 2006 invoice, Kornman simply stopped paying. By June 2006—after Kornman had failed to pay Robbins Russell's March, April, and May invoices—the unpaid balance had grown to $116,208.25. Robbins Exh. C, pp. 64-67. On June 5, 2006, Robbins sent Kornman an invoice for that amount and hand-wrote on the accompanying cover letter a demand for payment: "Gary—I would appreciate it if you could get rid of some of the older invoices. Thanks. Larry." *Id.* at 64.

Kornman never responded to that invoice, or to any of the invoices that followed it. Specifically, Kornman failed to respond to invoices dated July 5 (for $144,250.11), August 3 (for $146,842.23), and September 7 (for $148,121.29). Robbins Exh. C, pp. 68-78; Exh. D. Yet Kornman and Tillotson (on Kornman's behalf) nevertheless continued to request legal services from Robbins Russell. See Robbins Decl. ¶ 12 & Exhs. E-1 to E-8. For example, in June 2006 Tillotson asked to review a draft of Robbins Russell's motion to suppress evidence in Mr. Kornman's criminal case (Exhs. E-6 to E-7), and Kornman even made a special point to instruct Robbins Russell associate Alice Yao to "send all future documents in Word format" (Robbins Exh. E-2).

In light of Kornman's nonresponsiveness to the invoices, on September 27, 2006, Robbins Russell sent to Mr. Tillotson by e-mail a copy of Kornman's unpaid invoices through August 2006. Robbins Decl. ¶ 14 & Exh. F. A week later, on October 4, 2006—nearly eight months after Kornman's last payment—Robbins Russell sent Kornman an invoice for $149,020.29. Robbins Exh. C, pp.79-80. Robbins hand-wrote the following note on the cover letter to the October 4, 2006, invoice:

> Gary–
>      I hope Jeff [Tillotson] has given you a set of the invoices I just e-mailed to him [on September 27, 2006]. I would really like to get these bills cleared up very soon. Thanks,
>                                                            Larry

*Id.* at 79.

Robbins Russell communicated its payment demands to Kornman in other ways as well. Because Kornman previously had instructed Robbins Russell to communicate with him by text messaging and not by phone or e-mail (see Robbins Decl. ¶ 16 & Exh. G), on September 20, 26, and 27, 2006—after Kornman's balance had exceeded $148,000—Robbins sent text messages to

Kornman asking him to call. Robbins Exh. H. In a second text message on September 27, Robbins wrote Kornman to make sure he knew that the "[i]nvoices have been sent to [Tillotson] per your request." *Id.* Kornman immediately replied, "Thanks." *Id.* Robbins then sent additional text messages to Kornman on October 4, 5, and 24. *Id.*

Kornman called Robbins after receiving the October 24 text message. He first assured Robbins that the outstanding bills would be paid. Robbins Decl. ¶ 18. But he then insisted that Robbins Russell do yet *more* work on his behalf before he would pay the outstanding balance. *Id.* Robbins declined that new request. Kornman responded that Robbins Russell had performed subpar work that was of no use to him. *Id.* This was the first and only time, over the entire course of Kornman's engagement of Robbins Russell, in which Kornman had uttered so much as a word of criticism of Robbins Russell's work. *Id.*

At Kornman's request, Robbins Russell sent its prior work product to Tillotson on October 26, 2006, for Kornman's review. Robbins Decl ¶ 19 & Exh. J. Kornman responded by sending the following text message to Robbins on October 26, 2006: "Larry, [Tillotson's] assistant is out on vacation. I won't be able to get the docs you have done from [Tillotson's] [e]-mail until late next week." Exh H. Robbins replied later that day, "Gary[,] [Tillotson] tells me that he can get you the documents right away so that we can get this done asap." *Id.* Kornman's response came less than 45 minutes later: "Ok." *Id.*

That was the last communication from Kornman to Robbins Russell concerning the unpaid bills before this litigation began. Robbins Decl. ¶ 22. At no time, not then, not ever, did Kornman or anyone speaking on his behalf ever call, write, e-mail, text-message, or otherwise communicate

to anyone at Robbins Russell that he questioned or disputed any entry on any of Robbins Russell's invoices.

Finally, on October 31, 2006 (Robbins Exh. K), and November 8, 2006 (Robbins Exh. L), Larry Robbins sent demand letters to both Kornman and Tillotson seeking payment by November 15, 2006. The first of those letters explained:

> Although you (and [Tillotson], on your behalf) have several times promised to pay these invoices in full – including as recently as [October 24, 2006] – you have yet to do so.
>
> * * *
>
> Gary, I deeply regret that matters have deteriorated to the point that I have had to send you this kind of letter. I cannot recall ever having done so with a client in nearly 30 years of law practice. But I find that I have exhausted nearly every other remedy at this point. I am therefore constrained to demand payment in full of all outstanding invoices – a total of $149,021.29 – by no later than November 15, 2006.

Kornman ignored these demand letters as well.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Galvin* v. *Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "There is such a 'genuine issue' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott* v. *Harris*, 127 S. Ct. 1769, 1776 (2007).

**ARGUMENT**

I. **Kornman's Motion For Summary Judgment On The Breach Of Contract Claim Should Be Denied.**

Kornman contended in his motion to dismiss that he "ha[d] no contractual obligation to the firm based on any work other than the carefully-defined scope found in the plain language of the contract." Op. Br. at 23.

But as we demonstrated in opposing Kornman's motion to dismiss, D.C. and Texas law both provide that parties can mutually assent to expand the scope of a contract, and that such an agreement can be (i) made orally[5] or (ii) inferred from the parties' conduct.[6] And as our Account Stated submissions show, Kornman modified the engagement letter in *both* of these ways. First, Kornman (and his agent, Jeffrey Tillotson) repeatedly asked Robbins Russell to provide legal services above and beyond those described in the engagement letter. See, *e.g.*, Robbins Decl. ¶¶ 4, 12 and Exhs. B-1 to B-7, E-1 to E-8; Orseck Exhs. A to G. Second, Robbins Russell performed that work, keeping Kornman informed every step of the way. See, *e.g.*, Orseck Exhs. A to G.

---

[5] *Clark v. Clark*, 535 A.2d 872, 876 (D.C. 1987) ("Under contract law, it is well-settled that a written contract may be orally modified or rescinded by a subsequent oral agreement"); *Hildreth Consulting Engineers, P.C. v. Larry E. Knight, Inc.*, 801 A.2d 967, 974 (D.C. 2002) ("Contracting parties may modify a written agreement by subsequent oral communications"); *Gagnon v. Wright*, 200 A.2d 196, 198 (D.C. 1964) ("Written agreements may be modified by subsequent oral agreement"); *Wesley v. Shaftel*, 170 A.2d 923, 924 (D.C. 1961) ("It is by no means a novel doctrine that parties to a contract may modify, rescind or discharge it by subsequent oral agreement"); *DiMiceli* v. *Affordable Pool Maint., Inc.*, 110 S.W.3d 164, 171 (Tex. App.–San Antonio 2003, no pet. h.) ("A written agreement may be modified by a subsequent oral agreement.").

[6] *Nolan v. Nolan*, 568 A.2d 479, 485 (D.C. 1990) ("parties [can] modify [a] written agreement *by subsequent conduct, including acquiescence* . . . .") (emphasis added); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.–San Ant. 1997) ("the [trial] court easily could have found mutual assent based upon the acts and conduct of the parties.")

-9-

Kornman's recently concocted approach to dealing with all this evidence is his assertion (Op. Br. at 23) that a "condition precedent" of our right to payment was that we submit "finished work product" to Kornman and that Robbins Russell failed to fulfill that condition. But he has not identified a single contemporaneous scrap of paper to support that assertion. All Kornman has offered is his own recent contention that he "understood that I did not owe anything for the [motion to dismiss, motion to suppress, and *Stringer* motion] projects until I received finished, ready-to-file work product and appropriate argument had been made on the motion to dismiss." Kornman Cert. ¶ 13. Those "[b]ald allegations . . . are not enough to survive a motion for summary judgment," much less to prevail on one. *Morgan* v. *Barry*, 785 F. Supp. 187, 195 (D.D.C. 1992). Indeed, Kornman nowhere alleges that anyone at Robbins Russell ever *agreed* that he could withhold payment pending completion of *any* project.[7] Nor does Kornman even attempt to explain why he failed to pay for work falling outside the "motion projects," such as Robbins Russell's Rule 16 letter. See Orseck Exhs. A and B.

Moreover, even if there had been a "completed work product" condition for payment, Robbins Russell still would be owed the amounts it billed. We have shown that Robbins Russell

---

[7] In January 2006, at Jeff Tillotson's request, Robbins Russell agreed "to do the opening brief, the reply brief, and any oral argument" on a "motion to dismiss the indictment" in the criminal case for a fee of $100,000. Pollack Cert. Exh. D. The exchange of emails between Robbins and Tillotson constitutes the universe of evidence on this topic, and the emails make the terms of the agreement abundantly clear. First, the agreement expressly covered the motion to dismiss, and *only* the motion to dismiss. When the parties meant to depart from the normal hourly billing arrangement, they knew how to do so; had they intended to agree to a fixed fee for the many other tasks assigned to Robbins Russell, the record would reflect it. Second, *nothing* in the emails between Robbins and Tillotson – indeed, nothing anywhere in the record, except for Kornman's Certification in response to this motion – remotely supports Kornman's claim that Robbins Russell was not entitled to any payment until (as Kornman now claims, Opp. at 6) Kornman filed "an opening brief and reply papers," and Robbins "participate[d] in oral argument on that motion." And Robbins Russell's bills on that one discrete project came nowhere close to $100,000.

-10-

provided its work product to Kornman, either directly or by making it available to his agent, Tillotson. Orseck Exhs. A to G. Some of the drafts Robbins Russell submitted to Kornman were of course called "drafts," such as occurred when Tillotson requested a "not final" draft of a motion to suppress. See, *e.g.*, Robbins Exhs. E-6 and E-7; Orseck Exh. C. But if calling something a draft means that a client need not pay for it, then a law firm's right to payment will always depend on the whims of its clients, who of course have the sole authority to determine when something can be filed in their names. Robbins Russell would never have agreed—and did not in fact agree—to placing such a condition on its right to collect from a client who, according to Tillotson, "turned [our work] into junk" and created a "holdup in sending things out" for filing. Robbins Exh. E-5 (contemporaneous notes of Robbins Russell attorney Gregory Poe). Far from carrying his burden on this issue, Kornman has done *nothing* (aside from signing his name to a fanciful certification) to advance his position beyond where it was when he moved unsuccessfully to dismiss our complaint.

## II.    Kornman's Motion For Summary Judgment On the *Quantum Meruit* Claim Should Be Denied

Kornman's motion on our *quantum meruit* claim advances two arguments that were rejected at the motion-to-dismiss stage. First, he alleges that the existence of a contract (*i.e.*, the one memorialized by the engagement letter) precludes Robbins Russell from seeking a *quantum meruit* recovery as an alternative theory of damages. Op. Br. at 25; Dismissal Memo at 9-10.  Second, Kornman contends that Robbins Russell must show that the unpaid-for work "benifited" him. Op. Br. at 24, 26-27; Dismissal Memo at 8-10. We have previously shown, in opposing Kornman's motion to dismiss, that neither argument has any legal basis. We now show that they lack a factual basis as well.

## A.     Kornman Ignores Case Law Allowing Alternative Pleading Of Breach-of-Contract And *Quantum Meruit* Claims

If we prevail in this litigation on our account stated or breach-of-contract claims, that may well preclude *quantum meruit* recovery as double counting. But until that happens, as we have already shown (see Dismissal Opp. at 8), it is black letter law that a plaintiff is permitted to allege *both* theories (even if, in the end, it recovers only on one of them).[8] Kornman's argument that our breach-of-contract claim in and of itself entitles him to summary judgment on our *quantum meruit* claim is meritless.

## B.     Robbins Russell Need Not Show, But Has Shown, That Its Work Benefitted Kornman

Kornman's second argument is no better. Kornman contends that Robbins Russell's *quantum meruit* (implied-in-fact contract) claim requires us to demonstrate that our work "*benefited*" Kornman. Op. Br. at 24 (emphasis added). In making that contention, Kornman appears to be laboring under the misapprehension that Robbins Russell's *quantum meruit* claim is an *unjust enrichment* claim, when it is actually an *implied-in-fact* contract claim. See Complaint at Count II (filed Feb. 26, 2007). As explained in *United States ex rel. Modern Electric, Inc.* v. *Ideal Electronic*

---

[8] See *North Am. Graphite Corp. v. Allan*, 184 F.2d 387, 389 (D.C. Cir. 1950) ("[N]o election is required between contract and quasi-contract. The two remedies may be joined and pursued in the same action."); *Illustro Sys. Int'l, LLC v. IBM*, 2007 WL 1321825, *14 (N.D. Tex. May 4, 2007) (slip copy) (allowing plaintiff to plead contract and unjust enrichment in the alternative); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007) ("assertion of a breach of contract claim does not preclude [plaintiff] from pleading an unjust enrichment claim in the alternative"); *Houston v. Southern Elec. Services, Inc.*, 2007 WL 1228549, *3 n.3 (Tex. App.–Houston (1st Dist.) Apr. 26, 2007) ("[T]he City also complains that it is inconsistent to plead both breach of contract and *quantum meruit*. However, SES's claim for *quantum meruit* is clearly an alternative pleading."); *Auguston v. Spry*, 282 A.D.2d 489, 491 (N.Y. App. 2001) ("causes of action alleging breach of contract and unjust enrichment may be pleaded alternatively."); *Schwartz v. Swartz*, 723 A.2d 841, 842 (D.C. 1998) (observing that plaintiff won jury trial in which he filed an "action for quantum meruit, breach of contract, and unjust enrichment").

*Security Co.*, 81 F.3d 240, 247 (D.C. Cir. 1996), *cited in* Op. Br. at 24, "the District of Columbia Court of Appeals uses the term 'quantum meruit' to describe both [implied-in-fact and unjust enrichment claims]." 81 F.3d at 246 (citing *TVL Assocs.* v. *A & M Constr. Corp.*, 474 A.2d 156, 159 (D.C. 1984)). But a crucial difference between those two types of recovery is that "an unjust enrichment theory requires a showing that 'a person retains a benefit … which in justice and equity belongs to another,'" whereas an implied-in-fact theory does not. *Id.* at 247 (quoting *4934, Inc.* v. *District of Columbia Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C. 1992).

We have adduced evidence satisfying the requirements for a breach of implied-in-fact contract claim. Robbins Russell (1) provided "valuable" legal services, (2) "for" Kornman, (2) which were "were accepted and enjoyed" by Kornman, (4) "under circumstances which reasonably notified [Kornman] that the plaintiff, in performing such services, expected to be paid." *Ellipso, Inc.* v. *Mann*, 460 F. Supp. 2d 99, 104 (D.D.C. 2006). Specifically, Robbins Russell made its work product available to Kornman or his agent, see, *e.g.*, Orseck Exhs. A to G (examples of forwarded work product); Robbins Exh. E-5 (Tillotson's instruction to "put [the *Stringer*] motion on the slow boat"); Robbins Exh. J (forwarding work product to Tillotson), and sent regular invoices for that work, see Robbins Exh. C. If Kornman did not "accept or enjoy" those services, he could have instructed Robbins Russell to stop working at any time. But he never did; he just asked for more.

Kornman's submission simply does not grapple with those facts or with the applicable law. *None* of the cases he cites for the proposition that Robbins Russell must show that its work "benefited" him actually imposes such a requirement.[9] And although Kornman cites cases that do

---

[9] See Op. Br. at 24 (citing *United States ex rel. Modern Elec.*, 81 F.3d 240 at 246 (requiring plaintiff to show only that the relevant services were provided "for the person from whom recovery is sought."); *Ellipso, Inc.*, 460 F. Supp. 2d at 104 (same); *Providence Hosp.* v. *Dorsey*, 634 A.2d

actually discuss an obligation to prove a benefit, *none* of them does so in the context of a breach of implied-in-fact contract claim. See Op. Br. at 26 (citing *Novecon, Ltd.* v. *Bulgarian-American Enter. Fund*, 967 F. Supp. 1382, 1389 (D.D.C. 1997) (concluding there was "no basis for a finding of unjust enrichment"); and *King & King, Chartered* v. *Harbert Int'l, Inc.*, 436 F. Supp. 2d 3, 14 n.20 (D.D.C. 2006) ("For present purposes, the Court believes that it is consistent with D.C. law to use the term *quantum meruit* as shorthand for the quasi-contractual remedy that plaintiff requests . . . .")).[10]

In any event, even though our breach of implied-in-fact contract claim does not require us to do so, Robbins Russell has shown that Kornman used and benefitted from its work product. That is evident from a simple comparison of Robbins Russell's draft suppression motion and motion to dismiss to the as-filed versions of those documents. Such a comparison shows that *Kornman has used, verbatim, large portions of Robbins Russell work product that he never paid for in motions later signed by other lawyers*. Compare, *e.g.*, Orseck Exh. C at 16 (Robbins Russell draft) ("Even if the affiant (despite the affidavit's own language) did *not* review the Seaberg transcript, the affiant's recklessness is properly inferred from the falsehood's materiality.  The Fifth Circuit has held that where a misrepresentation is 'clearly critical to a finding [of] probable cause the fact of

---

1216, 1219 n.8 (D.C. 1993) (same); *New Econ. Capital, LLC* v. *New Mkts. Capital Group*, 881 A.2d 1087, 1094-95 (D.C. 2005) ("for the person sought to be charged"); *Bashara* v. *Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985) (same); and *Dueitt* v. *Dueitt*, 2007 WL 274739, *1 n.2 (Tex. Ct. App.-Beaumont Feb. 1, 2007) (same)).

[10] Kornman's reliance on *Carr* v. *Austin Forty*, 744 S.W.2d 267 (Tex. Ct. App. – Austin 1987), *cited in* Op. Br. at 27, is also misplaced. Unlike this case, *Carr* involved an "implied by law" *quantum meruit* claim. *Id.* at 272. Moreoever, the plaintiff's "own pleadings acknowledge[d] that the labor and services [underlying its] quantum merit claim were initiated by [the plaintiff] for his own benefit." *Id.* at 273. The services at issue in *Carr* might have been "valuable" in some sense, but they were not "valuable from the perspective of the defendant" because they had been performed *to benefit the plaintiff.  Id.*  That case does not remotely resemble this one.

-14-

recklessness may be inferred from the proof of the omission itself'") with Kornman's as-filed Motion to Suppress Evidence at 6 (verbatim) (attached hereto as Exhibit A).

Although the degree of word-for-word copying is far less substantial, Kornman's as-filed motion to dismiss makes both of the arguments first suggested to Kornman by Robbins Russell: First, that the ruling in the parallel SEC case that it was an "extremely close" question whether Kornman owed a fiduciary duty to the putative victims of his insider trading foreclosed a criminal prosecution for the same allegations; and second, that as a matter of law there *was no* fiduciary duty here, and thus the prosecution must fail. See Kornman's as-filed Motion to Dismiss (attached hereto as Exhibit B). Kornman made both of those arguments under the names of other lawyers, and he paid only in part for Robbins Russell's draft. Thus, even under Kornman's view of the law, but especially under the correct view, Kornman's summary judgment motion is meritless.

**CONCLUSION**

For the foregoing reasons, and those stated in our opposition to Kornman's motion to dismiss, the Court should deny Kornman's summary judgment motion in its entirety. Moreover, for the reasons stated in our account stated submissions, the Court should enter summary judgment in favor of Robbins Russell on its account stated claim.

Dated: October 19, 2007

Respectfully submitted,

_____/s/ Gary A. Orseck_____
Gary A. Orseck (Bar No. 433788)
Alan D. Strasser (Bar No. 967885)
Matthew R. Segal (Bar No. 483486)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411
Washington, DC  20006
Telephone: (202) 775-4500
Fax: (202) 775-4510

**Attorneys for Plaintiff Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP**

-16-

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | **Criminal Action No.** |
| | § | |
| **v.** | § | **3:05-CR-0298P** |
| | § | |
| **GARY M. KORNMAN,** | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| **Defendant.** | § | |

---

**MOTION TO SUPPRESS EVIDENCE AND MOTION FOR**
**AN EVIDENTIARY (*FRANKS vs. DELAWARE*) HEARING**
**AND BRIEF IN SUPPORT THEREOF**

---

Dan K. Webb
(Admitted *Pro Hac Vice*)
Winston & Strawn, L.L.P.
35 West Wacker Dr.
Chicago, Illinois 60601-9703
Telephone: (312) 558-5856
Fax: (312) 558-5700
Email:  dwebb@winston.com

Jeffrey M. Tillotson
State Bar No. 20039200
Lynn, Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839
Email:  jmt@lynnllp.com

Michael P. Gibson
Texas Bar Card No. 07871500
Burleson, Pate & Gibson, L.L.P.
2414 N. Akard, Suite 700
Dallas, Texas 75201
Telephone:  (214) 871-4900
Fax:  (214) 871-7543
Email:  mgibson@bp-g.com

**ATTORNEYS FOR DEFENDANT**
**GARY M. KORNMAN**

**Exhibit A**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

ARGUMENT .................................................................................................................... 3

I.     A *FRANKS* HEARING IS WARRANTED AS THE AFFIDAVIT RELIES ON
DELIBERATE OR RECKLESS FALSEHOODS AND MATERIAL OMISSIONS OF
FACT. ........................................................................................................................ 3

     A.    A *Franks* Hearing is Necessary Because The Affidavit Contains At Least Two
Knowing or Reckless Falsehoods which were Necessary to the Probable Cause
Determination. ................................................................................................ 4

          1.    The First Falsehood:  The affiant claims that there was a tape recording of
a February 7, 2001 meeting with Al Mann when he knew otherwise. ........ 5

          2.    The Second Falsehood:  The affidavit falsely claims that Jack Pratt
testified that Heritage representatives told him that Heritage would keep
his information confidential. ........................................................................ 7

II.    A *FRANKS* HEARING IS WARRANTED BECAUSE THE AFFIDAVIT FAILS TO
IDENTIFY A KEY OBJECT OF THE SEARCH, WHICH WAS CENTRAL TO THE
GOVERNMENT'S CASE AGAINST GARY KORNMAN. ............................................ 8

III.   A *Franks* Hearing is Necessary Because The Affiant Deliberately or Recklessly Omits
Information about the Biases of the Named Informants. .................................................. 11

IV.   THE GOVERNMENT'S AFFIDAVIT IS DEFECTIVE IN THAT IT FAILED TO
ESTABLISH PROBABLE CAUSE THAT EVIDENCE OF SECURITIES FRAUD
WAS LOCATED ON THE PREMISES. ....................................................................... 13

     A.    The Affidavit Places Undue Reliance on Unsubstantiated Anonymous Sources..13

     B.    The Affidavit Relies On Stale Allegations. ......................................................... 15

     C.    The Affidavit's Reference to Kornman's Assertion of His Fifth Amendment
Privilege Taints the Probable Cause Determination. ............................................ 17

V.    THE SEARCH WARRANT WAS A GENERAL WARRANT WHICH FAILED TO
SPECIFY WITH REQUISITE PARTICULARITY THE THINGS TO BE SEIZED, IN
VIOLATION OF THE FOURTH AMENDMENT. ....................................................... 19

**Exhibit A**

A.    The Standard for a Sufficiently Particularized Warrant. ........................................19

B.    The Warrant in This Case Fails to Meet the Applicable Standard. .......................19

VI.    THE COMPUTER EVIDENCE SHOULD BE SUPPRESSED BECAUSE THE
WARRANT LACKED A SEARCH PROTOCOL.............................................................22

CONCLUSION....................................................................................................................24

CERTIFICATE OF CONFERENCE.........................................................................................26

**Exhibit A**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ........................................................................ 9

*Franks v. Delaware*, 438 U.S. 154 (1978) ........................................................................... passim

*Griffin v. California*, 380 U.S. 609 (1965) ................................................................................ 18

*In the Matter of the Search of 3817 W. West End*, 321 F. Supp. 2d 960 .............................. 22, 23

*Marron v. United States*, 275 U.S. 192 (1927) .......................................................................... 19

*Naugle v. Witney*, 755 F. Supp. 1504 (D. Utah 1990) ............................................................... 22

*Spevack v. Klein*, 385 U.S. 511 (1967) ...................................................................................... 18

*Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457 (5th Cir. 1994) ....................... 24

*United States* v. *Alvarez*, 127 F.3d 372 (5th Cir. 1997) ............................................................ 7, 8

*United States* v. *Cavazos*, 288 F.3d 706 (5th Cir. 2002) ........................................................... 4, 6

*United States v. Cook*, 657 F.2d 730 (5th Cir. 1981) ......................................................... 19, 20, 21

*United States v. Craig*, 861 F.2d 818 (5th Cir. 1988) ................................................................ 16

*United States v. Falon*, 959 F.2d 1143 (1st Cir. 1992) .............................................................. 24

*United States v. Freeman*, 685 F.2d 942 (5th Cir. 1982) ..................................................... 15, 16

*United States v. Garrett*, 495 F.Supp. 159 (D.C. Tex. 1980) ................................................... 14

*United States v. Hauk*, 412 F.3d 1179 (10th Cir. 2005) ........................................................... 14

*United States v. Haydel*, 649 F.2d 1152 (5th Cir. 1981), *cert. denied,* 455 U.S. 1022 (1982) ..... 19

*United States v. Holmes*, 537 F.2d 227 (5th Cir. 1976) ............................................................ 14

*United States v. Horton*, 496 U.S. 128 (1990) ........................................................................... 9

*United States v. Hyde*, 574 F.2d 856 (5th Cir. 1978) ................................................................ 16

*United States v. Kow*, 58 F.3d 423 (9th Cir. 1995) .................................................................... 21

*United States v. Leary*, 846 F.2d 592 (10th Cir. 1988) ........................................................ 20, 21

**Exhibit A**

*United States v. Martin*, 615 F.2d 318 (1980) ................................................................ 11

*United States v. Mays*, 466 F.3d 335 (5th Cir. 2006) ..................................................... 12

*United States v. Namer*, 680 F.2d 1088 (5th Cir. 1982) .......................................... 3, 13

*United States v. Prescott*, 581 F.2d 1343 (9th Cir 1978) ............................................. 19

*United States v. Puma*, 937 F.2d 151 (5th Cir. 1991) ................................................... 16

*United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002) ................................................ 19

*United States v. Satterwhite*, 980 F.3d 317 (5th Cir. 1992) ......................................... 14

*Williams v. Kunze*, 806 F.2d 594 (5th Cir. 1986) ......................................................... 22

**Statutes**

18 U.S.C. § 1348 ............................................................................................................ 11

18 U.S.C. § 1349 ............................................................................................................ 11

**Exhibit A**

COMES NOW Defendant GARY M. KORNMAN ("Gary Kornman" or "Mr. Kornman") and files his Motion to Suppress Evidence and Motion for an Evidentiary (*Franks vs. Delaware*) Hearing, and in support thereof, would show as follows:

## INTRODUCTION AND SUMMARY OF ARGUMENT

Suppression is an appropriate remedy in this case because the search of Defendant's home violated Gary Kornman's Fourth Amendment rights in multiple respects and, pursuant thereto, this Court should conduct a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), after which the evidence seized and its fruits should be suppressed. The basis is that the affidavit submitted in support of the search warrant by Agent Parker contained knowingly false statements, or at least, statements made in reckless disregard of the truth, or knowingly or recklessly disregarded omissions of fact, including:

(1)    any facts necessary to substantiate the *reliability* of anonymous *sources of information*; and

(2)    the staleness of information included in the affidavit as to the passage of time and changed circumstances; and

(3)    many facts attested to by the affiant were unreliable *hearsay received through SEC Senior Enforcement* Attorney *Reding ("*<u>SEC Senior Attorney Reding</u>*") from unsubstantiated sources*; and

(4)    a critical object (the tape of the SEC's phone call with Mr. Kornman on October 29, 2003) of the search which the government knowingly sought from the search but withheld knowledge of that fact from the magistrate; and

(5)    specific information about the *biases* of anonymous government informants; and

(6)    many of the *facts alleged* in the statements made by the named sources were *rank speculations;* and

(7)    crucial information about the *biases* of named government informants.

When these false statements and material omissions are corrected and removed from the Affidavit, they obviate any finding of probable cause. The finding of probable cause is further

fatally tainted by the reference by Agent Parker to the fact that Mr. Kornman asserted his

constitutional rights under the Fifth Amendment to the U.S. Constitution.  In his affidavit, Agent

Parker specifically stated that "In response to a subpoena directing Gary Kornman to provide

sworn testimony before the SEC, Gary Kornman asserted his Fifth Amendment rights against

self-incrimination".  *See* Exhibit A (Affidivit of Christian Parker).

*Second*, suppression of the evidence seized and its fruits is also appropriate here because

the affidavit by Agent Parker and the resulting warrant issued by the magistrate in reliance on the

affidavit is defective in three key respects.  *See* Exhibit B (Search Warrant).  Those defects are:

(A)     The affidavit by Agent Parker and the resulting warrant was a general, exploratory warrant lacking in the requisite particularity required by the Fourth Amendment.  As such, the warrant improperly authorized the seizure of virtually all of Kornman's business records, both paper and electronic – including, as the search inventory.  Exhibit E (Inventory) shows, dozens of home computers, hundreds of computer hard drives and media storage devices, numerous personal digital assistants, and microcassettes, tapes, floppy disks, CDs, and DVDs;

(B)     Even if the warrant otherwise passed muster, the computer evidence and its fruits should be suppressed because the affidavit by Agent Parker and the resulting warrant did not include any search protocols, and

(C)     The affidavit by Agent Parker and the resulting warrant provided no safeguards or protocols for the protection of Mr. Kornman's attorney-client privilege.

Moreover, these critical defects in both the affidavit and the warrant preclude any

reliance on the "good faith" exception to the requirement that any seizure be made pursuant to a

lawful warrant.  The affidavit relies on falsehoods, makes material omissions including, but not

limited to, of critical objects of the search and information about the potential bias of informants,

and is so lacking in indicia of probable cause that reliance upon it is entirely unreasonable.

Further, the affidavit by Agent Parker and the resulting warrant were facially overbroad and thus

failed to particularize the things to be seized or how the search for those things was to be carried

out.  For these reasons, any reasonably well trained law enforcement professional could not, in

good faith, rely on these defective documents, and would have to conclude that any search based on these document was unlawful.

The same day, the government also carried out a search for items that Mr. Kornman had arranged to have stored at the home of Michael Kornman, who is Mr. Kornman's son. Gary Kornman's personal Fourth Amendment rights were also violated by this search. The same defective affidavit supports the warrant authorizing this search. For these reasons, the *Franks* hearing should also consider the unlawful searches and seizures from Michael Kornman's home, after which the evidence seized and its fruits should be suppressed.

## ARGUMENT

## I.    A *FRANKS* HEARING IS WARRANTED AS THE AFFIDAVIT RELIES ON DELIBERATE OR RECKLESS FALSEHOODS AND MATERIAL OMISSIONS OF FACT.

Probable cause must be sufficiently established by an affidavit in support of a search warrant. "In a search warrant case, the magistrate must have probable cause to believe that certain items evidence criminal activity and that those items are presently located in a certain place." *United States v. Namer*, 680 F.2d 1088, 1095 (5th Cir. 1982). The affidavit (Exhibit A) in support of the warrant authorizing the search of Gary Kornman's home[1] however, suffered from three major deficiencies, which individually as well as in combination, render it insufficient to establish probable cause that evidence of a securities fraud violation would be found on the premises.

*One*, the affidavit relies on false statements made knowingly or in reckless disregard of the truth. *Two*, it fails to mention a critical object of the search that the government knew existed

---

[1] The Affidavit was issued in support of both the search of Gary Kornman's home and the search of Michael Kornman's home, as ¶¶ 4-5 of the Affidavit make explicit.

and sought to obtain to build its case against Mr. Kornman. *Three*, the affiant deliberately or recklessly makes material omissions of the rank speculation and strong biases of the named witnesses, a fact the magistrate should have been aware of in making his probable cause determination. A hearing under *Franks v. Delaware* is required, therefore, to determine whether the affidavit can support a finding of probable cause when the false statements are removed and the material information that was omitted is included.

    A.    **A *Franks* Hearing is Necessary Because The Affidavit Contains At Least Two Knowing or Reckless Falsehoods which were Necessary to the Probable Cause Determination.**

Gary Kornman is entitled to an evidentiary hearing under *Franks* v. *Delaware*, 438 U.S. 154 (1978), because the affidavit relies on false statements. The language of the Warrant Clause of the Fourth Amendment "takes the affiant's good faith as its premise." *Id.* at 164. An evidentiary hearing under *Franks* is required where a defendant makes a "substantial preliminary showing" by a preponderance of the evidence that false statements in an affidavit were made "knowingly and intentionally, or with reckless disregard for the truth," and that the false material was necessary to a finding of probable cause. *Id.* at 155-56. See also *United States* v. *Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002). Going behind the affidavit in this fashion is appropriate to preserve the integrity of the magistrate's role in authorizing a search under the Fourth Amendment. As the Supreme Court explained in *Franks*: "[b]ecause it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Franks*, 438 U.S. at 165 (internal citations omitted). If, after conducting a hearing, a court determines that "with the affidavit's false material set to one side, the affidavit's remaining content is

insufficient to establish probable cause," then "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.  For the reasons set out below, a *Franks* hearing is required in this case.

       1.    <u>The First Falsehood</u>:  **The affiant claims that there was a tape recording of a February 7, 2001 meeting with Al Mann when he knew otherwise.**

Several months before the affidavit was submitted, the SEC took the sworn testimony of Timothy Seaberg ("<u>Tim Seaberg</u>" or "<u>Mr. Seaberg</u>") in connection with its civil investigation of Gary Kornman regarding the same insider trading allegations.  Tim Seaberg had been employed by Heritage in a sales position and had attended the February 7, 2001 meeting with Gary Kornman and Al Mann.  The Government, of course, now alleges that Mr. Mann imparted material, non-public information regarding MiniMed, Inc. to Mr. Kornman at this February 7, 2001 meeting.

SEC Senior Attorney Reding took the testimony and asked Mr. Seaberg point blank whether the February 7, 2001 meeting involving himself, Al Mann and Gary Kornman, was recorded.  Tim Seaberg testified unambiguously that *the meeting was neither recorded nor transcribed*:

       Ques.( By SEC Senior Attorney Reding)    **Was this meeting [on February 7, 2001, with Mann] recorded?**

       Ans. ( By Tim Seaberg)    **No.**

       Q.    **Why wasn't this meeting recorded?**

       A.    **Because we made it a practice not to record meetings in non-record states.**

May 11, 2004 Deposition of Timothy William Seaberg, attached as Exhibit C.  Tim Seaberg was later asked by SEC Senior Attorney Reding whether "**Gary Kornman ever asked**

**MOTION TO SUPPRESS EVIDENCE AND MOTION FOR AN EVIDENTIARY**
**(*FRANKS vs. DELAWARE*) HEARING AND BRIEF IN SUPPORT THEREOF**    **PAGE 5**
01654-505/159090    **Exhibit A**

him to record a meeting in a **non-record state**". Mr. Seaberg replied, "**Not that I remember**." Exhibit C at 181.

Remarkably, three months later, Agent Parker falsely told the Magistrate in his affidavit the exact *opposite*: "[a]ccording to the Affiant's sources and information disclosed to Mr. Reding, this February 7, 2001 meeting was likely recorded and later transcribed with Gary Kornman's knowledge." Exhibit A at ¶ 16. Even more remarkable is that Agent Parker relies on Mr. Reding as his "source." *Id.* Agent Parker declares at ¶ 10: "Mr. Reding does not believe that Gary Kornman and Heritage supplied all documents responsive to the SEC's subpoenas and other document requests. This belief is allegedly based upon information SEC Senior Attorney Reding learned from reliable informants, including former employees, about Heritage's document retention practices, coupled with Heritage's apparent incomplete document production."

Agent Parker attested that he was "thoroughly familiar with the information contained in the affidavit, either through personal investigation, review of the documents provided by the SEC, or through discussions with other persons assisting with this case." Exhibit A ¶ 6. By the affiant's own assertion, therefore, he reviewed the SEC testimony that SEC Senior Attorney Reding purportedly relied on, including Seaberg's deposition transcript. The false statement in the affidavit, that the meeting of February 7, 2001 was recorded, must therefore have been made knowingly and intentionally, or at the least in reckless disregard of the truth.

Even if the affiant (despite the affidavit's own language) did *not* review the Seaberg transcript, the affiant's recklessness is properly inferred from the falsehood's materiality. The Fifth Circuit has held that where a misrepresentation is "clearly critical to a finding [of] probable cause the fact of recklessness may be inferred from the proof of the omission itself." *Namer*, 680

F.2d at 1094. *Accord*, *United States* v. *Alvarez*, 127 F.3d 372, 374-75 (5th Cir. 1997). The allegation that Mr. Kornman withheld documents from the SEC, including the transcript to the February 7, 2001 meeting, must have been critical to the magistrate's determination of probable cause. The affiant himself described the February 7, 2001 meeting with Mann as "critical," alleging that during the meeting, Mann shared material, nonpublic information with Mr. Kornman. The transcript of this meeting, if it existed, would have been a key piece of evidence regarding exactly what, if anything, Mann told Mr. Kornman about a possible sale of MiniMed. Thus, the *allegation* that the transcript existed and that Mr. Kornman withheld it from the SEC was clearly a central factor in the magistrate's probable cause determination. *Namer*, 680 F.2d at 1095.

2.    <u>The Second Falsehood</u>:  **The affidavit falsely claims that Jack Pratt testified that Heritage representatives told him that Heritage would keep his information confidential.**

Special Agent Parker also claimed in his affidavit that he had "reviewed sworn statements [Jack] Pratt and Mann gave the SEC" which ostensibly state that Heritage representatives "told them that the company would keep the information confidential." (Exhibit A ¶ 13). This is a crucial allegation, since it is the linchpin for the government's argument that Mr. Kornman owed a duty of trust and confidence to Mr. Pratt, a *prospective* customer. *Without* the existence of a duty of trust and confidence between Mr. Kornman and Jack Pratt, then Mr. *Kornman* had *no legal obligation* to refrain from trading on any information allegedly imparted to him by Mr. Pratt.

The allegation regarding Mr. Pratt is false. Pratt's declaration – which is otherwise almost word-for-word the same as Mann's – does *not* make the crucial claim that Heritage representatives *told* Pratt that they would keep the information confidential. Even a cursory

glance at the two-and-a-half page declaration of Pratt confirms this point. *See* Exhibit D (Pratt Declaration). The knowingly false – or at least recklessly made – nature of this statement is evident on the affidavit's face. The affiant himself asserted that he had reviewed Pratt's declaration (Exhibit A ¶ 6) but then goes on to describe the Pratt declaration as stating that Heritage representatives told him that "all information that [he] gave Heritage would be kept confidential." *Id.* ¶ 13. Again, the affiant must have known that this statement was false; its inclusion in the affidavit was either deliberate or reckless. *See* Exhibit D at ¶ 5.

The importance of this false allegation to the magistrate's probable cause determination is evident from the way the government characterizes the allegation. The affiant claims that "[b]ecause of the confidential nature of these disclosures, Gary Kornman owed a duty of trust and confidence to the sources of the information." (Exhibit A ¶ 14). Like the allegation concerning the supposed Mann transcript, the Pratt confidentiality assertion was therefore critical to establish probable cause. If the affiant's false assertion concerning the alleged promise of confidentiality to Pratt is set aside, no alleged "duty of trust and confidence" could be said to exist, and the magistrate could not have concluded that probable cause existed for the issuance of the warrant.

## II. A *FRANKS* HEARING IS WARRANTED BECAUSE THE AFFIDAVIT FAILS TO IDENTIFY A KEY OBJECT OF THE SEARCH, WHICH WAS CENTRAL TO THE GOVERNMENT'S CASE AGAINST GARY KORNMAN.

The government further recklessly or intentionally failed to mention a material piece of evidence they were searching for in their affidavit in support. The government in this case specifically sought a particular piece of evidence in its search of Gary Kornman's home, namely a tape of an October 29, 2003 phone call between Gary Kornman and the SEC, which it believed to be important in building its case against Mr. Kornman. The government failed, however, to

alert the magistrate to this object of its search in its affidavit. The search therefore violated the Fourth Amendment, which requires that all warrants must "particularly describ[e] . . . the persons or things to be seized," U.S. CONST. amend. IV. "[T]he Magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). Law enforcement may not conduct general, unparticularized searches because of the "requirements that no warrant issue unless it 'particularly describ[es] the place to be searched and the persons or things to be seized,' and that a warrantless search be circumscribed by the exigencies which justify its initiation." *United States v. Horton*, 496 U.S. 128, 139-140 (1990). "If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants * * * particularly describing * * * (the) things to be seized.'" *Coolidge.* 403 U.S. at 471.

The government has failed to meet these standards in this case, by failing to particularly describe the things to be seized in its affidavit. The government believed that the tape of October 29, 2003 was significant in building its case against Gary Kornman prior to the search being carried out. And yet, despite how important the government believed this tape to be, there is *no mention* of this tape of October 29, 2003 *anywhere* in the affidavit requesting the search. The government acknowledges in its own pleadings the significance it ascribed to this tape prior to the search. Specifically, on January 5, 2005 the government filed a Reply Brief in Support of Expedited Application for Stay of Proceedings in the parallel civil case of *Securities and Exchange Commission v. Gary M. Kornman*, No. 3:04-CV-1803-L, page 3 (Exhibit G). In its brief the government argues:

> "Significantly, Kornman fails to point out that the Government executed a search
> warrant at his residence on August 3, 2004. The search led to the recovery of a

secret tape recording Kornman made of an October 29, 2003, interview with the SEC staff – evidence the SEC did not obtain from Kornman despite lawful requests for its production. Indeed, due to suspicions that Kornman had secretly recorded his interview by the SEC investigators, the SEC expressly subpoenaed any recording of the October 29, 2003, interview. Kornman, presumably aware that the tape contained a number of false statements as well as damaging admissions, failed to produce the tape. Instead, it did not surface until the government executed its search warrant for his residence. Kornman's false statements to the SEC, as reflected in the recording, are the bases for count three of the indictment, charging 18 U.S.C. § 1001." [See attached]

By the government's own admission, therefore, the tape of October 29, 2003 was a critical, but missing, piece of evidence, which the government hoped it would find and planned to seize prior to the search. Indeed, the tape is now a key element in the government's indictment. Count Three of the government's superseding indictment (Exhibit F) charges a violation of 18 U.S.C. § 1001 based on alleged false statements made by Gary Kornman on October 29, 2003. Additionally Count Four of the government's superseding indictment (Exhibit F) charges Mr. Kornman with one count of obstruction in violation of 18 U.S.C. § 1519, based on the alleged failure to produce the above-described tape to the SEC when requested to do so pursuant to an administrative subpoena issued by the SEC demanding that tape.

*No* facts were set out in the affidavit establishing probable cause that Gary Kornman had made false statements or obstructed justice under 18 U.S.C. § 1001 or § 1519; neither statute is even mentioned to in the affidavit, though the Reply Brief of January 5, 2005 makes it clear the government had specifically been looking for such evidence to substantiate such charges. (Exhibit G at ¶ 6). In *Coolidge* the Supreme Court reasoned:

Since the police knew of the presence of the automobile and planned all along to seize it, there was no 'exigent circumstance' to justify their failure to obtain a warrant. The application of the basic rule of Fourth Amendment law therefore requires that the fruits of the warrantless seizure be suppressed.

*Coolidge*, 403 U.S. at 473.  Here the same situation arises: the government believed that a tape existed and planned all along to seize it.  It failed, however, to mention any facts or circumstances relating to this tape in their supporting affidavit to the Magistrate.  This failure was deliberate or, at the very least, reckless.

Material omissions are clearly relevant in determining if a *Franks* hearing is necessary. *United States v. Martin*, 615 F.2d 318 (1980).  Here, if the affidavit had included information that the government was looking for the tape in question, that inclusion would have enabled the magistrate to determine if probable cause existed to seize the tape.  As neither the affidavit nor the warrant make any mention of false statement or obstruction charges, it would be entirely unclear on the face of the affidavit what the government needed the tape for, even if they had told the magistrate they were looking for it.  As such, when the material omission (i.e. the fact that the government was looking for the tape) is included, it becomes clear that there is no probable cause to believe there has been the commission of any of the crimes specified in the affidavit, i.e. violations of 18 U.S.C. §§ 1348 and 1349 and 15 U.S.C. § 78j(b), that would justify the seizure of the tape.  In other words, the tape is a classic example of evidence seized during a governmental fishing expedition which is then used to substantiate later criminal charges not raised at the time of the search.  Because of this material omission, a *Franks* hearing is justified, after which this evidence should be suppressed.

**III.    A *Franks* Hearing is Necessary Because The Affiant Deliberately or Recklessly Omits Information about the Biases of the Named Informants.**

Information about possible biases of informants should be included in affidavits in support of search warrants.  The 5th Circuit's analysis of whether a *Franks* hearing is required considers "the totality of the circumstances, including. . .the veracity and the basis of the

knowledge of the informant" and whether "the affidavit contained sufficient indication of the informant's reliability." *United States v. Mays*, 466 F.3d 335, 343-344 (5th Cir. 2006).

The affiant relies extensively on the information provided by Anthony Bird and Chris Seeber, whom he interviewed on July 21, 2004 (Exhibit A ¶¶ 20, 22). Both individuals had a significant bias against Gary Kornman, however. Anthony Bird set up a company in direct competition with Heritage upon leaving Heritage, and was engaged in a bitter lawsuit with Heritage worth several million dollars which was ongoing at the time he spoke to the FBI in July 2004 *See* Exhibit H (Testimony of Anthony Bird). Bird had a significant pecuniary interest in a successful government prosecution of Gary Kornman. *Id.*

The affiant would have, or should have, been well aware of these biases. The SEC was clearly aware of them. The affiant both discussed the case with Senior SEC Attorney John Reding (Exhibit A ¶ 3) and thoroughly reviewed all SEC documents about this case (Exhibit A ¶ 6). The failure to include this information was therefore a deliberate, or at least reckless, omission of a material fact which, when included in the affidavit, significantly affects the probable cause determination.

For all of the reasons stated above, an evidentiary hearing under *Franks v. Delaware* is required. Gary Kornman has made a "substantial preliminary showing" that (1) false statements and the material omissions were made "knowingly and intentionally, or with reckless disregard for the truth," and (2) that the falsehoods and omissions were necessary to a finding of probable cause in this case. *Franks*, 438 U.S. at 155-56.

Special Agent Parker's affidavit was issued in support of both the warrant for the search of Gary Kornman's property, and the warrant for the search of Michael Kornman's property (Exhibit A at ¶¶ 4-5). As such, the same deliberate or reckless falsehoods and omissions were

made to support the search of Michael Kornman's home. For these reasons, the *Franks* hearing should also consider the unlawful searches and seizures from Michael Kornman's home, after which the evidence seized during the searches and its fruits should be suppressed.

## IV.    THE GOVERNMENT'S AFFIDAVIT IS DEFECTIVE IN THAT IT FAILED TO ESTABLISH PROBABLE CAUSE THAT EVIDENCE OF SECURITIES FRAUD WAS LOCATED ON THE PREMISES.

Probable cause must be sufficiently established by an affidavit in support of a search warrant. "In a search warrant case, the magistrate must have probable cause to believe that certain items evidence criminal activity and that those items are presently located in a certain place." *United States v. Namer*, 680 F.2d 1088, 1095 (5th Cir. 1982). The affidavit in support of the warrant authorizing the search of Gary Kornman's home[2] however, suffered from three major deficiencies, which individually as well as in combination, render it insufficient to establish probable cause that evidence of a securities fraud violation would be found on the premises. *First*, the affidavit relied on information allegedly obtained from unsubstantiated anonymous sources. *Second*, the affidavit was based on stale information. *Third*, the affidavit improperly referred to Kornman's assertion of his Fifth Amendment privilege against self-incrimination in a related civil proceeding to secure a finding of probable cause.

### A.    The Affidavit Places Undue Reliance on Unsubstantiated Anonymous Sources.

The affidavit is defective because of its undue reliance on anonymous sources and its failure to establish their credibility. An affiant's mere assertion that a source is "reliable" is insufficient to establish probable cause based on that anonymous source's information. "In determining the sufficiency of an affidavit, the test is whether the affidavit sets forth sufficient

---

[2] The Affidavit was issued in support of both the search of Gary Kornman's home and the search of Michael Kornman's home, as ¶¶ 4-5 of the Affidavit make explicit.

underlying facts and circumstances to the end that the magistrate can make a detached judgment as to the reliability of the various sources of the affiant's information." *United States v. Holmes*, 537 F.2d 227, 235-236 (5th Cir. 1976). The underlying facts and circumstances must establish that the affiant's tip is not based on mere rumor or speculation. *United States v. Garrett*, 495 F.Supp. 159, 163-164 (D.C. Tex. 1980).[3]

Moreover, in situations such as this where an affiant relies on information from a confidential informant that has been offered to the affiant <u>indirectly</u> through a specifically identified source, concerns about the veracity of such information can be cured provided the affidavit sets out a "substantial basis for crediting the hearsay." For example, an assertion that the confidential informant "had in the past given true and accurate information..." *United States v. Satterwhit*e, 980 F.3d 317, 321 (5th Cir. 1992). Such assertions can "sufficiently establish the confidential informant's veracity." *Id.* The facts alleged in an affidavit in support of a search warrant "must be of a weight and reliability that would lead a reasonable person learned in the law to conclude that the law has probably been violated." United States v. Carlson, 236 F.Supp.2d 686, 687-688 (S.D. Tex. 2002). Such a conclusion would be unreasonable <u>without</u> a substantial foundation for the credibility of anonymous sources relied upon in an affidavit.

<u>No</u> such assertions as to the reliability of <u>any</u> of the anonymous informants are presented anywhere in this affidavit. The affidavit here is replete with references to "reliable sources," "reliable informants" and the "Affiant's sources." (Ex. A ¶¶ 9-11, 14-16, 18, 34). Yet nowhere in the affidavit does it explain <u>why</u> such sources should be considered credible. Of further

---

[3] This approach is follow in other Circuits as well. *See e.g. United States v. Hauk*, 412 F.3d 1179, 1188 (10th Cir. 2005): "[i]f anonymous uncorroborated tips were deemed a sufficient basis for a search, malicious informants could use the device of a phony tip to wreak injury (indignity, invasion of privacy, suspicions, and sheer annoyance) on their enemies, rivals, or acquaintances without fear of being held responsible."

concern is the fact that certain references to these unknown persons clearly involve double-hearsay; i.e. hearsay which the affiant himself has not received directly from its source. For example, at paragraph 10 the affiant writes, "[t]his belief is based upon information Mr. Reding learned from reliable informants." (Ex. A ¶ 10). Likewise, at paragraph 16 the affiant states; "According to Affiant's sources and information disclosed to Mr. Reding. . ." (Ex. A ¶ 16). Yet the affiant provides no substantial basis for crediting this double-hearsay.

In summary, mere conclusory statements by the affiant as to the reliability of informants, particularly when these "reliable" individuals have not have spoken directly to the affiant, are inadequate to form a basis for a finding of probable cause sufficient to justify a search: " *Illinois v. Gates*, 462 U.S. 213, 239 (1983). The fact that this affidavit relies on conclusory statements, and fails to establish a substantial factual basis for its claims about the reliability of the information justifying the search, means that probable cause is lacking here. When evaluating the affidavit for probable cause, paragraphs that rely upon unsubstantiated anonymous sources should be stricken. The affidavit lacks a sufficient basis for a finding of probable cause in the absence of those stricken paragraphs. Consequently, evidence obtained during the search, and its fruits, should be suppressed.

### B.    The Affidavit Relies On Stale Allegations.

Probable cause for the search warrant was also lacking because the affidavit was rooted in information that was over three months old, and in some respects, over two years old. The Fifth Circuit has consistently held that the existence of probable cause is determined at the time that the warrant is issued. *United States v. Freeman*, 685 F.2d 942, 951 (5th Cir. 1982)("[p]robable cause must be found to exist at the time the warrant issues.") Because in this case the government relied on stale information, the resulting affidavit was "so lacking in indicia

of probable cause as to render belief in its existence unreasonable." *United States v. Puma*, 937 F.2d 151, 158 (5th Cir. 1991).

"[A] mechanical count of days is of little assistance" in determining whether information in a warrant is stale. *United States v. Hyde*, 574 F.2d 856, 865 (5th Cir. 1978). The passage of time is certainly indicative of staleness, however, when an affidavit in support of a warrant fails to rely on more up-to-date information. "Although probable cause may exist at one point to believe that evidence will be found in a given place, the passage of time may (without additional newer facts confirming the location of the evidence sought) render the original information insufficient to establish probable cause at the later time." *Freeman*, 685 F.2d at 951.

Here, the affiant relied on information that the government received from Chris Seeber, who worked in Heritage's Information Technology department until late April 2004. (Ex. A ¶ 22). The affiant also relied on information that the government received from Anthony Bird, a former vice-president of Heritage who left the company in July 2002. (Ex A. ¶ 20). The warrant, however, was not issued until August 2004 – more than three months after Chris Seeber left the company, and over two years after Anthony Bird left the company. In fact, Mr. Seeber "was last at Gary Kornman's house sometime between April 15 and April 23, 2004." *Id*. ¶ 28. Critically, after Seeber departed Heritage, the company itself filed for bankruptcy. This resulted in the extensive relocation of files, computers and all other electronic devices. Heritage's bankruptcy could have dramatically changed the circumstances of Gary Kornman's operations and the locations of any computers storing business information.

Nor was there any showing of a long-standing and ongoing pattern of criminal activity, which might otherwise mitigate against the sale nature of the information relied upon by the affidavit. *United States v. Craig*, 861 F.2d 818, 822-823 (5th Cir. 1988) In an effort to mask the

staleness of its information, the affidavit speculates that Kornman's business was ongoing, relying on nothing but tissue-thin allegations to back up its claims. These allegations of an ongoing business are based upon nothing more than observations of three parked vehicles and speculation that this indicates a continuing business activity. These observations occurred "[o]n Thursday July 22, 2004 at approximately 3pm." Ex. A ¶ 33. There is no continuous observation of these vehicles mentioned in the affidavit; they might have been observed for only a few moments. Furthermore, the affidavit acknowledges that all three vehicles are registered to either Gary Kornman himself, or "to Vehicle Leasing LLC, a Gary Kornman entity." *Id.* Significantly, the affidavit makes <u>no</u> mention of any observations of people accompanying these observations of vehicles: no one is described entering or leaving the premises at any time.

According to the affidavit, "[b]ased on the number of vehicles parked in front of Gary Kornman's residence, it appears that Gary Kornman is working out of his residence with the select number of employees that have remained with him from Heritage. As such, the computers described by Chris Seeber are still being used by Gary Kornman and his Heritage operation at the residences." *Id*. ¶ 34. To claim that Kornman was continuing to perform the same wealth management consulting services from his home, based on <u>nothing more</u> than brief observations of parked cars registered to Gary Kornman or one of his companies, is rank speculation at best. Moreover <u>nothing</u> in the affidavit indicates that the speculated ongoing business was criminal in nature.

**C.**    **<u>The Affidavit's Reference to Kornman's Assertion of His Fifth Amendment Privilege Taints the Probable Cause Determination.</u>**

In an effort to shore up the government's allegations, the affidavit states that, "[i]n response to a subpoena directing Gary Kornman to provide sworn testimony before the SEC, Gary Kornman asserted his Fifth Amendment rights against self-incrimination." Ex. A ¶ 9. By

slipping in a reference to Kornman's assertion of his Fifth Amendment privilege against self-incrimination in the parallel SEC proceeding, the government no doubt hoped that the magistrate judge reviewing the affidavit for probable cause would make an adverse inference against Kornman. The government's unjustified reference to Kornman's silence strengthens the proposition that there was no probable cause for granting a warrant in this case.

In *Griffin v. California*, 380 U.S. 609 (1965), the Supreme Court held that a prosecutor may not comment on the defendant's failure to testify and a judge is forbidden from instructing a jury that it may draw inferences from such silence, without running afoul of the defendant's Fifth Amendment privilege against self-incrimination. *Id.* at 614. The Court later held that any penalty against a defendant for asserting his Fifth Amendment privilege against self-incrimination violates his constitutional rights. In *Spevack v. Klein*, 385 U.S. 511 (1967), the Court determined that "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make [the defendant] relinquish the privilege." *Id.* at 516. The Court held that "'penalty' is not restricted to fine or imprisonment. It means, as we said in Griffin v. State of California, the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Id.* at 515. Here, the affidavit's reference to Gary Kornman's assertion of his Fifth Amendment privilege in parallel proceedings betrays the government's attempt to use Kornman's assertion of the privilege as evidence of a crime.

Adverse inferences drawn from a suspect's silence are impermissible as evidence against an accused in a criminal case. A parallel may be drawn here with Fourth Amendment protections. Just as a suspect's refusal to consent to a search cannot in and of itself be evidence of his commission of a crime, an accused's refusing to testify against himself cannot be evidence

of the commission of a crime. *United States v. Runyan*, 290 F.3d 223, 249 (5th Cir. 2002), *citing United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir 1978). Using Kornman's assertion of privilege to influence the magistrate's probable cause finding tainted the probable cause determination in violation of Griffin and Spevack. Consequently, the evidence and its fruits should be suppressed.

## V.    THE SEARCH WARRANT WAS A GENERAL WARRANT WHICH FAILED TO SPECIFY WITH REQUISITE PARTICULARITY THE THINGS TO BE SEIZED, IN VIOLATION OF THE FOURTH AMENDMENT.

### A.    The Standard for a Sufficiently Particularized Warrant.

Warrants must state with particularity the targets of the search. This specificity is to "enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. 1981). "[A]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). General warrants, which authorize a "general, exploratory rummaging in a person's belongings," are strictly forbidden by the Fourth Amendment. Coolidge v. New Hampshire, 403 U.S. at 467. The Fifth Circuit has held that the particularity requirement may be satisfied "by reliance on an affidavit when the affidavit is incorporated by reference into the warrant." *Id.* at 561. The Fifth Circuit has also held, however, that "[a]n insufficient warrant cannot be cured by the most detailed affidavit". *United States v. Haydel*, 649 F.2d 1152, 1157 (5th Cir. 1981), *cert. denied,* 455 U.S. 1022 (1982).

### B.    The Warrant in This Case Fails to Meet the Applicable Standard.

The warrant in this case failed to address these requirements. The affidavit in support of the warrant only refers to two isolated incidents of securities fraud; the first allegedly occurring on February 7, 2001, the second allegedly occurring on November 19, 2001. The warrant,

however, broadly authorized the seizure of all of Gary Kornman's documents relating to *any* publicly traded securities.  Specifically, the affiant requested the authority to seize, *inter alia*, "other documents discussing or relating to the use, receipt, or retention of material, nonpublic information concerning any publicly-traded securities or actions based on that information." (Exhibit A, Attachment B ¶ 3) (emphasis added).

That sweeping authorization amounts to a general warrant in three ways: (1) it extended far beyond potential evidence of any allegedly criminal activity for which the government had even attempted to establish probable cause; (2) it failed to list specific categories of documents (and instead targeted documents that are typical of those kept by a hedge fund and an asset-planning firm); and (3) it failed to limit the warrant to any relevant time frame despite the fact that dates relevant to the alleged crimes *were* provided in the supporting affidavit.  Individually and collectively, these shortcomings rendered the warrant impermissibly overbroad on its face. *Cook*, 657 F.2d at 734; *Accord United States v. Leary*, 846 F.2d 592, 602 (10th Cir. 1988). Therefore, all evidence and its fruits obtained pursuant to this overbroad general warrant should be suppressed.  *Coolidge*, 403 U.S. at 473.

The warrant's overbreadth is clear both from what it says *and* from what it does not say. *First*, the warrant authorized the seizure of evidence beyond merely potential evidence of criminal activity, because it targeted all manner of "other documents" that were not relevant to the alleged crimes.  In particular, the affidavit in support of the warrant refers only to two securities in which Gary Kornman is alleged to have made "suspicious stock purchases and sales" (Exhibit A ¶ 8): MiniMed and Hollywood Casino.  The warrant, however, authorized government agents to seize documents relating to any publicly traded security.  Indeed, that is

exactly what the government seized in this case, according to the inventory of items seized during the search.  *See* Exhibit E (Inventory).

**Second**, the warrant is overbroad because it *failed* to provide any guidance as to what categories of "other documents" were to be seized.  Owing to the nature of Gary Kornman's businesses, most, if not all, of his business and financial records fall within the scope of the warrant's broad descriptions.  Requesting the seizure of all "other documents" relating to publicly-traded securities, without further clarification, is simply insufficient to meet the particularity requirements of the Fourth Amendment.  The Fifth Circuit has stated that:

> The use of a generic term or a general description in a warrant, however, is acceptable to the judicial officer issuing the warrant *only* when a more specific description of the things to be seized is unavailable. . .[f]ailure to employ the specificity available will invalidate a general description in a warrant.

*Cook*, 657 F.2d at 733 (emphasis added).

In *Leary*, 846 F.2d at 594, a case directly on point, the Tenth Circuit held a similar warrant to be constitutionally overbroad because "the documents to be seized had to fall within a long list of business records typical of the documents kept by an export company" and "those documents had to relate to 'the purchase, sale and illegal exportation of materials in violation of the' federal export laws," effectively providing no limitations at all.  *Id*. at 600-01.  Just as in *Leary*, the government's description of what documents should fall within the scope of the warrant here was constitutionally overbroad because it authorized the seizure of virtually all of Mr. Kornman's business and financial records.

**Third**, the warrant failed to "limit the scope of the seizure to a time frame within which the suspected criminal activity took place," *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995), even though the affidavit in support of the warrant specified the dates on which Mr. Kornman allegedly met with the MiniMed and Hollywood Casino executives, and the dates on

which the Heritage hedge funds bought and sold MiniMed and Hollywood Casino stock. (Exhibit A ¶¶ 11, 16-19).  *See also Naugle v. Witney*, 755 F. Supp. 1504, 1514 (D. Utah 1990). As the Sixth Circuit held in *Ford*, 184 F.3d at 576, "[f]ailure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad."

In certain extraordinary situations seizure of all the records of a business, relating to all dates the business has been in operation, might be justified.  For example, such seizures of all business records would be appropriate where there is probable cause to believe an entire business was merely a scheme to defraud.  See e.g. *Williams v. Kunze*, 806 F.2d 594, 598 (5th Cir. 1986).  But where, as in this case, probable cause is narrowly tailored to specific, isolated incidents which occurred on specific dates, the warrant may only authorize seizure of evidence pertaining to those specific, isolated incidents.  Put simply, seizure may *not* be "broader than what was justified by the showing of probable cause upon which the warrant was based."  *Id.* at 598-599.

## VI.    THE COMPUTER EVIDENCE SHOULD BE SUPPRESSED BECAUSE THE WARRANT LACKED A SEARCH PROTOCOL.

The warrant's broad authorization for the search and seizure of "any and all" of Mr. Kornman's home computers and computer equipment, without any protocol or strategy for searching the computers and storage devices and for ensuring that only files and documents relevant to the investigation would be targeted to be searched, fails to meet the minimum requirements of the Fourth Amendment.  Without any limiting language in the warrant, the authorization to carry out the search gave the government "a license to roam through everything in the computer[s] without limitation and without standards."  *In the Matter of: 3817 W. West End, First Floor, Chicago, Illinois 60621*, 321 F. Supp. 2d 953, 962 (N.D. Ill. 2004).  The government in this case requested the search and seizure of virtually all electronic media located

on the property (Exhibit B, Attachment B, ¶ 2). The government's searches included dozens of computers, hundreds of hard drives and media storage devices, personal digital assistants, and numerous microcassettes, tapes, floppy disks, CDs, and DVDs, and documents (*see* Exhibits B and E.) These seizures went far beyond the scope of the criminal activity alleged in the supporting affidavit. Because the warrant lacked a search protocol, the search violated the Fourth Amendment. Accordingly, the court should suppress all of the evidence and its fruits gathered from the computers and computer equipment.

The isolated incidents of alleged fraud specific in the affidavit cannot establish probable cause to search *all* of Gary Kornman's computer files. *See In the Matter of Search of 3817 W. West End*, 321 F. Supp. 2d at 958. The broad language of the warrant does not establish *any* limits for searching Gary Kornman's computers and computer equipment. See e.g. Exhibit A ¶¶ 21-27, 31, 32. Instead, the sections of the warrant based on this part of the affidavit amounts to "a catch-all paragraph, which lacks sufficient limitation." *Hunter*, 13 F. Supp. 2d at 584. Nowhere does the affidavit describe how the computers would be searched and evidence would be extracted.[4] Despite a generic assurance that "unrelated data will not be used and will be separated, to the extent possible, from the evidentiary data and preserved" (Exhibit A ¶ 37) neither the affidavit nor the resulting warrant specify how searching agents would attempt to distinguish innocuous documents from actual evidence of the alleged offenses; for example through the use keyword searches or date ranges. See e.g. In the Matter of Search of 3817 W. West End, 321 F. Supp. 2d at 960. Such absolute silence flouts the DOJ's *own recommended protocol*. DOJ MANUAL at 69.

---

[4] *See* Ex. A ¶¶ 20-45, which are related to the search and seizure of Kornman's computers.

Mr. Kornman's computers undoubtedly contained a plethora of materials wholly irrelevant to this case. Not only did his computers contain strictly personal information, but Mr. Kornman also had business interests wholly unrelated to this case (Exhibit A. ¶ 9). Given the specificity of the government's allegations regarding Gary Kornman's dealings with the MiniMed and Hollywood Casino executives, including a search protocol in the warrant *would not* have been onerous. As the Fifth Circuit has noted, "technology exists by which relevant communications can be located without the necessity of reviewing the entire contents of all of the stored communications." *Steve Jackson Games, Inc. v. U.S. Secret Service*, 36 F.3d 457, 463 (5th Cir. 1994). In *United States v. Falon*, 959 F.2d 1143, 1148 (1st Cir. 1992) the court held that without "extraordinary proof to demonstrate that an individual's life is consumed by fraud and that all records found in the home were subject to seizure," the items that may be seized "must be sufficiently linked to the alleged criminal activity so as to distinguish them from innocent, personal materials").

Here, no such linkage has been established by the government. Accordingly, the computer evidence should be suppressed.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant Gary Kornman requests that the Court hold a *Franks* hearing. After the *Franks* hearing and again for the foregoing reasons, Gary Kornman asks this Court to strike the defective paragraphs in the affidavit and add the omitted material information to the affidavit, after which the Court can determine whether the affidavit lacks the probable cause necessary to support the seizure of any evidence or its fruits obtained during the government's searches of Kornmans' homes on August 3, 2004.

Dated:    February 9, 2007.

Respectfully submitted,

/s/ Jeffrey M. Tillotson

Dan K. Webb
(Admitted *Pro Hac Vice*)
Winston & Strawn, L.L.P.
35 West Wacker Dr.
Chicago, Illinois 60601-9703
Telephone: (312) 558-5856
Fax: (312) 558-5700
Email: dwebb@winston.com

Jeffrey M. Tillotson
State Bar No. 20039200
Lynn, Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839
Email: jmt@lynnllp.com

Michael P. Gibson
Texas Bar Card No. 07871500
Burleson, Pate & Gibson, L.L.P.
2414 N. Akard, Suite 700
Dallas, Texas 75201
Telephone: (214) 871-4900
Fax: (214) 871-7543
Email: mgibson@bp-g.com

**ATTORNEYS FOR DEFENDANT
GARY M. KORNMAN**

## <u>CERTIFICATE OF CONFERENCE</u>

This is to certify that on the 9th day of February, 2007, undersigned counsel conferred with Jeffrey Ansley, Esq., and is authorized to state the Government will respond in writing to this motion pursuant to the Court's order.

/s/ Michael P. Gibson
MICHAEL P. GIBSON

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record, as identified below, on this the 9th day of February, 2006:

> ***Via ECF***
> Jeffrey J. Ansley
> Assistant United States Attorney
> 1100 Commerce Street, Suite 300
> Dallas, Texas 75242
> Telephone: (214) 659-8600
> Fax: (214) 767-4100

/s/  Jeffrey M. Tillotson
Jeffrey M. Tillotson

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | **Criminal Action No.** |
| | § | |
| **v.** | § | **3:05-CR-0298P** |
| | § | |
| **GARY M. KORNMAN,** | § | **ORAL ARGUMENT REQUESTED** |
| | § | |
| **Defendant.** | § | |

---

**MOTION TO DISMISS COUNTS I AND II (ON THE ISSUE OF "DUTY")**
**AND MEMORANDUM IN SUPPORT**

---

Dan K. Webb
(Admitted *Pro Hac Vice*)
Winston & Strawn, L.L.P.
35 West Wacker Dr.
Chicago, Illinois 60601-9703
Telephone: (312) 558-5856
Fax: (312) 558-5700
Email: dwebb@winston.com

Jeffrey M. Tillotson
State Bar No. 20039200
Lynn, Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839
Email: jmt@lynnllp.com

Michael P. Gibson
Texas Bar Card No. 07871500
Burleson, Pate & Gibson, L.L.P.
2414 N. Akard, Suite 700
Dallas, Texas 75201
Telephone: (214) 871-4900
Fax: (214) 871-7543
Email: mgibson@bp-g.com

**ATTORNEYS FOR DEFENDANT**
**GARY M. KORNMAN**

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

**I.** INTRODUCTION...........................................................................................................1

**II.** BACKGROUND FACTS ALLEGED IN THE INDICTMENT ...............................1

**III.** THE LAW OF INSIDER TRADING ......................................................................2

**IV.** JUDGE LINDSAY'S RULING ...............................................................................4

**V.** *MENS REA* REQUIRED IN A CRIMINAL CASE..................................................4

**VI.** MOTION TO DISMISS ...........................................................................................6

    **A.**     Duty Allegations .......................................................................................6

    **B.**     The Significance of the *Chestman*, *Kim* and *Cassese* Cases ...................8

**Exhibit B**

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Dirks v. SEC*, 463 U.S. 646 (1983) ............................................................................................. 3

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976)........................................................................ 6

*Morrisette v. United States*, 342 U.S. 246 (1952).......................................................................... 5

*Ratzlaf v. United States*, 510 U.S. 135 (1994) ............................................................................... 5

*SEC v. Mayhew*, 916 F.Supp. 123 (D.Conn. 1995) ...................................................................... 10

*Staples v. United States*, 511 U.S. 600 (1994)............................................................................... 5

*United States v. Cassese*, 273 F.Supp.2d 481 (S.D.N.Y. 2003) ............................................... 9, 10

*United States v. Chestman*, 947 F.2d 551 (2nd Cir. 1991) ......................................................... 8, 9

*United States v. Garrett*, 984 F.2d 1402 (5th Cir. 1993) ................................................................ 5

*United States v. Kim*, 184 F.Supp.2d 1006 (N.D. Cal. 2002) ............................................... 8, 9, 10

*United States v. O'Hagan*, 521 U.S. 642 (1997) ..................................................................... 3, 4, 6

**Statutes**

15 U.S.C. § 78(j)(b) (1934)............................................................................................................ 2

17 CFR § 240.10b-5 (1996) ........................................................................................................... 3

**Exhibit B**

COMES NOW Defendant GARY M. KORNMAN ("Gary Kornman" or "Mr. Kornman") and files this, his Motion To Dismiss Counts I And II on the Issue of "Duty":

## I.
## INTRODUCTION

Defendant Gary M. Kornman has been charged with two counts of insider trading, one count of making false statements to the SEC and one count of obstruction of justice. The two counts of insider trading are premised upon the misappropriation theory of insider trading. This theory requires proof of a duty of trust and confidence between Mr. Kornman and the alleged sources of inside information. The indictment fails to allege or specifically identify the basis of duty of trust and confidence breached and, as a result, counts I and II should be dismissed.

## II.
## BACKGROUND FACTS ALLEGED IN THE INDICTMENT

On November 16, 2005, a grand jury indicted Gary Kornman on two counts of securities fraud arising from his alleged trading by purchasing and selling stock in MiniMed, Inc. and Hollywood Casino, Corp. on the basis of material, nonpublic information. The government also charged Mr. Kornman with making false statements to the SEC and obstruction of justice.[1]

MiniMed Inc. ("MiniMed") was a NASDAQ listed medical equipment company. A Heritage telemarketer originally approached the founder and chief executive officer of MiniMed, Alfred Mann, by making a telephone "cold call." Between October 2000 and June 2001, Heritage personnel had telephone conferences, and, on two occasions met with Mann. The purpose of those meetings was *to solicit* the executive to have Heritage to provide certain services to him. An agreement between Heritage and the executive was never reached. According to the allegations contained in the indictment, at a meeting at which Mr. Kornman

---

[1]The most recent superseding indictment was filed December 20, 2006. The superseding indictment does not change the counts with which Mr. Kornman is charged.

was present on February 7, 2001, the MiniMed executive informed Mr. Kornman of its potential acquisition by "a Fortune 100 company." The indictment alleges that, on February 9, 2001, Heritage Partners Fund purchased 6,600 shares of MiniMed stock, at a cost of $250,050.06. On August 31, 2001, after agreement of Medtronic to purchase MiniMed had been announced, Heritage Partners Fund sold its MiniMed shares realizing a $66,749.94 profit.

Hollywood Casino Corporation ("Hollywood") was a publicly traded company that developed and owned casino entertainment facilities. On November 19, 2001, following another "cold call" from a Heritage employee, Mr. Kornman met with a former chief executive officer, founder, board member and major shareholder of Hollywood, Jack Pratt, to discuss the possible retention of Heritage to provide certain services to him. No agreement was ever reached to provide those services. The indictment alleges that, at this meeting Mr. Kornman was informed that Hollywood would "definitely be sold in the very near future, probably during the late summer or early fall of 2002." Between November 26, 2001 and June 27, 2002, Heritage Opportunities Fund acquired 29,900 shares of Hollywood at an average price of $9.39 per share. On August 13, 2002, after Hollywood's acquisition by Penn National Gaming, Inc. ("PNG") was announced, the fund sold all of its Hollywood shares for a profit of approximately $75,000.

### III.
### THE LAW OF INSIDER TRADING

An allegation of securities fraud by means of insider trading is premised upon § 10(b) of the Securities Exchange Act. This provision provides that the use of any "manipulative or deceptive device" in connection with the purchase or sale of any security in contravention of [rules and regulations of the Securities and Exchange Commission] shall be unlawful. 15 U.S.C. § 78(j)(b) (1934) (amended 2000). Pursuant to its § 10(b) rulemaking authority, the SEC has adopted Rule 10b-5, which in relevant part, provides, "It shall be unlawful . . .to employ any

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT**      **PAGE 2**
01654-505/ C:\Documents and Settings\bwonnacott\Desktop\ECF\Kornman\FINALS\Motion to Dismiss-Counts 1 and 2\Motion To Dismiss On Issue Of Duty or, In The Alternative, Motion For A Bill Of Particulars And Memorandum In Support.DOC

**Exhibit B**

device, scheme, or artifice to defraud, [or] to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with purchase or sale of any security.  17 CFR § 240.10b-5 (1996).

Two general theories of insider trading liability exist under § 10(b) of the Exchange Act and Rule 10b-5.  One theory is the "classical theory" of insider trading.  This refers to a situation when a corporate insider trades in the securities of his or her cooperation on the basis of material, nonpublic information.  This theory applies to officers, directors, and other permanent insiders of a corporation, as well as to attorneys, accountants, consultants and others who temporarily become fiduciaries of the corporation.  *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).  Moreover, outsiders may also be liable under this theory when they trade on the basis of a "tip" given to them by a corporate insider.  *Dirks v. SEC*, 463 U.S. 646, 655 (1983).

The other general theory is the misappropriation theory.  Under this theory, "a person commits fraud "in connection with" a securities transaction . . . when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."  *O'Hagan,* 521 U.S. at 652.

The distinction between the two theories may not be readily apparent upon first consideration.  The classical theory targets a "corporate insider's breach of duty to shareholders with whom the insider transacts.]  The misappropriation theory outlaws trading on the basis of nonpublic information by a corporate 'outsider' in breach of a duty owed not to a trading party, but to the source of the information." *Id.*

In this case, the government is alleging that Mr. Kornman violated his duty of confidentiality to them when he allegedly made trades on the basis of confidential non-public information provided in the course of soliciting business.  In this case, the government's liability

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT** **PAGE 3**
01654-505/ C:\Documents and Settings\bwonnacott\Desktop\ECF\Kornman\FINALS\Motion to Dismiss-Counts 1 and 2\Motion To Dismiss On Issue Of Duty  or, In The Alternative, Motion For A Bill Of Particulars And Memorandum In Support.DOC

**Exhibit B**

is premised on the theory of misappropriation theory of liability for insider trading. In order for liability to exist under this theory, the government must show more than Mr. Kornman made trades based on material nonpublic information.[2] The government must show that Mr. Kornman had a duty of trust and confidence with the two executives who allegedly provided him the insider information.

## IV.
## JUDGE LINDSAY'S RULING

Judge Lindsay addressed the government's theory of wrongdoing in this case at length in the companion civil case of *Securities and Exchange Commission v. Kornman*, Civil Action No. 3:04CV1803-L. In his 30-page memorandum opinion (underline attached hereto as Attachment A), after grappling with and ultimately denying Mr. Kornman's motion to dismiss the complaint for failing to state a cause of action, Judge Lindsay described this as an "*extremely close case.*" *Id.,* at 13 (emphasis added).[3] This Court should take note when one of its brethren, in ruling on a motion to dismiss a civil complaint on the basis that it is premised on an inadequate legal theory, considers the issue "extremely close." Significantly, the government, apparently relying on that exact same legal theory, dismissed the civil case and decided to pursue a criminal indictment that actually lacks much of the detail contained in the civil complaint that barely survived a motion to dismiss.

## V.
## *MENS REA* REQUIRED IN A CRIMINAL CASE

Unlike in a civil insider trading case, in a criminal case the government must prove that the defendant acted willfully and with knowledge that his conduct was unlawful in order to

---

[2]There is "no general duty between all participants in market transaction to forgo actions based on material nonpublic information." *O'Hagan*, 521 U.S. at 663,

[3]"*See also* Attachment A at 24 ("[I]n close cases, the better practice is to let the complaint stand and consider the adequacy of proof at the summary judgment stage." )

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT**                    **PAGE 4**
01654-505/ C:\Documents and Settings\bwonnacott\Desktop\ECF\Kornman\FINALS\Motion to Dismiss-Counts 1 and 2\Motion To Dismiss On Issue Of Duty or, In The Alternative, Motion For A Bill Of Particulars And Memorandum In Support.DOC

**Exhibit B**

establish a willful violation of a statute.  *See Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).

*Accord Staples v. United States*, 511 U.S. 600 (1994).  "The requirement of *mens rea* as

predicate to criminal liability is a fundamental precept of the Anglo-American common law."

*United States v. Garrett*, 984 F.2d 1402, 1410 (5th Cir. 1993) (citing *Morrisette v. United States*,

342 U.S. 246, 250 (1952)).[4]

Specifically, in *Ratzlaf* (a case involving charges of fraudulent financial structuring), the

Supreme Court found that if the government seeks to establish a person's willful violation of the

antistructuring law, it cannot do so simply by showing that the defendant structured financial

transactions to circumvent a bank's reporting requirement.  It pointedly rejected the

government's argument that a defendant's engaging in structuring was in and of itself nefarious

and sufficient to impose criminal liability without the need to prove specific knowledge that the

evasion was unlawful.  As the Court stated:

> We hold that the 'willfulness' requirement mandates something more.  To establish that a defendant 'willfully violat[ed]' [sic] the antistructuring law, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.

*Ratzlaf*, 510 U.S. at 136-37.

The element of *scienter* plays an essential role in criminal securities fraud cases.  The

Supreme Court has defined *scienter* within the context of securities fraud cases as "a mental state

embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder,* 425 U.S.

185, 193-94 (1976).  More recently, in *United States v. O'Hagan*, 521 U.S. 642 (1997) the

---

[4]In *Morrisette v. United States*, 342 U.S. 246, 250 (1952), the Supreme Court eloquently stated the purpose of the *mens rea* requirement:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion.  It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT                    PAGE 5**
01654-505/ C:\Documents and Settings\bwonnacott\Desktop\ECF\Kornman\FINALS\Motion to Dismiss-Counts 1 and 2\Motion To Dismiss On Issue Of Duty  or, In The Alternative, Motion For A Bill Of Particulars Memorandum In Support.DOC

**Exhibit B**

Supreme Court further emphasized that proof of "willfulness" is necessary to sustain a *criminal* securities fraud conviction:

> Vital to our decision that criminal liability may be sustained under the misappropriation theory, we emphasize, are two sturdy safeguards Congress has provided regarding *scienter*.  To establish a criminal violation of Rule 10b-5, the Government must prove that a person "willfully" violated the provision. . .Furthermore, a defendant may not be imprisoned for violating Rule 10b-5 if he proves that he had no knowledge of the Rule.

*Id*. at 665-66.  In short, where there is activity that is not itself nefarious, (such as the conduct underlying any securities fraud case), the government must prove that the defendant acted with the intent to violate the law.

In the present case, the *scienter* issue takes on paramount importance due to the ambiguity concerning the "duty" issue. The government's bald assertions that Mr. Kornman "knowingly and willfully" employed unspecified manipulative and deceptive devices to defraud and deceive, or that he "knew well" that the prospective customers shared confidences, provide no help in understanding what the government intends to prove how Mr. Kornman knew that he allegedly owed a duty of confidence and trust to two prospective customers.

## VI.
## MOTION TO DISMISS

Because the government's general theory of insider trading liability in this case is premised upon the misappropriation theory, in order for the government to allege an offense it must allege and identify that Mr. Kornman owed a duty to the executives from whom he allegedly received material non-public information leading to the trades at issue.

### A.    Duty Allegations

With respect to the MiniMed executive, the government states the following in the indictment:

---

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT                     PAGE 6**

**Exhibit B**

On or about October 12, 2000, Kornman caused a person known to the Grand Jury, who was a Heritage representative located in Dallas, Texas, to speak by telephone with a MiniMed senior executive (the MiniMed executive) located in Sylmar, California regarding Heritage's estate planning and capital gains tax services.  During the call, the MiniMed executive provided information to the Heritage representative regarding his estate planning, charitable donations, capital gains matters, personal tax matters, and future plans for his private and public companies, including MiniMed. . . [A] senior Heritage representative, had a series of meetings with the MiniMed executive in California to present Heritages' estate planning and capital gains tax services to the executive.  As Kornman well knew, the MiniMed executive shared numerous confidences with Kornman, whom the MiniMed executive understood to be a licensed attorney, and the other Heritage representative during the course of the meetings, including but not limited to, detailed information regarding the MiniMed executive's personal financial condition; his ownership interests in numerous public and private companies, including MiniMed; his business plans and financing arrangements for those public and private companies, including MiniMed; his anticipated income and taxes resulting from his business operations and interests; information regarding taxes the MiniMed executive paid in the proceeding year and his future tax strategy; and other detailed personal and family information.

With respect to the Hollywood executive, the government states the following in the indictment:

On or about March 23, 2001 and on or about November 19, 2001, the exact dates being unknown to the Grand Jury, Kornman and a person known to the Grand Jury, who was a senior Heritage representative, had a series of meetings with Hollywood Casino executive in Dallas, Texas to present Heritage's estate planning and capital gains tax services to the executive.  As Kornman well knew, the Hollywood Casino executive shared numerous confidences with Kornman, whom the Hollywood Casino executive understood to be licensed attorney, and the other Heritage representative during the course of the meetings.  The confidences disclosed by the Hollywood Casino executive to Kornman and other Heritage representative included, but were not limited to details regarding estate and tax planning matters; the Hollywood Casino executive's personal ownership interest in Hollywood Casino, his plans to hire an investment banker and to sell Hollywood Casino; the nature of the expected transaction his expected forthcoming capital gains arising from the acquisition of Hollywood Casino by another company; and other personal and family matters.

Although with respect to both executives, the indictment is, admittedly, rich in detail concerning the nature of the information they shared with Mr. Kornman or one of his employees, nowhere does the indictment specify what duty Mr. Kornman owed to either executive.  This

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT**           **PAGE 7**
01654-505/ C:\Documents and Settings\bwonnacott\Desktop\ECF\Kornman\FINALS\Motion to Dismiss-Counts 1 and 2\Motion To Dismiss On Issue Of Duty  or, In The Alternative, Motion For A Bill Of Particulars And Memorandum In Support.DOC

**Exhibit B**

Court and Mr. Kornman are left to speculate that the government bases its misappropriation theory on the belief that Mr. Kornman was acting either as an attorney, stock-broker, or as a financial planner for the executives or some other unidentifiable theory.[5]

**B.    The Significance of the *Chestman*, *Kim* and *Cassese* Cases**

The Second Circuit in *United States v. Chestman*, 947 F.2d 551, 566 (2nd Cir. 1991) (en banc) *cert. denied*, 503 U.S. 1004 (1992), articulated the precise contours of a fiduciary relationship necessary to establish a claim of insider trading under the misappropriation theory.[6] Noting that some relationships, such as an attorney and client, or agent and principal are inherently fiduciary, the court held that liability under the misappropriation theory also exists when there is a "similar relationship of trust and confidence," which the court defined as the functional equivalent of a fiduciary relationship. *Id*. at 568. The court stated, "At the heart of the fiduciary relationship lies reliance, and de facto control and dominance. The relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Id*. at 569 (internal quotations and citations omitted).

In *Chestman*, a wife told her husband about a pending offer for her family's company and told him that the information was confidential. Because the wife's communication of the information to her husband served no business purpose, and there was no evidence that the husband had assented to a duty of trust with respect to the information, the court found the

---

[5]Notably, Judge Lindsay in his memorandum opinion denying Mr. Kornman's motion to dismiss the civil complaint held, "The SEC's reliance on the attorney-client privilege as a source of fiduciary duty herein is unsupported by the allegations in the complaint." *See* Attachment A at 13, n. 3. Undeterred, the SEC made repeated references to the fact that Mr. Kornman is an attorney in the indictment without in any way indicating whether it is alleging Mr. Kornman was acting in his capacity as an attorney when he met with the executives of MiniMed and Hollywood. This allegation is particularly confusing because the government does not appear to ever contend that Mr. Kornman was ever Mr. Mann's lawyer.

[6]*Chestman*, was superseded by regulation on other grounds as noted by *United States v. Kim*, 184 F.Supp.2d 1006, 1014 (N.D. Cal. 2002).

---

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION
FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT                    PAGE 8**

**Exhibit B**

evidence insufficient to sustain a verdict on the basis of the misappropriation theory of insider trading. *Id.* at 570-71.

In determining whether a fiduciary like relationship exists in a given relationship for the purpose of determining insider trading liability under the misappropriation theory, one court stated the reviewing court should look for a 1) disparate knowledge and expertise, 2) a persuasive need to share confidential information, and 3) a legal duty to render competent aid. *United States v. Kim*, 184 F.Supp.2d 1006, 1011 (N.D. Cal. 2002). Applying this analysis, the court in *Kim* rejected the contention that a fiduciary relationship existed between two chief executive officers who shared confidences as members of the Young Presidents Organization, a social and professional networking group. *Id.* at 1008. In that case, a member of the organization sent word that he would not be attending a retreat because his company was involved in merger negotiations. The defendant in *Kim* then traded in that company's stock for personal profit. *Id.* The court, on the defendant's pretrial motions, dismissed count two of the indictment holding that the defendant could not be charged with insider trading under the misappropriation theory because there was no "influence of a superior or dominating nature," but only the influence that "one peer might exert on another." *Id.* at 1011.

Even more pertinent to the analysis of this case is *United States v. Cassese*, 273 F.Supp.2d 481 (S.D.N.Y. 2003). In *Cassese*, the chief executive officer of one company met with a senior manager of a competitor to discuss the potential acquisition of his company by the competitor. Ultimately, the competitor decided to acquire another, third party business. The chief executive officer of the competitor called the defendant and informed him of the decision to acquire the other business. Armed with this information, the defendant purchased stock in the third-party business and eventually realized a profit of over $150,000. *Id.* 483-84. The district

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT**    **PAGE 9**
01654-505/ C:\Documents and Settings\bwonnacott\Desktop\ECF\Kornman\FINALS\Motion to Dismiss-Counts 1 and 2\Motion To Dismiss On Issue Of Duty or, In The Alternative, Motion For A Bill Of Particulars and Memorandum In Support.DOC

**Exhibit B**

court dismissed the government's security fraud count concluding that failed to allege facts sufficient to show that the defendant owed a duty to the executives of the competitor business. *Id*. at 488.  The court determined that the defendant and the competitor executives were not fiduciaries but potential arms-length business partners. *Id.* at 485-88.  *See also SEC v. Mayhew*, 916 F.Supp. 123 (D.Conn. 1995) (The prospective nature of the parties relationship one of several factors considered by the court in reaching the conclusion that the SEC had failed to submit enough proof of a fiduciary like relationship to sustain liability under the misappropriation theory of liability for insider trading.)

In all of the above-mentioned cases the information at issue was "confidential."  As the foregoing case law makes clear, however, the fact that the information may be confidential is insufficient to sustain liability under the misappropriation theory unless there also exists a duty of trust and confidence between the defendant and the individual that related the confidential information.

Therefore, given the fact that the government has failed to adequately allege a duty of trust and confidence that Mr. Kornman owed to MiniMed and/or Hollywood Casinos, this Court should follow the lead of the Court in *Kim* and *Casssese* and dismiss Counts 1 and 2 of the indictment.  This is appropriate since the government's allegations barely survived a motion to dismiss under a much more relaxed civil standard before Judge Lindsay.

**Exhibit B**

Dated: February 9, 2007.

Respectfully submitted,


/s/ Jeffrey M. Tillotson

Dan K. Webb
(Admitted *Pro Hac Vice*)
Winston & Strawn, L.L.P.
35 West Wacker Dr.
Chicago, Illinois 60601-9703
Telephone: (312) 558-5856
Fax: (312) 558-5700
Email:  dwebb@winston.com

Jeffrey M. Tillotson
State Bar No. 20039200
Lynn, Tillotson & Pinker, L.L.P.
750 N. St. Paul Street, Suite 1400
Dallas, Texas 75201
Telephone: (214) 981-3800
Fax: (214) 981-3839
Email:  jmt@lynnllp.com

Michael P. Gibson
Texas Bar Card No. 07871500
Burleson, Pate & Gibson, L.L.P.
2414 N. Akard, Suite 700
Dallas, Texas 75201
Telephone:  (214) 871-4900
Fax:  (214) 871-7543
Email:  mgibson@bp-g.com

**ATTORNEYS FOR DEFENDANT
GARY M. KORNMAN**

**MOTION TO DISMISS ON ISSUE OF "DUTY" OR, IN THE ALTERNATIVE, MOTION
FOR A BILL OF PARTICULARS AND MEMORANDUM IN SUPPORT**          **PAGE 11**
01654-505/ C:\Documents and Settings\bwonnacott\Desktop\ECF\Kornman\FINALS\Motion to Dismiss-Counts 1 and 2\Motion To Dismiss On
Issue Of  Duty  or, In The Alternative, Motion For A Bill Of Particulars And Memorandum In Support.DOC

**Exhibit B**

## <u>CERTIFICATE OF CONFERENCE</u>

      This is to certify that on the 9th day of February, 2007, undersigned counsel conferred with Jeffrey Ansley, Esq., and is authorized to state the Government will respond in writing to this motion pursuant to the Court's order.


           /s/ Michael P. Gibson               
           MICHAEL P. GIBSON


## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record, as identified below, on this the 9th day of February, 2006:

      ***<u>Via ECF</u>***
      Jeffrey J. Ansley
      Assistant United States Attorney
      1100 Commerce Street, Suite 300
      Dallas, Texas 75242
      Telephone: (214) 659-8600
      Fax: (214) 767-4100


           /s/ Jeffrey M. Tillotson             
                Jeffrey M. Tillotson

**Exhibit B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ROBBINS, RUSSELL, ENGLERT** | : | |
| **ORSECK & UNTEREINER LLP,** | : | |
| | : | **Civil Action No.** |
| **Plaintiff,** | : | **1:07-cv-00554-JR/JMF** |
| | : | |
| **v.** | : | |
| | : | |
| **GARY KORNMAN,** | : | |
| | : | |
| **Defendant.** | : | |

---

**PLAINTIFFS' STATEMENT OF GENUINE ISSUES IN RESPONSE TO DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to LcvR 7(h) and 56.1, Plaintiff/Counterclaim Defendant Robbins, Russell, Englert,

Orseck, Untereiner & Sauber LLP ("Robbins Russell") files this Statement of Genuine Issues in

Response to Defendant Gary M. Kornman's Cross-Motion for Summary Judgment filed on

October 8, 2007. Although, as the Local Rules require, this submission is styled as a Statement of

Genuine Issues, in fact there are no issues on which Kornman could prevail at a trial of this matter.

**STATEMENT OF ISSUES THAT PRECLUDE SUMMARY JUDGMENT IN
KORNMAN'S FAVOR[1]**

**Issue 1:** The scope of the contract for legal services between Robbins Russell and Kornman

was repeatedly modified and expanded at Kornman's request. Consequently, all of the legal services

that Robbins Russell ever performed on Kornman's behalf fell within that contract for legal services

---

[1] This Statement hereby incorporates by reference Plaintiff's Statement of Material Fact as To
Which there is No Genuine Issue, filed on September 24, 2007, in support of Robbins Russell's
Account Stated motion.

(as modified) because they were all authorized either by Kornman or by his agent, Jeffrey Tillotson. See, *e.g.*, Robbins Decl. ¶¶ 4, 12 and Exhs. B-1 to B-7 and E-8; Orseck Exhs. A to G.

**Issue 2:** Even if Kornman (by himself and through Tillotson) had not expressly authorized Kornman's work (he did), Kornman impliedly authorized it by receiving Robbins Russell's bills and requesting more work without any objection. See, *e.g.*, Robbins Decl. ¶¶ 4-24 and Exhs. B-1 to B-7, C, D, and E-1 to E-8; Orseck Exhs. A to H.

**Issue 3:** Robbins Russell fully performed under the contract and kept Kornman informed of the legal services it was providing. See Robbins Exhs. C, J; Orseck Exhs. A to G. That Robbins Russell called its work product "drafts" does not mean that the work product was not worth what Robbins Russell charged for it. Indeed, neither Kornman nor Tillotson (on Kornman's behalf) ever communicated to Robbins Russell any disapproval of Robbins Russell's work until Kornman called the work "subpar" when, on October 24, 2006, he was informed that he would receive no more of that work unless he paid his bills. See, *e.g.*, Robbins Decl. ¶¶ 4-24 and Exhs. Exh. E-3, E-4, Exh. E-5, Exh. E-7, and E-8.

**Issue 4:** Robbins Russell's services were valuable, were accepted and enjoyed by Kornman, and provided him a benefit. See Robbins Exhs. C, J; Orseck Exhs. A to G; see also *United States v. Kornman*, No. 3:05-CR-0298P (N.D. Tex.), Dkt. 75, 79.

**Issue 5:** Robbins Russell made all of its work product available to Kornman or Tillotson. See Robbins Exh. E-5, J; Orseck Exhs. A to G.

**Issue 6:** Robbins Russell and Kornman established a debtor-creditor relationship at hourly rates that were acceptable to Kornman. For example, Kornman paid in full Robbins Russell's first

twelve monthly invoices, dated November 1, 2004 through February 2, 2006. Robbins Exhs. C and D.

**Issue 7:** Kornman's February 2006 check was not an "escrow" payment; rather it was a payment on Kornman's then-outstanding balance for work in the civil and criminal case. See Robbins Exh. C at 46-50; see also Orseck Exh. H; Robbins Exh. C at 51, 55.

**Issue 8:** Kornman failed to pay $149,021.29, which includes unpaid work in both the civil and criminal cases. See Robbins Exhs. C and D.

**Issue 9:** Following Kornman's February 2006 payment, Robbins Russell sent numerous invoices and demands for payment to Kornman. For over eight months, Kornman neither paid nor responded to those invoices and payment demands. See Robbins Decl. ¶¶ 4-24 and Exhs. C, F, H, J, K, and L.

**Issue 10:** Kornman (and Tilltoson, on Kornman's behalf) continued to request more work from Robbins Russell months after he stopped paying. See, e.g., Robbins Exhs. E-2, E-5, and E-6. Kornman never sought to terminate the attorney-client relationship. See generally Robbins Decl. and Exh. C.

**Issue 11:** Kornman did not dispute the invoices. In fact, neither Kornman nor Tillotson ever expressed to Robbins Russell any dissatisfaction with the extent of completion of any Robbins Russell's work product, or with any other aspect of Robbins Russell's work product. See generally Robbins Decl. ¶¶ 4-24 and Exh. E-2. To the contrary, the communications Robbins Russell received were laudatory. See Robbins Exhs. E-3, E-4, E-5, E-7, E-8.

**Issue 12:** The billing arrangement described in the engagement letter covered all of the legal services that Robbins Russell provided Kornman, with the sole exception that total hourly fees for

-3-

a motion to dismiss the criminal indictment were capped by a fixed-fee agreement. See Robbins Decl. ¶¶ 1, 4-10 and Exh. A (engagement letter). Indeed, Kornman himself paid for work in both the civil and criminal matters that was invoiced according to the engagement letter but not specifically described in the engagement letter. See, *e.g.*, Robbins Exh. C. at 16-17, 23, 26, 46-50; see also Robbins Exh. D.

**Issue 13:** No "completed work" condition was placed on any fee arrangement between Robbins Russell and Kornman. See Pollack Cert. Exhs. C, D, E, and G; Orseck Exh. H; Robbins Exh. C. Indeed, Robbins Russell never even *discussed* with Kornman in any communication before October 24, 2006, a "completed work" condition on payment. See Robbins Decl. ¶¶ 4-24 and Exhs. A to L. Kornman sought to impose such a condition for the first time on October 24, 2006, after ignoring bills for eight months, and only after first saying that he would pay his outstanding bills. Robbins Decl. ¶ 18 and Exh. C; see also Robbins Exhs. F, H, J, K, and L (other demands for payment that never provoked Kornman to say that he must deem work complete before payment is due). Even on October 24, Kornman merely insisted on more work; he did not say that payment was not *due* unless he received it.  Robbins Decl. ¶ 18.

## RESPONSE TO DEFENDANT'S COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS

**Kornman's Purported Undisputed Material Fact No. 1:**  By its express terms, the only written "engagement letter" between the parties covered work done on a civil matter brought by the SEC against Mr. Kornman.  *See* Kornman Cert. ¶ 2.

**Response:**  Disputed. Nothing in the "express terms" of the engagement letter holds that the billing arrangement it defines was limited to particular legal services that Robbins Russell might

provide to Kornman. In fact, the billing arrangement described in the engagement letter covered all of the legal services that Robbins Russell provided Kornman, with the sole exception that total hourly fees for a motion to dismiss the criminal indictment were capped by a fixed-fee agreement. See Robbins Decl. ¶¶ 1, 4-10 and Exh. A (engagement letter). Indeed, Kornman himself paid for work in both the civil and criminal matters that was invoiced according to the engagement letter but not specifically described in the engagement letter. See, *e.g.*, Robbins Exh. C. at 16-17 (time entries for December 2, 3, and 17, 2004); *id* at 22 (Gregory Poe time entry for January 21, 2005) *id.* at 23, 26 (time entries for  January 24, 25, and 26, 2005, and February 14 and 16, 2005, concerning the criminal matter); *id.* at 46-50 (February 2006 invoice for work in the civil and criminal matters); see also Robbins Exh. D (ledger of Kornman's payments).

**Kornman's Purported Undisputed Material Fact No. 2:**    The Robbins Firm drafted that engagement letter.  *Id.*

**Response:**  Undisputed.

**Kornman's Purported Undisputed Material Fact No. 3:**  The parties never discussed applying the terms of the engagement letter to work on a subsequent criminal matter.  *Id.* ¶¶ 6-14; Tillotson Cert. ¶ 11.

**Response:**  Disputed. Although there may have been no such *oral* discussions, the parties repeatedly communicated through invoices, payments, and payment demands about the billing arrangement for the criminal matter. As the invoices and payments make clear, the parties agreed in the criminal matter to following the billing practices first outlined in the engagement letter. See Robbins Exh. C.; see generally Response No. 1, *supra*. Moreover, Kornman also communicated to Robbins Russell through his *conduct* that he agreed that the billing practices described in the

engagement letter would apply to the criminal matter. Specifically, he continued to request work from Robbins Russell while Robbins Russell invoiced him and demanded payment according to the billing arrangement described in the engagement letter. See Robbins Exhs. B-1 to B-7, C, D, and E-1 to E-8; Orseck Exhs. A to H.

**Kornman's Purported Undisputed Material Fact No. 4:**  As the Robbins Firm communicated with Tillotson regarding its involvement in the criminal matter, the Robbins Firm agreed, on or about January 3, 2006, to propose a flat rate for completion of a motion to dismiss. Pollack Cert. Exh. C.

> **Response:**  Undisputed.

**Kornman's Purported Undisputed Material Fact No. 5:**  On or about January 3, 2006, the Robbins Firm communicated to Tillotson in part that its "only qualm about a flat rate, [by the way], is gary's [sic] usual desire to edit until the very last minute, but we can build in some extra time for that and take the risk that we've underbid." *Id.*

> **Response:**  Undisputed.

**Kornman's Purported Undisputed Material Fact No. 6:**  On or about January 6, 2006, the Robbins Firm communicated to Tillotson in part that "here is a proposal for the motion to dismiss the indictment: flat fee of 100K to do the opening brief, the reply brief, and any oral argument the court permits." Pollack Cert. Exh. D.

> **Response:**  Undisputed.

**Kornman's Purported Undisputed Material Fact No. 7:**  In January 2006, the parties agreed to a fixed fee of $100,000 for the Robbins Firm to complete an opening brief and a reply brief,

and to participate in oral argument, on a motion to dismiss in the criminal matter. *Id.*; Tillotson Cert. ¶ 9; Kornman Cert. ¶ 11.

**Response:** Disputed. The agreement was for "[$100,000] to do the opening brief, the reply brief, and any oral argument the court permits." Pollack Cert. Exh. D. Moreover, insofar as Kornman means to suggest that it was necessary for Kornman to deem the opening brief, reply brief, and oral argument "complete" before any payment would be due to Robbins Russell. No such condition was included in the agreement, as numerous contemporaneous documents make clear. See Pollack Cert. Exhs. C, D, E, and G; Orseck Exh. H; Robbins Exh. C at 51, 55.

**Kornman's Purported Undisputed Material Fact No. 8:** Mr. Kornman and the Robbins Firm discussed directly with each other the completion of a motion to suppress and Stringer motion for the criminal matter. Kornman Cert. ¶ 12.

**Response:** It undisputed that Kornman and Lawrence Robbins discussed a motion to suppress and a so-called *Stringer* motion. Kornman's assertion (Kornman Cert. ¶ 12) that Robbins Russell agreed to cap the fees for those projects is disputed because it is false. No such condition was placed on any fee arrangement between Robbins Russell and Kornman, as numerous contemporaneous documents make clear. See Pollack Cert. Exhs. C, D, E, and G; Orseck Exh. H; Robbins Exh. C. Indeed, Robbins Russell never even *discussed* with Kornman in any communication before October 24, 2006, a "completed work" condition on payment. See Robbins Decl. ¶¶ 4-24 and Exhs. A to L. Kornman sought to impose such a condition for the first time on October 24, 2006, after ignoring bills for eight months, and only after first saying that he would pay his outstanding bills. Robbins Decl. ¶ 18 and Exh. C; see also Robbins Exhs. F, H, J, K, and L (other demands for payment that never provoked Kornman to say that he must deem work complete before payment is

due). Even on October 24, Kornman merely insisted on more work; he did not say that payment was not *due* unless he received it.  Robbins Decl. ¶ 18.

**Kornman's Purported Undisputed Material Fact No. 9:**  While working on the criminal matter, other than the January 6, 2006 email from Attorney Robbins to Attorney Tillotson regarding a flat-fee arrangement, the Robbins Firm never reduced to writing a fee agreement or engagement agreement for Mr. Kornman describing the fees for work on that matter, and never orally agreed to apply any of the terms of the engagement letter from the civil matter. Kornman Cert. ¶ 9-14.

**Response:**  Disputed. See Responses Nos. 1 and 3, *supra*, and the record evidence cited therein.

**Kornman's Purported Undisputed Material Fact No. 10:**  On or about February 10, 2006, Mr. Kornman issued a check to the Robbins Firm in the amount of $50,000 as a deposit against fees. Pollack Cert. Exh. G.

**Response:** Disputed, insofar as Kornman now uses the term "deposit" to mean "escrow payment." That is plainly not what Kornman meant at the time he wrote "Deposit Against Legal Fees for Government Litigation" on his February 2006 check. See Orseck Exh. H; Robbins Exh. C at 51, 55. And although Kornman now argues that the check was an escrow payment, his Certification contains no such assertion. See Kornman Cert. ¶¶ 10, 21.

**Kornman's Purported Undisputed Material Fact No. 11:**  The Robbins Firm applied the $50,000 deposit against hourly-rate billing for work on Mr. Kornman's criminal matter. Kornman Cert. ¶ 21.

**Response:** Disputed. Robbins Russell applied the February 2006 payment initially to Kornman's outstanding balance, which included work on both the civil matter and the criminal matter. See Robbins Exh. C at 46-50. Robbins Russell applied the remainder of the balance to its March 2006 invoice, which likewise included work on by the civil matter and the criminal matter. See Robbins Exh. C at 51-55; see also Robbins Exh. D.

**Kornman's Purported Undisputed Material Fact No. 12:**  By October 24, 2006, Mr. Kornman and Tillotson had requested several times that the Robbins Firm produce completed work product on the motions for the criminal matter. Kornman Cert. ¶¶ 13, 20; Tillotson Cert. ¶ 14.

**Response:**  Disputed. At various times Kornman and Tillotson asked Robbins Russell to provide certain work product; that is, of course, why Robbins Russell created it. See, *e.g.*, B-1 to B-7, C, D, and E-1 to E-8; Orseck Exhs. A to H. But, unless an instruction to "send all future documents in Word format" (see Robbins Exh. E-2) counts as a request to "produce completed work," neither Kornman nor Tillotson ever expressed to Robbins Russell any dissatisfaction with the extent of completion of any Robbins Russell's work product, or with any other aspect of Robbins Russell's work product. See generally Robbins Decl. ¶¶ 4-24.

To the contrary, the communications Robbins Russell received were laudatory. See Robbins Exh. E-3 (May 2006 Tillotson e-mail calling Robbins Russell "absolutely first rate" and endorsing "the approach" Robbins Russell had recommended in May 2006 for certain as-yet-unpaid-for work in the civil case); Exh. E-4 (March 2006 e-mail from Tillotson saying "[t]hanks a ton" for certain work product); Exh. E-5 (June 2006 e-mail from Gregory Poe memorializing conversation in which Tillotson criticized Kornman but not Robbins Russell); Exh. E-7 (June 2006 e-mail from Tillotson

saying he "appreciate[d] very much" that Robbins Russell was able to provide a draft suppression motion when it did); Exh. E-8 (October 2006 e-mail message memorializing a call from Kornman in which he requested a copy of a document from Robbins Russell but not the "completion" of any project).

**Kornman's Purported Undisputed Material Fact No. 13:**   On or about October 24, 2006, Mr. Kornman insisted on receiving the outstanding motions in finished form before any amounts would be paid to the Robbins Firm. Kornman Cert. ¶ 25; Tillotson Cert. ¶ 15.

**Response:** Disputed, insofar as Kornman means to suggest that he articulated on October 24, 2006, a view that there had been an agreement that Kornman need not pay Robbins Russell's bills until he deemed its work complete. It is undisputed that Kornman insisted on more work on October 24, 2006. See Robbins Decl. ¶ 18. But he first assured Lawrence Robbins that Robbins Russell's outstanding bills would be paid. *Id.* He never asserted then what he says now: that there was a "completed work" condition on payment. *Id.*; see Kornman Cert. ¶ 25.

**Kornman's Purported Undisputed Material Fact No. 14:**   On or about October 26, 2006, the Robbins Firm produced what it referred to as nine months of work product. Pollack Cert. Exhs. H, I, J.

**Response:** Disputed, insofar as Kornman means to suggest that October 26, 2006, was when Robbins Russell first produced its work product. It most certainly did re-send its work product on that date, see Robbins Exh. J, but it had previously made all of that work product available to Kornman or Tillotson. See *id.* (forwarding prior e-mail messages); Orseck Exhs. A to G (sending work product); Robbins Exh. E-5 (reporting Tillotson's instruction to hold on to the *Stringer* motion).

**Kornman's Purported Undisputed Material Fact No. 15:**  The Robbins Firm did not complete

the opening brief on the motion to dismiss that was ultimately filed, did not perform any

work on a reply brief, and did not participate in oral argument. Kornman Cert. ¶ 16; Tillotson

Cert. ¶ 12.

**Response:**  Disputed. On April 6, 2006, Lawrence Robbins sent Tillotson a completed draft

of the motion to dismiss the indictment and invited him to share it with Kornman. Orseck Exh. E.

Robbins wrote Tillotson three days later to find out "where we are on the [motion to dismiss]."

Orseck Exh. F. Subsequently, on April 12, 2006, Robbins Russell sent an updated version of the

draft to Tillotson. Orseck Exh. G. Ultimately, Kornman filed a version of the motion to dismiss

(signed by other laywers) that used Robbins Russell's arguments. See *United States v. Kornman*, No.

3:05-CR-0298P (N.D. Tex.), Dkt. 75.

**Kornman's Purported Undisputed Material Fact No. 16:**  The Robbins Firm referred to its

motion to suppress as a "draft," that Attorney Robbins had not even reviewed, the structure

of which needed to be revisited and arguments in it needed to be "honed" or removed, and

the draft was not ready for Mr. Komman's eyes or the Court. Pollack Cert. Exh. H.

**Response:**  It is undisputed that Robbins Russell attorney Gregory Poe said those things in

response to Tillotson's specific request for a "not final" draft. Robbins Exh. E-6. Robbins Russell

disputes the implication that the draft Robbins Russell provided was not worth what Robbins Russell

invoiced for that draft. See Robbins Exh. C. Calling something a "draft" does not make it valueless;

it merely acknowledges that it is ultimately up to the client (or his agent) to decide what to do with

the work product. See Robbins Exh. E-5 (Poe e-mail reporting Tillotson's view that "Kornman took

[our Rule 16 letter] and turned it into junk," and that "the holdup in sending things out has been due

-11-

to the client's position on things"). Moreover, Kornman plainly did not consider Robbins Russell's

motion to suppress as a mere "draft"; he authorized other lawyers to file portions of it verbatim. See

*United States v. Kornman*, No. 3:05-CR-0298P (N.D. Tex.), Dkt. 75.

**Kornman's Purported Undisputed Material Fact No. 17:** With regard to the Stringer motion, the

Robbins Firm provided a draft to Tillotson but they chose not to forward it to Mr. Kornman

because they did not think it should be filed. Kornman Cert. ¶ 16.

**Response:** Disputed. Robbins Russell refrained from providing its *Stringer* motion draft

directly to Kornman because his agent, Tillotson, instructed us not to do so, Robbins Exh. E-5, and

because Kornman instructed us not to communicate with him directly by telephone or e-mail. See

Robbins Exh. ¶ 16 and Exh. G. On October 26, 2006, Robbins Russell provided Kornman (through

Tillotson) with Robbins Russell's draft *Stringer* motion. See Orseck Exh. D.


Dated: October 19, 2007

                                    Respectfully submitted,


                                    _____/s/ Gary A. Orseck_____
                                    Gary A. Orseck (Bar No. 433788)
                                    Alan D. Strasser (Bar No. 967885)
                                    Lawrence S. Robbins (Bar No. 420260)
                                    Matthew R. Segal (Bar No. 483486)
                                    ROBBINS, RUSSELL, ENGLERT,
                                      ORSECK, UNTEREINER & SAUBER LLP
                                    1801 K Street, NW, Suite 411
                                    Washington, DC  20006
                                    Telephone: (202) 775-4500
                                    Fax: (202) 775-4510


                                    **Attorneys for Plaintiff Robbins, Russell, Englert,
                                    Orseck, Untereiner & Sauber LLP**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ROBBINS, RUSSELL, ENGLERT** | : | |
| **ORSECK & UNTEREINER LLP,** | : | |
| | : | **Civil Action No.** |
| **Plaintiff,** | : | **1:07-cv-00554-JR/JMF** |
| | : | |
| **v.** | : | |
| | : | |
| **GARY KORNMAN,** | : | |
| | : | |
| **Defendant.** | : | |

**ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT III
(ACCOUNT STATED) OF COMPLAINT AND COUNTERCLAIMS**

This matter comes before the Court on motion of Plaintiff, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP for summary judgment on the account stated claims alleged in Count III of its Complaint in case number 07-00554 and Count III of its Counterclaims in case number 07-01613, and on Defendant Gary M. Kornman's Corss-Motion for Summary Judgment.

Having considered Plaintiff's motion and having reviewed the Opposition thereto, it is hereby ORDERED that the motion is GRANTED and that summary judgment shall be entered against Defendant on the account stated claims.

Having considered Defendant's cross-motion and having reviewed the Opposition thereto, it is hereby ORDERED that the motion is DENIED in its entirety.

SIGNED this _____ day of _____, 2007.

_____
THE HONORABLE JAMES ROBERTSON
UNITED STATES DISTRICT JUDGE