# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP, | ) ) ) |  |
| Plaintiff/Counterclaim-Defendant, | ) ) | Case No. 1:07-cv-00554-JR/JMF |
| v. | ) ) |  |
| GARY M. KORNMAN, | ) ) |  |
| Defendant/Counterclaim-Plaintiff. | ) ) |  |

## DEFENDANT GARY M. KORNMAN'S EMERGENCY MOTION FOR REFORMATION OF FINAL SETTLEMENT AGREEMENT

Defendant Gary Kornman ("Mr. Kornman") respectfully submits this emergency motion for reformation of the Settlement Agreement reached yesterday, October 23, 2007, with Robbins, Russell, Englert, Orseck & Untereiner LLP ("Robbins Russell"), based on an issue raised earlier today by Robbins Russell regarding D.C. Legal Ethics Committee Formal Opinion 260, as explained in more detail below.

**Formal Opinion 260**

Formal Opinion 260 of the D.C. Legal Ethics Committee states:

> The organization of the Bar of the District of Columbia serves, *inter alia*, "to aid the Court in carrying on and improving the administration of justice; to foster and maintain on the part of those engaged in the practice of law high ideals of integrity, * * * and high standards of conduct; * * * to the end that the public responsibility of the legal profession may be more effectively discharged." District of Columbia Court Rules Ann., D.C. Bar Rule I (1994) (hereinafter "D.C. Bar Rule __"). To accomplish these goals, the Bar has adopted the Rules of Professional Conduct and established procedures by which members of the Bar who violate those Rules shall be disciplined. D.C. Bar Rules X, XI. ***Allowing a lawyer to bargain with a client to avoid those procedures, would significantly impair the Bar's ability to***

> ***regulate its members as well as protect the courts, the legal
> profession, and the public's confidence in the integrity and
> competence of the judicial system, thereby "seriously
> interfere[ing] with the administration of justice."***
>
> It is irrelevant, in our opinion, that a lawyer seeks to preclude
> the filing of a complaint by a client or negotiates for the
> withdrawal of an existing complaint as part of an agreement to
> settle a malpractice claim or fee dispute with a former client.
> ***Under no circumstances may a lawyer seek to thwart the Bar's
> duty to oversee, regulate and discipline its members by eliciting a
> former client's agreement not to file a complaint with Bar
> Counsel.***

DC Bar Legal Ethics Committee Formal Ethics Opinion 260, Section C (October 18, 1995)

(emphases added).  A copy of Formal Opinion 260 is attached hereto as Exhibit A.

**The Robbins Firm Demands that its Former Client File No Ethical Complaints**

Late yesterday afternoon, the Robbins Firm demanded an additional term for the parties'

contemplated settlement, directly contrary to Formal Opinion 260.  Specifically, the Robbins

Firm demanded that Mr. Kornman foreswear from filing any ethical complaints.  The Robbins

Firm demanded that Mr. Kornman accept that additional -- albeit problematic -- term, that very

day, or else face the expense and burdens of depositions the following two days.  Mr. Kornman

requested an emergency conference call with this Court, and his counsel explained that there had

been insufficient time to consider the ethical implications of the Robbins Firm's demand.  The

Robbins Firm assured the Court that there was nothing unethical about its request and, as a

result, the Court refused to postpone depositions while the parties explored the ethical

implications of the Robbins Firm's new demand.

**The Parties Reach a Settlement Agreement**

After the conference call with the Court, at approximately 8:30 p.m. last night, the parties

reached a Settlement Agreement.  Attached hereto as Exhibit B is a copy of the Settlement

Agreement.  Attached hereto as Exhibit C is an exchange of emails confirming assent to the

Settlement Agreement. Attached hereto as Exhibit D is a Fedex receipt reflecting that the consideration has been paid by overnight mail to the Robbins Firm. In the final Settlement Agreement, at the request of the Robbins Firm, Paragraph 1.6 states:

> The Parties agree that the initiation by either Party of administrative or ethics proceedings, or sanctions motions, against Robbins Russell, Mr. Kornman or any of their lawyers, in any way arising from or concerning either (i) this lawsuit, or (ii) the representation of Mr. Kornman at any time prior to the execution of this Settlement Agreement, shall constitute a material breach of this Settlement Agreement and shall revive any claims released hereunder by the aggrieved Party, subject to any right of setoff for payments made under this Settlement Agreement.

*See* Exhibit B.

The Robbins Firm's demand for the provision that could prohibit Mr. Kornman from reporting ethical violations appears to transgress the plain language in Formal Opinion 260, namely that "[u]nder no circumstances may a lawyer seek to thwart the Bar's duty to oversee, regulate and discipline its members by eliciting a former client's agreement not to file a complaint with Bar Counsel."

**Recognition of Ethical Issues**

This morning, the Robbins Firm acknowledged, in an email, the ethical issues that have arisen under Opinion 260. Recognizing that its assurances to this Court of the propriety of its demand, during yesterday's conference call, were premature and problematic, the Robbins Firm has now agreed either to re-affirm the final Settlement Agreement *as is*, or to revert to a draft version of the Settlement Agreement that did not include Paragraph 1.6 (or Paragraph 1.7, or certain other changes). A copy of the email from Attorney Robbins is attached hereto as Exhibit E.

At least two issues arise with the Robbins Firm's proposed change in its approach. First, the Settlement Agreement has undergone other changes since the *earlier draft* that the Robbins Firm presents as an alternative. By limiting Mr. Kornman to only the draft as an alternative, the Robbins Firm is essentially demanding that Mr. Kornman foreswear filing ethical complaints in order to enforce the remaining lawful, agreed-upon terms in the *final* Settlement Agreement. This new demand also transgresses the spirit, if not the letter, of Formal Opinion 260.

Second, the language in Opinion 260 arguably creates an obligation on all of the lawyers in this case, perhaps even the Court, to report to Bar Counsel the Robbins Firm's ongoing demand from a former client to foreswear filing ethics complaints:

> Under no circumstances may a lawyer seek to thwart the Bar's duty to oversee, regulate and discipline its members by eliciting a former client's agreement not to file a complaint with Bar Counsel.
>
> Of course, where the former client has obtained counsel for the settlement agreement, the former client's counsel has a duty to report any unprivileged misconduct that is discovered to Bar Counsel if the conduct fits within the standards set forth in Rule 8.3(a).

Formal Opinion 260, Section C. This is not a new principle of law, but rather a Formal Opinion issued in 1995, based on similar rulings in other jurisdictions. Formal Opinion 260 cites to the following examples of precedent:

> *E.g., People v. Bennett*, 810 P.2d 661, 663-66 (Colo. 1991) (attorney may not ask former client to withdraw grievance to bar committee, whether or not request is a condition to a settlement of a malpractice claim); applying DR 1-102(A)(5)); *People v. Moffitt*, 801 P.2d 1197, 1198 (Colo. 1990) (same); *Committee on Legal Ethics of the W. Va. State Bar v. Smith*, 156 W. Va. 471, 194 S.E.2d 665, 667-69 (1973) (once complaint has been filed with state ethics board, that board must hear it whether or not the complainant has subsequently agreed to withdraw the complaint); N.C. Op. 83 (1989), *digested in* Lawyers Man. at 901:6615 (attorney against whom malpractice suit has been filed may not condition its settlement on withdrawal of or promise not to file

disciplinary complaint against attorney; applying state's equivalent of D.C. Rule 8.4(a), (d)).

Formal Opinion 260 n. 5.

**Other Potential Ethical Questions**

The Robbins Firm has attacked Mr. Kornman in pleadings for having raised several ethical questions during the course of these proceedings.  For example, Mr. Kornman has referred to Rule 1.5 of the D.C. Rules of Professional Conduct, which prevents lawyers from seeking costs of collection, such as attorneys' fees, interest and costs, during a fee dispute, unless a retention agreement with the former client expressly permitted the law firm to recover such costs of collection.  As the D.C. Bar Legal Ethics Committee has stated:

> It cannot be forgotten, however, that a fee arrangement between a lawyer and client is not like a standard business arrangement. Clients often seek legal services at times of difficulty, and the client must feel free to impose a high level of trust in the lawyer and to have confidence in the relationship. In dealing with the client, the lawyer should not take advantage of either the lawyer's superior knowledge and experience or the lawyer's freedom from the concern and distress that disturb the client. Moreover, because it is unusual for a client to obtain independent legal advice when concluding a fee arrangement with a lawyer means that lawyers owe a particular duty to avoid overreaching in the fee-setting process.
>
> *            *            *            *
>
> [W]e conclude that we adhere to the view expressed in Opinion No. 11 that a client's unexcused failure to meet a fee obligation does not allow a lawyer to seek to collect interest on the unpaid portion of the debt unless that is specifically provided for in the existing fee arrangement.

Formal Opinion 310 at Sections 2, 4.  A copy of Formal Opinion 310 is attached hereto as Exhibit F.  Here, the Robbins Firm has improperly sought attorneys' fees, interest and costs, even though it must admit that no agreement with Mr. Kornman allows it to recover those items.

As another example, at the core of the fee dispute was the Robbins Firm's agreement to a flat fee for certain services, followed by erroneous billing on an hourly basis, and no effort by the Robbins Firm to segregate or clarify matters it believed were subject to hourly billing from those that were clearly subject to flat fee billing. Even if just sloppy, this practice could constitute a violation of Rule 1.5 of the Rules of Professional Conduct, requiring a lawyer's obligation to make fee agreements clear and reasonable.

**Proposed Reformation**

Mr. Kornman hoped that a settlement would bring finality to this dispute, but the Robbins Firm's late demand may create issues rather than resolve all of them. In the interests of finality and consistent with what should be deemed the parties' mutual intent to enter into an ethically sound settlement agreement, Mr. Kornman proposes the following two alternatives for the Court's consideration:

1) strike Paragraph 1.6 and all references to Paragraph 1.6 from the final Settlement Agreement, consistent with the email from Attorney Robbins (*see* Exhibit E) and reaffirm the remainder of the Settlement Agreement as binding and enforceable.

2) replace Paragraph 1.6 with the following language:

> The Parties represent that they have not initiated any administrative or ethics proceedings, and will not file any sanctions motions, against Robbins Russell, Mr. Kornman or any of their lawyers, in any way arising from or concerning either (i) this lawsuit, or (ii) the representation of Mr. Kornman at any time prior to the execution of this Settlement Agreement. This representation shall constitute a material term of this Settlement Agreement and a breach of it shall revive any claims released hereunder by the aggrieved Party, subject to any right of setoff for payments made under this Settlement Agreement. The Parties agree that the resolution of the fee dispute in this matter is fair and reasonable.

Either of these proposals accomplish the parties' objective expressions of a shared intention to achieve finality between them, but does so in an ethically sound way. Mr. Kornman is not requesting that this Court declare or determine that Paragraph 1.6, or any part thereof, is invalid or unenforceable,[1] but rather simply to reform the Settlement Agreement with language that accomplishes the parties' intentions and objectives consistent with ethical obligations. *Max Holtzman, Inc. v. K&T Co.*, 375 A.2d 510, 513 (D.C. 1977) (even where not expressly raised in pleadings, "a court in equity may intervene to reform the imperfectly written agreement to correct defects and to reflect the true agreement and intention of the parties").

Finally, Mr. Kornman's request for reformation and enforcement of the Settlement Agreement follows the fundamental principle that "[t]he law favors the settlement of controversies." *Brown v. Brown*, 343 A.2d 59, 61 (1975). In addition, "[i]t is well settled that the compromising of legal proceedings and the relinquishment of rights in connection therewith" constitute "such part performance" to require enforcement of a settlement agreement even in the absence of a signed writing. *Id.* Here, Mr. Kornman has already sent a check to the Robbins Firm in the amount that fully satisfies his financial obligations under the Settlement Agreement.

---

[1] Today, Mr. Kornman and his counsel discovered that the Robbins Firm had inserted in a late version of the Settlement Agreement, without a prior (or subsequent) discussion, a term that purported to exclude Paragraph 1.6 of the Settlement Agreement from a provision that confirmed that an "invalid" or "unenforceable" part of a provision would not affect the remainder of the agreement. *See* Settlement Agreement ¶ 4.5. If this unilateral insertion were given any effect, the resulting provision in Paragraph 4.5 is now simply unclear about what should happen to the remainder of the Settlement Agreement if the Robbins Firm has been unethical in its demand for the language in Paragraph 1.6. This Court can avoid any of these complexities by simply reforming the language, rather than determining that it is "invalid" or "unenforceable," thereby maintaining and honoring the finality of the settlement.

## Conclusion

Based on the foregoing, this Court should reform the parties' Settlement Agreement by either

1) striking Paragraph 1.6 and all references to Paragraph 1.6 from the final Settlement Agreement, consistent with the email from Attorney Robbins (*see* Exhibit E) and reaffirm the remainder of the Settlement Agreement as binding and enforceable.

2) replacing Paragraph 1.6 with the following language:

> The Parties represent that they have not initiated any administrative or ethics proceedings, and will not file any sanctions motions, against Robbins Russell, Mr. Kornman or any of their lawyers, in any way arising from or concerning either (i) this lawsuit, or (ii) the representation of Mr. Kornman at any time prior to the execution of this Settlement Agreement. This representation shall constitute a material term of this Settlement Agreement and a breach of it shall revive any claims released hereunder by the aggrieved Party, subject to any right of setoff for payments made under this Settlement Agreement. The Parties agree that the resolution of the fee dispute in this matter is fair and reasonable.

Dated:  October 24, 2007                    Respectfully submitted,


                                            **/s/ Orlando E. Vidal**
                                            Orlando E. Vidal (D.C. Bar No. 461815)
                                            Barry S. Pollack, *Admitted Pro Hac Vice*
                                            Sullivan & Worcester, LLP
                                            1666 K Street, NW, Suite 700
                                            Washington, DC 20006
                                            Telephone: (202) 775-1200
                                            Fax: (202) 293-2275

                                            **COUNSEL FOR GARY M. KORNMAN**

EXHIBIT "A"



**For Lawyers**

Home > For Lawyers > Ethics > Legal Ethics > Opinions

## Opinion 260

**Agreements Limiting the Professional Liability of Lawyers to Former Clients**

- For Lawyers
- For the Public
- Inside the Bar

A lawyer may not condition settlement of a pending fee dispute on the agreement of the lawyer's unrepresented former client to release the lawyer from malpractice liability unless, prior to negotiating such a release, the lawyer advises the former client of any facts and circumstances known to the lawyer that he reasonably believes might give rise to a claim of malpractice liability.

   A lawyer may agree to forgo full payment of fees in exchange for a release from or waiver of liability to a client as to a malpractice claim that the lawyer knows might have been resolved in the client's favor, providing the lawyer first gives timely written notice to the client that independent counsel should be obtained prior to negotiating such a settlement or release. Under no circumstances may a lawyer ask a former client to execute a release prohibiting the client from filing a complaint with Bar Counsel.

**Applicable Rules**

- Rule 1.8(g) (Conflict of Interest: Prohibited Transactions)
- Rule 8.3(a) (Reporting Professional Misconduct)
- Rule 8.4 (Misconduct)

**Inquiry**

The Inquirer has requested an opinion based on the following hypothetical fact situation:

   A retained lawyer provides substantial legal services for a client over an extensive period of time. When a disagreement occurs, the client discharges the lawyer. The lawyer then sues the client for non-payment of fees. During settlement discussions, the lawyer agrees to accept a portion of the fee that the lawyer believes is due in exchange for a written release from the client. That release states: "I agree to waive and release this firm, including the lawyers employed by the firm, from all claims, complaints or causes of action of any nature as a result of or relating to this firm's representation of and billings to me through the date of this agreement."

   Based on this hypothetical, Inquirer asks the following questions:

1. Is this a violation of the ethical standards in the District of Columbia Rules of Professional Conduct?[1]
2. Are the following factors outcome determinative:
   a. whether the client was represented by different counsel at the time the release was executed;
   b. whether the lawyer has filed suit against the client for non-payment of fees;
   c. whether the lawyer was aware of any potential

malpractice claims against him?
3. Can a lawyer agree to forgo full payment of fees in exchange for a release or waiver of the lawyer's liability to the client in a malpractice suit that the lawyer knows may have resulted in a verdict favoring the client?
4. Under what circumstances, if any, may a lawyer ask a client to execute a release prohibiting the client from filing a complaint with Bar Counsel?

We conclude that the lawyer in the hypothetical would violate Rule 8.4(c) if: (i) the former client was not represented at the time the release was executed; (ii) the former client was executing the release in consideration for the lawyer's release of the former client from any liability arising out of the lawyer's claim for unpaid fees; and (iii) the lawyer was aware of facts and circumstances that the lawyer reasonably believed might give rise to a claim of malpractice. We further conclude that a lawyer may agree to forgo full payment of fees in exchange for a release from or waiver of liability to a client in a malpractice claim that the lawyer knows might have been resolved in the client's favor, providing the lawyer first gives timely written notice to the client that independent counsel should be obtained prior to negotiating such a settlement or release. Finally, we conclude that under no circumstances may a lawyer seek to execute a release that would bar a lawyer's client from filing a complaint with Bar Counsel. The bases of these conclusions are discussed below.

**Discussion**

**A. Rule 8.4(c): Conduct Involving Dishonesty, Fraud, or Misrepresentation**

Rule 8.4(c) provides that a lawyer engages in professional misconduct when he or she engages "in conduct involving dishonesty, fraud, deceit, or misrepresentation." In D.C. Bar Op. 79 (1979), we interpreted the term "fraud" as including a false or misleading statement, and we have recognized "that 'fraud' almost always means acts of affirmative representation rather than failure to disclose material facts."[2] Where a lawyer is seeking to settle a claim filed for unpaid fees against a former client who is unrepresented in exchange for the former client's release of malpractice liability, the former client must be able to compare the value of the offered fee reduction with the value of the lawyer's potential malpractice liability in order to determine whether the settlement offer is fair. The lawyer's failure to disclose facts of which he has knowledge that would reasonably give rise to malpractice liability would violate the prohibition in Rule 8.4(c) against dishonest or fraudulent conduct. Absent such a requirement, the former client might not be fully apprised of potential malpractice claims where, as in the hypothetical presented, the client waives rights to pursue "all claims, complaints or causes of action of any nature," and the drafting lawyer seems intent on obfuscating the meaning of the agreement, and not merely limiting malpractice liability. To find otherwise would allow a lawyer to provide the former client with "false or misleading" information about the agreement.

In reaching our conclusion that the facts presented in the hypothetical would run afoul of Rule 8.4(c), we wish to stress that each of the factors raised in Inquirer's second inquiry is outcome-determinative. First, Rule 8.4(c) would not require disclosure if the lawyer had not filed suit to collect unpaid fees. Otherwise, there would be no consideration to support the former client's promise to release the lawyer from any future malpractice liability. Second, Rule 8.4(c) would not apply if the former client were represented, because the client's new

counsel would be capable of evaluating the existence and value of the client's malpractice claim through discovery. And third, Rule 8.4(c) would only require disclosure of facts known to the lawyer that the lawyer reasonably believes would give rise to malpractice liability, since one cannot withhold or misrepresent information about which one has no knowledge or that one does not reasonably believe is relevant.

Finally, the Committee wishes to emphasize that its opinion about a lawyer's duty under Rule 8.4(c) is limited to the facts presented in this hypothetical: whether disclosure is required in the context of a negotiation between a lawyer and a former client to settle a fee dispute between them. The Committee is not concluding that a lawyer has a general duty to disclose malpractice liability to a former client in the absence of these circumstances.

## B. Rule 1.8(g)(2): Agreements Limiting a Lawyer's Malpractice Liability to an Unrepresented or Former Client

Rule 1.8 prohibits certain lawyer-client transactions as conflicts of interest, including the making of certain agreements with a client to limit a lawyer's professional liability. Rule 1.8(g). Under Rule 1.8(g)(2), "[a] lawyer shall not settle a claim for . . . [malpractice] liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith." This provision refers to the negotiation and execution of an agreement to limit or release a lawyer's professional liability once representation has commenced or has been terminated.

A lawyer "settling a claim" under Rule 1.8(g)(2) owes certain duties to a former client. For example, a discharged lawyer must advise a former client in writing that independent representation is appropriate. When a former client has already filed a claim for malpractice and has already obtained independent counsel for that action, the discharged lawyer need not provide this notice, as discovery will unearth the relevant facts.

A discharged lawyer also must allow the former client a reasonable period of time to consult and/or retain new counsel regarding the effect of a release of malpractice claims and, if needed, to negotiate and execute such a settlement or release on the former client's behalf. Where a former client opts not to retain independent counsel after receiving such notice, the discharged lawyer has nonetheless fulfilled this obligation.

Therefore, a lawyer may agree to forgo full payment of fees in exchange for a release or waiver of the lawyer's liability to the client in a malpractice suit that the lawyer knows might have resulted in a verdict favoring the client if the lawyer first gives timely written notice to the client that independent counsel should be obtained prior to negotiating such a settlement or release and allows the client a reasonable period of time to retain new counsel.

## C. Rule 8.4(d): Agreements Limiting a Lawyer's Exposure to Disciplinary Action

Rule 8.4 makes subject to discipline several types of behavior characterized as "professional misconduct," including conduct that "seriously interferes with the administration of justice." Rule 8.4(d).[3] We believe that an agreement whereby an unrepresented client or former client executes a release in which the client agrees not to file a complaint with Bar Counsel against the lawyer constitutes conduct that "seriously interferes with the administration of justice."[4]

The organization of the Bar of the District of Columbia serves, *inter alia*, "to aid the Court in carrying on and

improving the administration of justice; to foster and maintain on the part of those engaged in the practice of law high ideals of integrity, * * * and high standards of conduct; * * * to the end that the public responsibility of the legal profession may be more effectively discharged." District of Columbia Court Rules Ann., D.C. Bar Rule I (1994) (hereinafter "D.C. Bar Rule ___"). To accomplish these goals, the Bar has adopted the Rules of Professional Conduct and established procedures by which members of the Bar who violate those Rules shall be disciplined. D.C. Bar Rules X, XI. Allowing a lawyer to bargain with a client to avoid those procedures, would significantly impair the Bar's ability to regulate its members as well as protect the courts, the legal profession, and the public's confidence in the integrity and competence of the judicial system, thereby "seriously interfere[ing] with the administration of justice."

It is irrelevant, in our opinion, that a lawyer seeks to preclude the filing of a complaint by a client or negotiates for the withdrawal of an existing complaint as part of an agreement to settle a malpractice claim or fee dispute with a former client.[5] Under no circumstances may a lawyer seek to thwart the Bar's duty to oversee, regulate and discipline its members by eliciting a former client's agreement not to file a complaint with Bar Counsel.

Of course, where the former client has obtained counsel for the settlement agreement, the former client's counsel has a duty to report any unprivileged misconduct that is discovered to Bar Counsel if the conduct fits within the standards set forth in Rule 8.3(a). Rule 8.3(a) requires that:

> A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

In this Committee's Opinion No. 246 (1994), we determined that Rule 8.3(a) imposed an absolute duty on a lawyer to report another lawyer's misconduct. To be sure, a lawyer's "failure to report would itself be an ethical violation." *Id.* at 62. This rule allows Bar Counsel to help maintain the Bar's integrity and prevents the use of such information as a threat during negotiations to obtain a bargaining advantage.[6]

Inquiry No. 88-1-1
Adopted: October 18, 1995

---

1.  See D.C. Rules of Professional Conduct (hereinafter "Rule _____"), D.C. Court Rules Ann., app. A (1994).
2.  D.C. Bar Op. 119 (1983) at 203 (quoting Note, *Legal Ethics and the Destruction of Evidence*, 88 Yale L.J. 1665, 1667 (1979)).
3.  ABA Model Rule 8.4(d) prohibits conduct "prejudicial" to the administration of justice." D.C. rejected that term as overly vague and, instead, adopted the language used to explain the meaning of the term "prejudicial." Proposed Rules of Professional Conduct and Related Comments, Showing the Language Proposed by the American Bar Association, Changes Recommended by the District of Columbia Bar Model Rules of Professional Conduct Committee, and Changes Recommended by the

Board of Governors of the District of Columbia Bar 249, at ¶ 10 (submitted to the D.C. Court of Appeals Nov. 19, 1986). Thus, the Rule was not intended to convey a different meaning. Rule 8.4(d) cmt 2. DR-1-102(A)(5) was the Model Code equivalent to Rule 8.4(d) and ABA Model Rule 8.4(d).

4. *Accord In re Blackwelder*, 615 N.E.2d 106, 108 (Ind. 1993) (applying Rule 8.4(d); Ariz. State Bar Op. No. 91-23 (Nov. 4 25, 1991), *digested in* Lawyers Man. at 1001:1404 (agreement barring filing of disciplinary complaint "undermin[es] the Bar's efforts at self-regulation" and limits "the integrity of the profession"; citing Rules 8.4(d) and 1.8(h)); Maine Op. 68 (1986), *digested in* Lawyers Man. at 901:4202 (attorney's attempt to be released from past or future ethical misconduct is "ineffective" and prohibited by ethics rules).

5. *E.g., People v. Bennett*, 810 P.2d 661, 663-66 (Colo. 1991) (attorney may not ask former client to withdraw grievance to bar committee, whether or not request is a condition to a settlement of a malpractice claim); applying DR 1-102(A)(5)); *People v. Moffitt*, 801 P.2d 1197, 1198 (Colo. 1990) (same); *Committee on Legal Ethics of the W. Va. State Bar v. Smith*, 156 W. Va. 471, 194 S.E.2d 665, 667-69 (1973) (once complaint has been filed with state ethics board, that board must hear it whether or not the complainant has subsequently agreed to withdraw the complaint); N.C. Op. 83 (1989), *digested in* Lawyers Man. at 901:6615 (attorney against whom malpractice suit has been filed may not condition its settlement on withdrawal of or promise not to file disciplinary complaint against attorney; applying state's equivalent of D.C. Rule 8.4 (a), (d)).

6. *See also* Rule 8.4(g), which states: "It is professional misconduct for a lawyer to seek or threaten to seek criminal or disciplinary charges solely to obtain an advantage in a civil matter."




Click to see how the D.C. Bar Membership Benefits Program can help you and your firm

The District of Columbia Bar | 1250 H Street NW, sixth floor | Washington DC 20005-5937 | 202-737-4700 | **Directions/Pa**
©**2007** District of Columbia Bar. All rights reserved. **Privacy Policy | Disclaimer | Author guidelines**

# EXHIBIT "B"

# SETTLEMENT AGREEMENT AND MUTUAL RELEASES

This Settlement Agreement (this "Agreement") is made as of this 23rd day of October, 2007, by and between Gary M. Kornman ("Mr. Kornman"), and Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP ("Robbins Russell"), of Washington D.C. The signatories to this Agreement will sometimes hereafter be referred to singularly as a "Party" and jointly as the "Parties." This Agreement is made as a compromise among the Parties for the complete and final settlement of their present claims, differences, and causes of action with respect to the dispute described below.

## PREAMBLE

**WHEREAS,** a dispute has arisen between Mr. Kornman, on the one hand, and Robbins Russell, on the other, concerning certain rights and obligations between them; and

**WHEREAS,** the Parties have filed claims and counterclaims between them in an action styled as Robbins Russell v. Kornman, Case No. 07-0554 (JR), in the United States District Court for the District of Columbia (the "District"), and a consolidated action transferred to the District styled as Kornman v. Robbins Russell, Case No. 07-1613 (both actions, collectively, the "Litigation");

**WHEREAS,** the Parties do not admit the truth of any assertions by the other in the Litigation between them and nothing in this settlement constitutes an admission of liability;

**WHEREAS,** the Parties to this settlement desire to avoid the expense and inconvenience of litigation among them, and to resolve and settle all existing claims, counterclaims, obligations and disputes among them which could be brought at any time up through this date in litigation among them;

**WHEREAS,** the Parties to this settlement desire that neither of them bring or pursue further claims or charges of any kind, in any forum, or help others to do so, by asserting any allegations of past ethical violations or other past misconduct, arising either from this lawsuit, from any and all duties that may be owed to Mr. Kornman, or from the representation of Mr. Kornman at any time; and,

**NOW, THEREFORE,** in consideration of the releases and mutual promises contained herein, and for other good and valuable consideration exchanged between the Parties, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

{B0691545; 2}

**Section 1. <u>Settlement</u>.**

1.1     In exchange for the releases and other consideration contained herein, upon execution of this Settlement Agreement, Robbins Russell shall be entitled to deposit in its account the           escrow deposit that it has held for Mr. Kornman.

1.2     Upon the full execution of this Settlement Agreement, and the same day thereof, Mr. Kornman shall pay or cause to be paid           by wire to an account designated in writing by Robbins Russell.

1.3     Except as specifically set forth herein, nothing in this Agreement in any way releases or limits Robbins Russell's obligations to Mr. Kornman, as a former client, under the D.C. Rules of Professional Conduct and/or other applicable professional obligations, including but not limited to the ongoing obligation to maintain confidences pursuant to Rule 1.6.

1.4     Upon receipt of the           payment in Paragraph 1.2 of this Settlement Agreement, and the same day thereof, Robbins Russell shall return all discovery produced to it by Attorney Jeffrey Tillotson ("Attorney Tillotson") and/or his firm to Attorney Tillotson, and to return any other materials it has obtained from former lawyers for Mr. Kornman to the respective former lawyers.  Robbins Russell shall promptly destroy any and all remaining copies of such materials within one day of receipt of the payment set forth in Paragraph 1.2.

1.5     Within three business days of the payment set forth in Paragraph 1.2 of this Settlement Agreement, the Parties shall jointly file a stipulation of dismissal with prejudice of the Litigation and all underlying claims and counterclaims comprising the Litigation.  The Parties have agreed that each will bear his or its own attorneys' fees and costs incurred in the Litigation. The Parties agree that this dismissal with prejudice shall have *res judicata* effect on all claims and counterclaims that they have raised, or that they could have raised, in the Litigation.  Counsel of record may sign the stipulation of dismissal with prejudice on behalf of its respective client.

1.6     The Parties agree that the initiation by either Party of administrative or ethics proceedings, or sanctions motions, against Robbins Russell, Mr. Kornman or any of their lawyers, in any way arising from or concerning either (i) this lawsuit, or (ii) the representation of Mr. Kornman at any time prior to the execution of this Settlement Agreement, shall constitute a material breach of this Settlement Agreement and shall revive any claims released

hereunder by the aggrieved Party, subject to any right of setoff for payments made under this Settlement Agreement.

1.7    Other than to refer to matters in the public record, Robbins Russell agrees not to discuss Mr. Kornman with, or to provide any information or documents regarding this matter or its representation of Mr. Kornman to, any third person or entity, unless it receives a subpoena or court order, the receipt of which will be governed by the same notification requirements as set forth in the second sentence of Section 5.  In addition, Robbins Russell agrees not to oppose a motion by Mr. Kornman to seal exhibits that have been filed in the Litigation that contain or reflect attorney-client privilege or work product information.  A violation of the provisions of this Paragraph 1.7 shall constitute a material breach of this Settlement Agreement and shall require the return to the aggrieved party of any consideration provided under this Settlement Agreement and shall revive any claims released hereunder by the aggrieved Party.

**Section 2.  <u>Compromise.</u>**

The Parties agree and acknowledge that this Agreement is the result of a compromise and shall not be construed as an admission of any liability, wrongdoing, or responsibility on either of their parts or on the part of their predecessors, successors, assigns, agents, partners, members, affiliates, employees, or attorneys.

**Section 3.  <u>Release.</u>**

3.1    Subject only to any express limitation(s) in this Agreement, including those rights contained in Section 1 hereof, Mr. Kornman, and his heirs and assigns, release and forever discharge Robbins Russell, and its partners, members, predecessors, successors, assigns, employees, principals, agents, and attorneys from and against all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, claims for attorney's fees, punitive damages, interest or costs, obligations and demands whatsoever, whether now known or unknown, liquidated or unliquidated, that Mr. Kornman now has or may have had at any time prior to and including the date of this Settlement Agreement.

3.2    Subject only to any express limitation(s) in this Agreement, including those rights contained in Section 1 hereof, Robbins Russell, and its partners, members, predecessors, successors and assigns, release and forever discharge Mr. Kornman, and his heirs, assigns, employees, principals, agents, and attorneys from and against all actions, causes of action,

claims, suits, debts, damages, judgments, liabilities, claims for attorney's fees, punitive damages, interest or costs, obligations and demands whatsoever, whether now known or unknown, liquidated or unliquidated, that Robbins Russell now has or may have had at any time prior to and including the date of this Settlement Agreement.

**Section 4. <u>Miscellaneous</u>.**

4.1    This document contains the complete agreement between the Parties regarding the subject matter hereof.

4.2    This Agreement may be executed in any number of multiple copies or counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such identical copy or counterpart. A photocopy of any executed copy or counterpart shall be valid as an original. Likewise, a facsimile of any executed copy or counterpart and/or a photocopy of a facsimile of any executed copy or counterpart shall be valid as an original. Facsimile transmission of any signed original document shall be the same as delivery of an original document. At the request of any Party, the Parties will confirm facsimile transmitted signatures by signing an original document.

4.3    This Agreement may be modified only by a written document signed by the Parties. No waiver of this Agreement or any of the promises, obligations, terms, or conditions hereof shall be valid unless it is written and signed by the Party against whom the waiver is to be enforced.

4.4    This Agreement shall be binding upon the Parties thereto, their predecessors, successors, heirs, assigns, partners and members. Each of the signatories of this Agreement represents and warrants that he is authorized to execute this Agreement and to bind the Party hereto.

4.5    Except for Subsection 1.6, if any part or any provision of this Agreement shall be finally determined to be invalid or unenforceable under applicable law by a court of competent jurisdiction, that part or provision shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of said provision or the remaining provisions of this Agreement.

4.6      The Parties hereby warrant and represent that they have not assigned or in any way transferred or conveyed all or any portion of the claims covered by this Agreement. The Parties acknowledge and agree that this warranty and representation is an essential and material term of this Agreement, without which they would not have entered into it.

4.7      The Parties acknowledge that they have had the opportunity to consult with legal counsel of their choosing prior to entering into this Agreement, that they indeed have consulted with such counsel and that they enter this Agreement knowingly and voluntarily.

4.8      Each of the Parties represents that the person executing this Agreement is duly authorized by the Party to execute and deliver this Agreement on its behalf, and each of the Parties shall be estopped hereafter to deny the genuineness of the signatures of the signatories hereof or their authority to execute and deliver this Agreement.

4.9      The Parties freely negotiated and cooperated in the drafting of this Agreement. Therefore, in the construction of this Agreement, the provisions hereof shall not be construed against any Party.

**Section 5.  Confidentiality.**

The Parties agree not to disclose the settlement amount to any third party unless such disclosure is (i) lawfully required by any governmental agency; (ii) otherwise required to be disclosed by law; (iii) necessary in any legal proceeding in order to enforce any provisions of this Agreement or to claim damages as a result of an alleged breach of this Agreement by the other Parties, or (iv) necessary for accounting or tax purposes. To the extent permitted by law, each Party agrees that it will notify the other affected Party in writing in sufficient time to permit an objection to any subpoena, court order or administrative order requiring disclosure, and, in no event, later than three (3) business days following the receipt of any subpoena, court order, or administrative order requiring disclosure of information subject to nondisclosure requirements.

**IN WITNESS WHEREOF,** the Parties have hereunto set their hands and seals as of the date first above written.

GARY M. KORNMAN

ROBBINS RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER, LLP


By:_____

By:_____

Name:_____

Name:_____

Witness: _____

Title:_____

(Printed Name): _____

Witness: _____

(Printed Name): _____

EXHIBIT "C"

**Vidal, Orlando**

---

| | |
|---|---|
| **From:** | Pollack, Barry S. |
| **Sent:** | Wednesday, October 24, 2007 1:57 PM |
| **To:** | Vidal, Orlando |
| **Subject:** | FW: Settlement Agreement; B0691545.DOC |

-----Original Message-----
From: Pollack, Barry S.
Sent: Tuesday, October 23, 2007 8:25 PM
To: 'Robbins, Larry'; Orseck, Gary
Cc: jmt@lynnllp.com
Subject: RE: Settlement Agreement; B0691545.DOC

We have reached an agreement with the understanding that until we confirm in writing tomorrow that we have received your firm's signature on the Settlement Agreement in the morning, you will hold the check and not deposit, assign or negotiate it.

-----Original Message-----
From: Robbins, Larry [mailto:lrobbins@robbinsrussell.com]
Sent: Tuesday, October 23, 2007 8:22 PM
To: Pollack, Barry S.; Orseck, Gary
Cc: jmt@lynnllp.com
Subject: Re: Settlement Agreement; B0691545.DOC

Probably -- but you have my word that the check will not be deposited until we have a signed agreement. If that does not suffice, I'll find a third party.
-------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Pollack, Barry S. <bpollack@sandw.com>
To: Robbins, Larry; Orseck, Gary
Cc: jmt@lynnllp.com <jmt@lynnllp.com>
Sent: Tue Oct 23 20:20:16 2007
Subject: RE: Settlement Agreement; B0691545.DOC

Is there a third party who can hold the check until the signature pages are exchanged?

-----Original Message-----
From: Robbins, Larry [mailto:lrobbins@robbinsrussell.com]
Sent: Tuesday, October 23, 2007 8:20 PM
To: Pollack, Barry S.; Orseck, Gary
Cc: jmt@lynnllp.com
Subject: Re: Settlement Agreement; B0691545.DOC

I accept adding that word; I cannot fax anything until tomorrow.
-------------------------
Sent from my BlackBerry Wireless Handheld

----- Original Message -----
From: Pollack, Barry S. <bpollack@sandw.com>
To: Robbins, Larry; Orseck, Gary
Cc: Jeff Tillotson <jmt@lynnllp.com>
Sent: Tue Oct 23 20:17:46 2007
Subject: Settlement Agreement; B0691545.DOC

If you will also accept us adding the word "past" before the word "misconduct" in the whereas clause, we have an agreement.

1

I think I have 5 minutes to catch fedex.
Can you fax a signature page to me?
<<B0691545.DOC>>

# EXHIBIT "D"

Insert airbill here ▼

186

500

fedex.com 1.800.GoFedEx 1.800.463.3339

**FedEx Express** *US Airbill*  8614 6199 2561  0215  From ID No.  FedEx Copy

**1 From**  Date 10/23/07  Sender's FedEx Account Number 0021-2538-2

Sender's Name barry Pollack

Company SULLIVAN & WORCESTER LLP

Address 1 POST OFFICE SQ FL 23  Phone 617 338-2800

City BOSTON  State MA  ZIP 02109-2106

**2 Your Internal Billing Reference.**

**3 To**
Recipient's Name Gary Orseck Esq.  Phone 8900-0005

Company Robbins, Russell, Englert Orseck, Untereiner & Sauber

Recipient's Address 1801 K Street N.W. Suite 411

City Washington  State DC  ZIP 20006

0356194503

8614 6199 2561

**4a Express Package Service** *Packages up to 150 lbs.*

**4b Express Freight Service**

**5 Packaging**  ☑ FedEx Envelope  ☐ FedEx Pak  ☐ FedEx Box  ☐ FedEx Tube  ☐ Other

**6 Special Handling** Include FedEx address in Section 3.
☐ SATURDAY Delivery

**7 Payment** Bill to:
☐ Sender  ☐ Recipient  ☐ Third Party  ☐ Credit Card  ☐ Cash/Check

Total Packages  Total Weight  Total Declared Value $ .00

**8 Residential Delivery Signature Options**
☐ No Signature Required  ☐ Direct Signature  ☐ Indirect Signature

519

EXHIBIT "E"

**Vidal, Orlando**

---

**Subject:**                    RE: Settlement Agreement

```
----- Original Message -----
From: Robbins, Larry <lrobbins@robbinsrussell.com>
To: Pollack, Barry S.
Cc: Orseck, Gary <gorseck@robbinsrussell.com>; Strasser, Alan
<astrasser@robbinsrussell.com>
Sent: Wed Oct 24 09:38:17 2007
Subject: Settlement Agreement

Barry:

Some overnight research has suggested that Section 1.6, as presently drafted, might
arguably run afoul of Opinion 260 of the D.C. Bar, which concerns agreements to foreswear
the filing of Bar complaints. On balance, we believe that the Opinion does not cover our
situation, not least because Mr. Kornman has been represented throughout this process and
because the proposed language of Section 1.6 was vetted yesterday afternoon with Judge
Robertson, who regarded language along these lines as a sensible solution to our concern
that Mr. Kornman might file what we believe to be a frivolous ethics charge against our
firm. We are therefore prepared to sign the existing document now that this potential
concern has been expressly called to your and Mr. Kornman's attention.

If, however, you and Mr. Kornman, on reflection, do not wish to include Section 1.6 in the
agreement, we are also prepared to execute the version of the agreement that you sent to
Mr. Orseck at 3:38 pm yesterday.

     Larry
```

# EXHIBIT "F"



Home    Find a Member

For Lawyers

▶ For Lawyers
▶ For the Public
▶ Inside the Bar

Home > For Lawyers > Ethics > Legal Ethics > Opinions

## Opinion 310

**Propriety Of Lawyer Charging Interest When the Client Fails to Pay Fees**

Opinion No. 11 re-examined and broadened; when a client fails without justification to make payments to a lawyer that are called for by their fee agreement, and that agreement does not provide for payment of interest on such amounts, the lawyer may, assuming there is no overreaching on the lawyer's part, request the client to alter the fee arrangement prospectively to include charges for interest on any unpaid balance for future work and condition further representation of the client on agreement to that condition.

**Applicable Rules**

- Rule 1.5 (Fees)
- Rule 1.8 (Conflicts of Interest: Prohibited Transaction)

Fee arrangements between lawyers and clients are of course a matter of constant interest to both. As lawyers and clients attempt to craft agreements that provide both for fair fee amounts and assurances of payment, fee arrangements increasingly include not simply the designation of a fee for service but also terms that give the lawyer rights vis-à-vis the client to assist the lawyer in inducing the client to pay—most particularly in the question of whether a lawyer may charge interest on an unpaid client balance, although other issues also arise. Generally speaking, there is wide agreement that a lawyer can charge a client interest on unpaid bills, although jurisdictions differ on whether such a charge can be imposed unilaterally by the lawyer if not agreed to by the client at the outset of the representation. In Opinion No. 11 (1975), we concluded that the former Code of Professional Responsibility allowed a lawyer to charge interest on an unpaid legal fee, but "only if clearly agreed to by the client, in advance of the representation or in advance of a new stage of the representation."

Because of current interest in the issue and because we have not examined it pursuant to the current Rules of Professional Conduct, we reconsider the issue.

**Discussion**

**1. Adversity in Fee Arrangements**

Finding the appropriate standpoint from which to assess fee arrangements can be difficult. There is some tendency to discuss the issue in terms of the adversity between the lawyer

and the client, particularly when the lawyer includes provisions in a fee agreement intended to induce the client to pay. *See, e.g., Lustig v. Horn*, 732 N.E. 2d 613 (Ill. App. 2000)(provision in fee agreement allowing lawyer to seek attorneys' fees for any lawsuit against the client to recover fees rejected as "potentially violative of the Rules of Professional Conduct barring an attorney from representing a client if such representation may be limited by the attorney's own interests"). Indeed, this Committee has considered a similar problem from that perspective in Opinion No. 211, one of a series of opinions dealing with the appropriateness of fee agreement provisions requiring arbitration of fee disputes.[1]

But at least some adversity likely exists between client and lawyer in the creation of virtually any fee arrangement. At the most basic level, the client's natural interest is to prefer the fee to be smaller and the lawyer's, larger. Moreover, in carrying out a representation, a lawyer is often faced with the need to resolve at least technically conflicting interests. If the fee basis is payment by the hour, for example, the lawyer (who has a financial incentive to do more work) may face the question of whether to perform work that appears to be at the margin of utility; if the fee is fixed (and in Opinion No. 238 we have recognized that fixed fees can serve to make legal services available to those who might not otherwise be able to afford them), there is a built-in incentive for the lawyer to forgo performing work that would take time and would be of uncertain benefit for the client. Therefore, it is not only not possible to erase all instances of adversity between client and lawyer in the fee process, but it must be recognized that the lawyer and client inescapably will have adverse interests to at least some degree throughout the relationship.

In Rule 1.8 (particularly Rule 1.8(a)), the D.C. Rules provide a framework for regulation of business relations between client and lawyer. However, to treat the relationship between client and lawyer in arriving at a fee arrangement as a legally adverse business relationship under Rule 1.8 would produce results that the Rules do not seem designed to bring about. Under Rule 1.8(a), a client could not be asked to negotiate a fee arrangement with a lawyer unless the client could consult a different lawyer. Rule 1.8(a)(2). Not only would such a result be highly unusual and disruptive, but, as the Association of the Bar of the City of New York has observed (ABCNY Formal Opinion 2000-3), it would also mean, logically, that a client could never retain a lawyer, i.e., to arrive at a fee arrangement with one lawyer the client would have to retain another lawyer, which the client could not do without retaining a third lawyer, and so on. For these reasons, analyzing particular aspects of a fee arrangement to determine whether or not they raise conflict of interest issues does not seem to be a fruitful approach.

Nor is it desirable to draw a bright-line distinction by saying that wherever a fee arrangement contemplates the possibility that the lawyer will institute adversary proceedings against the client to compel payment that a sufficient level of adversity had been reached to give a rise to a conflict. Our Opinion 218, for example, approves a fee arrangement between lawyer and client providing for mandatory arbitration of fee disputes under the rules of the Attorney/Client Arbitration Board. While such a proceeding can be hoped to be less antagonistic than litigation, it is nonetheless distinctly adversarial. Thus, we have approved

fee arrangements that contemplate adversary proceedings between lawyers and clients. Indeed, fee arrangements are in general intended to create legally enforceable obligations to pay (*see* Restatement of the Law Governing Lawyers, §§ 17-18 (2000)), and thus necessarily contemplate at least the possibility of a legal action to enforce them. It is difficult to see how there could be effective lawyer-client relationships without this ability.

## 2. Considerations Involved in Attorney-Client Fee Agreements

It cannot be forgotten, however, that a fee arrangement between a lawyer and client is not like a standard business arrangement. Clients often seek legal services at times of difficulty, and the client must feel free to impose a high level of trust in the lawyer and to have confidence in the relationship. In dealing with the client, the lawyer should not take advantage of either the lawyer's superior knowledge and experience or the lawyer's freedom from the concern and distress that disturb the client. Moreover, because it is unusual for a client to obtain independent legal advice when concluding a fee arrangement with a lawyer means that lawyers owe a particular duty to avoid overreaching in the fee-setting process.

At the same time, there are benefits to providing assurances of payment of fees or compensation for late payment. First, the binding contractual commitment between client and lawyer makes the provision of legal services possible in the first place. Second, it is the client's duty to pay fees to the lawyer that the lawyer appropriately earns under their fee arrangement. See Restatement of the Law Governing Lawyers, § 17(1) (2000). The payment of fees the lawyer has earned is not a voluntary act on the part of the client, and the lawyer is entitled to insist on being paid in accord with the terms of the fee arrangement and to pursue reasonable steps to enforce payment from a recalcitrant client. Not just individual lawyers, but the profession as a whole and the availability of legal services would suffer if that were not the case.

Third, the availability of fee arrangements with incentives for timely payment may well have a positive impact on the formation of lawyer-client relationships. Since a lawyer must somehow account for the additional cost—in time as well as money—of clients who do not pay or who delay payment in violation of the fee agreement, recovery of the additional costs of dealing with clients who do not pay or pay timely from those clients themselves allows the lawyer to avoid spreading those additional costs among all of the lawyer's clients, thus minimizing upward fee pressure on clients who do pay their fees. Such an assurance may even make a lawyer willing to take on representation of a particular client who presents an unusual risk of delayed payment or non-payment where the lawyer would be unwilling otherwise.

## 3. Provisions of Rule 1.5

The District of Columbia Rules of Professional Conduct deal with fees in a fashion that allows taking full account of these considerations in individual cases. Rule 1.5 requires a lawyer's fee to be "reasonable." While the rule provides a list of factors that may be considered in that determination (including the time and labor, difficulty and skill required, the likelihood that

acceptance of the assignment will preclude the lawyer from accepting other work, customary fees for such work, the amount at issue and the result obtained, time limits, nature and length of the client relationship, experience and reputation of the lawyer, and fixed or contingent nature of the fee), that list is non-exclusive.[2] As the comments indicate, the Rule covers not just the amount of a fee but fee arrangements generally, including method of payment and the impact of the agreement on the provision of the lawyer's services. *See* Comment [4] (discussing advance payment of fees and the "special scrutiny" necessary when fees are paid in property rather than money) and Comment [5] (cautioning that "an agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest").[3]

The reasonableness requirement is an objective standard. Because the term "reasonable" is well understood to be a broad one, the lawyer must consider not just the non-exclusive list of factors provided in Rule 1.5(a)(1)–(8), but all issues that may bear upon the fairness and reasonableness of a fee arrangement. This balance is more wide-ranging than application of a simple standard that merely looks for adverse interests.[4] The lawyer must be aware that when the reasonableness of a fee is reviewed, such factors as the lawyer's experience and superiority of legal knowledge over the client will be taken into account, as well as the client's sophistication or lack thereof, need for legal services, and mental state of distraction or worse caused by the situation that has caused the client to seek legal advice. The wise lawyer will explain all aspects of a proposed fee relationship in detail in advance of obtaining the client's agreement. As we stated in Opinion No. 267, it is the lawyer's responsibility to make sure that the client understands the fee arrangement. It is also the lawyer who, if challenged, will have the burden of establishing the reasonableness of the fee agreement. In this connection, the importance of having a written arrangement cannot be overstressed. Of course Rule 1.5(b) requires that the lawyer provide to a client whom the lawyer has not regularly represented a written statement of the basis or rate of the fee at or shortly after the representation begins. A writing would also be highly advisable, if not compelled by Rule 1.5 (see the final sentence of Comment [1] to Rule 1.5), whenever an existing fee arrangement with a client is altered during a representation.

The decision in *Lustig v. Horn, supra*, well illustrates the difference between application of a reasonableness standard versus a standard that simply looks for elements of adversity. The court there held improper a fee arrangement that provided that in a lawsuit to collect the attorney's legal fees the lawyer could obtain attorney's fees and costs attributable to the collection action from the client. It found that the retainer agreement "anticipates suit against and recovery of additional fees from a client should that client fail to pay the bill within the time required" and that this gave rise "to substantial fees for vigorous prosecution of the attorney's own client," raising the concern on the client's part of "his attorney's retaliation for nonpayment of even unreasonable fees." The court concluded that the fee provision was "potentially violative of the Rules of Professional Conduct barring an attorney from representing a

client if such representation may be limited by the attorney's own interests." Concluding that a lawyer "should not place himself in a position where he may be required to choose between conflicting duties or where he must reconcile conflicting interests rather than protect fully the rights of his client," the court held that the award of attorney's fees for the collection action under the agreement should be set aside.

While the court is correct that the fee arrangement in Lustig contemplated adverse action by the lawyer against the client to collect fees, it omitted to note that, as discussed above, any fee arrangement, given that it is a binding contract, contemplates such an action in the event of nonpayment. The proper question, we think, is whether these provisions were reasonable in the circumstances. It appears that they were, despite the adversity. First, a collection action by a lawyer against a client is a relatively remote contingency. In such an action the lawyer's entitlement to collect attorney's fees for the collection action itself would become an issue only if the lawyer had already prevailed on the merits against the client—i.e., if the lawyer first established that the client had violated the obligation to pay the lawyer. The lawyer could not prevail on that point without establishing that the fees had been reasonable. Since the client had known from the beginning that in the event the client was held liable to the lawyer for unpaid fees the cost of collection would be a part of the damages, it would not appear that there is anything per se unreasonable about such a condition in a fee agreement.

## 4. Assessing Provisions Aimed at Compensating the Attorney for the Client's Lateness in Paying or Failure to Pay

The most commonly discussed question in this general topic is the charging of interest on a client's unpaid bills. The result in Opinion No. 11—that under the Code of Professional Responsibility a lawyer could charge interest on a client's unpaid bills as long as that possibility had been agreed to by the client "in advance of representation or in advance of a new stage of representation"—is consistent with the rule in many jurisdictions. See, e.g., ABA Formal Opinion 338 (1974); New York Opinion No 399 (1975); Connecticut Opinion No. 99-26; Missouri No. 960017; Wolfram, *Modern Legal Ethics* § 9.2.2 at 506 (1986).

A logical question is whether it may be reasonable to go further and hold, as a number of jurisdictions do,[5] that the lawyer can in appropriate cases ethically seek interest on amounts owed even if there is no such provision in the fee agreement. This issue may be examined in the context of a hypothetical case in which a lawyer and a client agree upon a fee arrangement requiring the client to make payments to the lawyer as the lawyer's work progresses; assume that the arrangement does not mention any requirement that interest is due where the client fails to make payments otherwise required. Then the client simply fails to pay the lawyer in a timely fashion. If we assume that the lawyer is performing appropriately, this puts the client in breach of the agreement. Why, if the client has breached the agreement, should it be ethically inappropriate for the lawyer to charge for the time value of the money that the client has wrongfully failed to pay on time? When the question is put that starkly, it is difficult to come up with a satisfactory answer.

However, we conclude that going from that abstraction to a practical standard that sufficiently protects the client is very difficult. There are too many possible compelling reasons that might cause a client to decline to pay fees to establish an absolute guideline, and it is a relatively simple matter for the lawyer to raise the issue of interest for untimely payment before the representation has begun. The latter point is reinforced by the policy underlying the requirement for a written explanation of fees in Rule 1.5(b).[6] While that rule does not require the lawyer to anticipate every contingency that may arise, it does clearly express a preference for having the client be presented in writing, before incurring any obligation to pay a fee, a description of what will occur with respect to fees as far as reasonably possible.

Therefore, we conclude that we adhere to the view expressed in Opinion No. 11 that a client's unexcused failure to meet a fee obligation does not allow a lawyer to seek to collect interest on the unpaid portion of the debt unless that is specifically provided for in the existing fee arrangement. However, we also conclude that a client's unexcused failure to meet fee obligations to the lawyer can be a basis for the lawyer to re-examine the fee arrangement and, as a condition of performing further work, request the client to agree to an interest charge, prospectively only, for unpaid amounts that may be owing for work done by the lawyer in the future, after this change in the fee arrangement becomes effective (i.e., a lawyer cannot unilaterally impose interest charges on unpaid amounts for work done before the interest charge was agreed to). The lawyer can do this only if the severe standard for changing the fee arrangement during the representation can be met. A change in a fee arrangement in an ongoing representation is subject to strict scrutiny for overreaching by the lawyer, who, as we recognized in Opinion No. 11, may have "acquired [since the beginning of the representation] an unfair advantage in negotiations—as where the client's cause would be significantly impaired by the lawyer's withdrawal." *See Chase v. Gilbert*, 499 A. 2d 1203, 1209 (D.C. 1985) ("District of Columbia courts will scrutinize closely an attorney-client contract which is beneficial to the attorney and executed long after the attorney-client relationship has commenced"). What may constitute overreaching in particular circumstances is of course dependent on such factors as the resources and sophistication of the client, the presence or absence of such external factors as a favorable litigation schedule that would be lost if the client had to change counsel, and so on. But where the occasion for the change is the client's failure to comply with an obligation that the fee agreement reasonably placed on the client, the lawyer's request for a change in the fee arrangement is limited to imposition of an interest charge to be applicable prospectively should that situation occur in the future, and there are no other factors suggesting overreaching by the lawyer or advantage being taken of the client, we see no reason why the lawyer should not be able to seek such a change in the fee arrangement during the representation.[7]

We find this course superior to the lawyer's simply seeking to impose an interest charge where none had been provided for because it provides the client unequivocal notice and an opportunity to fully ventilate whatever concerns the client may have had about the representation. An additional advantage is that at a point where the fee arrangement itself is being

changed, such important matters as the rate of interest and when it becomes applicable may, and indeed must, be fixed with specificity. This result is consistent with, and arguably does not even work a change in, the rationale of Opinion No. 11, in which we noted:

> An agreement for the imposition of interest or a finance charge that is entered into during the course of representation, where there was no such agreement at the outset, would be improper *if, by reason of his representation the lawyer had acquired an unfair advantage in negotiations*—as where the client's cause would be significantly impaired by the lawyer's withdrawal. [Emphasis added.]

If the fee arrangement is altered under the circumstances described above, the lawyer will not be exploiting "an unfair advantage in negotiations" as prohibited by Opinion No. 11.[8]

Inquiry No. 99-8-31
Adopted: November 20, 2001

---

1. *See* Opinion Nos. 190, 211 and 218. It is not our purpose here to revisit or re-examine those issues in any degree.
2. Subsection (b) requires the basis or rate of the fee to be in writing when the lawyer has not regularly represented the client; subsection (c) contains special requirements for contingent fees; subsection (d) bars the use of contingent fees in criminal cases; subsection (e) governs division of fees between lawyers in different firms; and subsection (f) provides that any fee prohibited "by law" or by subsection (d) is per se unreasonable.
3. While there are provisions specifically regulating fee arrangements in other Rules, notably in Rules 1.8 and 1.15 these tend to be specific provisions dealing with particular and well-defined issues rather than the general requirements of Rule 1.5. A lawyer's treatment of fee advances is covered in Rule 1.15(d); whether a lawyer may take literary or media rights as part of a fee is covered by Rule 1.8(c); Rule 1.8(e) restricts the conditions under which a lawyer may accept fees from someone other than a client; and Rule 1.8(i) governs liens to secure payment of fees. We do not express an opinion on whether a fee arrangement as part of which the lawyer arguably "acquire[d] an ownership, possessory, security, or other pecuniary interest adverse to a client" within the meaning of Rule 1.8(a) would trigger that Rule's applicability as well. *See Renouf v. Multicultural Broadcasting*, 1994 WL 499060 (D.D.C. 1994) at *2–3.
4. This conclusion is consistent with Scope Comment[5] of the Rules, a rule of construction that cautions against importing additional general considerations into the operation of Rule provisions that deal with specific

issues, as Rule 1.5 does with fee arrangements. Scope Comment [5] provides:

> In interpreting these Rules, the specific shall control the general in the sense that any rule that specifically addresses conduct shall control the disposition of matters and the outcome of such matters shall not turn upon the application of a more general rule that arguably also applies to the conduct in question. In a number of instances, there are specific rules that address specific types of conduct. The rules of interpretation expressed here is meant to make it clear that the general rule does not supplant, amend, enlarge, or extend the specific rule. So, for instance, the general terms of Rules 1.3 are not intended to govern conflicts of interest, which are particularly discussed in Rules 1.7, 1.8 and 1.9. Thus, conduct that is proper under the specific conflicts rules is not improper under the more general rule of Rule 1.3. Except where the principle of priority state here is applicable, however, compliance with one rule does not generally excuse compliance with other rules. Accordingly, once a lawyer has analyzed the ethical considerations under a given rule, the lawyer must generally extend the analysis to ensure compliance with all other applicable rules.

5.  Such a view is consistent with that taken by the New York City Bar Association (Formal Opinion No. 2000-2), Georgia Opinion 45 (1985), Massachusetts Opinion 83-1 (1983), Rhode Island Opinion 98-06 (1998), and North Carolina (98-3 (1998). In Massachusetts and Georgia, while interest can be imposed even though that is not provided for in the original fee arrangement, the client must first be given an opportunity to pay without interest.

6.  Rule 1.5(b) requires a lawyer who has not regularly represented a client to provide the client, in writing, a statement of the basis or rate of the fee.

7.  West Virginia (Opinion No. 93-02) refuses to allow a lawyer to charge interest on an unpaid balance where there was no provision for such a charge in the original fee agreement, finding that such a charge might "confuse" the client and "carry with it the threat that the attorney might withdraw." We think that the client is unlikely to be confused where the occasion for the lawyer's request to change the fee arrangement is the client's failure to pay.

8.  Cf. Rule 1.16 (b)(3), which authorizes a lawyer to withdraw from a representation upon the failure of the client "substantially to fulfill an obligation to the lawyer [if the client] has been given reasonable warning that the attorney will withdraw unless the obligation is fulfilled.

. . ."



Click to see how the D.C. Bar Membership Benefits Program can help you and your firm

The District of Columbia Bar | 1250 H Street NW, sixth floor | Washington DC 20005-5937 | 202-737-4700 | **Directions/Pa**
©**2007** District of Columbia Bar. All rights reserved. **Privacy Policy | Disclaimer | Author guidelines**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                        :
ROBBINS, RUSSELL, ENGLERT,              :
ORSECK & UNTEREINER LLP,                :
                                        :
         Plaintiff/Counterclaim-Defendant   :      Case No. 1:07-cv-00554-JR/JMF
                                        :
              v.                        :
                                        :
GARY M. KORNMAN,                        :
                                        :
         Defendant/Counterclaim-Plaintiff.   :
_____:
```

## <u>ORDER</u>

The Court **GRANTS** Defendant Gary M. Kornman's *Emergency Motion for Reformation of Final Settlement Agreement* ("*Emergency Motion*").  The Court hereby:

[Alternative # 1] strikes Paragraph 1.6 and all references to Paragraph 1.6 from the final Settlement Agreement, consistent with the email from Attorney Robbins (*see* Exhibit E to *Emergency Motion*), and reaffirms the remainder of the Settlement Agreement as binding and enforceable.

[Alternative #2] replaces Paragraph 1.6 with the following language:

> The Parties represent that they have not initiated any administrative or ethics proceedings, and will not file any sanctions motions, against Robbins Russell, Mr. Kornman or any of their lawyers, in any way arising from or concerning either (i) this lawsuit, or (ii) the representation of Mr. Kornman at any time prior to the execution of this Settlement Agreement. This representation shall constitute a material term of this Settlement Agreement and a breach of it shall revive any claims released hereunder by the aggrieved Party, subject to any right of setoff for payments made under this Settlement Agreement.  The Parties agree that the resolution of the fee dispute in this matter is fair and reasonable.

**[CONTINUATION OF PROPOSED ORDER
GRANTING DEFENDANT GARY M. KORNMAN'S *EMERGENCY
MOTION FOR REFORMATION OF FINAL SETTLEMENT AGREEMENT*]**

**BY THE COURT:**

_____

**Judge**

Dated: _____